UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- x

KHRISTINA MCLAUGHLIN,                                    :        Case No. 1:17-cv-09023-RA
                                                         :
                                    Plaintiff,           :
                                                         :
            — against —                                  :
                                                         :
                                                         :
                                                         :
MACQUARIE CAPITAL (U.S.A.) INC., and                     :
ROBERT ANSELL                                            :
                                    Defendants.          :
                                                         :
-------------------------------------------------------------------- x

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT MACQUARIE CAPITAL (USA) INC'S MOTION TO COMPEL ARBITRATION

## SACK & SACK, LLP

Attorneys for Plaintiff
70 East 55th Street, 10th Floor
New York, New York 10022
(212) 702-9000

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ...........................................................................................2

**PRELIMINARY STATEMENT** ..................................................................................3

**ARGUMENT** .................................................................................................................3

    I.   MCLAUGHLIN'S AGREEMENT TO ARBITRATE HER QUID PRO QUO SEXUAL HARASSMENT CLAIMS SHOULD BE VOID FOR PUBLIC POLICY CONCERNS ...............................................................................................................3

        A.   Trends In This Circuit Disfavor Confidential Resolution Of Workplace Matters..............................5

        B.   Confidential Arbitration Of Mclaughlin's Sexual Harassment And Retaliation Claims Meets The Standard Of Violating Public Policy.................................................................9

        C.   Congressional Legislation Demonstrates Public Policy ........................................11

**CONCLUSION** ...........................................................................................................12

## TABLE OF AUTHORITIES

### CASES

Arciniaga v. Gen. Motors Corp., 460 F.3d 231, 234 (2d Cir. 2006) .............................................1

Brooklyn Savings Bank v. O'Neil, 324 U.S. 697, 706-707 (1945)..............................................4

Camacho v. Ess–A–Bagel, Inc., No. 14–CV–2592 (LAK), 2015 WL 129723, at *2–3 (S.D.N.Y. Jan. 9, 2015)........................................................................................................5

Chao v. Gotham Registry, Inc., 514 F.3d 280, 285 (2d Cir. 2008) ...............................................4

Cheeks v. Freeport Pancake House, Inc., 796 F3d 199, 206 (2d Cir 2015)...................................4

Franks v. Bowman Transportation CO., Inc., 424 U.S. 747, 763 (1976) .....................................5

Geiss et al v. The Weinstein Company Holdings LLC et al., 1:17-cv-09554 (AKH)...................6

Guerra–Alonso v. West 54 Deli. Corp., No. 14–CV–7247 (WHP), 2015 WL 3777403, at *1 (S.D.N.Y. May 22, 2015) ......................................................................................................4

Hoffman v. Empire Blue Cross and Blue Shield, 96 CIV. 5448 (BSJ), 1999 WL 782518, at *5 (SDNY Sept. 30, 1999) ........................................................................................................2

JLM Indus., Inc. v. Stolt–Nielsen SA, 387 F.3d 163, 171 (2d Cir.2004) ......................................1

Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 64–65, 106 S.Ct. 2399, 2404–05, 91 L.Ed.2d 49 (1986) ..................................................................................................................................5

New England Mutual Life Ins. Co. v. Caruso, 73 N.Y.2d 74, 81, 535 N.E.2d 270, 274 (N.Y.1989)...............................................................................................................................2

Newsday, Inc. v. Long Is. Typographical Union No. 915, CWA, AFL-CIO, 56 Fair Empl Prac Cas (BNA) 167, affd sub nom ...............................................................................................7

Noble v. Weinstein et al., 1:17-cv-09260 (RWS)........................................................................6

Oldroyd v. Elmira Sav. Bank, FSB, 134 F.3d 72, 76 (2d Cir.1998)...........................................2

Rehal v. Weinstein et al., :18-cv-00674 (JMF) ..........................................................................6

United Paperworkers International Union v. Misco, Inc., 484 U.S. 29, 43 (126 LRRM 3113) (1987) .......................................................................................................................................7

W.R. Grace & Co. v. Rubber Workers, 461 U.S. 757, 766 (31 FEP Cases 1409) (1983).............7

White v. Fitzgerald, 393 Fed Appx 804, 805 (2d Cir 2010) .......................................................2

<h1 style="text-align:center">PRELIMINARY STATEMENT</h1>

On behalf of Plaintiff Khristina McLaughlin ("*Plaintiff*" or "*McLaughlin*") we submit this Memorandum of Law Opposition to Defendant Macquarie Capital (USA) Inc.'s ("*Macquarie*" or "*Defendant*") Motion to Compel Arbitration.

<h1 style="text-align:center">ARGUMENT</h1>

### I.  MCLAUGHLIN'S AGREEMENT TO ARBITRATE HER QUID PRO QUO SEXUAL HARASSMENT CLAIMS SHOULD BE VOID FOR PUBLIC POLICY CONCERNS

Conditioning McLaughlin's continued employment upon her acceptance of an agreement forcing her to arbitrate egregious claims of quid pro quo and hostile work environment sexual harassment and retaliation behind closed doors in a non-appealable forum (to be decided by a select few lawyers and arbitrators as opposed to a jury of her peers, which would otherwise be her option in this Court), is unenforceable as a matter of public policy.

Indeed, over the past several years, Courts in this Circuit (and throughout the nation) have compelled employees to arbitrate claims noting that there is a "strong federal policy in favor of arbitration.  See, Arciniaga v. Gen. Motors Corp., 460 F.3d 231, 234 (2d Cir. 2006).

This "strong federal policy," however, turns a blind eye to the reality of the bargaining process.

When it comes to arbitration agreements entered into by employees such as McLaughlin, Courts ignore the reality of the bargaining process by routinely holding that arbitration "is a matter of consent, not coercion."  JLM Indus., Inc. v. Stolt–Nielsen SA, 387 F.3d 163, 171 (2d Cir.2004) (quoting, Volt Info. Scis. v. Bd. of Trs. of Leland Stanford Junior Univ., 489 U.S. 468, 479, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989)).  Such fallacy flies in the face of the reality that here,

Macquarie admits that McLaughlin's agreement to arbitrate claims that don't yet exist are "a precondition" for receiving [her] promotion and corresponding raise." <u>See</u>, Def. Mem at 3.

Thus, under these circumstances, Macquarie wants this Court to confirm that McLaughlin's agreement to sign or be employed somehow demonstrates a presumed desirability of arbitrability from the employee's perspective based upon that employee's agreement to arbitrate disputes "arising under" or "in connection with" an employment agreement. <u>See</u>, <u>White v. Fitzgerald</u>, 393 Fed Appx 804, 805 (2d Cir 2010), <u>citing</u>, <u>Oldroyd v. Elmira Sav. Bank, FSB</u>, 134 F.3d 72, 76 (2d Cir.1998).

However, because such presumption is rebuttable, this Court should deny Macquarie's motion to compel McLaughlin's sexual harassment claims in arbitration because it violates public policy. See, <u>White v. Fitzgerald</u>, 393 Fed Appx 804, 807 (2d Cir 2010).

When a contract or contractual provision violates public policy, the proper inquiry by the Court is to weigh interests in enforcement of the contract provision against that public interest. <u>Hoffman v. Empire Blue Cross and Blue Shield</u>, 96 CIV. 5448 (BSJ), 1999 WL 782518, at *5 (SDNY Sept. 30, 1999); <u>New England Mutual Life Ins. Co. v. Caruso</u>, 73 N.Y.2d 74, 81, 535 N.E.2d 270, 274 (N.Y.1989) ("Freedom of contract itself is deeply rooted in public policy, however, and therefore a decision to refrain from enforcing a particular agreement depends upon a balancing of the policy considerations against enforcement and those favoring the encouragement of transactions freely entered into by the parties").

Here, the competing policies to be weighed are Macquarie's desire to have McLaughlin's claims of sexual harassment be subject to confidential, behind-closed-doors arbitration – which claims did not exist at the time she "agreed" to arbitrate – versus the urgent and indisputable public

policy of ending the forced silence of women who fall victim to sexual harassment and discrimination.

At the outset, Macquarie makes no secret as to *why* they force employees, such as Ms. McLaughlin, to agree to arbitration as a condition of continued employment: to ensure that seriously egregious matters, such as the sexual harassment alleged by Ms. McLaughlin, be kept "strictly confidential."  For instance, in the first paragraph of its Demand for Arbitration, Macquarie notes **twice** that Ms. McLaughlin's claims should be kept "confidential."  See, Demand for Arbitration at 1  (Demand for Arbitration seeking "declaratory judgment (i) that any disputes between Macquarie and McLaughlin are subject to **strictly confidential mandatory arbitration** and (ii) that Macquarie has not committed any discrimination or retaliation in violation of Title VII of the Civil Rights Act of 1964, the New York State Human Rights Law, and the New York City Human Rights Law vis-a-vis McLaughlin and an award finding that McLaughlin breached the **confidential arbitration** provision of her employment agreement and requiring the payment of damages for her breach").

Compelling McLaughlin to arbitrate her claims gives support to Macquarie's new-fangled Filing, using the arbitration as a sword to turn the victim into the wrongdoer.

### A.  TRENDS IN THIS CIRCUIT DISFAVOR CONFIDENTIAL RESOLUTION OF WORKPLACE MATTERS

Legal rulings in this Circuit demonstrate a trend of moving away from keeping claims by employees of unlawful conduct committed by their employers confidential as a means of workplace reform.

In the last three years, the Second Circuit has supported the movement of leveling the playing field between employer and employee, and, more specifically, male and female employees.

Requiring judicial or DOL approval of wage claim settlements is consistent with what both the United States Supreme Court and the Second Circuit have long recognized: that statutes such as the Fair Labor Standards Act ("*FLSA*") and the provisions within them "were designed to remedy the evil of overwork by ensuring workers were adequately compensated for long hours, as well as by applying financial pressure on employers to reduce overtime." Cheeks v. Freeport Pancake House, Inc., 796 F3d 199, 206 (2d Cir 2015), quoting, Chao v. Gotham Registry, Inc., 514 F.3d 280, 285 (2d Cir. 2008) (internal quotation marks omitted). Thus, "[i]n service of the statute's remedial and humanitarian goals, the Supreme Court consistently has interpreted the Act liberally and afforded its protections exceptionally broad coverage." Id. at 285

Indeed, the FLSA "was a recognition of the fact that due to the unequal bargaining power as between employer and employee, certain segments of the population required federal compulsory legislation to prevent private contracts on their part which endangered national health and efficiency and as a result the free movement of goods in interstate commerce." Cheeks v. Freeport Pancake House, Inc., 796 F3d at 202, quoting, Brooklyn Savings Bank v. O'Neil, 324 U.S. 697, 706-707 (1945).

After Cheeks was decided, it was this Court that correctly pointed out the trend that allowing confidentiality provisions in FLSA settlements is "contrary to public policy." Guerra–Alonso v. West 54 Deli. Corp., No. 14–CV–7247 (WHP), 2015 WL 3777403, at *1 (S.D.N.Y. May 22, 2015) (citation omitted); Thallapaka, 2015 WL 5148867, at *1 ("overwhelming majority of courts reject the proposition that FLSA settlements can be confidential").

The reason being that such provisions, and similar ones that impose an obligation on a settling plaintiff to refrain from discussing any aspect of the case or the settlement, "come into conflict with Congress' intent ... both to advance employees' awareness of their FLSA rights and

to ensure pervasive implementation of the FLSA in the workplace," which intent requires a court to consider "both the rights of the settling employee and the public at large" in approving any settlement. Camacho v. Ess–A–Bagel, Inc., No. 14–CV–2592 (LAK), 2015 WL 129723, at *2–3 (S.D.N.Y. Jan. 9, 2015) (internal quotation omitted); see, also, Elizabeth Wilkins, Silent Workers, Disappearing Rights: Confidential Settlements and the Fair Labor Standards Act, 34 Berkeley J. Emp. & Lab. L. 109, 111–12 (2013) (collecting cases that have barred confidentiality provisions in FLSA settlements and contending that "the rights of the general public and of similarly situated workers to know when employers have violated the FLSA outweigh private litigants' interests in keeping a settlement confidential").

Similarly,  the intent of Congress in enacting Title VII was  to  prohibit  all  practices  in whatever form which create inequality in employment due to discrimination on the basis of race, religion, sex, or national origin. Franks v. Bowman Transportation CO., Inc., 424 U.S. 747, 763 (1976) (citations omitted); see, Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 64–65, 106 S.Ct. 2399, 2404–05, 91 L.Ed.2d 49 (1986) (holding that Congress enacted Title VII with the intent to prohibit a discriminatorily hostile or abusive work environment).

Despite the Supreme Court's observations of the intentions of Congress in 1964, as recently as December 2017, an overwhelming number of members of that same Congress were sadly compelled to call for a "cultural revolution" to change the way women are treated.

Have we not progressed at all over the last *half-century*?

For example, Senator Bernie Sanders (I-Vermont), along with more than 30 other lawmakers, publicly called for the resignation of another lawmaker,  Senator Al Franken (D-Minnesota), over sexual misconduct allegations.  Indeed, on January 2, 2018, Senator Al Franken did resign from Congress amid allegations of sexual harassment.

Senator Sanders elaborated his desire for a "cultural revolution," stating, "What I worry about right now as I speak is that in restaurants, in offices all over this country where you have bosses that are not famous, there is harassment, women are being intimidated, and we need a cultural revolution in this country…".  Sanders further said that the current national conversation should include a "woman's right to control her own body," saying that the U.S. has "a lot of work to do to protect women's equality in this country."

While much of the traction of the newly dubbed #metoo cultural movement (*i.e.,* thousands of victims of sexual harassment bravely publicizing their solidarity under the social media hashtag #metoo) can be attributed to the fame and stature of the Hollywood actresses making public accusations, the legal implications and immediate relevance of this movement are highlighted by public lawsuits filed by *less-famous* employees of Harvey Weinstein and the Weinstein Companies.

 As of the date of this Memorandum, in three cases filed in the Southern District of New York alone, there are at least *eight* female former employees of a single person alleging a pervasive and severe sexually hostile work environment defined by endless offensive, degrading, and sexually harassing actions, statements, and touching at the hands of Harvey Weinstein: See, Rehal v. Weinstein et al., :18-cv-00674 (JMF); Noble v. Weinstein et al., 1:17-cv-09260 (RWS), and Geiss et al v. The Weinstein Company Holdings LLC et al., 1:17-cv-09554 (AKH), which is a class action lawsuit listing *six* plaintiffs in the caption alone (the "*Weinstein Cases*").

The effects of cultural change and, certainly, public policy stemming from the Weinstein Cases have already impacted workplace rules and laws; which impact would be *significantly deflated* if the plaintiffs in the Weinstein cases were compelled to keep their allegations "strictly confidential," as Macquarie wants Ms. McLaughlin to do – and, significantly, as Weinstein is

alleged to have done in the past to at least eight other women, over as much as three decades, with non-disclosure provisions in his settlement agreements with the women.[1]

With Weinstein being just one of hundreds of thousands of "bosses," as the Co-Defendant Robert Ansell in this case is, it is easy to see the direct dangers of allowing cases involving sexual harassment or other workplace wrongdoing to remain confidential under the guise of arbitrations that are supposedly "consented to" and not "coerced."

Not only does the Plaintiff risk being blamed and ostracized by coworkers for any legal action against the company, as is happening in the McLaughlin matter on a daily basis; but other employees are left in danger, potentially vulnerable to exactly the same situation: "shut up or face the consequences."

### B. CONFIDENTIAL ARBITRATION OF MCLAUGHLIN'S SEXUAL HARASSMENT AND RETALIATION CLAIMS MEETS THE STANDARD OF VIOLATING PUBLIC POLICY

Deeply rooted common law doctrine dictates that contracts that violate law or public policy will not be enforced. W.R. Grace & Co. v. Rubber Workers, 461 U.S. 757, 766 (31 FEP Cases 1409) (1983). Nonetheless, the public policy that is offended must be "some explicit public policy that is well defined and dominant, and is to be ascertained by reference to the laws and legal precedents." Newsday, Inc. v. Long Is. Typographical Union No. 915, CWA, AFL-CIO, 56 Fair Empl Prac Cas (BNA) 167, affd sub nom. Newsday, Inc. v. Long Is. Typographical Union, No. 915, CWA, AFL-CIO., 915 F2d 840 (2d Cir 1990), quoting, United Paperworkers International Union v. Misco, Inc., 484 U.S. 29, 43 (126 LRRM 3113) (1987).

---

[1] See, Michelle Fabio, "The Harvey Weinstein Effect: The End Of Nondisclosure Agreements In Sexual Assault Cases?", *Forbes*, October 26, 2017, https://www.forbes.com/sites/michellefabio/2017/10/26/the-harvey-weinstein-effect-the-end-of-nondisclosure-agreements-in-sexual-assault-cases/#6fe62d8f2c11; see, also, Jodi Cantor and Megan Twohey, "Harvey Weinstein Paid Off Sexual Harassment Accusers for Decades," *N.Y. Times*, October 5, 2017, https://www.nytimes.com/2017/10/05/us/harvey-weinstein-harassment-allegations.html.

Here, the public policy that is offended by Macquarie's requirement that McLaughlin arbitrate her sexual harassment claims is well founded in this Circuit, which is the public policy that "is aimed at condemning sexual harassment in the workplace and is reflected in Title VII of the Civil Rights Act of 1964, Section 703, 42 U.S.C. Section 2000e-2(a)(1) which makes it unlawful to discriminate against any person with respect to conditions of employment because of that person's sex." Id.

Given the current state of affairs, this Court needs to revisit this public policy in the context of forced arbitration for victims of sexual harassment.

Just pick up a newspaper, log onto any social media outlet, or randomly ask any New Yorker in Foley Square if they've heard of "#metoo."

Indeed, in a New York Times Editorial dated October 28, 2017, entitled, "Will Harvey Weinstein's Fall Finally Reform Men?", the Times' Editorial Board declared, "This may turn out to be the year when the tide finally turned on sexual harassment. The elements for a permanent cultural shift are certainly in place."[2]

Moreover, if there is any doubt as to the public policy against requiring confidential adjudication of sexual harassment claims, another October 2017 New York Times article reported that days after the story broke of accusations of sexual harassment against Harvey Weinstein, actress Alyssa Milano tweeted, "If you've been sexually harassed or assaulted write 'me too' as a reply to this tweet."[3]

---

[2] See, The Editorial Board, "Will Harvey Weinstein's Fall Finally Reform Men?", *N.Y. Times*, October 28, 2017, https://www.nytimes.com/2017/10/28/opinion/sunday/harvey-weinstein-sexual-harassment.html.
[3] Margaret Renkl, "The Raw Power of #MeToo", *N.Y. Times*, October 19, 2017, https://www.nytimes.com/2017/10/19/opinion/the-raw-power-of-metoo.html.

According to the article, "Within minutes the hashtag #MeToo was all over Twitter, Facebook and Instagram — over 500,000 times on Twitter and 12 million times on Facebook in the first 24 hours alone — and the deluge shows no sign of slowing…".

Awareness to raise the curtain on the pervasiveness of sexual harassment in the workplace rapidly spread beyond Hollywood.  Indeed, "The Silence Breakers" were collectively named 2017 Person of the Year by Time Magazine.

Furthermore, Ms. McLaughlin's argument is not completely reliant upon, what Macquarie may dare argue is *pop culture* or *Hollywood media*, but upon the actions of lawmakers in response to public policy that claims, such as Ms. McLaughlin's sexual harassment claims, should not be swept under the proverbial arbitration rug, which would serve as a legally-veiled cloak of invisibility for firms such as Macquarie.

### C.  CONGRESSIONAL LEGISLATION DEMONSTRATES PUBLIC POLICY

On December 6, 2017, after the filing of Ms. McLaughlin's case, Congressional lawmakers introduced bipartisan legislation that would eliminate mandatory arbitration clauses in employment agreements to prevent employers from silencing women in sexual harassment and gender discrimination cases.

The Ending Forced Arbitration of Sexual Harassment Act of 2017, S. 2203 ("*EFASHA*"), was introduced on December 6 by Senators Kirsten Gillibrand (D-N.Y.) and Lindsey Graham (R-S.C.).  The Senators were joined by journalist Gretchen Carlson, who gained national attention when she left the Fox News Channel after enduring what she said were years of sexual harassment.

EFASHA provides that no predispute arbitration agreement shall be valid or enforceable if it requires arbitration of a sex discrimination or harassment dispute.

On December 19, 2017, within two weeks of the announcement of EFASHA, Microsoft President and Chief Legal Officer Brad Smith announced that Microsoft is the first Fortune 100 company to publicly endorse EFASHA and demonstrated its support by immediately waiving any contractual requirement for Microsoft employees to arbitrate sexual harassment claims.

## **CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that this Court deny Defendants' Motion in its entirety.

Dated:  New York, New York
        February 1, 2018

Respectfully submitted,

**SACK & SACK, LLP**

By:     */s/ Jonathan Sack*
        Jonathan S. Sack, Esq.

70 East 55th Street, 10th Floor
New York, New York 10022
(212) 702-9000
Attorneys for Plaintiff