# Exhibit C



**AMERICAN ARBITRATION ASSOCIATION®**

**EMPLOYMENT ARBITRATION RULES
DEMAND FOR ARBITRATION**

*Please visit our website at www.adr.org if you would like to file this case online. AAA Customer Service can be reached at 800-778-7879.*

**Mediation:** If you would like the AAA to contact the other parties and attempt to arrange mediation, please check this box ☐.

### Parties (Claimant)

| | |
|---|---|
| Name of Claimant: Macquarie Holdings (USA), Inc. | Representative's Name (if known): Lloyd Chinn |
| Address:<br><br>125 W 55 St, 22nd Floor | Firm (if applicable): Proskauer Rose LLP |
| | Representative's Address:<br><br>11 Times Square |

| City: New York | State: NY | Zip Code: 10019 | City: New York | State: NY | Zip Code: 10036 |
|---|---|---|---|---|---|
| Phone No.: 212-231-2156 | Fax No.: | | Phone No.: 212-969-3000 | Fax No.: 212-969-2900 | |
| Email Address: hoi-ling.wong@macquarie.com | | | Email Address: lchinn@proskauer.com | | |

### Parties (Respondent)

| | |
|---|---|
| Name of Respondent: Khristina McLaughlin | Representative's Name (if known): Jonathan Sack |
| Address: | Firm (if applicable): Sack & Sack |
| | Representative's Address:<br><br>70 E 55 St, 10th Floor |

| City: | State: | Zip Code: | City: New York | State: NY | Zip Code: 10022 |
|---|---|---|---|---|---|
| Phone No.: | Fax No.: | | Phone No.: 212-702-9000 | Fax No.: 212-702-9702 | |
| Email Address: | | | Email Address: jsack@sackandsack.com | | |

| Claim: What was/is the employee/worker's annual wage range?  ☐ Less than $100,000  ☐ $100,000-$250,000  ☑ Over $250,000<br>Note: This question is required by California law. |
|---|

| Amount of Claim: Please see attached demand for arbitration. | Claim involves: ☑ Statutorily Protected Rights  ☐ Non-Statutorily Protected Rights |
|---|---|

| In detail, please describe the nature of each claim. You may attach additional pages if necessary:<br><br>Please see attached demand for arbitration. |
|---|

| Other Relief Sought: ☐ Attorneys Fees  ☐ Interest  ☐ Arbitration Costs  ☐ Punitive/ Exemplary  ☐ Other |
|---|

| Please describe the qualifications for arbitrator(s) to hear this dispute:<br><br>Familiar with contractual obligations to maintain confidentiality and procedures to safeguard confidentiality in the course of arbitration. |
|---|

| Hearing: Estimated time needed for hearings overall: | hours or 5 | days |
|---|---|---|

| Hearing Locale: New York | ☐ Requested by Claimant  ☑ Locale provision included in the contract |
|---|---|

| Filing Fee requirement or $300 (max amount per AAA)<br>Filing by Company: ☑ $2,200 single arbitrator  ☐ $2,800 three arbitrator panel |
|---|

Notice: To begin proceedings, please send a copy of this Demand and the Arbitration Agreement, along with the filing fee as provided in the Rules, to: American Arbitration Association, Case Filing Services, 1101 Laurel Oak Road, Suite 100, Voorhees, NJ 08043. Send the original Demand to the Respondent.

| Signature (may be signed by a representative): | Date: NOVEMBER 27, 2017 |
|---|---|

Pursuant to Section 1284.3 of the California Code of Civil Procedure, consumers with a gross monthly income of less than 300% of the federal poverty guidelines are entitled to a waiver of arbitration fees and costs, exclusive of arbitrator fees. This law applies to all consumer agreements subject to the California Arbitration Act, and to all consumer arbitrations conducted in California. Only those disputes arising out of employer plans are included in the consumer definition. If you believe that you meet these requirements, you must submit to the AAA a declaration under oath regarding your monthly income and the number of persons in your household. Please contact the AAA's Western Case Management Center at 1-800-778-7879. If you have any questions regarding the waiver of administrative fees, AAA Case Filing Services can be reached at 877-495-4185.

AMERICAN ARBITRATION ASSOCIATION
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
MACQUARIE HOLDINGS (USA), INC.          :
                                        :
                    Claimant,           :
                                        :          **AAA Case No.**
          v.                            :
                                        :          **DEMAND FOR ARBITRATION**
KHRISTINA MCLAUGHLIN                     :
                                        :
                    Respondent.         :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X


Claimant Macquarie Holdings (USA), Inc. ("Macquarie"), by its attorneys Proskauer

Rose, LLP, hereby address this Demand for Arbitration ("Demand") to Respondent Khristina

McLaughlin ("McLaughlin") demanding: a declaratory judgment (i) that any disputes between

Macquarie and McLaughlin are subject to strictly confidential mandatory arbitration and (ii) that

Macquarie has not committed any discrimination or retaliation in violation of Title VII of the

Civil Rights Act of 1964, the New York State Human Rights Law, and the New York City

Human Rights Law vis-à-vis McLaughlin and an award finding that McLaughlin breached the

confidential arbitration provision of her employment agreement and requiring the payment of

damages for her breach.

## **INTRODUCTION**

1.      McLaughlin is the Head of US Sales, Cash Equities, at Macquarie.  On November

17, 2017, McLaughlin filed a complaint against Macquarie, and its former employee, Robert

Ansell, in the United States District Court for the Southern District of New York, alleging sex

discrimination, harassment and retaliation, in violation of Title VII of the Civil Rights Act of

1964, the New York State Human Rights Law, and the New York City Human Rights Law.  The

filing of this complaint was in direct and knowing violation of McLaughlin's employment

agreement, which contains a provision requiring McLaughlin to bring any claims arising out of

or relating to her employment with Macquarie in "strictly confidential" arbitration before the

American Arbitration Association ("AAA").  (*See* McLaughlin Employment Agreement

(hereinafter the "Agreement"), attached hereto as Exhibit A).

## FACTS

2.      Macquarie Group Limited is a global investment banking and diversified financial

services group.  Macquarie Capital (USA) Inc. – an operating group of Macquarie Group

Limited, and a subsidiary of Macquarie Holdings (USA) Inc. – comprises the U.S. arm of

Macquarie Group's corporate advisory, equity, debt and private capital markets businesses.

3.      Macquarie Holdings (USA) Inc. (hereinafter "Macquarie") is a Delaware

corporation with a principal place of business in New York, New York.  Macquarie has

operations across the United States.

4.      Macquarie has employed McLaughlin since February 21, 2012, in its office

located at 125 W 55 Street, 22nd Floor, New York, NY, 10019.  McLaughlin's employment

agreement contains an arbitration agreement which provides for strictly confidential arbitration

of all claims related to her employment.  (*See* Exhibit B, 2-6-12 Employment Agreement)

5.      On or about May 9, 2017, Macquarie promoted McLaughlin to Head of US Sales,

Cash Equities, at Macquarie.  At that time, McLaughlin entered into a new employment

agreement, setting forth certain terms and conditions of her employment, to which she

electronically agreed.  (*See* Exhibit A; 5-6-17 Correspondence to McLaughlin, attached hereto as

Exhibit C).

6.  McLaughlin's Agreement, at Annex A, provides the following:

> As a condition of your employment at Macquarie, you agree that any controversy or claim arising out of or relating to your employment relationship with Macquarie, the terms and conditions of your employment or the termination thereof must be submitted for final and binding resolution by a private and impartial arbitrator, to be jointly selected by you and Macquarie.

(Exhibit A at Annex A)

7.      The Agreement specifically notes that "claims for discrimination…based on sex…and/or claims for violation of any federal state or other governmental law, statute, regulation or ordinance including…Title VII of the Civil Rights Act of 1964" are covered by the arbitration provision.

8.      Further, the Agreement provides that "the arbitration will be conducted under the Employment Dispute Resolution Rules of AAA, **with the proviso that the arbitration shall be strictly confidential**." (Exhibit A at Annex A, p. 12) (emphasis added)

9.      The Agreement was entered into knowingly and willingly by McLaughlin, and is a valid, irrevocable and enforceable Agreement to arbitrate as contemplated by the Federal Arbitration Act, 9 U.S.C. § 2.

10.      On or about October 23, 2017, Macquarie received a letter from McLaughlin's counsel, notifying Macquarie for the first time of McLaughlin's "complaint of gender and sex based discrimination, specifically quid pro quo and hostile work environment sexual harassment, at the hands of her direct manager, Robert Ansell." (*See* 10-23-17 correspondence from J. Sack, attached hereto as Exhibit D).

11.      After a thorough investigation, Macquarie uncovered no evidence suggesting that McLaughlin's claims of discrimination or harassment were meritorious.

3

12.     Rather, Macquarie came to the conclusion that, based on the information available to it, McLaughlin and Ansell had been engaged in a consensual relationship, and that McLaughlin had suffered no adverse action or discrimination as a result of that relationship.

13.     McLaughlin's counsel made several threats to commence litigation against Macquarie and emphasized the harm that a public lawsuit would cause Macquarie. (*See, e.g.,* 10-24-17 correspondence from J. Sack, attached hereto as Exhibit E). As part of that threat, McLaughlin's counsel boasted that, after his filing of a public sex discrimination lawsuit against Bank of America for another client recently, the "phones" of certain Bank of America sales desks "didn't ring" for weeks.

14.     Macquarie's counsel reminded McLaughlin, including in a written communication to her counsel, of her obligations under the Agreement, including the requirement to bring any claims in strictly confidential arbitration. (*See* 11-17-17 correspondence from L. Chinn, attached hereto as Exhibit F).

15.     Later that same day, in complete and knowing disregard of the confidential arbitration provision in the Agreement, and with the improper purpose of pressuring Macquarie to settle by making her salacious allegations public, McLaughlin filed the complaint described in Paragraph 1 above. (*See* McLaughlin Complaint, attached hereto as Exhibit G).

16.     Macquarie immediately filed a letter motion to temporarily seal the complaint, which was granted by Judge Victor Marrero. (*See* Macquarie's Letter Motion to Temporarily Seal, attached hereto as Exhibit H; Order Granting Motion to Temporarily Seal, attached hereto as Exhibit I).

17.     However, due to the fact that the Complaint was filed at or around 4 PM on Friday November 17 and Judge Marrero's Order issued around 6:30 PM, after the courthouse had officially closed, the Complaint was not immediately removed from the public docket.

18.     McLaughlin's filing of the Complaint constitutes a clear breach of her contractual obligations to Macquarie.

## CAUSE OF ACTION
### (Breach of Contract)

19.     Macquarie repeats and realleges the preceding paragraphs as if fully set forth herein.

20.     Macquarie and McLaughlin entered into a valid contract – the Agreement – on or about May 5, 2017.

21.     Pursuant to the Agreement, McLaughlin agreed to bring any controversy or claim arising out of or relating to the employment relationship between McLaughlin and Macquarie in final, binding and strictly confidential arbitration.

22.     The Agreement's arbitration provision is a binding, irrevocable and enforceable Agreement to arbitrate as contemplated by the Federal Arbitration Act, 9 U.S.C. § 2.

23.     On November 17, 2017, Macquarie reminded McLaughlin in writing of her obligation to arbitrate under the Agreement.

24.     McLaughlin breached the confidential arbitration provision of the Agreement on November 17, 2017, by filing a complaint against Macquarie and its former employee Robert Ansell in federal court, alleging sex discrimination, harassment, and retaliation.

25.     McLaughlin has also courted publicity for these allegations, including by granting an interview to Bloomberg in violation of Macquarie's policies.  (*See* 11-20-17 Bloomberg Article, attached hereto as Exhibit J).

26.     The complaint contains salacious allegations and content, which has resulted and will undoubtedly continue to result in negative publicity resulting from publication of the allegations, and will cause irreparable harm to Macquarie and its reputation.

27.     Macquarie has and will continue to incur legal fees responding to McLaughlin's complaint.

28.     Therefore, Macquarie is entitled to damages from McLaughlin in an amount to be determined by the arbitrator.


## REQUEST FOR DECLARATORY JUDGMENT

29.     Macquarie repeats and realleges the preceding paragraphs as if fully set forth herein.

30.     Macquarie and McLaughlin entered into a fully enforceable agreement to submit all disputes to strictly confidential mandatory arbitration.

31.     The claims set forth in McLaughlin's November 17, 2017 complaint are subject to strictly confidential mandatory arbitration.

32.     On information and belief, McLaughlin engaged in a consensual sexual relationship with Robert Ansell, and suffered no adverse action or discrimination as a result of that relationship.

33.     Consequently, Macquarie has committed no violation of Title VII of the Civil Rights Act of 1964, the New York State Human Rights Law, and the New York City Human Rights Law against McLaughlin.

**WHEREFORE**, Macquarie respectfully requests that the Arbitrator issue:

34.     On Macquarie's Cause of Action for Breach of Contract: an award of money damages in an amount to be determined by the Arbitrator and pre-judgment and post-judgment interest and all costs.

35.     On Macquarie's Request for Declaratory Judgment, a declaration (i) that any disputes between Macquarie and McLaughlin are subject to strictly confidential mandatory arbitration and (ii) that Macquarie has not committed any discrimination or retaliation in violation of Title VII of the Civil Rights Act of 1964, the New York State Human Rights Law, and the New York City Human Rights Law against McLaughlin.

36.     An award granting Macquarie such other and further relief as may be just and proper.

Dated: New York, New York
       November 27, 2017

                                        PROSKAUER ROSE LLP

                                        By: _____
                                              Lloyd B. Chinn, Esq.

                                        Lloyd B. Chinn, Esq.
                                        Jenna L. Hayes, Esq.
                                        Eleven Times Square
                                        New York, NY  10036
                                        212.969.3341
                                        212.969.2900 (fax)
                                        lchinn@proskauer.com

                                        7

*Attorneys for Claimant*
Macquarie Holdings (USA), Inc.

# EXHIBIT "A"

**Macquarie Holdings (U.S.A.) Inc.**
A member of the Macquarie Group

| | | |
|---|---|---|
| 125 West 55th Street | Telephone | (212)231 1000 |
| 22nd Floor | Facsimile | (212)231 1010 |
| New York  NY  10019 | Internet | http://www.macquarie.com |

May 5, 2017

Khristina McLaughlin
C/o Macquarie Holdings (U.S.A.) Inc.
New York Office



Dear Khristina,

This employment agreement ('Agreement') sets out terms and conditions of your employment effective from July 1, 2017. Except as set forth in any prior agreement with respect to any previous or existing clawbacks or other contractual repayments owed to the firm, which shall remain in full force and effect, this Agreement constitutes the entire agreement between you and Macquarie Holdings (U.S.A.) Inc. ('Employer') in relation to the subject matter herein and supersedes any previous or contemporaneous written and oral agreements, understandings, commitments and representations between you and the Employer in relation to that subject matter.  Any implied contractual duty of good faith or duty of cooperation owed to you by the Employer is expressly excluded from forming part of this Agreement. By entering into this Agreement, you confirm that you have not relied on any previous written or oral agreement, understandings, commitments or representations other than those set out in this Agreement. Any amendments or revisions to the terms of this Agreement must be in writing and signed by an authorized officer of the Employer.

Subject to the conditions herein, below is a summary of the terms of your employment with the Employer:

| | |
|---|---|
| **Position:** | Head of US Sales, Cash Equities |
| **Assigned to:** | Macquarie Capital (U.S.A.) Inc. |
| **Business Group:** | Commodities and Global Markets |
| **Salary:** | USD 400,000.00 |

The Macquarie Group ('Macquarie') comprises the Employer, Macquarie Group Limited and their worldwide related entities (each a 'Macquarie entity'). You agree that your obligations under this Agreement are owed to, and for the benefit of, Macquarie and that this Agreement shall serve to the benefit of and be binding upon the Employer's successors and assigns.

**Employee Information**

The Employer relies on representations made and information given by you during your recruitment process and on the Employment Declaration as being true and correct for the

**Macquarie Holdings (U.S.A.) Inc. is not an authorised deposit-taking institution for the purposes of the Banking Act (Commonwealth of Australia) 1959, and Macquarie Holdings (U.S.A.) Inc.'s obligations do not represent deposits or other liabilities of Macquarie Bank Limited ABN 46 008 583 542 (MBL).  Neither MBL nor any other Macquarie Group entity guarantees or otherwise provides assurances in respect of the obligations of Macquarie Holdings (U.S.A.) Inc.**

duration of your employment with the Employer. You must update or provide to the Employer any material information in relation to those representations or any matters which may impact your employment which may change or arise at any time during your employment. The omission of any relevant information, or the provision of false or misleading information, could result in disciplinary action including termination of employment.

Your employment is contingent upon your compliance with the Immigration and Naturalization regulations requiring the establishment of your identity and ongoing right to work in the United States.

It is the Employer's practice to conduct occasional background checks on its employees during their employment. It is a condition of your employment that you consent to additional background checks being conducted during your employment, and to the results of those checks being made available to Macquarie, for the purpose of considering your suitability for ongoing employment. Your employment may be terminated if the Employer considers the results of a background check to be unsatisfactory or materially inconsistent with the information given to the Employer during the recruitment process.

**Employment within Macquarie**

From time to time, the Employer may change your role, duties, responsibilities, reporting line and/or work location and direct you to work for, or undertake duties for, another business group or Macquarie entity.

Macquarie may, at times, need to transfer employees from one Macquarie entity to another Macquarie entity for accounting, taxation, regulatory, licensing, business or other reasons. You consent, to the extent permissible by law, to your employment being transferred to another Macquarie entity at the discretion of the Employer.

Although your, role, duties, responsibilities, reporting line, work location and/or employer within Macquarie may change, unless otherwise agreed, the terms and conditions set out in this Agreement will continue to apply.

**Employee Obligations and Macquarie's Policies**

Macquarie's policies, including, but not limited to, Macquarie's Code of Conduct, Confidential Information policy, Works Created during Employment policy, Information Barriers and Confidentiality policy, Outside Business Activities policy, Conflicts of Interest policy, Personal Investments policy and Appropriate Workplace Behaviour (EEO) policy, are available on Macquarie's intranet ('Macnet') (collectively, the 'Policies'). You agree to comply fully with the Policies and Macquarie's guidelines and procedures applicable to employees, as amended, varied or replaced from time to time. Macquarie may amend, replace, revoke or suspend the Policies at any time (with the exception of its "at will" policy) and you must comply with any amended or new Policies.

You agree that you will act in the best interests of Macquarie and faithfully and diligently devote your full time and energies to your position. You agree that you will perform your duties in a manner that is consistent with all laws and regulatory requirements (including without limitation any regulations of any applicable self-regulatory organization) applicable to your position and the work you perform. You also agree to comply with all lawful directions of the Employer and undertake training as directed.

You further agree to inform the Employer of any matter in connection with your employment which comes to your notice that may be regarded as material and relevant to the Employer or Macquarie; and to immediately disclose to the Employer any information which does, or may, lead to you not being lawfully entitled to perform your duties or responsibilities. A breach by you

of any of the Policies may result in disciplinary action which may include the termination of your employment for cause.

**Outside Business Activities**

The Employer may require you to provide details of interests you have outside of your employment for regulatory purposes or to help the Employer manage risks. You are required to advise the Employer of any external directorships, secondary employment or engagement or other business activities ('Outside Business Activities') that you hold or engage in or which you propose to take up. The Employer may require that you resign from, do not accept or do not take up such Outside Business Activities. You must not engage in any Outside Business Activities without the prior written consent of the Employer. This obligation is currently detailed in Macquarie's Outside Business Activities policy and Conflicts of Interest policy.

**Confidential Information**

During your employment and after your employment with the Employer ends, you must not, directly or indirectly, disclose, copy or use any information which Macquarie designates as being confidential or that you might reasonably expect Macquarie to regard as confidential. You are directed to not bring or use any information to the Employer or Macquarie which belongs to a third party, or to which you are not lawfully entitled. Further details of your duties regarding confidential information are included in Macquarie's Confidential Information policy which has been provided to you with this Agreement.

**Compensation**

Your annualized salary of $400,000.00 will be paid at a semi-monthly rate of $16,666.67 in accordance with customary payroll practices and procedures, subject to applicable law. This salary covers all hours worked by exempt employees. You will receive your semi-monthly pay on or around the 15th and the last day of each month.

**Discretionary Profit Share**

In addition to your base salary, a discretionary profit share bonus may be allocated to you in recognition of your contribution in the course of your employment for the financial year to 31 March. Profit share bonuses are completely discretionary, do not form part of your base salary, and will not be included in the calculation of any termination payments including payments in lieu of notice and payments in lieu of accrued but untaken leave.

While you may receive a profit share bonus in a particular financial year, you will not necessarily receive a profit share bonus in any subsequent year. All profit share allocations will be made in installments in accordance with applicable Macquarie policies, including the Profit Share and Profit Share Retention policies, as amended from time to time. Under these policies, any profit share allocations are conditional on, among other things, your remaining employed by the Employer on the relevant vesting and crystallization dates. No amounts (pro-rata or otherwise) or payments in lieu will be payable if you are not employed on those dates. This means that you will have no entitlement to any retained portion of your profit share allocation until the relevant vesting dates.

The Employer reserves the right to terminate (with or without substitution) or vary the terms of any profit sharing or bonus scheme, including, without limitation, the Profit Share and Profit Share Retention policies, at its discretion from time to time.

**Insurance and Other Benefits**

All regular full-time, regular part-time (scheduled to work 20 or more hours per week), and fixed-term employees (with an initial term of greater than 90 days) are eligible as of their date of hire to participate in the Employer's health and welfare benefit plans, as they exist from time to time, in accordance with the terms of applicable plan documents.

If, after the initial date of hire, an ineligible employee subsequently meets the eligibility requirements as described above, he or she will become eligible to participate in the Employer's health and welfare benefit plans after a waiting period of 90 days of continuous employment.

All eligible employees will be enrolled in the Employer's default medical benefits coverage selection, as then in effect, if no affirmative election or declination of coverage is made within 30 days of their date of hire or the end of their waiting period, as applicable.

**401(k) Plan**

The Employer maintains a 401(k) plan for its eligible employees. Subject to the terms and conditions set forth in the applicable plan documents, eligible employees may participate in the plan following their date of hire.

The 401(k) plan has an automatic enrollment feature. All employees will be enrolled automatically in the plan if no affirmative election or declination of participation is made within the first 60 days of employment, in accordance with the terms and conditions set forth in applicable plan documents.

**Paid Time Off**

Full-time exempt employees are eligible for four weeks of vacation per year and for other holiday, sick and personal time as is generally provided to other exempt staff.  Part-time employees will accrue vacation time on a pro-rata basis. Time is accrued on a monthly basis pursuant to the Employer's governing time off policies, which also set forth rules pertaining to usage of time and other related issues.

The Employer requires you to submit a properly completed and authorized leave application for all periods of absence. Depending on your role, you may be required to take at least two weeks of continuous leave during every 12 month period for risk management purposes. If at any time you work in such a role, you agree to take the required period of continuous leave annually.

You will be entitled to statutory public holidays in accordance with the relevant legislation of the location in which you are based. Employee who trade or settle foreign markets are expected to take such holidays in accordance with the Cash Equities and Equities & Derivatives Trading's public holiday guidelines as amended from time to time.

**Status of Employment/Termination of Employment**

<u>Termination with Notice</u>

Your employment is "at will."  Either you or the Employer may terminate your employment, with or without cause at any time, subject to the notice provisions set forth herein.

You agree to provide the Employer with four (4) weeks' notice of your voluntary resignation. The Employer may exercise its discretion to shorten any notice period associated with your resignation. The Employer agrees to provide you with four (4) weeks' notice of your termination when feasible except in the case of a termination for Cause. The period between such notice and

termination of employment will be referred to as the 'Notice Period.' Such notice provision shall not alter your at-will status.

If the Employer terminates your employment without Cause or you resign by giving notice in accordance with the terms herein, the Employer may in its sole discretion, alter your duties or place you on a paid leave of absence during the Notice Period.

You may not provide services to any other employer or act as a consultant or otherwise assist any person or entity in connection with their business during your employment including during the Notice Period, regardless of whether you are working or on a paid leave of absence during such period, unless otherwise approved by management. You must continue to act in accordance with your employment obligations during your employment, including during any Notice Period.

<u>Termination for Cause</u>

For the purposes of this Agreement only, termination for 'Cause' means:

(i)     an action taken by a regulatory body or a self-regulatory organization against you that substantially prohibits or suspends you from performing or substantially impairs the performance of your duties of employment;

(ii)    your lack of relevant qualifications, licenses or approvals by a regulatory body required to perform your duties of employment;

(iii)   your negligent or wilful failure to perform the material duties of your employment (other than any such failure resulting from incapacity due to physical or mental illness);

(iv)    your material misrepresentation of facts relied upon in entering this Agreement or your material breach of any of your obligations under the terms and conditions of your employment, including but not limited to your obligations set out under this Agreement or of any of the Policies or Macquarie procedures (written or unwritten) of which you are aware or reasonably should be aware;

(v)     your breach of fiduciary duties to Macquarie;

(vi)    your conviction of, or pleas of guilty or nolo contendere to, a criminal offense (where the offense is relevant to your employment) or an action taken by a law enforcement organisation against you that substantially prohibits or suspends you from performing or substantially impairs the performance of your duties of employment;

(vii)   your wilful refusal to follow the proper direction of the Employer or any individual to whom you directly report;

(viii)  your commission of an act or omission that, in the reasonable opinion of the Employer, may materially injure the reputation of the Employer or Macquarie; and

(ix)    your commission of an act or omission that constitutes fraud, embezzlement or material dishonesty or any other act of gross misconduct.

**Property**

On termination of employment, or if instructed at any time during your employment, you must deliver to the Employer any Macquarie property in your possession or control and certify that you have not retained Macquarie property. For the avoidance of doubt, Macquarie property includes, but is not limited to, data or any phone or computer hardware and software belonging to Macquarie. You are not entitled to retain a copy of, or record in any form, any documents or records referred to above following the termination of your employment.

On termination of employment, or if instructed at any time during your employment, you must provide (to an appropriate individual within Macquarie's Human Resources or Technology division) details of any passwords required to access and reset any device or technology belonging to Macquarie.

**Protection of Macquarie's Interests**

<u>Acknowledgement</u>

You acknowledge and agree that:

a. Macquarie engages in a broad range of activities on a global basis in connection with its banking, financial, financial markets, advisory, capital raising, investment and funds management businesses and related support functions across its different business groups (collectively, 'the Activities'); and

b. during your employment, you have been and/or will be exposed to Confidential Information (as defined in the Confidential Information policy, as amended, varied or replaced from time to time), and other aspects of Macquarie's business that are the property of, and valuable to, Macquarie (including the Employer), and Macquarie is entitled to reasonable protection of those rights.

Notwithstanding any other term of this Agreement, you acknowledge and agree that, immediately upon accepting any offer of new employment, you will inform your new employer of the restrictions contained in this Protection of Macquarie's Interests clause which continue to apply to you following the end of your employment with the Employer.

<u>Non-Competition</u>

This clause will apply automatically during your employment. This clause will also apply for a period ('Restraint Period') of three months following the date on which this Agreement ends ('Termination Date'), if:

- you hold the position of, or equivalent to, Senior Manager, Associate Director, Division Director or Executive Director on the Termination Date; and

- the Employer notifies you in writing within 14 days following the Termination Date that it has exercised its discretion to enforce this clause.

You agree that:

- during your employment you will not, either directly or indirectly and whether as an employee, contractor, consultant, director or agent or in any other capacity, be engaged by, assist, work for or participate in any business that competes with any of the Activities: in which you were materially involved; or in respect of which you had access to Confidential Information, within the last 12 months of your employment with Macquarie ('Material Activities'), in any country in which those Activities are undertaken by the group or groups in Macquarie in which you were employed.

- during the Restraint Period (if applicable), you will not, either directly or indirectly and whether as an employee, contractor, consultant, director or agent or in any other capacity, be engaged by, assist, work for or participate in any Material Activities, in the same, or a substantially similar position, or in a position where you perform any of the Material Activities, that you held with Macquarie, in any country in which those Activities are undertaken by the group or groups in Macquarie in which you were employed.

If the Employer enforces this clause after the Termination Date, it will pay you an amount equal to the base salary and the value of medical benefits (which you had elected at the time of your notice of termination) that you would have received, less any applicable deductions, had you been employed during the Restraint Period ('Restraint Payment').

<u>Non-Solicitation</u>

You agree that:

- during your employment and for a period of three months after the Termination Date, regardless of the reason your employment ends, you must not:

  - directly or indirectly, solicit, canvass or approach any person who, or any entity which, was at any time within the last 12 months of your employment with Macquarie, an actual or prospective client or business partner of Macquarie in that part or parts of the business carried on by Macquarie in which you worked and with whom you had contact, dealings, influence, or learned information about, with a view to obtaining the business or patronage of such client or business partner in a business that is the same or similar to that part or parts of Macquarie's business; or

  - otherwise interfere with the relationship between Macquarie and its clients or business partners with whom you had contact, influence or learned information about while you were employed by Macquarie;

- during your employment and for a period of six months after the Termination Date, regardless of the reason your employment ends, you must not:

  - directly or indirectly, induce or assist in the inducement or solicitation of any employee, contractor or consultant of Macquarie who was an employee, contractor or consultant of Macquarie within the last 12 months of your employment with Macquarie, and with whom you had contact or influence during your employment, to leave their employment or engagement with Macquarie, or to become employed by you or an entity with whom you become affiliated, after the Termination Date, whether or not in leaving their employment or engagement the employee, contractor or consultant would breach the terms of that employment or engagement; or

  - otherwise interfere with the relationship between Macquarie and its employees, contractors or consultants with whom you had contact, influence or learned information about while you were employed by Macquarie.

The restrictions contained in this Non-Solicitation clause are not contingent on a Restraint Payment being made.

Violation of Covenant Provisions

You agree that the restrictions contained in the above clauses, Confidential Information, Non-Competition and Non-Solicitation together with any applicable Policies ('Covenant Provisions') are fair and reasonable and necessary for the protection of the Employer's legitimate business interests and that the Employer would not have entered into this Agreement without the inclusion of such restrictions. Moreover, you recognize and expressly acknowledge that these restrictions grant to the Employer only such reasonable protection as is admittedly necessary to preserve Macquarie's legitimate business interests. It is expressly agreed by the Employer and you that the Covenant Provisions shall survive the termination of this Agreement and the termination of your employment, for any reason.

You further acknowledge that any breach of the Covenant Provisions will result in irreparable harm to the Employer and that no remedy at law will be adequate for such breach, and you therefore consent to the entry of a restraining order, preliminary injunction or other court order to enforce this Agreement without posting of bond, to the extent permitted by law.  You agree that the foregoing relief shall be in addition and without prejudice to all other remedies to which Employer is entitled at law or in equity.

**No Third Party Rights or Benefits**

The parties do not intend that this Agreement should confer any right or benefit on any third party, other than the entities within Macquarie.

**Ongoing Obligations**

The clauses titled "Confidential Information", "Property", and "Protection of Macquarie's Interests", continue to apply following the end of your employment with Macquarie.

**No Waiver**

Any failure or delay by Macquarie to enforce a provision of this Agreement will not affect or render that provision unenforceable, or prevent Macquarie from pursuing remedies in respect of a breach of this Agreement at any time in the future.

**Arbitration Agreement**

You agree that the Arbitration Agreement attached to this Agreement as Annex A applies to the terms and conditions of your employment with the Employer.  By accepting this Agreement, you affirmatively indicate your agreement to the terms set forth therein.  Both you and the Employer understand that by agreeing to the terms of the Arbitration Agreement, both are giving up any constitutional or statutory right they may possess to have covered claims decided in a court of law before a judge or a jury.

**Data Privacy**

You acknowledge and agree that the Employer has the right to collect, use and disclose your personal information for purposes relating to the administration of your employment with the Employer, including administering your compensation and benefits and compliance with any regulatory, reporting and withholding requirements.  You acknowledge and agree that your personal information may be disclosed by the Employer to its affiliated entities for such purposes. The Employer will take reasonable steps to maintain physical, technical and procedural safeguards regarding your personal information. You consent to the transmission, processing and storage of your personal information in the United States and at international service centres outside the United States.

**Governing Law and Forum Selection**

This Agreement shall be governed by and construed in accordance with the laws of the state of New York without giving effect to its principles of conflict of laws.  Should any dispute not be subject to arbitration, any action to enforce the terms of this Agreement or any other dispute arising out of your employment shall be brought in the appropriate state or federal court located closest to your final work location and the parties consent to such personal jurisdiction and waive any objections to the resolution of disputes hereunder in such jurisdiction.

**Severability**

Any provision or part of a provision of this Agreement which is held to be illegal, void or unenforceable will either be modified so that it is enforceable, or deemed ineffective to the extent only that it is illegal, void or unenforceable, without invalidating the remaining provisions or part of a provision of the Agreement.

Yours truly,

**Austin Dowling**
Regional Head of Human Resources, Americas

**Acceptance**

I understand and, by selecting the 'accept' button on the portal, acknowledge and accept the terms of my employment as set out in this Agreement and the Arbitration Agreement, and will comply with the terms and conditions of my employment and the Policies as amended from time to time.

I acknowledge that I have received, read and understand the Policies provided to me with this Agreement entitled Benefit and Policy Information (March 2017 v1) and that these provisions are incorporated by reference into this Agreement.  My acceptance indicates my agreement to comply with and be bound by these Policies and with all Policies as amended from time to time, including but not limited to:

- Acceptable Use of Technology policy
- Appropriate Workplace Behaviour (EEO) policy
- Code of Conduct
- Confidential Information policy
- Conflicts of Interest policy
- Information Barriers and Confidentiality policy
- Macquarie US Benefits Guide
- New York City's Earned Sick Time Act
- Outside Business Activities policy
- Pregnancy and Employment Rights
- Personal Investments policy
- Works Created during Employment policy
- MSG Personal Investments policy

I confirm that this Agreement has been provided to me in my primary language, or if English is not my primary language I confirm that the information relating to compensation has been provided to me in my primary language if a translation has been prepared by the Department of Labor.

**ANNEX A**

**ARBITRATION AGREEMENT**
**For Registered Employees of Macquarie Holdings (U.S.A.) Inc.**

While Macquarie hopes that employment disputes with its Employees will not occur, Macquarie believes that where such disputes do arise, it is in the mutual interest of all concerned to handle them promptly and with minimal disturbance to the operations of Macquarie's businesses and the lives of its Employees.

Accordingly, to provide for more expeditious resolution of certain employment-related disputes that may arise between Macquarie and its Employees, Macquarie has instituted a mandatory arbitration procedure (the "Macquarie Arbitration Procedure" or the "Procedure") for its Employees as set forth herein.  This Arbitration Agreement ("Agreement") applies to all Macquarie Employees in the United States of America.  Under the Procedure, certain disputes that may arise from your employment with Macquarie, the terms and conditions of your employment or the termination of your employment must (after appropriate attempts to resolve your dispute internally through Macquarie management channels) be submitted for resolution by mandatory arbitration.

In agreeing to submit employment disputes for resolution by arbitration, you acknowledge that such agreement is given in exchange for rights to which you are not otherwise entitled - namely, your employment as a Macquarie Employee and the more expeditious resolution of such disputes.  In exchange for your agreement to submit such disputes to the binding arbitration process set forth herein, Macquarie likewise agrees to the use of arbitration as the exclusive forum for resolving employment disputes covered by this Agreement.

Hence, the parties shall be precluded from bringing or raising in court or another forum any dispute that was or could have been brought or raised pursuant to the procedures set forth in this Agreement.

**Arbitration Procedure**

As a condition of your employment at Macquarie, you agree that any controversy or claim arising out of or relating to your employment relationship with Macquarie, the terms and conditions of your employment or the termination thereof must be submitted for final and binding resolution by a private and impartial arbitrator, to be jointly selected by you and Macquarie.

<u>Claims Covered:</u>  This Agreement to arbitration includes any claim that could be asserted in court or before an administrative agency or claims as to which the employee has an alleged cause of action, including without limitation claims for breach of any contract or covenant (express or implied), tort claims, claims for discrimination (including, but not limited to, discrimination based on sex, pregnancy, race, national or ethnic origin, age, religion, creed, marital status, sexual orientation, mental or physical disability or medical condition, or other characteristics protected by statute), claims for wrongful discharge, violations of confidentiality or breaches of trade secrets, and/or claims for violation of any federal state or other governmental law, statute, regulation or ordinance (including, but not limited to, the Americans With Disabilities Act, the Age Discrimination in Employment Act, the Family Medical Leave Act, the Fair Labor Standards Act, the Employee Retirement Income Security Act, Title VII of the Civil Rights Act of 1964, the Genetic Information Non-Discrimination Act and any and all claims relating to your employment and/or termination of your employment with the company whether based on state law, commonwealth law, local law, statute, regulation, ordinance or common law).

Disputes covered by the Procedure include all such claims whether made against Macquarie, any of its subsidiary or affiliated entities, or its individual officers, directors, or trustees thereof (in an official or personal capacity).

**Claims Not Covered:**  Claims covered by this Agreement do not include (i) a claim for workers' compensation benefits; (ii) a claim for unemployment compensation benefits; (iii) a claim by Macquarie for temporary or preliminary injunctive and/or other equitable relief, including, but not limited to, such claims for unfair competition and/or the use or unauthorized disclosure of trade secrets or confidential information, as to which Macquarie may seek and obtain relief from a court of competent jurisdiction in advance of pursuing such claims in arbitration pursuant to this Agreement; (iv) a claim for money damages by Macquarie related to claims for unfair competition and/or the use or unauthorized disclosure of trade secrets or confidential information, as to which Macquarie may seek and obtain relief from a court of competent jurisdiction; (v) a claim based upon Macquarie's current (successor or future) employee benefits and/or welfare plans that contain an appeal procedure or other procedure for the resolution of disputes under the plan; (vi) a claim for violation of the National Labor Relations Act; (vii) any non-employment-related claim that arises out of an Employee's Form U4 Agreement and relates solely to the obligations attendant to the Employee's status as a  "Registered Representative"; and (viii) any claim in respect of which arbitration is prohibited under applicable law.

You shall not be entitled to join or consolidate claims in arbitration with claims brought by other individuals, or to arbitrate any claim as a representative member of a class or in a private attorney general capacity.  Nor shall any arbitrator appointed pursuant to this Agreement have the authority to arbitrate claims on a class, collective or multiple-claimant basis.  Accordingly, you and Macquarie agree that the American Arbitration Association's ("AAA") Supplementary Rules for Class Action Arbitration shall not apply to any arbitration under this Procedure.  If, however, an agreement to dispense with class, collective or multiple-claimant claims in arbitration is held to be unenforceable, then such claims shall proceed in court, not in arbitration. Any dispute about the enforceability, applicability or interpretation of any portion of this paragraph shall be submitted to and resolved by a court of competent jurisdiction only and shall not under any circumstances be submitted to or resolved by any arbitrator or organization sponsoring arbitration.

**Internal Efforts**

As a prerequisite for submitting an employment dispute to arbitration, both you and Macquarie agree to make good-faith efforts at resolving any dispute internally on an informal basis through Macquarie management channels appropriate to the circumstances of that individual dispute, including, but not limited to, Employee Relations and/or the Head of Human Resources, Americas.  Only when such internal efforts fail may an employment dispute be submitted to binding arbitration under the terms of this Procedure.

**Binding Arbitration**

If a covered dispute remains unresolved at the conclusion of a good-faith effort to resolve the dispute internally, either party may submit the dispute for resolution by final binding arbitration under this Procedure.  The arbitration will be conducted under the Employment Dispute Resolution Rules of AAA, with the proviso that the arbitration shall be strictly confidential.  These Rules, incorporated by reference herein, include (but are not limited to) the procedures for the joint selection of an impartial arbitrator and for the hearing of evidence before the arbitrator.  The arbitrator shall have the authority to allow for appropriate discovery and exchange of information prior to a hearing, including (but not limited to) production of documents, information requests, depositions, and subpoenas.  Discovery shall be conducted pursuant to the AAA rules.  A copy of the complete AAA Employment Dispute Resolution Rules may be obtained from the AAA as Administrator.  You may also access the Rules from AAA's website at http://www.adr.org.[1]

---

[1] This Agreement does not prohibit or restrict Associated Persons from filing an arbitration claim in the FINRA arbitration forum as specified in FINRA rules.

Any conflict between the rules and procedures set forth in the AAA rules and those set forth in this Agreement shall be resolved in favor of those in this Agreement. The burden of proof at arbitration shall at all times be upon the party seeking relief. The arbitrator shall have the power to award all remedies that could be awarded by a court or administrative agency in accordance with the governing and applicable substantive law relating to covered claims, except is limited to individual relief, and not relief on a class or collective basis. Without limiting the arbitrator's power and authority, it is understood that the arbitrator shall have the authority to entertain and rule on motions to dismiss and motions for summary judgment by any party and shall apply the standards governing such motions under the Federal Rules of Civil Procedure (unless otherwise agreed to by the parties in connection with disputes involving a non-US Employee).

**Choice of Law**

In reaching his/her decision, the arbitrator shall apply the governing substantive law applicable to the claim(s), cause of action(s), and defense(s) asserted by the parties as applicable in the state in which you are primarily assigned to work.

**Forum of Arbitration**

Any arbitration conducted pursuant to this Agreement shall take place in the state in which you are primarily assigned to work unless an alternative location is chosen by the mutual agreement of the parties.

**Time Limits and Procedures**

The aggrieved party must give written notice of any claim to the other party within the same statute of limitations period that would apply with respect to such claim if it was brought in a judicial or administrative forum. The written notice shall describe the nature of all claims asserted and the facts upon which such claims are based and shall be mailed to the other party by certified or registered mail, return receipt requested. Any such notice mailed to Macquarie shall be addressed to Macquarie's Head of Human Resources, Americas, and the AAA as Administrator in accordance with applicable AAA rules.

The arbitrator shall render a decision and award within 30 days after the close of the arbitration hearing or at any later time on which the parties may agree. The award shall be in writing and signed and dated by the arbitrator and shall contain express findings of fact and the basis for the award.

The parties agree that Macquarie will pay all of the AAA administrative fees and the arbitrator's fees and expenses. All other costs and expenses associated with the arbitration, including, without limitation, the party's respective attorneys' fees, shall be borne by the party incurring the expense, unless the law under which the claim is brought permits an award of attorneys' fees and/or costs to the prevailing party.

Judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction. The award may be vacated or modified only on the grounds specified in the U.S. Federal Arbitration Act or other applicable law.

**Severability**

Except as specifically set forth herein, if any provision of this Agreement is held to be illegal, void or unenforceable, the agreement will be ineffective to the extent only of that illegality, voidness or unenforceability, without invalidating the remaining parts of this Agreement. If a court or arbitrator should determine that any portion of this Agreement is overbroad or unreasonable, such provision shall be given effect to the maximum extent possible by narrowing the provision found to be overbroad or unreasonable.

**No Retaliation/Employment At-Will**

Under no circumstance will a Macquarie Employee be retaliated against in any way for invoking this Procedure in good-faith to seek the resolution of a dispute.  Macquarie managers who engage in such retaliation will be subject to discipline under the appropriate Macquarie disciplinary procedures.

The Macquarie Arbitration Procedure does not in any way alter the at-will employment status of Macquarie Employees.  Macquarie and its Employees are always free to terminate the employment relationship at any time for any lawful reason, with or without cause, and employment is not for any specific or definite duration.

This Agreement sets forth the complete agreement of the parties on the subject of arbitration of the covered claims defined above, and supersedes any prior or contemporaneous oral or written understanding on these subjects.  No party is relying on any representations, oral or written, on the subject of the effect, enforceability or meaning of this Agreement, except as specifically set forth herein.
_____

**END OF DOCUMENT**

# EXHIBIT "B"

**Macquarie Holdings (U.S.A.) Inc.**
A member of the Macquarie Group

125 West 55th Street      Telephone    (212) 231 1000
22nd Floor                Facsimile    (212) 231 1010
New York  NY  10019       Internet http://www.macquarie.com

February 1, 2012

Khristina McLaughlin
50 Murray Street, Apartment 801
New York, NY 10007

Dear Khristina:

We are pleased to confirm our offer to you to join Macquarie Holdings (U.S.A.) Inc.
('Employer').  Your employment will commence on or about February 20, 2012 ('Commencement
Date').

This employment agreement ('Agreement') sets out the terms and conditions of your employment.
It constitutes the entire agreement between you and the Employer and supersedes any previous
agreements or commitments between you and the Employer.

Subject to the conditions herein, below is a summary of the terms of your employment with the
Employer:

| | |
|---|---|
| **Position:** | Division Director, US Equities Sales |
| **Assigned to:** | Macquarie Capital (USA) Inc. |
| **Business Group:** | Macquarie Securities Group |
| **Salary:** | USD 300,000.00 |
| **MGL Equity Awards:** | 1500 |

The Macquarie Group ('Macquarie') comprises the Employer, Macquarie Group Limited and their
worldwide related entities.  You agree that your obligations under this Agreement are owed to,
and for the benefit of, Macquarie and that this Agreement shall serve to the benefit of and be
binding upon the Employer's successors and assigns.

**Employee Information**

The Employer relies on representations made by you during your recruitment process and on the
Employment Declaration as being true and correct for the duration of your employment with the

Macquarie Holdings (U.S.A.) Inc. is not an authorised deposit-taking institution for the purposes of the Banking Act
(Commonwealth of Australia) 1959, and Macquarie Holdings (U.S.A.) Inc.'s obligations do not represent deposits or other
liabilities of Macquarie Bank Limited ABN 46 008 583 542 (MBL).  Neither MBL nor any other Macquarie Group entity guarantees
or otherwise provides assurances in respect of the obligations of Macquarie Holdings (U.S.A.) Inc.

Employer. You must update or provide to the Employer any material information in relation to those representations or any matters which may impact your employment which may change or arise at any time prior to the commencement of or during your employment. The omission of any relevant information, or the provision of false or misleading information, could result in disciplinary action including termination of employment.

Your employment is contingent upon your compliance with the Immigration and Naturalization regulations requiring the establishment of your identity and ongoing right to work in the United States.

Your employment is also contingent upon the results of a background investigation. It is the Employer's practice to conduct occasional background checks on its employees during their employment. It is a condition of your employment that you consent to additional background checks being conducted during your employment, and to the results of those checks being made available to Macquarie, for the purpose of considering your suitability for ongoing employment. Your employment may be terminated if the Employer considers the results of a background check to be unsatisfactory.

You confirm, and the Employer relies on your confirmation, that in accepting the offer of employment on the terms set out in this Agreement you are not breaching and will not breach any obligation owed by you to a third party, including an obligation to a former employer.

**Employee Obligations and Macquarie's Policies**

The Employer's Code of Conduct, Goals and Values, Confidential Information policy, Works Created During Employment policy, and the Employee Guide are included on the enclosed CD, and further policies are available on Macquarie's intranet (Macnet) (collectively the 'Policies'). You agree to comply fully with the Policies and Macquarie procedures applicable to employees, as amended from time to time.

You agree that you will act in the best interests of Macquarie and faithfully and diligently devote your full time and energies to your position. You will be required to observe all statutes and regulations (including without limitation any regulations of any applicable self-regulatory organization) concerning the work performed by you and to comply with all lawful directions of the Employer, including complying with the Policies, and undertaking training as directed. You must not engage in secondary employment without the written consent of the Employer. A breach of any of the Policies may result in disciplinary action which may include the termination of your employment for cause.

The Policies form part of this Agreement. Macquarie may amend, revoke or suspend the Policies at any time (with the exception of its "at will" policy) and you must comply with any amended or new Policies.

**Confidential Information**

During and after your employment with the Employer, you must not disclose, copy or use any information which Macquarie designates as being confidential or that you might reasonably expect Macquarie to regard as confidential. You are directed to not bring or use any information to the Employer or Macquarie which belongs to a third party, or to which you are not lawfully entitled. Further details of your duties regarding confidential information are included on the enclosed CD.

2

**Compensation**

Your annualized salary of $300,000.00 will be paid at a semi-monthly rate of $12,500.00 in accordance with customary payroll practices and procedures, subject to applicable law. This salary covers all hours worked by exempt employees. You will receive your semi-monthly pay on the 15th and the last day of each month.

**Discretionary Profit Share**

In addition to your annual base salary, a discretionary profit share bonus may be allocated to you in recognition of your contribution in the course of your employment for the financial year to 31 March. Profit share bonuses are completely discretionary, do not form part of your base salary, and will not be included in the calculation of any termination payments including payments in lieu of notice and payments in lieu of accrued but untaken leave.

While you may receive a profit share bonus in one financial year, you will not necessarily receive a profit share bonus in any subsequent year.

The Employer reserves the right to terminate (with or without substitution) or vary the terms of any profit sharing or bonus scheme, including, without limitation, the <u>Profit Share</u> and <u>Profit Share Retention</u> policies, at its discretion from time to time.

Except as varied by this Agreement, all profit share allocations, will be subject to the Employer's crystallization date requirements and retention arrangements and other provisions of the applicable <u>Profit Share</u> and <u>Profit Share Retention</u> policies, as amended from time to time. Under these policies, any profit share allocations are conditional on your remaining employed by the Employer on the relevant vesting and crystallization dates and no pro-rata amounts will be payable. This means that you may have no entitlement to the retained portion of your profit share allocation until the relevant crystallization dates.

**MGL equity awards**

Under the Macquarie Group Employee Retained Equity Plan ('MEREP') you will be invited to apply for 1500 Macquarie Group Limited ('MGL') equity awards ('Equity Awards').

For details of vesting and the other rules applicable to the Equity Awards see the MEREP as well as Macquarie's Personal Dealing policy. None of this information constitutes an offer or invitation to apply for equity awards under the MEREP. You will also receive a disclosure document for the Equity Awards with the award invitation you will receive shortly after your commencement.

**Insurance and Other Benefits**

You will be eligible to participate in the Employer's health and welfare benefit plans as they exist from time to time in accordance with the terms of the plan documents which will be made available to you.

**401(k) Plan**

The Employer maintains a 401(k) plan for its eligible employees. Subject to the terms and conditions set forth in the official plan documents you will be eligible to join the plan following your commencement of employment.

**Paid Time Off**

Full-time exempt employees are eligible for four weeks of vacation per year and for other holiday, sick and personal time as is generally provided to other exempt staff. Part-time employees will accrue vacation time on a pro-rata basis. Time is accrued on a monthly basis pursuant to the Employer's governing time off policies, which also set forth rules pertaining to usage of time and other related issues.

The Employer requires you to submit a properly completed and authorised leave application for all periods of absence and it is policy that you take at least two weeks of uninterrupted leave during any twelve month period.

You will be entitled to statutory public holidays in accordance with the relevant legislation of the location in which you are based. Employee who trade or settle foreign markets are expected to take such holidays in accordance with the Macquarie Securities Group's public holiday guidelines as amended from time to time.

**Status of Employment/Termination of Employment**

Termination with Notice

Your employment is "at will". Either you or the Employer may terminate your employment, with or without cause at any time, subject to the notice provisions set forth herein.

You agree to provide the Employer with two (2) weeks' notice of your voluntary resignation. The Employer agrees to provide you with two (2) weeks' notice of your termination when feasible except in the case of a termination for Cause. The period between such notice and termination of employment will be referred to as the 'Notice Period'. Such notice provision shall not alter your at-will status.

If the Employer terminates your employment without Cause or you resign by giving notice in accordance with the terms herein, the Employer may in its sole discretion, alter your duties or place you on a paid leave of absence during the Notice Period.

You may not provide services to any other employer or act as a consultant or otherwise assist any person or entity in connection with their business during your employment or during the Notice Period, regardless of whether you are working or on a paid leave of absence during such period, unless otherwise approved by management. You must continue to act in accordance with your employment obligations during any Notice Period.

Termination for Cause

For the purposes of this Agreement only, termination for 'Cause' shall mean: (i) an action taken by a regulatory body or a self-regulatory organization against you that substantially prohibits or suspends you from performing or substantially impairs the performance of your duties of

4

employment;  (ii) your negligent performance or failure to perform your duties of employment or inadequate performance in your employment (other than any such failure resulting from incapacity due to physical or mental illness);  (iii) your breach of any of your obligations set forth in this Agreement, including but not limited to your obligations under the covenants and conflict of interest provisions contained in this Agreement, or of any of the Policies or Macquarie procedures (written or unwritten);  (iv) your breach of fiduciary duty of loyalty to Macquarie;  (v) your violation of federal or state securities law, or any other law, rule or regulation;  (vi) your conviction of or plea of guilty or nolo contendere to a job-related felony or any other job-related criminal offense;  (vii) your wilful refusal to follow the proper direction of the Board or any individual that you directly report to; and  (viii) your commission of an act that constitutes fraud, embezzlement or dishonesty.

## Property

On termination of employment, or if instructed at any time during your employment, you must deliver to the Employer any Macquarie property in your possession or control and certify that you have retained no Macquarie property.  For the avoidance of doubt, Macquarie property includes but is not limited to data or any computer hardware and software belonging to Macquarie.

## Protection of Macquarie's Interests

### Acknowledgement

You acknowledge and agree that:

a. Macquarie engages in a broad range of activities on a global basis in connection with its banking, financial, financial markets, advisory, capital raising, investment and funds management businesses and related support functions across its different business groups (collectively, 'the Activities'); and

b. during your employment, you have been and/or will be exposed to Confidential Information (as defined in the Confidential Information policy on the enclosed CD),  and other aspects of Macquarie's business that are the property of, and valuable to, Macquarie (including the Employer), and Macquarie is entitled to reasonable protection of those rights.

### Non-Competition

This clause will apply automatically during your employment.  This clause will also apply for a period of three months following the Termination Date, or a lesser period as may be specified in writing by the Employer at its discretion ('Restraint Period') if:

- you hold the position of, or equivalent to, Senior Manager, Associate Director, Division Director or Executive Director on the date of the termination of your employment (the 'Termination Date'); and

- the Employer notifies you in writing within 14 days following the Termination Date that it has exercised its discretion to enforce this clause.

5

You agree that:

- during your employment you will not, either directly or indirectly and whether as an employee, contractor or agent or in any other capacity, be engaged by or participate in, any business that competes with any of the Activities in which you were materially involved during the preceding 12 months of your employment with Macquarie, in any country in which those Activities are undertaken by the group or groups in Macquarie in which you were employed.

- during the Restraint Period (if applicable), you will not, either directly or indirectly and whether as an employee, contractor or agent or in any other capacity, be engaged by or participate in, any business that competes with any of the Activities in which you were materially involved during the preceding 12 months of your employment with Macquarie, in any country in which those Activities are undertaken by the group or groups in Macquarie in which you were employed.

If the employer enforces this clause after the Termination Date, it will pay you an amount equal to the base salary and the value of medical benefits (which you had elected at the time of your notice of termination) that you would have received, less any applicable deductions, had you been employed for the Restraint Period ('Restraint Payment').

<u>Non-Solicitation</u>

You agree that:

- during your employment and for a period of three months after the Termination Date, regardless of the reason your employment terminates, you must not solicit, canvass or approach any person who, or entity which, was at any time during your preceding 12 months with the Employer, a client or business partner of Macquarie in that part or parts of the business carried on by Macquarie in which you worked and with whom you had contact, influence or exposure, with a view to obtaining the business or patronage of that person or that entity in a business that is the same or similar to that part or parts of Macquarie's business; or

- during your employment and for a period of six months after the Termination Date, regardless of the reason your employment terminates, you must not induce or assist in the inducement of any employee or consultant of Macquarie who was an employee or consultant of Macquarie within the last 12 months of your employment, and with whom you had contact or influence during your employment , to leave their employment or engagement with Macquarie, or to become employed by you or an entity with whom you become affiliated, after the Termination Date; or

- you must not otherwise interfere with the relationship between Macquarie employees or consultants.

The restrictions contained in this Non-Solicitation clause are not contingent on a Restraint Payment being made.

6

<u>Violation of Covenant Provisions</u>

You agree that the restrictions contained in the above clauses, Confidential Information, Non-Competition and Non-Solicitation together with any applicable Policies ('Covenant Provisions') are fair and reasonable and necessary for the protection of the Employer's legitimate business interests and that the Employer would not have entered into this agreement without the inclusion of such restrictions. Moreover, you recognize and expressly acknowledge that these restrictions grant to the Employer only such reasonable protection as is admittedly necessary to preserve Macquarie's legitimate business interests. It is expressly agreed by the Employer and you that the Covenant Provisions shall survive the termination of this Agreement and the termination of your employment, for any reason.

You further acknowledge that any breach of the Covenant Provisions will result in irreparable harm to the Employer and that no remedy at law will be adequate for such breach, and you therefore consent to the entry of a restraining order, preliminary injunction or other court order to enforce this agreement without posting of bond, to the extent permitted by law. You agree that the foregoing relief shall be in addition and without prejudice to all other remedies to which Employer is entitled at law or in equity.

**Arbitration Agreement**

You agree that the Arbitration Agreement attached to this Agreement as Annex A applies to the terms and conditions of your employment with the Employer. By accepting this Agreement, you affirmatively indicate your agreement to the terms set forth therein. Both you and the Employer understand that by agreeing to the terms of the Arbitration Agreement, both are giving up any constitutional or statutory right they may possess to have covered claims decided in a court of law before a judge or a jury.

**Governing Law and Forum Selection**

This Agreement shall be governed by and construed in accordance with the laws of the state of New York without giving effect to its principles of conflict of laws. Should any dispute not be subject to arbitration, any action to enforce the terms of this Agreement or any other dispute arising out of your employment shall be brought in the appropriate state or federal court located closest to your final work location and the parties consent to such personal jurisdiction and waive any objections to the resolution of disputes hereunder in such jurisdiction.

**Severability**

Any provision or part of a provision of this Agreement which is held to be illegal, void or unenforceable will either be modified so that it is enforceable, or deemed ineffective to the extent only of that illegality, voidness or unenforceability, without invalidating the remaining provisions or part of a provision of the Agreement.

Yours truly,

**Jana E. Carlson**
Head of Human Resources, Americas

7

**Acceptance**

I understand and hereby acknowledge and accept the terms of my employment as set out in this Agreement and the Arbitration Agreement, and will comply with the terms and conditions of my employment and the Policies as amended from time to time. I acknowledge that I have received, read and understand the Policies provided to me on the CD entitled Benefit and Policy Information (August 2011) ('Policies CD') and that these provisions are incorporated by reference into this Agreement. My signature below indicates my agreement to comply with and be bound by these Policies and with all Policies as amended from time to time, including but not limited to:

- Acceptable Use of Technology policy
- Anti-money Laundering policy
- Appropriate work place behaviour (EEO) policy
- Chinese wall policy
- Code of Conduct
- Confidential information policy
- External Directorships policy
- Leave policy
- Macquarie employee guide
- Personal Conflicts of Interest policy
- Personal Dealings policy
- Profit share policy
- Profit share retention policy
- Training and Compliance policy
- What we stand for
- Whistleblower policies
- Works Created During Employment policy

I confirm that this Agreement has been provided to me in my primary language, or if English is not my primary language I confirm that the information relating to compensation has been provided to me in my primary language if a translation has been prepared by the Department of Labor.

I also confirm my start date of: _2/20/12_

Name          Khristina McLaughlin

Signature     _[signature]_

Date          _2/6/12_

**ANNEX A**

**ARBITRATION AGREEMENT**
**For Employees of Macquarie Holdings (U.S.A.) Inc.**

While Macquarie hopes that employment disputes with its Employees will not occur, Macquarie believes that where such disputes do arise, it is in the mutual interest of all concerned to handle them promptly and with a minimum of disturbance to the operations of Macquarie's businesses and the lives of its Employees.

Accordingly, to provide for more expeditious resolution of certain employment-related disputes that may arise between Macquarie and its Employees, Macquarie has instituted a mandatory arbitration procedure (the "Macquarie Arbitration Procedure" or the "Procedure") for its Employees as set forth herein.  This Arbitration Agreement applies to all Macquarie Employees in the United States of America.  Under the Procedure, certain disputes that may arise from your employment with Macquarie, the terms and conditions of your employment or the termination of your employment must (after appropriate attempts to resolve your dispute internally through Macquarie management channels) be submitted for resolution by mandatory arbitration.

In agreeing to submit employment disputes for resolution by arbitration, you acknowledge that such agreement is given in exchange for rights to which you are not otherwise entitled - namely, your employment as a Macquarie Employee and the more expeditious resolution of such disputes. In exchange for your agreement to submit such disputes to the binding arbitration process set forth herein, Macquarie likewise agrees to the use of arbitration as the exclusive forum for resolving employment disputes covered by this agreement.

Hence, the parties shall be precluded from bringing or raising in court or another forum any dispute that was or could have been brought or raised pursuant to the procedures set forth in this Agreement.

**Arbitration Procedure**

As a condition of your employment at Macquarie, you agree that any controversy or claim arising out of or relating to your employment relationship with Macquarie, the terms and conditions of your employment or the termination thereof must be submitted for final and binding resolution by a private and impartial arbitrator, to be jointly selected by you and Macquarie.

<u>**Claims Covered:**</u>  This agreement to arbitration:  (1) covers any dispute regarding the arbitrability of any such controversy or claim; and (2) includes, but is not limited to, any claim that could be asserted in court or before an administrative agency or claims as to which the employee has an alleged cause of action, including without limitation claims for breach of any contract or covenant (express or implied), tort claims, claims for discrimination (including, but not limited to, discrimination based on sex, pregnancy, race, national or ethnic origin, age, religion, creed, marital status, sexual orientation, mental or physical disability or medical condition, or other characteristics protected by statute), claims for wrongful discharge, violations of confidentiality or breaches of trade secrets, and/or claims for violation of any federal state or other governmental law, statute, regulation or ordinance (including, but not limited to, the Americans With Disabilities Act, the Age Discrimination in Employment Act, the Family Medical Leave Act, the Fair Labor Standards Act, the Employee Retirement Income Security Act, Title VII of the Civil Rights Act of 1964, the Genetic Information Non-Discrimination Act and any and all claims relating to your employment and/or termination of your employment with the

9

company whether based on state law, commonwealth law, local law, statute, regulation, ordinance or common law).

Disputes covered by the Procedure include all such claims whether made against Macquarie, any of its subsidiary or affiliated entities, or its individual officers, directors, or trustees thereof (in an official or personal capacity).

**Claims Not Covered:**  Claims covered by this Agreement do not include (i) a claim for workers' compensation benefits; (ii) a claim for unemployment compensation benefits; (iii) a claim by Macquarie for injunctive and/or other equitable relief, including, but not limited to, such claims for unfair competition and/or the use or unauthorized disclosure of trade secrets or confidential information, as to which Macquarie may seek and obtain relief from a court of competent jurisdiction; (iv) a claim for money damages by Macquarie related to claims for unfair competition and/or the use or unauthorized disclosure of trade secrets or confidential information, as to which Macquarie may seek and obtain relief from a court of competent jurisdiction; (v) a claim based upon Macquarie's current (successor or future) employee benefits and/or welfare plans that contain an appeal procedure or other procedure for the resolution of disputes under the plan; (vi) a claim for violation of the National Labor Relations Act; and (vii) any non-employment related claim that arises out of an Employee's U4 agreement and relates solely to the obligations attendant to the Employee's status as a  "Registered Representative", and (viii) any claim in respect of which arbitration is prohibited under applicable law.  This subsection does not exempt any employment-related dispute between Macquarie and an Employee, such as those described in the "Claims Covered" provision of this Arbitration Agreement, from the mandatory arbitrations procedures set forth herein, regardless of whether the Employee has signed a U4 agreement.

Neither you nor Macquarie shall be entitled to join or consolidate claims in arbitration with claims brought by other individuals or entities, or to arbitrate any claim as a representative member of a class or in a private attorney general capacity.  Nor shall any arbitrator appointed pursuant to this Agreement have the authority to arbitrate claims on a class, collective or multiple-claimant basis.  Accordingly, you and Macquarie agree that the American Arbitration Association's ("AAA") Supplementary Rules for Class Action Arbitration shall not apply to any arbitration under this Procedure.  If, however, under the law of your state, an agreement to dispense with class, collective or multiple-claimant claims in arbitration is held to be unenforceable, then this paragraph shall be deemed severed from our Agreement, and such claims shall proceed in court, not in arbitration.

**Internal Efforts**

As a prerequisite for submitting an employment dispute to arbitration, both you and Macquarie agree to make good-faith efforts at resolving any dispute internally on an informal basis through Macquarie management channels appropriate to the circumstances of that individual dispute, including, but not limited to, the Human Resources Manager.  Only when such internal efforts fail may an employment dispute be submitted to binding arbitration under the terms of this Procedure.

**Binding Arbitration**

If a covered dispute remains unresolved at the conclusion of a good-faith effort to resolve the dispute internally, either party may submit the dispute for resolution by final binding arbitration under this Procedure.  The arbitration will be conducted under the Employment Dispute Resolution Rules of AAA, with the proviso that the arbitration shall be strictly confidential.

These Rules, incorporated by reference herein, include (but are not limited to) the procedures for the joint selection of an impartial arbitrator and for the hearing of evidence before the arbitrator. The arbitrator shall have the authority to allow for appropriate discovery and exchange of information prior to a hearing, including (but not limited to) production of documents, information requests, depositions, and subpoenas.  Discovery shall be conducted pursuant to the AAA rules.  A copy of the complete AAA Employment Dispute Resolution Rules may be obtained from the AAA as Administrator.  You may also access the Rules from AAA's website at http://www.adr.org.

Any conflict between the rules and procedures set forth in the AAA rules and those set forth in this Agreement shall be resolved in favor of those in this Agreement.  The burden of proof at arbitration shall at all times be upon the party seeking relief.  The arbitrator shall have the power to award all remedies that could be awarded by a court or administrative agency in accordance with the governing and applicable substantive law relating to covered claims, except is limited to individual relief, and not relief on a class or collective basis.  Without limiting the arbitrator's power and authority, it is understood that (i) the arbitrator shall have exclusive authority to resolve any dispute relating to the interpretation, applicability or formation of this Agreement, and any claim that all or any part of this Agreement is void or voidable and (ii) the arbitrator shall have the authority to entertain motions to dismiss and motions for summary judgment by any party and shall apply the standards governing such motions under the Federal Rules of Civil Procedure (unless otherwise agreed to by the parties in connection with disputes involving a non-US Employee).

**Choice of Law**

In reaching his/her decision, the arbitrator shall apply the governing substantive law applicable to the claim(s), cause of action(s) and defense(s) asserted by the parties as applicable in the state in which you are primarily assigned to work.

**Forum of Arbitration**

Any arbitration conducted pursuant to this Agreement shall take place in the state in which you are primarily assigned to work unless an alternative location is chosen by the mutual agreement of the parties.

**Time Limits and Procedures**

The aggrieved party must give written notice of any claim to the other party within the same statute of limitations period that would apply with respect to such claim if it was brought in a judicial or administrative forum.  The written notice shall describe the nature of all claims asserted and the facts upon which such claims are based and shall be mailed to the other party by certified or registered mail, return receipt requested.  Any such notice mailed to Macquarie shall be addressed to Macquarie's Head of Human Resources, Americas and the AAA as Administrator in accordance with applicable AAA rules.

The arbitrator shall render a decision and award within 30 days after the close of the arbitration hearing or at any later time on which the parties may agree.  The award shall be in writing and signed and dated by the arbitrator and shall contain express findings of fact and the basis for the award.

The parties agree that Macquarie will pay all of the AAA administrative fees and the arbitrator's fees and expenses. All other costs and expenses associated with the arbitration, including, without limitation, the party's respective attorneys' fees, shall be borne by the party incurring the expense, unless the law under which the claim is brought permits an award of attorneys' fees and/or costs to the prevailing party.

Judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction. The award may be vacated or modified only on the grounds specified in the U.S. Arbitration Act or other applicable law.

**Severability**

If any provision of this agreement is held to be illegal, void or unenforceable, the agreement will be ineffective to the extent only of that illegality, voidness or unenforceability, without invalidating the remaining parts of this agreement. If a court or arbitrator should determine that any portion of this agreement is overbroad or unreasonable, such provision shall be given effect to the maximum extent possible by narrowing the provision found to be overbroad or unreasonable.

**No Retaliation/Employment At-Will**

Under no circumstance will a Macquarie Employee be retaliated against in any way for invoking this Procedure in good faith to seek the resolution of a dispute. Macquarie managers who engage in such retaliation will be subject to discipline under the appropriate Macquarie disciplinary procedures.

The Macquarie Arbitration Procedure does not in any way alter the at-will employment status of Macquarie Employees. Macquarie and its Employees are always free to terminate the employment relationship at any time for any lawful reason, and employment is not for any specific or definite duration.

This Agreement sets forth the complete agreement of the parties on the subject of arbitration of the covered claims defined above, and supersedes any prior or contemporaneous oral or written understanding on these subjects. No party is relying on any representations, oral or written, on the subject of the effect, enforceability or meaning of this Agreement, except as specifically set forth herein.

# EXHIBIT "C"

**From:**      COG HR Employment Agreement
**To:**        Khristina McLaughlin
**Subject:**   53616 - Khristina McLaughlin - EA Confirmation - Acceptance of updated employment documentation
**Date:**      Saturday, May 06, 2017 2:26:39 PM
**Importance:** High
**Sensitivity:** Private

Dear Khristina

You have just accepted the updated employment documentation via the online portal system. The updated employment documentation which is effective from 1 July 2017 is listed below.

If you did not intend to accept, please contact the Employee Relations consultant for your Group/Division immediately. Otherwise, you do not need to take any further action. A copy of your acceptance will be retained on your file.

Regards,
COG HR Employment Agreement


_____

EA Confirmation Details:

Action: Acknowledged acceptance of updated employment documentation effective 1 July 2017

Time stamp: 7 May 2017 4:26:27 AM AEST

Employment Documentation:

   * 53616~1~Khristina McLaughlin~USA~2017 Employment Agreement.pdf


This email and any attachment is confidential. If you are not the intended recipient, please delete this message. Macquarie does not guarantee the integrity of any emails or attachments. For important disclosures and information about the incorporation and regulated status of Macquarie Group entities please see: https://protect-us.mimecast.com/s/kJ5aBRIOLw7vCL?domain=macquarie.com

# EXHIBIT "D"



**From:** Jonathan Sack [mailto:jsack1@gmail.com]
**Sent:** Monday, October 23, 2017 8:42 AM
**To:** Jenny Kiernan <Jenny.Kiernan@macquarie.com>
**Subject:** Fwd: Khristina McLaughlin adv. Macquarie and Robert Ansell

I represent Khristina McLaughlin.

Stop emailing her feigning concern.

See below:

Direct all inquiries to me.

This Robby Ansell fellow needs to face the music now.

Please focus your attention ████████████████████

Let's see what Macquarie will do to immediately remediate the problem; ████████
███████████████████████████████

████████████████████████████████████
████████████████████████

Please stop with the sham set-up and ambush using a "consultant" to do the
retaliatory clean up for HR.

Get Macquarie's attorney to call me, now.


Jonathan Sack, Esq.
Sack & Sack
70 East 55th Street, 10th Floor
New York, NY 10022
Tel:  212-702-9000

Direct: 212-224-0660
Fax: 212-702-9702
Cell: 917-754-9000
Email: jsack@sackandsack.com

---------- Forwarded message ----------
From: **Jonathan Sack** <jsack1@gmail.com>
Date: Mon, Oct 23, 2017 at 12:01 AM
Subject: Khristina McLaughlin adv. Macquarie and Robert Ansell
To: andrew.downe@macquarie.com, Nicola.Hetherington@macquarie.com,
Christine.Hayward@macquarie.com, austin.dowling@macquarie.com
Cc: Eric Stern <estern@sackandsack.com>, Alex Seidenberg
<aseidenberg@sackandsack.com>, Michael Mui <mmui@sackandsack.com>, Jane Albertson
<jane@sackandsack.com>, Jonathan Sack <jsack@sackandsack.com>

To the referenced individuals:

I represent Khristina McLaughlin in connection with her complaint of gender and sex
based discrimination, specifically quid pro quo and hostile work environment sexual
harassment, at the hands of her direct manager, Robert Ansell.

Please direct all communications to the undersigned.

My client will not be attending tomorrow's US Cash Equity management team off-site
with the consultant, Ed Eppley.

Any interviews with my client regarding her employment at Macquarie and the
complaint to be filed will be conducted in my presence.

And please ensure the preservation of all communications, however stored, of the
persons involved.

I look forward to meeting with you, so that I may share the details of this matter.

Very truly yours,


Jonathan Sack, Esq.
Sack & Sack
70 East 55th Street, 10th Floor
New York, NY 10022
Tel:  212-702-9000
Direct: 212-224-0660
Fax: 212-702-9702
Cell: 917-754-9000
Email: jsack@sackandsack.com


This email and any attachment is confidential. If you are not the intended recipient, please
delete this message. Macquarie does not guarantee the integrity of any emails or attachments.

For important disclosures and information about the incorporation and regulated status of Macquarie Group entities please see: www.macquarie.com/disclosures

# EXHIBIT "E"



**From:** Jonathan Sack <jsack1@gmail.com>
**Date:** October 23, 2017 at 6:36:15 PM EDT
**To:** Jonathan Sack <jsack@sackandsack.com>, Hoi-Ling Wong <Hoi-Ling.wong@macquarie.com>
**Cc:** andrew.downe@macquarie.com, Nicola.Hetherington@macquarie.com, Christine.Hayward@macquarie.com, Eric Stern <estern@sackandsack.com>, Alex Seidenberg <aseidenberg@sackandsack.com>, Michael Mui <mmui@sackandsack.com>
**Subject: Re: FW: Khristina McLaughlin adv. Macquarie and Robert Ansell**
**Reply-To:** jsack@sackandsack.com


Dear Hoi-Ling:

I want to show you a scan of a letter (tomorrow I can send you a clean photocopy of it), which Robby Ansell sent to my client after his wife found out about his extra-marital affair.

Remember when I told you this morning that I gave you only the cards I chose to turn over (you asked if what I gave you were my high cards and I said no), well, here is a bit more for you to consider when you and the decision makers seek to choose war over peace, cover and make it about villianizing the victim.

Read the attachment ███████████████████████████
██████████

As if she brought this on.  Recall with specificity the details I gave to you about the "Robby Ansell to the rescue" incident we discussed and how he went to HR for her?

███████████████████████████

Read for yourself his own words.

In summary - he admits seeking her out, she trying to set boundaries and he admits she is being uncomfortable but him persisting nonetheless.

It's all so fucking sick to me now each time I read it.

Your CEO is next.

And there's more to come.

Get your risk hat on, and recount to the decision makers what I told you happened to the trading volumes at [redacted] after I filed this complaint last year:

And read this:

Jonathan Sack, Esq.
Sack & Sack

70 East 55th Street, 10th Floor
New York, NY 10022
Tel:  212-702-9000
Direct: 212-224-0660
Fax: 212-702-9702
Cell: 917-754-9000
Email: jsack@sackandsack.com

On Mon, Oct 23, 2017 at 5:38 PM, Jonathan Sack <jsack1@gmail.com> wrote:

Dear Hoi-Ling:

Thanks for taking the time to come over to my office this morning to discuss this rather nasty and urgent matter.

I include another ███████████ text from Bobby Ansell sent to my client on June 10, 2017.

I failed to provide to you, and it is attached here:

It is entitled, ████████████████

I will need from you a complete file of all communications and contracts related to the sham consultant Ed Eppley.

Please let me know when I can expect that information.

Please let me know what we are doing with this situation before week's end.

Thank you.


Jonathan Sack, Esq.
Sack & Sack
70 East 55th Street, 10th Floor
New York, NY 10022
Tel:  212-702-9000
Direct: 212-224-0660
Fax: 212-702-9702
Cell: 917-754-9000
Email: jsack@sackandsack.com

On Mon, Oct 23, 2017 at 10:20 AM, Jonathan Sack <jsack1@gmail.com> wrote:

Calling you now.  This one is really bad.  Call me back.  212-702-9000, or cell, 917-754-9000.


Jonathan Sack, Esq.
Sack & Sack
70 East 55th Street, 10th Floor

New York, NY 10022
Tel: 212-702-9000
Direct: 212-224-0660
Fax: 212-702-9702
Cell: 917-754-9000
Email: jsack@sackandsack.com

On Mon, Oct 23, 2017 at 10:15 AM, Hoi-Ling Wong <Hoi-Ling.Wong@macquarie.com> wrote:

> Jonathan, change in schedule – I'm able to speak any time before 2:30pm. Pls call me (contact info below). Thanks.
>
>
>
> **Hoi-Ling Wong**
>
> Sr. Employment Counsel
>
> Macquarie Group
>
> 125 W. 55th Street, L19, New York, NY 10019
>
> D 212.231.1916 I M 646.288.4329 I E hoi-ling.wong@macquarie.com
>
> http://www.macquarie.com/mgl/com/us

This email and any attachment is confidential. If you are not the intended recipient, please delete this message. Macquarie does not guarantee the integrity of any emails or attachments. For important disclosures and information about the incorporation and regulated status of Macquarie Group entities please see: www.macquarie.com/disclosures

# EXHIBIT "F"



Proskauer»    Proskauer Rose LLP   Eleven Times Square   New York, NY 10036-8299

November 17, 2017

Lloyd B. Chinn
Member of the Firm
d +1.212.969.3341
f 212.969.2900
lchinn@proskauer.com
www.proskauer.com

<u>Via Email</u>
Jonathan Sack, Esq.
Sack 4, Sack
70 East 55 Street
New York, NY 10022

Re:    <u>McLaughlin vs. Macquarie Capital (USA) Inc.</u>

Dear Jonathan:

As you have on several occasions referred to your client's intention to pursue claims against Macquarie in court, I attach for you a copy of her employment agreement. Please note that "Annex A" to the agreement is an Arbitration Agreement, which provides in relevant part the following:

> As a condition of your employment at Macquarie, you agree that any controversy or claim arising out of or relating to your employment relationship with Macquarie, the terms and conditions of your employment or the termination thereof must be submitted for final and binding resolution by a private and impartial arbitrator, to be jointly selected by you and Macquarie.
>
> Annex A, p. 11.

Annex A also provides that "the arbitration shall be <u>strictly confidential</u>." Annex A. p. 12, (emphasis added).

Although I advised you of this provision during our first conversation on this matter, I wanted to make sure you had a copy of it.

Very truly yours,

Lloyd B. Chinn

**Macquarie Holdings (U.S.A.) Inc.**
A member of the Macquarie Group

| | | |
|---|---|---|
| 125 West 55th Street | Telephone | (212)231 1000 |
| 22nd Floor | Facsimile | (212)231 1010 |
| New York  NY  10019 | Internet | http://www.macquarie.com |

May 5, 2017

Khristina McLaughlin
C/o Macquarie Holdings (U.S.A.) Inc.
New York Office


MACQUARIE

Dear Khristina,

This employment agreement ('Agreement') sets out terms and conditions of your employment effective from July 1, 2017. Except as set forth in any prior agreement with respect to any previous or existing clawbacks or other contractual repayments owed to the firm, which shall remain in full force and effect, this Agreement constitutes the entire agreement between you and Macquarie Holdings (U.S.A.) Inc. ('Employer') in relation to the subject matter herein and supersedes any previous or contemporaneous written and oral agreements, understandings, commitments and representations between you and the Employer in relation to that subject matter.  Any implied contractual duty of good faith or duty of cooperation owed to you by the Employer is expressly excluded from forming part of this Agreement. By entering into this Agreement, you confirm that you have not relied on any previous written or oral agreement, understandings, commitments or representations other than those set out in this Agreement. Any amendments or revisions to the terms of this Agreement must be in writing and signed by an authorized officer of the Employer.

Subject to the conditions herein, below is a summary of the terms of your employment with the Employer:

| | |
|---|---|
| **Position:** | Head of US Sales, Cash Equities |
| **Assigned to:** | Macquarie Capital (U.S.A.) Inc. |
| **Business Group:** | Commodities and Global Markets |
| **Salary:** | USD 400,000.00 |

The Macquarie Group ('Macquarie') comprises the Employer, Macquarie Group Limited and their worldwide related entities (each a 'Macquarie entity'). You agree that your obligations under this Agreement are owed to, and for the benefit of, Macquarie and that this Agreement shall serve to the benefit of and be binding upon the Employer's successors and assigns.

**Employee Information**

The Employer relies on representations made and information given by you during your recruitment process and on the Employment Declaration as being true and correct for the

**Macquarie Holdings (U.S.A.) Inc. is not an authorised deposit-taking institution for the purposes of the Banking Act (Commonwealth of Australia) 1959, and Macquarie Holdings (U.S.A.) Inc.'s obligations do not represent deposits or other liabilities of Macquarie Bank Limited ABN 46 008 583 542 (MBL).  Neither MBL nor any other Macquarie Group entity guarantees or otherwise provides assurances in respect of the obligations of Macquarie Holdings (U.S.A.) Inc.**

duration of your employment with the Employer. You must update or provide to the Employer any material information in relation to those representations or any matters which may impact your employment which may change or arise at any time during your employment. The omission of any relevant information, or the provision of false or misleading information, could result in disciplinary action including termination of employment.

Your employment is contingent upon your compliance with the Immigration and Naturalization regulations requiring the establishment of your identity and ongoing right to work in the United States.

It is the Employer's practice to conduct occasional background checks on its employees during their employment. It is a condition of your employment that you consent to additional background checks being conducted during your employment, and to the results of those checks being made available to Macquarie, for the purpose of considering your suitability for ongoing employment. Your employment may be terminated if the Employer considers the results of a background check to be unsatisfactory or materially inconsistent with the information given to the Employer during the recruitment process.

**Employment within Macquarie**

From time to time, the Employer may change your role, duties, responsibilities, reporting line and/or work location and direct you to work for, or undertake duties for, another business group or Macquarie entity.

Macquarie may, at times, need to transfer employees from one Macquarie entity to another Macquarie entity for accounting, taxation, regulatory, licensing, business or other reasons. You consent, to the extent permissible by law, to your employment being transferred to another Macquarie entity at the discretion of the Employer.

Although your, role, duties, responsibilities, reporting line, work location and/or employer within Macquarie may change, unless otherwise agreed, the terms and conditions set out in this Agreement will continue to apply.

**Employee Obligations and Macquarie's Policies**

Macquarie's policies, including, but not limited to, Macquarie's Code of Conduct, Confidential Information policy, Works Created during Employment policy, Information Barriers and Confidentiality policy, Outside Business Activities policy, Conflicts of Interest policy, Personal Investments policy and Appropriate Workplace Behaviour (EEO) policy, are available on Macquarie's intranet ('Macnet') (collectively, the 'Policies'). You agree to comply fully with the Policies and Macquarie's guidelines and procedures applicable to employees, as amended, varied or replaced from time to time. Macquarie may amend, replace, revoke or suspend the Policies at any time (with the exception of its "at will" policy) and you must comply with any amended or new Policies.

You agree that you will act in the best interests of Macquarie and faithfully and diligently devote your full time and energies to your position. You agree that you will perform your duties in a manner that is consistent with all laws and regulatory requirements (including without limitation any regulations of any applicable self-regulatory organization) applicable to your position and the work you perform. You also agree to comply with all lawful directions of the Employer and undertake training as directed.

You further agree to inform the Employer of any matter in connection with your employment which comes to your notice that may be regarded as material and relevant to the Employer or Macquarie; and to immediately disclose to the Employer any information which does, or may, lead to you not being lawfully entitled to perform your duties or responsibilities. A breach by you

of any of the Policies may result in disciplinary action which may include the termination of your employment for cause.

**Outside Business Activities**

The Employer may require you to provide details of interests you have outside of your employment for regulatory purposes or to help the Employer manage risks. You are required to advise the Employer of any external directorships, secondary employment or engagement or other business activities ('Outside Business Activities') that you hold or engage in or which you propose to take up. The Employer may require that you resign from, do not accept or do not take up such Outside Business Activities. You must not engage in any Outside Business Activities without the prior written consent of the Employer. This obligation is currently detailed in Macquarie's Outside Business Activities policy and Conflicts of Interest policy.

**Confidential Information**

During your employment and after your employment with the Employer ends, you must not, directly or indirectly, disclose, copy or use any information which Macquarie designates as being confidential or that you might reasonably expect Macquarie to regard as confidential. You are directed to not bring or use any information to the Employer or Macquarie which belongs to a third party, or to which you are not lawfully entitled. Further details of your duties regarding confidential information are included in Macquarie's Confidential Information policy which has been provided to you with this Agreement.

**Compensation**

Your annualized salary of $400,000.00 will be paid at a semi-monthly rate of $16,666.67 in accordance with customary payroll practices and procedures, subject to applicable law. This salary covers all hours worked by exempt employees. You will receive your semi-monthly pay on or around the 15th and the last day of each month.

**Discretionary Profit Share**

In addition to your base salary, a discretionary profit share bonus may be allocated to you in recognition of your contribution in the course of your employment for the financial year to 31 March. Profit share bonuses are completely discretionary, do not form part of your base salary, and will not be included in the calculation of any termination payments including payments in lieu of notice and payments in lieu of accrued but untaken leave.

While you may receive a profit share bonus in a particular financial year, you will not necessarily receive a profit share bonus in any subsequent year. All profit share allocations will be made in installments in accordance with applicable Macquarie policies, including the Profit Share and Profit Share Retention policies, as amended from time to time. Under these policies, any profit share allocations are conditional on, among other things, your remaining employed by the Employer on the relevant vesting and crystallization dates. No amounts (pro-rata or otherwise) or payments in lieu will be payable if you are not employed on those dates. This means that you will have no entitlement to any retained portion of your profit share allocation until the relevant vesting dates.

The Employer reserves the right to terminate (with or without substitution) or vary the terms of any profit sharing or bonus scheme, including, without limitation, the Profit Share and Profit Share Retention policies, at its discretion from time to time.

**Insurance and Other Benefits**

All regular full-time, regular part-time (scheduled to work 20 or more hours per week), and fixed-term employees (with an initial term of greater than 90 days) are eligible as of their date of hire to participate in the Employer's health and welfare benefit plans, as they exist from time to time, in accordance with the terms of applicable plan documents.

If, after the initial date of hire, an ineligible employee subsequently meets the eligibility requirements as described above, he or she will become eligible to participate in the Employer's health and welfare benefit plans after a waiting period of 90 days of continuous employment.

All eligible employees will be enrolled in the Employer's default medical benefits coverage selection, as then in effect, if no affirmative election or declination of coverage is made within 30 days of their date of hire or the end of their waiting period, as applicable.

**401(k) Plan**

The Employer maintains a 401(k) plan for its eligible employees. Subject to the terms and conditions set forth in the applicable plan documents, eligible employees may participate in the plan following their date of hire.

The 401(k) plan has an automatic enrollment feature. All employees will be enrolled automatically in the plan if no affirmative election or declination of participation is made within the first 60 days of employment, in accordance with the terms and conditions set forth in applicable plan documents.

**Paid Time Off**

Full-time exempt employees are eligible for four weeks of vacation per year and for other holiday, sick and personal time as is generally provided to other exempt staff.  Part-time employees will accrue vacation time on a pro-rata basis. Time is accrued on a monthly basis pursuant to the Employer's governing time off policies, which also set forth rules pertaining to usage of time and other related issues.

The Employer requires you to submit a properly completed and authorized leave application for all periods of absence. Depending on your role, you may be required to take at least two weeks of continuous leave during every 12 month period for risk management purposes. If at any time you work in such a role, you agree to take the required period of continuous leave annually.

You will be entitled to statutory public holidays in accordance with the relevant legislation of the location in which you are based. Employee who trade or settle foreign markets are expected to take such holidays in accordance with the Cash Equities and Equities & Derivatives Trading's public holiday guidelines as amended from time to time.

**Status of Employment/Termination of Employment**

<u>Termination with Notice</u>

Your employment is "at will."  Either you or the Employer may terminate your employment, with or without cause at any time, subject to the notice provisions set forth herein.

You agree to provide the Employer with four (4) weeks' notice of your voluntary resignation. The Employer may exercise its discretion to shorten any notice period associated with your resignation. The Employer agrees to provide you with four (4) weeks' notice of your termination when feasible except in the case of a termination for Cause. The period between such notice and

termination of employment will be referred to as the 'Notice Period.' Such notice provision shall not alter your at-will status.

If the Employer terminates your employment without Cause or you resign by giving notice in accordance with the terms herein, the Employer may in its sole discretion, alter your duties or place you on a paid leave of absence during the Notice Period.

You may not provide services to any other employer or act as a consultant or otherwise assist any person or entity in connection with their business during your employment including during the Notice Period, regardless of whether you are working or on a paid leave of absence during such period, unless otherwise approved by management. You must continue to act in accordance with your employment obligations during your employment, including during any Notice Period.

<u>Termination for Cause</u>

For the purposes of this Agreement only, termination for 'Cause' means:

(i)    an action taken by a regulatory body or a self-regulatory organization against you that substantially prohibits or suspends you from performing or substantially impairs the performance of your duties of employment;

(ii)    your lack of relevant qualifications, licenses or approvals by a regulatory body required to perform your duties of employment;

(iii)    your negligent or wilful failure to perform the material duties of your employment (other than any such failure resulting from incapacity due to physical or mental illness);

(iv)    your material misrepresentation of facts relied upon in entering this Agreement or your material breach of any of your obligations under the terms and conditions of your employment, including but not limited to your obligations set out under this Agreement or of any of the Policies or Macquarie procedures (written or unwritten) of which you are aware or reasonably should be aware;

(v)    your breach of fiduciary duties to Macquarie;

(vi)    your conviction of, or pleas of guilty or nolo contendere to, a criminal offense (where the offense is relevant to your employment) or an action taken by a law enforcement organisation against you that substantially prohibits or suspends you from performing or substantially impairs the performance of your duties of employment;

(vii)    your wilful refusal to follow the proper direction of the Employer or any individual to whom you directly report;

(viii)    your commission of an act or omission that, in the reasonable opinion of the Employer, may materially injure the reputation of the Employer or Macquarie; and

(ix)    your commission of an act or omission that constitutes fraud, embezzlement or material dishonesty or any other act of gross misconduct.

**Property**

On termination of employment, or if instructed at any time during your employment, you must deliver to the Employer any Macquarie property in your possession or control and certify that you have not retained Macquarie property. For the avoidance of doubt, Macquarie property includes, but is not limited to, data or any phone or computer hardware and software belonging to Macquarie. You are not entitled to retain a copy of, or record in any form, any documents or records referred to above following the termination of your employment.

On termination of employment, or if instructed at any time during your employment, you must provide (to an appropriate individual within Macquarie's Human Resources or Technology division) details of any passwords required to access and reset any device or technology belonging to Macquarie.

**Protection of Macquarie's Interests**

Acknowledgement

You acknowledge and agree that:

a. Macquarie engages in a broad range of activities on a global basis in connection with its banking, financial, financial markets, advisory, capital raising, investment and funds management businesses and related support functions across its different business groups (collectively, 'the Activities'); and

b. during your employment, you have been and/or will be exposed to Confidential Information (as defined in the Confidential Information policy, as amended, varied or replaced from time to time), and other aspects of Macquarie's business that are the property of, and valuable to, Macquarie (including the Employer), and Macquarie is entitled to reasonable protection of those rights.

Notwithstanding any other term of this Agreement, you acknowledge and agree that, immediately upon accepting any offer of new employment, you will inform your new employer of the restrictions contained in this Protection of Macquarie's Interests clause which continue to apply to you following the end of your employment with the Employer.

Non-Competition

This clause will apply automatically during your employment. This clause will also apply for a period ('Restraint Period') of three months following the date on which this Agreement ends ('Termination Date'), if:

- you hold the position of, or equivalent to, Senior Manager, Associate Director, Division Director or Executive Director on the Termination Date; and

- the Employer notifies you in writing within 14 days following the Termination Date that it has exercised its discretion to enforce this clause.

You agree that:

- during your employment you will not, either directly or indirectly and whether as an employee, contractor, consultant, director or agent or in any other capacity, be engaged by, assist, work for or participate in any business that competes with any of the Activities: in which you were materially involved; or in respect of which you had access to Confidential Information, within the last 12 months of your employment with Macquarie ('Material Activities'), in any country in which those Activities are undertaken by the group or groups in Macquarie in which you were employed.

- during the Restraint Period (if applicable), you will not, either directly or indirectly and whether as an employee, contractor, consultant, director or agent or in any other capacity, be engaged by, assist, work for or participate in any Material Activities, in the same, or a substantially similar position, or in a position where you perform any of the Material Activities, that you held with Macquarie, in any country in which those Activities are undertaken by the group or groups in Macquarie in which you were employed.

If the Employer enforces this clause after the Termination Date, it will pay you an amount equal to the base salary and the value of medical benefits (which you had elected at the time of your notice of termination) that you would have received, less any applicable deductions, had you been employed during the Restraint Period ('Restraint Payment').

<u>Non-Solicitation</u>

You agree that:

- during your employment and for a period of three months after the Termination Date, regardless of the reason your employment ends, you must not:

    - directly or indirectly, solicit, canvass or approach any person who, or any entity which, was at any time within the last 12 months of your employment with Macquarie, an actual or prospective client or business partner of Macquarie in that part or parts of the business carried on by Macquarie in which you worked and with whom you had contact, dealings, influence, or learned information about, with a view to obtaining the business or patronage of such client or business partner in a business that is the same or similar to that part or parts of Macquarie's business; or

    - otherwise interfere with the relationship between Macquarie and its clients or business partners with whom you had contact, influence or learned information about while you were employed by Macquarie;

- during your employment and for a period of six months after the Termination Date, regardless of the reason your employment ends, you must not:

    - directly or indirectly, induce or assist in the inducement or solicitation of any employee, contractor or consultant of Macquarie who was an employee, contractor or consultant of Macquarie within the last 12 months of your employment with Macquarie, and with whom you had contact or influence during your employment, to leave their employment or engagement with Macquarie, or to become employed by you or an entity with whom you become affiliated, after the Termination Date, whether or not in leaving their employment or engagement the employee, contractor or consultant would breach the terms of that employment or engagement; or

    - otherwise interfere with the relationship between Macquarie and its employees, contractors or consultants with whom you had contact, influence or learned information about while you were employed by Macquarie.

The restrictions contained in this Non-Solicitation clause are not contingent on a Restraint Payment being made.

Violation of Covenant Provisions

You agree that the restrictions contained in the above clauses, Confidential Information, Non-Competition and Non-Solicitation together with any applicable Policies ('Covenant Provisions') are fair and reasonable and necessary for the protection of the Employer's legitimate business interests and that the Employer would not have entered into this Agreement without the inclusion of such restrictions. Moreover, you recognize and expressly acknowledge that these restrictions grant to the Employer only such reasonable protection as is admittedly necessary to preserve Macquarie's legitimate business interests. It is expressly agreed by the Employer and you that the Covenant Provisions shall survive the termination of this Agreement and the termination of your employment, for any reason.

You further acknowledge that any breach of the Covenant Provisions will result in irreparable harm to the Employer and that no remedy at law will be adequate for such breach, and you therefore consent to the entry of a restraining order, preliminary injunction or other court order to enforce this Agreement without posting of bond, to the extent permitted by law.  You agree that the foregoing relief shall be in addition and without prejudice to all other remedies to which Employer is entitled at law or in equity.

**No Third Party Rights or Benefits**

The parties do not intend that this Agreement should confer any right or benefit on any third party, other than the entities within Macquarie.

**Ongoing Obligations**

The clauses titled "Confidential Information", "Property", and "Protection of Macquarie's Interests", continue to apply following the end of your employment with Macquarie.

**No Waiver**

Any failure or delay by Macquarie to enforce a provision of this Agreement will not affect or render that provision unenforceable, or prevent Macquarie from pursuing remedies in respect of a breach of this Agreement at any time in the future.

**Arbitration Agreement**

You agree that the Arbitration Agreement attached to this Agreement as Annex A applies to the terms and conditions of your employment with the Employer.  By accepting this Agreement, you affirmatively indicate your agreement to the terms set forth therein.  Both you and the Employer understand that by agreeing to the terms of the Arbitration Agreement, both are giving up any constitutional or statutory right they may possess to have covered claims decided in a court of law before a judge or a jury.

**Data Privacy**

You acknowledge and agree that the Employer has the right to collect, use and disclose your personal information for purposes relating to the administration of your employment with the Employer, including administering your compensation and benefits and compliance with any regulatory, reporting and withholding requirements.  You acknowledge and agree that your personal information may be disclosed by the Employer to its affiliated entities for such purposes. The Employer will take reasonable steps to maintain physical, technical and procedural safeguards regarding your personal information. You consent to the transmission, processing and storage of your personal information in the United States and at international service centres outside the United States.

**Governing Law and Forum Selection**

This Agreement shall be governed by and construed in accordance with the laws of the state of New York without giving effect to its principles of conflict of laws.  Should any dispute not be subject to arbitration, any action to enforce the terms of this Agreement or any other dispute arising out of your employment shall be brought in the appropriate state or federal court located closest to your final work location and the parties consent to such personal jurisdiction and waive any objections to the resolution of disputes hereunder in such jurisdiction.

**Severability**

Any provision or part of a provision of this Agreement which is held to be illegal, void or unenforceable will either be modified so that it is enforceable, or deemed ineffective to the extent only that it is illegal, void or unenforceable, without invalidating the remaining provisions or part of a provision of the Agreement.

Yours truly,

**Austin Dowling**
Regional Head of Human Resources, Americas

**Acceptance**

I understand and, by selecting the 'accept' button on the portal, acknowledge and accept the terms of my employment as set out in this Agreement and the Arbitration Agreement, and will comply with the terms and conditions of my employment and the Policies as amended from time to time.

I acknowledge that I have received, read and understand the Policies provided to me with this Agreement entitled Benefit and Policy Information (March 2017 v1) and that these provisions are incorporated by reference into this Agreement.  My acceptance indicates my agreement to comply with and be bound by these Policies and with all Policies as amended from time to time, including but not limited to:

- Acceptable Use of Technology policy
- Appropriate Workplace Behaviour (EEO) policy
- Code of Conduct
- Confidential Information policy
- Conflicts of Interest policy
- Information Barriers and Confidentiality policy
- Macquarie US Benefits Guide
- New York City's Earned Sick Time Act
- Outside Business Activities policy
- Pregnancy and Employment Rights
- Personal Investments policy
- Works Created during Employment policy
- MSG Personal Investments policy

I confirm that this Agreement has been provided to me in my primary language, or if English is not my primary language I confirm that the information relating to compensation has been provided to me in my primary language if a translation has been prepared by the Department of Labor.

**ANNEX A**

**ARBITRATION AGREEMENT**
**For Registered Employees of Macquarie Holdings (U.S.A.) Inc.**

While Macquarie hopes that employment disputes with its Employees will not occur, Macquarie believes that where such disputes do arise, it is in the mutual interest of all concerned to handle them promptly and with minimal disturbance to the operations of Macquarie's businesses and the lives of its Employees.

Accordingly, to provide for more expeditious resolution of certain employment-related disputes that may arise between Macquarie and its Employees, Macquarie has instituted a mandatory arbitration procedure (the "Macquarie Arbitration Procedure" or the "Procedure") for its Employees as set forth herein.  This Arbitration Agreement ("Agreement") applies to all Macquarie Employees in the United States of America.  Under the Procedure, certain disputes that may arise from your employment with Macquarie, the terms and conditions of your employment or the termination of your employment must (after appropriate attempts to resolve your dispute internally through Macquarie management channels) be submitted for resolution by mandatory arbitration.

In agreeing to submit employment disputes for resolution by arbitration, you acknowledge that such agreement is given in exchange for rights to which you are not otherwise entitled - namely, your employment as a Macquarie Employee and the more expeditious resolution of such disputes.  In exchange for your agreement to submit such disputes to the binding arbitration process set forth herein, Macquarie likewise agrees to the use of arbitration as the exclusive forum for resolving employment disputes covered by this Agreement.

Hence, the parties shall be precluded from bringing or raising in court or another forum any dispute that was or could have been brought or raised pursuant to the procedures set forth in this Agreement.

**Arbitration Procedure**

As a condition of your employment at Macquarie, you agree that any controversy or claim arising out of or relating to your employment relationship with Macquarie, the terms and conditions of your employment or the termination thereof must be submitted for final and binding resolution by a private and impartial arbitrator, to be jointly selected by you and Macquarie.

<u>Claims Covered:</u>  This Agreement to arbitration includes any claim that could be asserted in court or before an administrative agency or claims as to which the employee has an alleged cause of action, including without limitation claims for breach of any contract or covenant (express or implied), tort claims, claims for discrimination (including, but not limited to, discrimination based on sex, pregnancy, race, national or ethnic origin, age, religion, creed, marital status, sexual orientation, mental or physical disability or medical condition, or other characteristics protected by statute), claims for wrongful discharge, violations of confidentiality or breaches of trade secrets, and/or claims for violation of any federal state or other governmental law, statute, regulation or ordinance (including, but not limited to, the Americans With Disabilities Act, the Age Discrimination in Employment Act, the Family Medical Leave Act, the Fair Labor Standards Act, the Employee Retirement Income Security Act, Title VII of the Civil Rights Act of 1964, the Genetic Information Non-Discrimination Act and any and all claims relating to your employment and/or termination of your employment with the company whether based on state law, commonwealth law, local law, statute, regulation, ordinance or common law).

Disputes covered by the Procedure include all such claims whether made against Macquarie, any of its subsidiary or affiliated entities, or its individual officers, directors, or trustees thereof (in an official or personal capacity).

**Claims Not Covered:**  Claims covered by this Agreement do not include (i) a claim for workers' compensation benefits; (ii) a claim for unemployment compensation benefits; (iii) a claim by Macquarie for temporary or preliminary injunctive and/or other equitable relief, including, but not limited to, such claims for unfair competition and/or the use or unauthorized disclosure of trade secrets or confidential information, as to which Macquarie may seek and obtain relief from a court of competent jurisdiction in advance of pursuing such claims in arbitration pursuant to this Agreement; (iv) a claim for money damages by Macquarie related to claims for unfair competition and/or the use or unauthorized disclosure of trade secrets or confidential information, as to which Macquarie may seek and obtain relief from a court of competent jurisdiction; (v) a claim based upon Macquarie's current (successor or future) employee benefits and/or welfare plans that contain an appeal procedure or other procedure for the resolution of disputes under the plan; (vi) a claim for violation of the National Labor Relations Act; (vii) any non-employment-related claim that arises out of an Employee's Form U4 Agreement and relates solely to the obligations attendant to the Employee's status as a  "Registered Representative"; and (viii) any claim in respect of which arbitration is prohibited under applicable law.

You shall not be entitled to join or consolidate claims in arbitration with claims brought by other individuals, or to arbitrate any claim as a representative member of a class or in a private attorney general capacity.  Nor shall any arbitrator appointed pursuant to this Agreement have the authority to arbitrate claims on a class, collective or multiple-claimant basis.  Accordingly, you and Macquarie agree that the American Arbitration Association's ("AAA") Supplementary Rules for Class Action Arbitration shall not apply to any arbitration under this Procedure.  If, however, an agreement to dispense with class, collective or multiple-claimant claims in arbitration is held to be unenforceable, then such claims shall proceed in court, not in arbitration. Any dispute about the enforceability, applicability or interpretation of any portion of this paragraph shall be submitted to and resolved by a court of competent jurisdiction only and shall not under any circumstances be submitted to or resolved by any arbitrator or organization sponsoring arbitration.

**Internal Efforts**

As a prerequisite for submitting an employment dispute to arbitration, both you and Macquarie agree to make good-faith efforts at resolving any dispute internally on an informal basis through Macquarie management channels appropriate to the circumstances of that individual dispute, including, but not limited to, Employee Relations and/or the Head of Human Resources, Americas.  Only when such internal efforts fail may an employment dispute be submitted to binding arbitration under the terms of this Procedure.

**Binding Arbitration**

If a covered dispute remains unresolved at the conclusion of a good-faith effort to resolve the dispute internally, either party may submit the dispute for resolution by final binding arbitration under this Procedure.  The arbitration will be conducted under the Employment Dispute Resolution Rules of AAA, with the proviso that the arbitration shall be strictly confidential.  These Rules, incorporated by reference herein, include (but are not limited to) the procedures for the joint selection of an impartial arbitrator and for the hearing of evidence before the arbitrator.  The arbitrator shall have the authority to allow for appropriate discovery and exchange of information prior to a hearing, including (but not limited to) production of documents, information requests, depositions, and subpoenas.  Discovery shall be conducted pursuant to the AAA rules.  A copy of the complete AAA Employment Dispute Resolution Rules may be obtained from the AAA as Administrator.  You may also access the Rules from AAA's website at http://www.adr.org.[1]

---

[1] This Agreement does not prohibit or restrict Associated Persons from filing an arbitration claim in the FINRA arbitration forum as specified in FINRA rules.

Any conflict between the rules and procedures set forth in the AAA rules and those set forth in this Agreement shall be resolved in favor of those in this Agreement. The burden of proof at arbitration shall at all times be upon the party seeking relief. The arbitrator shall have the power to award all remedies that could be awarded by a court or administrative agency in accordance with the governing and applicable substantive law relating to covered claims, except is limited to individual relief, and not relief on a class or collective basis. Without limiting the arbitrator's power and authority, it is understood that the arbitrator shall have the authority to entertain and rule on motions to dismiss and motions for summary judgment by any party and shall apply the standards governing such motions under the Federal Rules of Civil Procedure (unless otherwise agreed to by the parties in connection with disputes involving a non-US Employee).

**Choice of Law**

In reaching his/her decision, the arbitrator shall apply the governing substantive law applicable to the claim(s), cause of action(s), and defense(s) asserted by the parties as applicable in the state in which you are primarily assigned to work.

**Forum of Arbitration**

Any arbitration conducted pursuant to this Agreement shall take place in the state in which you are primarily assigned to work unless an alternative location is chosen by the mutual agreement of the parties.

**Time Limits and Procedures**

The aggrieved party must give written notice of any claim to the other party within the same statute of limitations period that would apply with respect to such claim if it was brought in a judicial or administrative forum. The written notice shall describe the nature of all claims asserted and the facts upon which such claims are based and shall be mailed to the other party by certified or registered mail, return receipt requested. Any such notice mailed to Macquarie shall be addressed to Macquarie's Head of Human Resources, Americas, and the AAA as Administrator in accordance with applicable AAA rules.

The arbitrator shall render a decision and award within 30 days after the close of the arbitration hearing or at any later time on which the parties may agree. The award shall be in writing and signed and dated by the arbitrator and shall contain express findings of fact and the basis for the award.

The parties agree that Macquarie will pay all of the AAA administrative fees and the arbitrator's fees and expenses. All other costs and expenses associated with the arbitration, including, without limitation, the party's respective attorneys' fees, shall be borne by the party incurring the expense, unless the law under which the claim is brought permits an award of attorneys' fees and/or costs to the prevailing party.

Judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction. The award may be vacated or modified only on the grounds specified in the U.S. Federal Arbitration Act or other applicable law.

**Severability**

Except as specifically set forth herein, if any provision of this Agreement is held to be illegal, void or unenforceable, the agreement will be ineffective to the extent only of that illegality, voidness or unenforceability, without invalidating the remaining parts of this Agreement. If a court or arbitrator should determine that any portion of this Agreement is overbroad or unreasonable, such provision shall be given effect to the maximum extent possible by narrowing the provision found to be overbroad or unreasonable.

**No Retaliation/Employment At-Will**

Under no circumstance will a Macquarie Employee be retaliated against in any way for invoking this Procedure in good-faith to seek the resolution of a dispute.  Macquarie managers who engage in such retaliation will be subject to discipline under the appropriate Macquarie disciplinary procedures.

The Macquarie Arbitration Procedure does not in any way alter the at-will employment status of Macquarie Employees.  Macquarie and its Employees are always free to terminate the employment relationship at any time for any lawful reason, with or without cause, and employment is not for any specific or definite duration.

This Agreement sets forth the complete agreement of the parties on the subject of arbitration of the covered claims defined above, and supersedes any prior or contemporaneous oral or written understanding on these subjects.  No party is relying on any representations, oral or written, on the subject of the effect, enforceability or meaning of this Agreement, except as specifically set forth herein.
_____

**END OF DOCUMENT**

# EXHIBIT "G"

**SACK & SACK, LLP**
70 East 55th Street, 10th Floor
New York, New York 10022
Tel.: (212) 702-9000
**Attorneys for Plaintiff, Khristina McLaughlin**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- X

KHRISTINA MCLAUGHLIN,                          :
                                               :          **CASE NO. _____**
                            Plaintiff,         :
                                               :          **COMPLAINT**
              vs.                              :
                                               :          **JURY TRIAL REQUESTED**
**MACQUARIE CAPITAL (USA) INC. and**           :
**ROBERT ANSELL,**                             :
                                               :
                            Defendants.        :

-------------------------------------------------------- X

      Plaintiff Khristina McLaughlin ("*McLaughlin*" or "*Plaintiff*"), by her attorneys, Sack &

Sack, LLP, as and for her complaint against Macquarie Capital (USA) Inc. ("*Macquarie*" or

"*Defendant*"), and Robert Ansell, ("*Ansell,*" and together with Macquarie, "*Defendants*")

alleges as follows:

<u>**NATURE OF THE ACTION**</u>

      1.    McLaughlin brings this action against Macquarie and Ansell to redress unlawful

discrimination and subsequent retaliation in the terms, conditions, and privileges of her

employment in violation of Title VII of the Civil Rights of 1964, 42 U.S.C.A §2000e ("*Title*

*VII*"), New York State Human Rights Law, Executive Law § 290 <u>et seq.</u> ("*NYSHRL*") and the

Administrative Code of the City of New York § 8-101 <u>et seq.</u> ("*NYCHRL*") based upon her

gender, female.

      2.    Specifically, Plaintiff suffers and continues to suffer sexual harassment amidst a

hostile work environment and quid pro quo sexual harassment, both of which were promulgated by Plaintiff's direct supervisor, Defendant Robert "Robby" Ansell ("*Ansell*"), the then all-powerful and significantly high level senior manager, whose title was Executive Director ("*ED*") and Head of the Global Index Arbitrage Trading desk in New York.

3.     Executive Directors report directly to Andrew Downe ("*Downe*"), one of five (5) business heads at the firm and Head of Commodities and Global Markets.  Ansell was the only Executive Director in the entire U.S. Cash Equities business. Following Ansell's termination of employment on or about November 2, 2017, there are no Executive Directors in the U.S. Cash business.

4.     Immediately following Plaintiff's lawful and protected complaints of harassment and discrimination and the conclusion of the *quid pro quo*, Plaintiff was retaliated against in respect of the terms, conditions, and privileges of her employment.

5.     Plaintiff files this action to seek monetary relief for the denial of equal employment opportunity and for the unlawful employment practices of Defendants.

6.     Plaintiff further complains that she has suffered, is suffering and will continue to suffer severe economic and non-economic damages because Defendants deprived Plaintiff of her employment rights in violation of federal, state and local city law.

7.     Despite her stellar professional qualifications and proven performance, long term employment and experience, proven commercial skills, capabilities and competences, and unquestioned outstanding personal moral and ethical character spanning her long career in the financial services sector and on Wall Street, McLaughlin experienced unwanted blatant and at times grotesque gender bias and discrimination.

8.     At all times relevant herein, Defendant Macquarie's employees, managers, and

Human Resource specialists acted at the behest of Defendants during the course, and within the scope, of their employment with Defendant Macquarie.

9.      McLaughlin seeks compensatory, liquidated, and punitive damages, the benefits she was denied, injunctive and declaratory relief, and appropriate legal and equitable relief, including liquidated damages and attorneys' fees.

**PARTIES**

10.      Plaintiff McLaughlin is a woman who, at all times relevant to this Complaint,  has resided at 10 Brook Road, Tenafly, New Jersey 07670.  She is a citizen of the United States. Plaintiff is divorced and the sole financial supporter of her household, and she is the sole source of financial support for her eight year old child.

11.      At all times relevant herein, Plaintiff was an "employee" within the meaning of 42 U.S.C.A. §§ 2000e, et seq., § 296 of the NYSHRL and under § 8-102(1) of the NYCHRL and is thus afforded protection against discrimination and retaliation in employment on the basis of her gender, female.

12.      Upon information and belief, Defendant Macquarie is a publicly-traded Australia-based corporation doing business within New York County in the State of New York and maintains office within the City and County of New York at 125 West 55th Street, New York, New York 10022.

13.      Upon information and belief, Defendant Macquarie maintains control, oversight, and direction over the operation of its facilities, including its employment practices.

14.      At all times material to this action, Macquarie was the Plaintiff's "employer" within the meaning of Section 701(f) of Title VII (42 U.S.C. § 2000e(f)), Section 292(1) of the NYSHRL, and Section 8-102(1) of the NYCHRL.

15. Upon information and belief, Defendant Ansell is a United Kingdom national with permanent resident status in the United States. ████████████████████████

████████████████████████████████████████

16. Defendant Ansell was the direct manager of Plaintiff McLaughlin. He was also responsible for hiring, screening, training, retention, supervision, discipline and counseling at Macquarie.

17. Defendant Ansell knew or should have known of the discriminatory customs, practices, policies and wrongful acts described in the complaint but nonetheless incited, condoned, ratified, and/or authorized such conduct. Ansell is being sued in his official and individual capacities.

18. At relevant times herein, Defendant Ansell was Plaintiff's supervisor and in a position to discriminate and retaliate against Plaintiff in violation of NYSHRL and NYCHRL.

19. At all relevant times herein, Defendant Ansell is an individual who, either aids, abets, incites, compels or coerces unlawful discriminatory retaliation pursuant to NYSHRL and NYCHRL.

20. At all times material to this action, Defendants have acted under color or custom or usage of law and continue to so act, depriving Plaintiff of rights, privileges and immunities secured to her by the Constitution and laws of the United States and the State of New York, and in direct violation of the Civil Rights Act of 1871, 42 U.S.C. § 1983.

21. Defendants individually and in their official capacities have individually and collectively harassed Plaintiff, fostered a hostile work environment, condoned horrific forms of sexual harassment, and retaliated against Plaintiff.

22. Defendants individually and in their official capacities have individually and

collectively discriminated and retaliated against Plaintiff on the basis of gender.

## JURISDICTION AND VENUE

23.     This Court has federal question jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 1343, respectively, and 15 U.S.C. § 78u- 6(h)(l)(B)(i).

24.     This court has jurisdiction of Plaintiff s state law claims pursuant to 28 U.S.C. § 1367(a), because the state law claims arise from a common nucleus of operative facts with the federal claims and are so related to Plaintiff s federal claims that they form a part of the same case or controversy between the parties under Article III of the United States Constitution.

25.     Venue is proper in the Southern District of New York under 28 U.S.C. § 1391(b)-(c) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred within the Southern District of New York.

26.     At all times relevant herein, Defendant is an "employer" within the meaning of 42 U.S.C.A. § 2000e-(b), § 292 of the NYSHRL and under § 8-102(5) of the NYCHRL.

## ADMINISTRATIVE PROCEDURES

27.     On November 14, 2017, McLaughlin filed a charge of discrimination with the Equal Employment Opportunity Commission ("*EEOC*").  The EEOC accepted the Charge and processed it by assigning charge number 520-2018-00551.

28.     Counsel for McLaughlin requested that the EEOC issue a Notice of Right to Sue ("*NORTS*") letter.  A copy of the NORTS letter is attached as Exhibit "A".

29.     Plaintiff has fulfilled the administrative prerequisite for filing federal claims of discrimination in this matter.

30.     Following commencement of this action, a copy of this Complaint will be served both on the New York City Commission on Human Rights and the Office of the Corporation

Counsel of the City of New York, thereby satisfying the notice requirements of the New York City Administrative Code.

31.     Any and all other prerequisites to the filing of this suit have been met.

## FACTS COMMON TO ALL COUNTS[1]

### PERSONAL AND PROFESSIONAL BACKGROUND

32.     McLaughlin is a 40 year-old female and is protected under the Federal, State and City anti-discrimination statutes protecting employees.

33.     In 1999, McLaughlin graduated *summa cum laude* from Arizona State University with a Bachelors degree (BA) in finance.

34.     Following graduation, McLaughlin began work as a trader on the equity execution desk at Vanguard Brokerage Services.

35.     In 2000, McLaughlin began working at Goldman Sachs in Equity Capital Markets.  In 2001, McLaughlin transitioned from Goldman's ECM desk to their Institutional Sales desk.

36.     In May 2007, McLaughlin attempted to resign from Goldman in high standing to start a family.

37.     At the time, McLaughlin believed she could not balance the intensity that was required to remain a top performer, while being the mom she always wanted to be.  Goldman did not want to lose McLaughlin, and asked her to take a three-month sabbatical (*i.e.*, rather than just leaving) to see if she could find another role within the firm that would allow her more work-family life balance.  McLaughlin agreed.

38.     At the end of the three-month leave, McLaughlin concluded that she could not

---

[1] All directly quoted statements, unless otherwise specified, are the sum and substance of such statements as recalled by Plaintiff.

find a role that would fulfill her at Goldman, while still being able to have the flexibility she wanted in motherhood to be around for her expected children.

39.     In July 2007, McLaughlin resigned from Goldman in order to start her family.

40.     In 2009, after a devastating late miscarriage of twins, in order to help her recover from the physical and emotional pain and of the devastating loss, McLaughlin rejoined the work force at WJB Capital, a commission-only execution shop; and she continuously worked there until WJB ceased operations and closed in January 2012.

41.     In October 2009, after 5 months of bed rest, McLaughlin gave birth to her son James.

42.     Over the course of January 2012, after WJB closed, McLaughlin interviewed far and wide to find a firm she thought would accommodate her need to successfully balance motherhood and her career on the sell-side.  Goldman Sachs made her an offer to return to work. Macquarie made her a competing offer to join its nascent equity sales, trading, and research division in New York City.  McLaughlin chose Macquarie, which she thought was a better platform in terms of culture, opportunity, career growth, and flexibility to balance her desire to be an active caregiver and mother to her infant son.

43.     In or around February 2012, McLaughlin joined Macquarie as a Managing Director in its U.S. Cash Sales group.

44.     McLaughlin's responsibilities included serving as U.S. account manager for large, predominantly New York based hedge funds.  McLaughlin was a producing salesperson covering mostly New York investors such as "Investor A" (a $18 billion assets under management long short equity activist fund founded by a well known sharp-tongued activist), "Investor B" (a $30 billion assets under management family office), and "Investor C" (a $16

billion assets under management long/short multi-manager platform).

45.     McLaughlin immediately became a top revenue producer and contributor on the team.   She brought with her a unique combination of bulge bracket bank (Goldman) and execution only commission shop (WJB) experience.  She used both to rise at the firm.

46.     McLaughlin was not only a top producer, but she also brought with her an inherent and natural networking ability.

47.     From the start of her career at Macquarie, she made it a point to collaborate with different divisions and foster a network to help build the cash businesses' internal brand.

48.     McLaughlin also proactively reached out to ████████████████████ who is Macquarie Americas Country Head and senior Managing Director / Executive Director (ED) in the Credit Markets Division.

49.     ████████████ remarked that, in all of his time at Macquarie, no one in the securities division (not even the senior leaders) had been proactive in making an introduction.

50.     McLaughlin cross-sold the firm's offerings and brought in other product specialists to market their respective financial products in growing both the Macquarie name and the client relationship.

51.     McLaughlin was an informal mentor to other less experienced women, including ████████████ who was one of several people on the floor that came to McLaughlin for guidance and support.

52.     As a result of McLaughlin's mentorship and sponsorship in early 2017, ██████ was able to successfully transition out of an administrative role into front office sales trading coverage for the New York based international desk.

53.     In January 2013, McLaughlin filed a TRO against her then-husband Brian

McLaughlin.

54.     In the Fall of 2013, McLaughlin finalized a difficult divorce.

55.     McLaughlin is a single mother and was awarded primary residential custody of her son, age 8.

56.     McLaughlin is her child's primary caregiver and financial provider / supporter.

57.     As of the filing of this complaint, McLaughlin remains and is currently employed by Macquarie as a Managing Director, Head of U.S. Cash Equity Sales.

### MCLAUGHLIN'S RISE TO SUCCESS AT MACQUARIE

58.     In February 2012, McLaughlin commenced employment with Macquarie as a Managing Director, U.S. Sales.

59.     In October 2013, McLaughlin earned a Macquarie Award.  The Macquarie Award recognizes people not just for what they achieve, but how they achieve: people who collaborate not just within their own team or division but across groups; people who go above and beyond the scope of their role to deliver outstanding results.

60.     The Macquarie Award reflects "What We Stand For": Opportunity, Accountability, Integrity. (Exhibit "B")

61.     In May 2014, McLaughlin was recognized in the inaugural Introducer Sales Credit initiative.  (Exhibit "C")

62.     At the time, the program was a new collaboration initiative that rewarded anyone within Macquarie Securities Group ("*MSG*", which has since merged with another division and is now called Commodities and Global Markets ("*CGM*")), who leveraged existing relationships to bring in "net new" business to another MSG regional business.

63.     McLaughlin's 2013/2014 reviews were stellar.

64.     Her anonymous mid-year peers' review states, among other comments:

- **"By far the hardest working, most active and best salesperson we have.**

- **She makes 2x the calls on the stocks of the next best person.**

- **Top salesperson on platform.  Khristina is awesome!**

- **She has put in the effort to match my product with the appropriate accounts and really sold my ideas.**

- **She has been instrumental in helping me gain traction and build out my franchise.**

- **Always engaged, passionate about her job and thoughtful with clients.**

- **Good with long-onlies and HFs.**

- **Khristina works harder than anyone to put me in front of clients, I wish she got some larger accounts.**

- **Super star, very meticulous and proactive.**

- **Khristina has been a great addition to the team and seems to be one of the most driven people on the desk.**

- **One of the best salespeople on our platform.**

- **Knows her accounts and how to sell the research.**

- **Best salesperson at Macquarie.**

- **Knows what matters and able to sell the call better than anybody;  Excellent, very glad to have KM on the team.**

- Arguably the best we have.  Please take good care of her."

(Exhibit "D")

65.     Additionally, Austin Graham, then-Head of U.S. Cash Equities Sales, wrote about McLaughlin: **"Khristina continues to be one of the most valuable sales professionals on the platform - one who works tirelessly, incorporates her fellow team members consistently and brands products outside of Equity effectively.  She has proven to be diligent on payment discussions and her CYTD revenues demonstrate that.  We will continue to lean on Khristina's skills with new account responsibilities and other projects and look forward to her continued success"**. (Exhibit "D")

66.     In 2015, due to her excellent performance, acumen, communication, mentorship, and leadership skills, McLaughlin was promoted to the role of Head of New York Sales by Andrew Root ("*Root*") and Austin Graham ("*Graham*"), then Co-Heads of U.S. Cash.

67.     McLaughlin would now be a *producing* manager, responsible for the 14-person, predominantly senior and male, New York and MidAtlantic-based sales team.

68.     In 2015, McLaughlin was given a verbal offer of employment from Macquarie's competitor, Deutsche Bank, for $900,000 in guaranteed total annual compensation.

69.     A loyal employee of Macquarie, McLaughlin chose to stay at Macquarie for $850,000 in guaranteed total annual compensation.

70.     McLaughlin had already invested two years and many long hours to acclimate at Macquarie, and as a single mom, she did not want to have to rebuild somewhere else.

71.     McLaughlin believed Macquarie was acutely aware of this ever-growing phenomenon and sought to take advantage of it where possible.

72.     Specifically, McLaughlin had previously shared with Macquarie the value she placed on "earned" flexibility as a working mom, and Macquarie took advantage of the idea that working moms would sacrifice some compensation for flexibility.

73.     Since recommitting herself to Macquarie, McLaughlin worked even harder and succeeded even more – especially to dispel the preconceived notions that reverberated amongst the management at Macquarie about working women and mothers.

74.     In March of 2016, McLaughlin used her professional network to secure Twitter's first Asian non-deal roadshow ("*NDR*").  McLaughlin took their representatives to meet with institutional investors and sovereigns across Tokyo, Singapore and Hong Kong.  The trip included an introduction to decision makers at "Investor E", a top 10 cash equities client of the firm.

75.     This roadshow significantly increased McLaughlin's global profile at Macquarie, not only in the securities division (MSG at the time), but firm-wide.  In Hong Kong, McLaughlin was introduced to Ben Way, Macquarie's CEO of Asia.

76.     In November 2016, McLaughlin helped champion a Women's Event with fashion legend Diane von Furstenburg ("*DVF*").

77.     Specifically, McLaughlin volunteered to represent the securities group invites for this event, which was being spearheaded by the Women's network.

78.     People often approach McLaughlin for diversity efforts and/or guidance.  Because of the network she has worked tirelessly and passionately to build, McLaughlin is the "go to" for other divisions, for guidance within U.S. cash equities.

79.     The DVF event in particular was another brand building event for Macquarie with Macquarie's female client base and senior women at the firm.  McLaughlin personally invited

several clients.

80.    The event provided clients and Women@Macquarie, Macquarie's internal women's group, the opportunity to hear an inspiring talk by DVF about her break into the male-dominated fashion industry.

81.    McLaughlin is also a regular contributor to Diversity & Inclusion events at the firm and consistently participates in recruiting efforts.

82.    In 2017, McLaughlin's base salary was raised from $350,000 to $400,000, setting her up to receive greater total compensation in fiscal year 2018, assuming the same profit share and bonus as in prior years.

83.    In March 2017, McLaughlin contributed to an internal Flexibility Campaign and shared her own personal experiences for people looking to work more flexibly.

84.    In April 2017, McLaughlin was promoted again, to Head of U.S. Sales.

85.    In October 2017, McLaughlin was nominated for the 2017 Markets Media Women in Finance Award.

86.    On or about November 7, 2017, McLaughlin learned that she had won the Markets Media Women in Finance Award for "Excellence in Institutional Sales."

87.    Currently, McLaughlin remains a *producing* manager, which is remarkable, considering she is now also responsible for 20 sales executives globally across Macquarie's New York, Boston, San Francisco, Atlanta, Boca and London offices, with $30+ million in targeted attributed revenue to the U.S. business.

88.    Since assuming the management role, McLaughlin has driven stability for the platform, reduced turnover, and created transparent and measurable goals, contributing to a 50% year over year increase in the division's bottom line.

89.     Although McLaughlin is still a top individual producer for the U.S. sales team, it is worth noting that she proactively chose to give up a significant portion of her client coverage, in order to put Macquarie's interest first and balance her increasing managerial responsibilities while turning client coverage over to up-and-comer salespeople who are looking to increase their client base,

90.     McLaughlin remains the #4 producer by attributable sales revenue on the team and is responsible for client coverage with an annual U.S. revenue budget of close to $4 million.

91.     Specifically, McLaughlin has transitioned full coverage of "Investor D" (a $9 billion AUM hedge fund) to her subordinate salesperson ████████.

92.     "Investor D" is one of McLaughlin's many success stories and client highlights at Macquarie.  In June 2016, "Investor D's" U.S. commissions were a mere $29,000, down over 60%, and globally, commissions were only $100,000.

93.     McLaughlin drove payment conversations with the head trader, who would later call McLaughlin a "bulldog."

94.     This was a compliment regarding how the conversation was delivered.  The trader told Rubin that, were it not for McLaughlin's service versus Macquarie's payment dialogue, Macquarie would not have the partnership that Macquarie now has.

95.     ████████████████████████████████████████████ ███████████ for the relationship, which includes research, trading ideas, and strategies.

96.     The account "Investor A" has also been a notable CGM highlight for McLaughlin this calendar year.

97.     McLaughlin introduced ████████ Macquarie MD in commodity sales, to "Investor A" to help expand the revenue opportunity.

98.     McLaughlin sought to introduce Macquarie's broader commodity capabilities (beyond cash equity) and to cross-sell the hedging business.

99.     Because of this timely introduction, "Investor A" gave Macquarie their very first iron ore options trade, which ended up being, as it is commonly discussed on the floor, "the largest iron ore options trade Macquarie has ever printed."

100.    "Investor A" (specifically, their Head trader) indicated that Macquarie made ~$400,000 in incremental commissions alone on this new iron ore options business.

101.    "Investor A" is tracking to be a seven-figure cross product account for Macquarie this year.

102.    Throughout her tenure at Macquarie, in recognition for her success, McLaughlin consistently received impeccable performance reviews concerning her revenue production, diligence, competence, exceptional management skills, and ability to enhance the profitability of the business and services that she managed.

### DEFENDANT ROBBY ANSELL INITIATES A PERSONAL RELATIONSHIP WITH MCLAUGHLIN

103.    █████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████

104.    █████████████████████████████████████████
████████████████████████████

105.    █████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████

106.     Ansell first took notice of McLaughlin in the Spring of 2015, when he saw McLaughlin weeping in an elevator and learned from others at the firm that it was because of McLaughlin's "messy" divorce.

107.     Then, in June/July of 2015, there was an incident on the New York floor whereby ██████████████████████ yelled at McLaughlin (the "█████████ *Incident*").

108.     This upset McLaughlin, and Ansell saw that she was upset when he passed by her near the kitchen, which is adjacent to the sales and trading area.

109.     Ansell approached McLaughlin and inquired what was bothering her.

110.     In response, McLaughlin told him what had happened, and Ansell said that he, as the most senior person on the floor, needed to escalate this to Human Resources, because he was **"not going to allow bad behavior under [his] watch."**

111.     Ansell's proclamation to McLaughlin was a documented guise to become closer to McLaughlin on a personal level, as he would later admit in writing.

112.     ████████████████████████████████████
████████████████████████████████████
██████████████████████████

113.     Ansell had now created an opportunity to check in with McLaughlin to see how things were going and to offer regular assistance to her in navigating her expanded responsibilities as Head of New York U.S. Cash Sales.

114.     On or about July 28, 2015, Ansell pinged McLaughlin from his vacation via a private account on his mobile phone called "What's App" and asked McLaughlin, **"have you spoken to** ████████ **yet [?]"**. ██████████████████ was the senior person in HR dealing with the ████████ Incident at the time.

115.    On or about July 30, 2015, Ansell texted McLaughlin that he had spoken to

██████ regarding the ██████ Incident.

116.    Ansell wrote, **"Kept it simple and factual.  Told her I randomly met**

**you in the lobby and you got upset.  You told me what happened.  I said to**

██████ **its [sic] unacceptable.  No one in the office male/female etc should be**

**made to feel like that.  That's not an acceptable work environment.  She's on**

**it.  How did your chat go?"**

117.    If anything, this is a highly uncommon occurrence; that a senior manager and

member of the leadership at Macquarie would take such a personal and intense interest in seeing

to it that McLaughlin's concerns were escalated to Human Resources – especially since she had

not sought to do so and from vacation.

118.    ████████████████████████████████████

████████████████████████████████████

████████████████████

119.    Ultimately, the ██████ Incident" was never resolved by HR.

120.    The relationship on the floor between McLaughlin and ██████ the two desk Heads,

was now, from McLaughlin's perspective, broken beyond repair.

121.    McLaughlin wanted to repair the relationship and even had conversations to this

effect as far up as Chris Hayward, then-Head of Cash HR in Sydney; but a resolution never

evolved, and McLaughlin could not fix the situation on her own.

122.    In an "arsonist sets a fire and then is the hero by pulling the fire alarm scenario,"

immediately following the ██████ Incident" and ensuing escalation to HR, Ansell succeeded

in establishing daily interaction with McLaughlin.

123.   ███████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████

124.   Consequently, Ansell successfully insinuated himself as McLaughlin's hero and protector of any wrongs, whether real or perceived.

125.   ███████████████████████████████████████████

████████████████

126.   Ansell was now going out of his way in offering to help McLaughlin at work.  As Ansell was the most senior person in Macquarie's New York U.S. securities business, McLaughlin, as most all other employees on the floor, looked up to Ansell, appreciated his input, and valued his guidance.

127.   ███████████████████████████████████████████

███████████████████████████████████████████████████

███████████

128.   █████████ Ansell would ██████ incorporate into conversation that he had Moore's full support and backing ███████████████████████████

129.   This was a selling card in his new role (one he was not experienced for), as no former Head of U.S. Cash had this longstanding tenure and close relationship to the CEO. ███████████████████████████████████████████████████

████████

130.   On or about August 12, 2015, Ansell pinged McLaughlin via What's App, writing to her, **"I'm REALLY looking forward to our big night out /  Next week we'll crush it".**

131.    On or about August 13, 2015, McLaughlin, feeling uncomfortable with Ansell's exuberance on grabbing a drink, responded to his August 12th text, **"only issue is just realizing Monday is my only non mom night next week** [McLaughlin makes it a point to not go out on the evenings because of her son] **... so maybe the following week better?"**

132.    On or about August 14, 2015, Ansell wrote to McLaughlin, unprompted: **"maybe a cold beer after work?  One for the road?"**

133.    After a pause and considerable trepidation, McLaughlin did not want to alienate this powerful person who seemed, at the time, to have a genuine and platonic likeness for McLaughlin.  And so she replied, **"so tempted...not sure I can swing it though."**

134.    Ansell immediately wrote back,   **"U need to get home or going out already?"**

135.    McLaughlin, rebuffing the pressed advance by Ansell, wrote to him, **"Home"**.

136.    McLaughlin was hoping he would "get the hint," and the message exchange would cease.

137.    Ansell replied,   **"OK.  Well let me know.  Just one for the road."**

138.    McLaughlin, feeling the pressure from this senior manager, whom she felt she needed to pacify, wrote,   **"Ok one.  Let's go"**.

139.    They went out for one drink, to Kingside bar on West 57th Street, across the street from Macquarie's office, after which McLaughlin headed home.

140.    Over drinks, ███████████████████████████████████████
███████████████████████████████████

141.    Ansell prodded McLaughlin for personal information about her life, her divorce

terms, and her then-relationship with her ex-husband.

142. McLaughlin was put off by the intrusiveness of the questions, but answered them and tried to act pleasant, ████████████████████████████████████████

████████████████████████████████████████████████████████

**ROBBY ANSELL IMPRESSES HIS CONNECTIONS UPON MCLAUGHLIN**

143. ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████

144. Of course, Ansell was willing to make his personal senior network available to McLaughlin.

145. It became quite apparent Ansell used his power dynamic as a tool and lever to have more dialogue and time with McLaughlin, ████████████████████████

146. Ansell ████████ McLaughlin he'd introduce her to powerful people who could assist her in driving sales; ████████████████████████████

████

147. Ansell indicated to McLaughlin that he has access and power, and because he felt a "special connection" with McLaughlin, he'd simply share it with her.

148. For example, to give McLaughlin a "taste," on or about August 19, 2015, Ansell texted McLaughlin, **"Do you know** ████████████ **I mean have you met him before [?]"**.

149. McLaughlin replied, **"Don't think so... who is he?"** Ansell wrote ████████

████████████ **(Macquarie Securities Group which is now Commodities and**

**Global Markets / CGM). He's here in NY from HK."**

150. McLaughlin replied, **"Havent [sic] met him. Should I?"**

151. Ansell wrote, **"Ill [sic] intro you tomorrow. Yes. Deffo [sic]"**.

152. McLaughlin replied, **"OK, thanks"**.

153. Ansell wrote, **"Ill [sic] organize. He's head of ████████ – all the MSG control functions report to him. You should ask him about things to look out for as head of sales."**

154. McLaughlin wrote, **"brilliant idea. Thanks. Will do."**

155. On or about August 20, 2015, Ansell wrote, **"Looking after you today"**.

156. McLaughlin replied, **"How so? ████████ or something I don't know about? Either way. Thank you as always"**.

157. Ansell wrote, **"Nah. ████ and meds"**.

158. McLaughlin replied, **"Brilliant". That pill was great, removes the edge."**

159. Ansell replied, **"Ha, I know. They're great. We'll both be having one in the office next Friday morning. They're my secret hangover cure"**.

160. McLaughlin, increasingly nervous, responded with a thumbs up emoji.

161. Ansell then wrote, referring to the upcoming night out he was planning for the two of them, **"This time next week. Very excited"**.

162. McLaughlin responded with another thumbs up emoji.

163. On or about August 21, 2015, Ansell wrote, **"cant wait til the "quick cocktail" becomes a big event next week"**.

164. McLaughlin replied, **"always good to have low expectations"**.

165. Ansell wrote, **"We're gonna party hard Thursday. Club scenes"**.

166. McLaughlin replied, **"Im [sic] not that cool"**.

167. Ansell wrote, **"Just follow me. You're more glamorous than cool. Which is much cooler."**

168. McLaughlin was anxious, and had a great sense of dread and fear about this upcoming social event; Ansell had not taken "no" for an answer in all of her prior subtle and direct messages to him.

169. On or about August 24th, McLaughlin, becoming increasingly anxious about Thursday's upcoming date with Ansell, wrote to Ansell, ████ **in town this week should we drag him along Thursday [?]"**. To translate, McLaughlin wanted to invite Macquarie's ████ Head of Asia, to their outing, so that they would be a group, and not a couple.

170. At this time, McLaughlin also expressed fears about meeting Zaki in a social setting, and more specifically, that ████ would judge McLaughlin for her friendship with Ansell: **"don't want people … ████ … to think I have gotten to where I am bc I am casual … make sense? […] bc easy for women to be put into fun  box which discredits effort"**. (Exhibit "E")

171. McLaughlin, already sensing Ansell's intentions, wanted to ensure that Ansell would not behave inappropriately towards her at this work event. She feared for her reputation in the professional space.

172. That same week, in advance of a day long female recruiting event that week, Ansell texted McLaughlin to let her know that he had proactively "switched things up" so that he

and McLaughlin would be paired up all day together.

173.   Ansell wrote: **"So I switched partners for tomorrow's interviews. You got me all day babes :P"**.

174.   McLaughlin replied, **"uh oh...really? not sure that is a good idea / actually I'm sure I will learn something"**.

175.   Ansell replied, **"What does that emoji mean?"**

176.   McLaughlin answered, **"nervous / professionally intimidated"**.

177.   On or about August 27, 2015, the highly anticipated big night out occurred.

178.   The night began with drinks at Hotel Hugo with ▮▮▮▮▮▮ their colleague from Asia, as well as Client "A", a Macquarie client and friend of McLaughlin's in town from San Francisco.

179.   As the night progressed, the group moved from the Hotel Hugo bar to the Jane Hotel bar.

180.   ▮▮▮ departed before they reached the Jane; and Ansell, McLaughlin and Client "A" went for another round of drinks.

181.   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

182.   McLaughlin was mortified and quickly closed out her tab.

183.   She had arranged to stay in the city that night, as her son was with his father for a visitation, and the following morning she was due to run an early morning meeting and presentation.

184.   After McLaughlin left the Jane, however, Ansell chased after her and invited himself to share the cab and go back to McLaughlin's hotel for one more drink.

185.    McLaughlin did not need another drink and said she was just going to go to sleep.



186.    ████████████████████████████████████████████

190.    At the time, Ansell was the only Executive Director on McLaughlin's floor and in Macquarie's New York based, U.S. cash business.  People looked up to Ansell and respected him, because he ran the only profit-making business in their division (Head of Global Index Arbitrage Trading / Proprietary Business).

191.    Ansell had been employed at Macquarie for more than 20 years, the majority of which in senior leadership roles.

192.    Ansell is also married, with three children.

193.    On the morning of August 28th, Ansell pinged McLaughlin via text from his office.

194.    The following morning, McLaughlin did not go straight to the office.  She had to host a breakfast with the energy sector investment representative at "Investor A", ████ ████████████████████████████████████████████ ████████████████ so she went straight from the hotel to meet the client.



195. ███████████████████████████████ ████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████

196. McLaughlin replied, **"Wow... pretty speechless / Juggling to get out door to take my son to an indoor bound and slide play park"**.

197. ███████████████████████████████████████

███████

198. ████████████ █████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████

199. Later that same day (August 30, 2015), at around 2:00 PM, McLaughlin texted Ansell, **"What night works for you this week to meet up and talk this thru?"**

200. Ansell replied, **"U tell me. You have your son to plan around..."**.

201. McLaughlin wrote, **"and you have a wife and 3 kids ..."**. Ansell did not reply.

202.    Near 8:00 PM that same day, Ansell texted McLaughlin, **"Howya doing?"**.

203.    McLaughlin replied, **"admittedly feeling a bit stressed and conflicted. Looking forward to clearing the air a bit Wednesday."**

204.    ████████████ ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████

205.    ████████████ ████████████████████████████████

████████████████████████████████████████████████

██████████████████

206.    ████████████████████████████████ ████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████

207.    ████████████████████████████████████ ██████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

208.    McLaughlin wrote back, **"pretty powerful stuff ... or it's the rose (wine)"**. McLaughlin was once again joking and trying to make light of the situation.

209.   ███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████

210.   ███████████████████████████████████████

████████████████  █████████████████████████  ███████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████

211.   ███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████

212.   On this occasion, Ansell was devastated.   ██████████████ and stated that he did not want the relationship to end, but on this occasion, it did, at McLaughlin's insistence.

213.   ███████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████

214.   Ansell knew McLaughlin went through a difficult divorce.

215.   Although McLaughlin always felt "less than" in terms of education (Arizona State, not ivy league), her upbringing (she grew up in a broken home), her difficult childhood, burying twin babies, being divorced herself and a single mom; she was very proud of where she had climbed to, and happy with her independent life.

216.   McLaughlin enjoyed being able to take care of herself and her child.

217.   Nonetheless, Ansell knew McLaughlin lacked some personal self confidence in comparison to him, and Ansell relished expressing that he would be her savior; he could take care of her and rescue her.

218.   For now, McLaughlin did not need rescuing; so, ███████████████, Ansell waited for an opportune moment when he could try again to be McLaughlin's "rescuer" – once he became her direct supervisor and boss.

219.   ███████████████████████



220.   ███████████████████████

The following day, December 25, 2015, Christmas Day, McLaughlin, ignoring a direct response to what Ansell had implied the night before in his text, McLaughlin wrote to Ansell, **"Merry Christmas.  Quiet house here … waiting to hear from Brian (her sons father) about when he will come over … good news is that scooter is charged and works.  I took it for a spin around the house"**.

222.   ███████████████████████

223.   On or about December 30, 2015, McLaughlin went to Florida for a long weekend. Ansell wrote to her,  **"Not heard from you.  Hope all ok"**.  McLaughlin had not been in contact with Ansell since their Christmas Day text message exchange.

224. ███████████████████ ████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████

225. ████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████

226. ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████   ████████████

227.   McLaughlin responded directly and firmly,  **"I don't. / and I don't know what I truly want for myself other than my job in order to take care of my boy. and a simply happy uncomplicated life."**  (Exhibit "F")

228. ████████████████████████████████████████████

█████████████████████

229.    Over the course of the next year, McLaughlin treaded carefully, hoping to steer her relationship with Ansell back to a purely professional one.

230.    As late as into October 2016, Ansell continued to push McLaughlin to hang out with him, suggesting a variety of activities such as drinks or yoga, but McLaughlin held her ground, constantly making excuses and continuing to turn down Ansell's invitations.

231.    ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

232.    On or about October 7, 2016, Ansell wrote to McLaughlin, **"Keep Thursday 13th free.  I bumped into** ███████████████ **yday.  He's** █████████████ ███████**.  Ex special forces.  Has amazing insight into stuff like the recent vote in Columbia, the bomb attack in Chelsea etc.  It's amazing the stuff they look at.  Anyway, I emailed him to go for a drink.  He came back with Thursday.  Come with.  He'll be great in front of clients.  Trust me.  We'll then go for bday margarita's."** (McLaughlin's birthday was approaching on October 12th.)

233.    ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████  ████████

234.    Ansell immediately replied, **"Is that a yes?  You'll keep it free?"**.

235.    In a one-word response, McLaughlin wrote, **"yes"**.

236.    Ansell, wanting to express *conquest*, wrote, **"faint"**.

237.    On or about October 13, 2016, the day of the meeting, Ansell texted McLaughlin, **"You still on for tonight?  Board preso [sic] was all fine"**. ███████████

████████████████████████████████████

238.    McLaughlin, wanting to communicate her intention of attending a business meeting and not a precursor to a social date, replied, **"Yes, but early and not crazy"**.  The evening remained professional.

239.    A few days later, Ansell predictably tried to follow up on the most recent meeting, texted,  **"Free for a drink tomorrow and Friday if you fancy"**.  McLaughlin declined.

240.    ████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████

241.    On or about October 22, 2016,  Ansell texted McLaughlin, **"I need to speak to you about work.  I need to do it tomorrow (Sunday).  I'm going to the office in the afternoon and if possible Id [sic] like to go via you.  I can either meet you at yours or in Tenafly village if your family is still here.  Please try as hard as you can to make it happen.  Let me know."**

242.    McLaughlin asked if everything was ok.  Ansell responded stating, **"yes, all ok.  Don't worry.  But I HAVE to speak with you tomorrow /  Ill [sic] pop in after 5 on my way home"**.

243.    When Ansell met with McLaughlin that evening, she realized why he insisted on

meeting in person; so he could read her body language in response to his now stepping up efforts to exert professional pressure over McLaughlin.

244.    At that time, Ansell told McLaughlin that ███████████ was being ousted as Head of U.S. Cash Equities and that Ansell was positioning himself for the newly "available" role as McLaughlin's boss.

245.    McLaughlin gulped in apprehension. **"Touché, Robby,"** McLaughlin nervously thought to herself.  McLaughlin knew that this role was actually a *demotion* for Ansell to a less stable and virtually unprofitable business. ████████████████████

████████████████████████████████████████

████████

246.    ████████████████████████████████████

████████████████████████████████████████

███

247.    As the time for Ansell to accept his new position approached, he began to communicate to McLaughlin more overtly that he had the ability to promote McLaughlin professionally and grow her career ████████████████████████████

████████████████████

248.    For example, on or about November 17, 2016, McLaughlin facilitated the "Success at Macquarie" panel for new hires.  The panelists included:  Ansell; Michelle Broom, Executive Director (and the most senior title at the firm), Risk Management Group; and Cavan O'Grady, Division Director (a step below Executive Director), Corporate Operations Group.

249.    After the panel discussion, Ansell texted McLaughlin: **"You know how things come up and its [sic] only afterward when you wish you said**

something different?  Well it dawned on me earlier that when we were

talking about success at Macquarie, what I should have done was turn and

address and tell everyone "you want to know what success looks like?"  This

is it.  Head of sales, single mom with a 7 year old son.  If I were to achieve a

fraction of her success then I would be a very fortunate guy".

250.    The next day, on or about November 18, 2016, Ansell asked McLaughlin to meet

him at the posh Baccarat Hotel to discuss his new role. During this meeting, Ansell shared with

McLaughlin the confidential internal confirmation from Michael Silverton ("*Silverton*"), Head of

U.S. Macquarie Capital USA, that Ansell had been endorsed in the new role. Silverton's

endorsement was critical.  Any candidate for the securities position would need the backing of

the Head of banking. (Exhibit "G")

251.    ███████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████

252.    ███████████████████████████████████████████

██████████████████████████████████

253.    Ansell was adamant that he would need McLaughlin's help in this new role, as he

admittedly had no experience with institutional cash equities.

254.    ███████████████████████████████████████████

██████████████████████████████████████

255.    McLaughlin could not afford to lose her job. Now that Ansell was McLaughlin's

new direct boss, she felt powerless and trapped.  She felt like the walls were closing in on her.

256.    ███████████████████████████████████████████

████████████████████

### ANSELL BECOMES HEAD OF U.S. CASH EQUITIES – AND MCLAUGHLIN'S SUPERVISOR

257.  On or about December 2, 2016, Ansell was officially announced as the new Head of U.S. Cash Equities and was now positioned to become McLaughlin's primary supervisor.

258.  ████████████████████████████████████████

████████████████████████████████████████

██████

259.  On or about December 7, 2016, Ansell informed McLaughlin that Andrew Downe, his boss, would be organizing a call tomorrow with the U.S. management team, which now included the following individuals: Ansell, Head of U.S. Cash Equities; McLaughlin, then-Head of New York sales, Christine Farkas, U.S. Director of Research, and JT Cacciabaudo, Head of U.S. Execution.

260.  McLaughlin asked Ansell what prep work she should do for the call.

261.  Ansell replied, **"None.  Relax / Ill [sic] spend time with you tomorrow"**.

262.  McLaughlin wrote, **"Speaking of spending time.  Do want to be super mindful that glass bubble** [Ansell's office on the 22nd trading floor] **everyone watches everything and your body language with me is super casual and light, very different than with others.  Just be aware"**.

263.  Ansell wrote, **"OK.  Will do off floor.  Good point"**.

264.  McLaughlin feared that if others discovered her relationship, it would be *her* career and position at Macquarie that would bear the brunt of the consequences.

265.  Ansell continued to escalate his behavior towards McLaughlin.

266.    On or about December 17, 2016, ████████████████████████████
████████████ █████████████████████████ ██ ██████████████████████
██████████ (Exhibit "H")

267.    ████████████████████████████████████████████

████████████████████████████████ ███████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████

268.    ████████████████████████████████████████████

████████████████████████████████████

269.    For example, McLaughlin tried to draw a line in the sand by telling Ansell that she needed some personal space: **"Im [sic] sorry.  I will continue to give you a million plus percent at work and more.  You can always count on me in that regard and trust me to do right for MSG.  I'm just having a hard time."**

270.    Shortly thereafter, McLaughlin took a day off from work for a long weekend. McLaughlin needed to escape.

271.    Presumably upset, the next day, Ansell asked McLaughlin to meet in person to discuss their "status." ████████████████████████████████████████

████████████████████████████████████████████████████████

272.    Trying to soften the blow by hopefully scaling back the relationship, McLaughlin told Ansell that he would still see her at the office, they would still work closely running the

business, and she would still be his friend.

273.    The very next day, on or about February 19, 2017, ███████████████

███████████  Ansell ██████████  decided to commence the year-end performance review

process by asking McLaughlin to write her own bullets for her year-end review meeting.

274.    Specifically, he told her to write bullet points of her accomplishments for the

year, which he could use as a basis to lead her upcoming review, both in person and in writing

(the comments would potentially be included in the online review system). This is unusual.

275.    On or about February 21, 2017, actual year-end compensation discussions began.

276.    

277.

278.    On or about February 22, 2017, McLaughlin, in another effort to formally end the

non-professional relationship, wrote to Ansell, **"We didn't really talk"**.

279.    Ansell replied, **"No. We didn't. Wasn't intentional and not
avoiding it. We'll deffo [sic] have it next week. / One of my best days ever
today. Started off** ████████████████████████**, then
a super productive day involving one of the most senior people in the bank.
All my managers are on top form. All fucking good. I mean it. Awesome day.
It's all coming together.** █████████████████

██

280.    McLaughlin, frustrated that Ansell always seemed to dismiss her concerns and in

what seemed an impossible and hopeless situation, just responded, **"So glad such a great day. Have an amazing time. You deserve"**.

281.  ████████████████████████ Ansell replied, matter of fact, **"I want you to have the status of Head of US Sales"**.

282.  On or about February 23, 2017, Ansell wrote to McLaughlin, **"You're a fucking ledge. I told Downe (Ansell's boss) that our value to me is that I trust you implicitly and that everyone else trusts you too. I cant [sic] do this without you. We are a fucking great team. You cover my weakness and I cover yours. It's as good as it gets. Oh, and I adore you too. Truly fucking adore you. / Maybe Ill get you in front of Nicholas [implying Nicholas Moore, Macquarie CEO]. / I want you to be the face of my vision / Ill [sic] protect you re: comp"**.

283.  McLaughlin replied, **"Im [sic] excited about Head of US Sales. Thinking more and more about it. Appreciative of the opportunity and wont [sic] let you down as Head of US Sales that is"**.

284.  On or about February 24, 2017, Ansell shared an email with McLaughlin that was sent to him from Walter Pye, Executive Director (ED) in Commodities and Global Markets regarding Nicholas Moore, Macquarie Group's Sydney-based CEO's, upcoming visit.

285.  The subject of Ansell's email forward to McLaughlin was, **"Glorious opportunity"**.

286.  Still by this time, Ansell and McLaughlin had not had the "talk." Ansell continued to push it off, and McLaughlin kept pressing him on it, to no avail.

287.    On or about February 26, 2017, Ansell texted McLaughlin, **"God it was great seeing you today / Such a large part of taking the role was the opportunity to work with you.  It's everything I hope it would be.  You're such quality.  A joy to work with"**.

### WHITE KNIGHT, ACT II

288.    At the end of February 2017, Ansell told McLaughlin that ████████ (the protagonist from the initial HR incident) was on his way out: he was being fired for additional HR violations that Ansell indicated included sexual discrimination and harassment.

289.    In or around Spring of 2017, ████ exited the firm. However, upon information and belief, he was provided a different job, again with Macquarie, in Sydney, Australia.  He is an "Aussie mate," after all, and the local boys always take care of each other.

290.    Macquarie did not provide sufficient training on workplace discrimination and harassment or the complaint procedures and rules on retaliation.  To the contrary, since the commencement of McLaughlin's employment, in or around Spring 2012, Macquarie conducted only one firm-wide appropriate workplace behavior/sexual harassment awareness online training for all of its U.S. employees.

291.    Around this time, in or around late February 2017, Ansell decided that he and McLaughlin needed to go to Houston and meet the team there. The Macquarie Securities division (MSG) had recently merged with the Commodities and Financial Markets division (CFM) to form a new Commodities and Global Markets (CGM) group.

292.    Ansell was not shy with McLaughlin about his true motivations. With the balance of power having shifted, he was planning work trips and being explicit that he ████████████ ████████**"**. (Exhibit "I")  In fact, Ansell planned trips to London, Boston, and the West Coast.

38

293. 

294.

295.   On or about April 6, 2017, Ansell noticed that McLaughlin was being less responsive to his overtures.  He told her that she had basically avoided every heart emoticon sentiment that he had sent her.

296.   McLaughlin replied, **"I know you tell me you love me and I just cant [sic] say it back.  Its [sic] painful for both of us.  Me not reciprocating... but you are married.  You have 3 beautiful daughters and we work together.  I cherish what we have, but it's hard for me."**  McLaughlin was always trying to let him down easy, because she feared the ramifications otherwise.

297.   Ansell replied, **"NO ISSUE YOU NOT RECIPROCATING.  Doesn't change a thing"**.

298.   McLaughlin wrote, **"Phew, don't want to hurt you"**.

299.   Ansell replied, **"Not at all.  You give me all the right messages indirectly.  You don't give me any mixed messages"**.

<u>**ANSELL PROMOTES MCLAUGHLIN**</u>

300.   A couple of months into his new role**,** Ansell informed McLaughlin that he was

39

going to promote her to Head of U.S. Sales, but that he needed to do so with proper structure and that doing so *after* year-end reviews (which occur in March, 2017) would be the most appropriate timing.

301.     Towards the end of March 2017, McLaughlin received her performance review.

302.     Ansell led the review, along with ████████████ New York-based Global Head of Sales. McLaughlin's review was solid in delivery (recalling that Ansell asked her to write her own bullets), in line by rating (considering that the overall relatively new management team was running an inherited, loss making business), but probably more positive qualitatively and in delivery. ████████████████████████████████████████████████████████

████████████████████████████████████████

303.     Ansell was successful in proving to McLaughlin that he had the ability to help or hurt her career.

304.     In April 2017, McLaughlin was promoted to Head of U.S. Sales. She was now Ansell's direct report.

305.     Ansell continued to pursue McLaughlin throughout the Summer. ████████████

████████████████████████████████████████████████████████

██████████████ ████████████████████████ ████████████

**THE TEXT MESSAGE**

306.     Once the unwanted sex came to an end, McLaughlin was discriminated against on the basis of her gender.

307.     If Ansell could not have her, then he would see to it that her career at Macquarie would come to an abrupt halt.

308.     Indeed, after receiving an angry text message from Ansell's wife at the end of

[redacted]

309. [redacted]

[redacted]

310.    Wanting to ensure that her desire to end their relationship was clear, McLaughlin went on the very next business trip without Ansell, but with two other colleagues.

311.    McLaughlin has subsequently made numerous business trips without Ansell, demonstrating that his attendance on prior trips was unwanted.

312.    Ansell tried to reach out to McLaughlin to talk with her.  In early August 2017, Ansell went to New Jersey, where McLaughlin lives, and they met at a restaurant, Axia.

313.    McLaughlin was very emotional, distraught, upset, and concerned about work.

314.    She implied that she was going to talk to a lawyer.

315.    McLaughlin told Ansell, **"I need to stop this.  You crossed the line and the boundaries I tried to set by your consistent refusal to respect my desire to not start, and then end, once and for all, this "relationship" of your own making.  I never wanted this.  I need my job, I love my career, and you know that my son relies upon me for everything.  Everything.  I need to be there for him, financially and as a good parent, engaged in an open and honest relationship.  Your infidelity is never something I wanted to be a part of.  I told you this repeatedly, you refused to listen, and now it appears I am a part**

of it. **I want to be recognized and treated well for the hard work and results I have earned, and not feel as though our sexual relationship is why you promoted and paid me. I want to go back to where my life was without you in it and without these complications."**

316.    After McLaughlin's proclamation, Ansell grew very anxious and began to make McLaughlin very uncomfortable at work.

317.    The following day, Ansell came running over to McLaughlin's desk in a panic asking if they could talk. McLaughlin said no, explaining that she did not want to become emotional in the office and had a lot of work to do. Ansell then asked if they could meet for a quick smoke after work; she said ok; and they had a smoke together on the sidewalk after work. Ansell stated that he was very concerned that she would hire a lawyer and asked her to give him a heads up if she did so, so that he could resign first.

318.    A short time later, Ansell wrote McLaughlin a letter, remarkably demonstrating confirmation and admission of the power dynamic inherent in the claims of sexual harassment. (Exhibit "L")

319.    In it, Ansell provides a timeline of his attraction to and pursuit of McLaughlin. He openly admits that:

       a.     His intentions **"were not wholly altruistic"** when he aided her at work (the ▮▮▮▮ Incident);

       b.     McLaughlin rebuffed his advances: **"You could see that this was going somewhere you didn't want it to. You told me as much. Boundaries"**;

       c.     He nonetheless persisted in pursuing her, against her wishes, as **"no one**

had ever said no to me" and **"This was something I really, really wanted"**;

d.      McLaughlin **"tried so many times to reset the boundaries,"** but he would not let her;

e.      ████████ ████████████████████████████████████████

████████████████████████████████████████████

f.      He **"unleashed a world of pain and a lifetime of hurt on so many innocent and undeserving people"**; and

g.      McLaughlin is **"a victim here too"**.

320.     Ansell continued to pursue McLaughlin as he had done in the past. He even asked McLaughlin if he could join her for yoga. McLaughlin ultimately told him that she did not want to invite him into something so personal to her, and that she hoped he understood.

321.     Having admitted to stalking and manipulating McLaughlin, Ansell proceeded to retaliate against her.

322.     ████████████████████████████████████████████████

████ Ansell undertook efforts to terminate McLaughlin from Macquarie.

323.     Ansell hired an outside "consultant" Ed Epperley under "cover" and pretext to analyze and locate any "weaknesses" in their team. At Ansell's behest and design, Epperley was looking for a pretext to support setting up and terminating McLaughlin. Epperley would ask peers leading and presumptive questions, such as, "Tell me about Khristina's leadership weaknesses."

324.     A teamwide offsite was scheduled in order to review the consultant's findings.

325.     As part of preparations for the offsite, everyone on the management team had to

do a questionnaire and an interview with the consultant.

326. On Friday, October 20, 2017, the weekend of McLaughlin's son's 8th birthday, Ansell notified McLaughlin that HR would like to schedule a call with McLaughlin and the consultant regarding the overwhelming collective and negative feedback shared about McLaughlin by her peers on the U.S. management team.

327. He further informed McLaughlin that other members of the team had purportedly criticized her in the sham set-up interviews with the consultant.

328. On October 21, 2017, the consultant emailed Ansell as follows, in relevant part, which email he forwarded to McLaughlin. The text reveals the set-up Epperley had planned:

> **"Good afternoon Robby,**
>
> **I'm looking forward to our dinner tomorrow night. …**
>
> **I understand you are interested in the talking points I would share with Khristina if given the chance to work with her before Monday's offsite.**
> **Here are the key items I think she needs to know:**
>
> - **There is a theme from her peers that its not safe to share opinions with either her or Robby that are in conflict with what Khristina wants.**
> - **This concern comes from a sense that Robby shows unusual amounts of bias to do as Khristina suggests and this is something that Khristina intentionally works to achieve.**
> - **This will test her ability to hear these concerns and understand that they are real. They are hopeful she will alter her behavior enough so her peers believe she is doing what is in Macquarie's best interest instead of what is of most benefit to her.**
> - **Her inability to listen and learn and accept this feedback is a moment of truth for her career. To the extent she takes this as valid and meaningful and makes adjustments will show she's capable of learning."**
> (Exhibit "M")

329. After sharing this email with McLaughlin, Ansell notably texted her: **"There's**

**no way you ever put yourself before MQ [....] We need to address [at the offsite and with the consultant] why people perceive it to be the case."** (Exhibit "N")

330.    Ansell, ████████████████████████████████████ texted McLaughlin with the details of the career ambush to come.

331.    From October 19-20, McLaughlin called in sick.  She thought she had a bad cold or maybe even the flu.  Once again, the stress wore her down and was taking its toll. McLaughlin's weight was dropping.  People at work had asked her if she was ok, and mentioned that she looked too thin (specifically, JT Cacciabaudo, her partner on the execution side of the business, whom she worked well with, respected and had an open line of communication with).

332.    After obtaining counsel, upon the agreement of counsel for both parties, McLaughlin did not dial in for the call on the 22nd and did not attend the setup / offsite, which took place October 23rd and October 24th.

333.    In stark contrast to the pretext of negative performance feedback, on or about September 12, 2017, McLaughlin had attended a dinner. The Macquarie Board was in town, along with Nicholas Moore ("*Moore*"), Macquarie's CEO. At the dinner, McLaughlin carried the conversation for about two hours. After the visit, she was told by ████████████████ ████████████████████ that McLaughlin's name was the only one Moore remembered and referred to her as a **"firecracker."**

334.    Then, in early October 2017, McLaughlin was approached by both Suntrust and Raymond James.

335.    SunTrust was looking for a Head of U.S. Sales, and the Head of Equities (Scott McLaughlin – no relation - formerly at Lazard) had remembered meeting McLaughlin when she

was interviewing following WJB Capital's demise.

336.    Raymond James was looking for a Head of New York sales.  McLaughlin spoke to Paul Steinhauser, Senior Managing Director, Head of Institutional Equity Sales, U.S. and UK.

337.    McLaughlin told both firms that she was happy where she was, but that she was always willing to meet with other senior leaders in the business.

338.    The coffees evolved beyond McLaughlin's initial intentions and expectations. She thought maybe she *should* consider a fresh start.  She was frustrated.  She knew leaving Macquarie would make her life easier by finally ending any connection with Ansell, but she also felt that Macquarie's platform really needed her, and she did not want to abandon her team at a time of turnaround.  She also did not want to have to start all over at a new firm.

339.    McLaughlin had built earned credibility at Macquarie and that provided her flexibility she valued.  McLaughlin was concerned about the hours and time it would take to rebuild on a new platform.  She would need to learn the product, the people, the platform, new clients - all very time consuming.

340.    On or about Wednesday, October 11th, McLaughlin respectfully ended the process with both firms.

341.    On or about October 23, 2017, McLaughlin's counsel put Macquarie on notice that McLaughlin has been the victim of egregious sexual harassment by Ansell that included, among other things, ████████████████████████████████ ████████████████████████████████████████████ ████████

342.    Immediately following Macquarie learning of McLaughlin's complaints, Macquarie continued the retaliation ████████████████, that includes leaving her out of

important management meetings and generally, mishandling of the entire situation allowing a rumor mill of scandal to permeate the workplace that characterizes Ansell as a victim and McLaughlin as a pariah.

343.    Macquarie has focused solely on covering up Ansell's wrongdoings and has done nothing to remediate the retaliatory environment McLaughlin now finds herself subjected to.

344.    On October 31, 2017, Andrew Downe informed the U.S. Cash Equity Management team that Ansell would not be returning to Macquarie.

345.    It was a simple message; no additional details were given, and no questions were asked.

346.    Not a single person on the management team has reached out to McLaughlin to discuss the news of Ansell's discharge from the firm. This is unusual, as McLaughlin was informed that there have been many discussions concerning the reason of his abrupt departure.

347.    Macquarie has done absolutely nothing to protect McLaughlin from the vicious rumor mill.

348.    The delivery of Ansell's firing has neither contained the rumor mill nor allowed McLaughlin to feel comfortable at work.

349.    The events following the offsite and Macquarie management's decisions to exclude her have ruined McLaughlin's mobility at the firm, her professional contacts at the firm, and potentially, her ability to find work outside the firm, as Macquarie has done nothing to contain the rumors, which have now reached McLaughlin's clients and contacts outside Macquarie.

350.    McLaughlin has since been ostracized, labeled, and stigmatized by Macquarie's retaliatory mishandling of McLaughlin's complaints in the hopes of forcing McLaughlin to

resign from Macquarie amidst a cloud of rumor, scandal, and shame.

351.    McLaughlin's mobility at the firm, her ability to expand and grow, has been severely and irreversibly impeded as she remains the victim of snicker, banter, and coffee room whisper.

352.    Macquarie has created, condoned, and fostered a work environment for McLaughlin that is so intolerable, no reasonable person would be able to withstand it.

353.    This is why most women in finance stay quiet and tolerate harassment.

354.    McLaughlin continues to report to work. It is very uncomfortable. She is being ostracized. In what would normally be an upbeat trading desk with lots of camaraderie, McLaughlin is isolated and no one is engaging her in personal or professional banter. Interactions with colleagues are minimal, making her job difficult to successfully perform.

355.    On Wednesday, November 1, 2017, Macquarie U.S. Cash had one of its biggest trading days of the year.  McLaughlin offered kudos to her sales team members, and received muted or non-replies.  The chorus of silence when there would otherwise be a loud cheer was astonishing to note.  The leak of Ansell's termination and the rumored reasons for it therefore was good for business at Macquarie.

356.    At 10:30AM on November 1st, McLaughlin's ex husband told her to call him, saying that he had gotten hit with the rumor mill that morning. (Exhibit "O")

357.    McLaughlin also received a text on the same day from a former Macquarie analyst and side-sell competitor, ████████, asking McLaughlin, **"What's your story?"**, to which she did not respond.

358.    As of November 2, 2017, no one in HR, nor Andrew Downe, had circled back with McLaughlin to check in on how things are going.

359.    On or about November 3, 2017, McLaughlin emailed █████████ her partner
on the execution side of the business, concerning the discomfort she felt with his treatment in
recent days. She wrote:



**Yesterday's conversation kept me up last night and is still bothering
me, so I felt I needed to address.**

**First, I want to acknowledge that I appreciate you proactively pulling
me off the desk to apologize for snapping at me on the attribution
project that you and I have worked tirelessly on for Robby this past
year. I was going to just let that one go, but I do appreciate the
recognition.**

**As you said, you are 'f---ing angry and resentful'. You didn't even need
to articulate it. Your body language and lack of even professional
courtesy this past week has been nothing short of hostile. We have gone
from talking consistently throughout our days, to you barely looking at
me, let alone engaging in personal or professional banter.**

**I will treat you with the professional and personal respect that I would
expect of any leader. I'd appreciate the same in return.**

**Khristina"**

360.    In a backtracking reply drafted by counsel, █████████ wrote:

**"Khristina,**

**Thanks for sharing how you feel. When I shared that I was angry and**

resentful, I was clear that I am angry and resentful at the situation we find ourselves in, having lost leadership yet again. My anger and resentment was not and is not directed at anyone in particular, including you.

As far as being hostile, I am sorry that you feel that way. You referenced this past week; however you were out of the office Tuesday and Wednesday, and Thursday early afternoon was when we had the conversation. I strongly disagree with you. Far from being hostile, I was quiet, reserved and to myself on Monday, based on the anger and disappointment I referenced earlier.

I will absolutely continue to treat you with personal and professional respect. I am sorry that we disagree, and I do not wish to go back and forth on this. For one, I simply want to move forward, look forward and work together and continue to improve this platform.

████

361.  It is remarkable that in this day and age, with the Anthony Wiener sexting scandal, the reports of rampant Harvey Weinstein and Bill O'Reilly sexual harassment, Macquarie has no checks for ensuring that this hostile work environment and *quid pro quo* sexual harassment does not occur.

362.  Macquarie does not engage in best industry practices, offering no sexual harassment and sensitivity training seminars to its employees and managers. Macquarie condones this behavior by ███████████████████████████

█████ a single mother who is the sole supporter and provider for her household.

363.    On or about November 7, 2017, McLaughlin had a one-on-one meeting with Andrew Downe.  During the meeting, he asked how she was; she said, **"Hanging in there."** He replied, **"I hope we can do better than that."**

364.    They shifted quickly into business conversation. At some point during the discussion, McLaughlin brought up how tense things were. Downe said he may have noticed in the management meeting earlier, when they were discussing the slides for the Town Hall.

365.    In the meeting, McLaughlin had called out that no one on the management team had responded to her input on the slides, and she asked them blatantly what they thought, because at this time, everyone else had slides to present but McLaughlin.

366.    At this point in her meeting with Downe, recounting the prior day's meeting, McLaughlin became emotional and told him how hard this was on her.

367.    In response, Downe told McLaughlin to **"put on a brave face"** and said he would **"address anything he needed to"**; however, the irreparable damage has been done.

368.    You cannot undo the damage that's already been done to McLaughlin's career and life by being subjected to this systemic and planned sex based discrimination.


## CLAIMS AND DAMAGES

Based upon the above allegations, Plaintiff maintains the following legal claims against Defendant:

## AS AND FOR A FIRST CAUSE OF ACTION

**SEX DISCRIMINATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964;
42 U.S.C.A. § 2000E**

369.    Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

370.    Defendants' discriminatory behavior and then retaliatory termination of Plaintiff's employment were made as a direct result of Plaintiff's sex, female, and show an animus of sex bias.

371.    Defendants' animus towards Plaintiff's sex is revealed in instances where similarly situated male employees were treated differently than Plaintiff in respect to of their terms, conditions, and privileges of employment.

372.    Defendants have undertaken these discriminatory practices willfully or with reckless disregard for the Plaintiff's rights protected under Title VII.

373.    These employment practices violate § 703 of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-2.

374.    As a result of Defendants' actions, Plaintiff is unable to return to comparable employment.

375.    The aforementioned acts of Defendants constitute unlawful discrimination against Plaintiff in the terms, conditions and privileges of her employment because of her gender and in retaliation against her in violation of the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e.

376.    As a proximate result of Defendants' aforementioned sex discrimination against Plaintiff, Plaintiff has and will continue to suffer substantial losses, including the loss of past and future earnings, bonuses, deferred compensation and other employment benefits.

377. As a further proximate result of Defendants' actions, Plaintiff has and will continue to suffer irreparable and significant damage to her personal and professional good name and reputation.

378. As a further proximate result of Defendants' actions taken because of Plaintiff's sex, Plaintiff has and will continue to suffer severe and lasting embarrassment, humiliation and anguish and other incidental and consequential damages and expenses.

379. As a result of the foregoing, Plaintiff is entitled to recover from Defendants, jointly and severally, an amount equal to the value of all compensation to be earned by Plaintiff had her employment not been interfered with, including all to be earned salary and bonuses, benefit payments, profit sharing, costs, attorney's fees and prejudgment interest at no less than 9%.

380. As a result of the foregoing acts, Plaintiff is entitled to recover an amount no less than $20,000,000 in compensatory damages from Defendants, jointly and severally, in addition to all other amounts sought herein.

381. In committing the acts alleged herein, Defendants, jointly and severally, acted in an outrageous and malicious manner with intent, oppression, gross negligence, malice, wanton disregard and indifference for Plaintiff's protected civil rights, as part of a continuing pattern of conduct, and Plaintiff is entitled to punitive damages of at least $20,000,000 to adequately punish Defendants, jointly and severally, and to deter Defendants from continuing and repeating such conduct in the future.

### AS AND FOR A SECOND CAUSE OF ACTION

**DISCRIMINATION ON THE BASIS OF GENDER UNDER
NEW YORK STATE HUMAN RIGHTS LAW §296(1)(A)**

382.    Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

383.    Defendants' discriminatory behavior and then retaliatory termination of Plaintiff's employment were made as a direct result of Plaintiff's gender, female, and show an animus of gender bias.

384.    Defendants' animus towards Plaintiff's gender, female, is revealed in instances where similarly situated male employees were treated differently than Plaintiff in respect to of her terms, conditions, and privileges of employment.

385.    As a result of Defendants' actions, Plaintiff is unable to return to comparable employment.

386.    The aforementioned acts of Defendants constitute unlawful discrimination against Plaintiff in the terms, conditions and privileges of her employment because of her gender and in retaliation against her in violation of the provisions of the NYSHRL § 296(1)(a).

387.    As a proximate result of Defendants' aforementioned sex discrimination against Plaintiff, Plaintiff has and will continue to suffer substantial losses, including the loss of past and future earnings, bonuses, deferred compensation and other employment benefits.

388.    As a further proximate result of Defendants' actions, Plaintiff has and will continue to suffer irreparable and significant damage to her personal and professional good name and reputation.

389.    As a further proximate result of Defendants' actions taken because of Plaintiff's sex, Plaintiff has and will continue to suffer severe and lasting embarrassment, humiliation and anguish and other incidental and consequential damages and expenses.

390. As a result of the foregoing, Plaintiff is entitled to recover from Defendants, jointly and severally, an amount equal to the value of all compensation to be earned by Plaintiff had her employment not been interfered with, including all to be earned salary and bonuses, benefit payments, profit sharing, costs, attorney's fees and prejudgment interest at no less than 9%.

391. As a result of the foregoing acts, Plaintiff is entitled to recover an amount no less than $20,000,000 in compensatory damages from Defendants, jointly and severally, in addition to all other amounts sought herein.

392. In committing the acts alleged herein, Defendants acted in an outrageous and malicious manner with intent, oppression, gross negligence, malice, wanton disregard and indifference for Plaintiff's protected civil rights, as part of a continuing pattern of conduct, and Plaintiff is entitled to punitive damages of at least $20,000,000 to adequately punish Defendants, jointly and severally, and to deter Defendants from continuing and repeating such conduct in the future.

## AS AND FOR A THIRD CAUSE OF ACTION

### DISCRIMINATION ON THE BASIS OF GENDER UNDER
### NEW YORK CITY HUMAN RIGHTS LAW § 8-107

393. Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

394. Defendants' discriminatory behavior and then retaliatory termination of Plaintiff's employment were made as a direct result of Plaintiff's gender, female, and show an animus of gender bias.

395.    Defendants' animus towards Plaintiff's gender, female, is revealed in instances where similarly situated male employees were treated differently than Plaintiff in respect to of their terms, conditions, and privileges of employment.

396.    As a result of Defendants' actions, Plaintiff is unable to return to comparable employment.

397.    The aforementioned acts of Defendants constitute unlawful discrimination against Plaintiff in the terms, conditions and privileges of her employment because of her gender and in retaliation against her in violation of the provisions of the NYCHRL § 8-107.

398.    As a proximate result of Defendants' aforementioned sex discrimination against Plaintiff, Plaintiff has and will continue to suffer substantial losses, including the loss of past and future earnings, bonuses, deferred compensation and other employment benefits.

399.    As a further proximate result of Defendants' actions, Plaintiff has and will continue to suffer irreparable and significant damage to her personal and professional good name and reputation.

400.    As a further proximate result of Defendants' actions taken because of Plaintiff's sex, Plaintiff has and will continue to suffer severe and lasting embarrassment, humiliation and anguish and other incidental and consequential damages and expenses.

401.    As a result of the foregoing, Plaintiff is entitled to recover from Defendants, jointly and severally, an amount equal to the value of all compensation to be earned by Plaintiff had her employment not been interfered with, including all to be earned salary and bonuses, benefit payments, profit sharing, costs, attorney's fees and prejudgment interest at no less than 9%.

402.     As a result of the foregoing acts, Plaintiff is entitled to recover an amount no less than $20,000,000 in compensatory damages from Defendants, jointly and severally, in addition to all other amounts sought herein.

403.     In committing the acts alleged herein, Defendants acted in an outrageous and malicious manner with intent, oppression, gross negligence, malice, wanton disregard and indifference for Plaintiff's protected civil rights, as part of a continuing pattern of conduct, and Plaintiff is entitled to punitive damages of at least $20,000,000 to adequately punish Defendants, jointly and severally, and to deter Defendants from continuing and repeating such conduct in the future.

## AS AND FOR A FOURTH CAUSE OF ACTION

### RETALIATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964; 42 U.S.C.A. § 2000E

404.     Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

405.     Based upon the aforementioned facts, Plaintiff had reasonable belief that Defendants were engaged in unlawful conduct under Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e.

406.     Plaintiff acted in opposition to such unlawful conduct by making good faith claims and/or complaints of sexual harassment and discrimination to Defendants and appropriate authorities, including the EEOC.

407.     Defendants had actual knowledge of Plaintiff's activities in respect of making good faith claims and/or complaints of sexual harassment and discrimination to Defendants and appropriate authorities, including the EEOC.

408.   As a proximate result of Plaintiff's activities in respect of making good faith claims and/or complaints of sexual harassment and discrimination to Defendants and appropriate authorities, including the EEOC, Defendants engaged in adverse treatment of Plaintiff, including, inter alia, terminating her employment.

409.   Plaintiff has been unable, despite reasonable efforts, to find comparable employment.

410.   The aforementioned acts of Defendants constitute unlawful retaliation against Plaintiff in violation of the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e.

411.   As a proximate result of Defendants' aforementioned retaliation against Plaintiff, Plaintiff has and will continue to suffer substantial losses, including the loss of past and future earnings, bonuses, deferred compensation and other employment benefits.

412.   As a further proximate result of Defendants' actions, Plaintiff has and will continue to suffer irreparable and significant damage to her personal and professional good name and reputation.

413.   As a further proximate result of Defendants' actions taken because of Plaintiff's sex, Plaintiff has and will continue to suffer severe and lasting embarrassment, humiliation and anguish and other incidental and consequential damages and expenses.

414.   As a result of the foregoing, Plaintiff is entitled to recover from Defendants, jointly and severally, an amount equal to the value of all compensation to be earned by Plaintiff had her employment not been interfered with, including all to be earned salary and bonuses, benefit payments, profit sharing, costs, attorney's fees and prejudgment interest at no less than 9%.

415. As a result of the foregoing acts, Plaintiff is entitled to recover an amount no less than $20,000,000 in compensatory damages from Defendants, jointly and severally, in addition to all other amounts sought herein.

416. In committing the acts alleged herein, Defendants acted in an outrageous and malicious manner with intent, oppression, gross negligence, malice, wanton disregard and indifference for Plaintiff's protected civil rights, as part of a continuing pattern of conduct, and Plaintiff is entitled to punitive damages of at least $20,000,000 to adequately punish Defendants, jointly and severally, and to deter Defendants from continuing and repeating such conduct in the future.

## AS AND FOR AN FIFTH CAUSE OF ACTION

### RETALIATION IN VIOLATION OF NEW YORK STATE HUMAN RIGHTS LAW §296(1)(A)

417. Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

418. Based upon the aforementioned facts, Plaintiff had reasonable belief that Defendants were engaged in unlawful conduct under NYSHRL § 296 (1) (a).

419. Plaintiff acted in opposition to such unlawful conduct by making good faith claims and/or complaints of sexual harassment and discrimination to Defendants and appropriate authorities, including the EEOC.

420. Defendants had actual knowledge of Plaintiff's activities in respect of making good faith claims and/or complaints of sexual harassment and discrimination to Defendants and appropriate authorities, including the EEOC.

421. As a proximate result of Plaintiff's activities in respect of making good faith claims and/or complaints of sexual harassment and discrimination to Defendants and appropriate

authorities, including the EEOC, Defendants engaged in adverse treatment of Plaintiff, including, inter alia, terminating her employment.

422.     As a result of Defendants' actions, Plaintiff is unable to return to comparable employment.

423.     The aforementioned acts of Defendants constitute unlawful retaliation against Plaintiff in violation of the provisions of NYSHRL § 296 (1) (a).

424.     As a proximate result of Defendants' aforementioned retaliation against Plaintiff, Plaintiff has and will continue to suffer substantial losses, including the loss of past and future earnings, bonuses, deferred compensation and other employment benefits.

425.     As a further proximate result of Defendants' actions, Plaintiff has and will continue to suffer irreparable and significant damage to her personal and professional good name and reputation.

426.     As a further proximate result of Defendants' actions taken because of Plaintiff's sex, Plaintiff has and will continue to suffer severe and lasting embarrassment, humiliation and anguish and other incidental and consequential damages and expenses.

427.     As a result of the foregoing, Plaintiff is entitled to recover from Defendants, jointly and severally, an amount equal to the value of all compensation to be earned by Plaintiff had her employment not been interfered with, including all to be earned salary and bonuses, benefit payments, profit sharing, costs, attorney's fees and prejudgment interest at no less than 9%.

428.     As a result of the foregoing acts, Plaintiff is entitled to recover an amount no less than $20,000,000 in compensatory damages from Defendants, jointly and severally, in addition to all other amounts sought herein.

429.   In committing the acts alleged herein, Defendants acted in an outrageous and malicious manner with intent, oppression, gross negligence, malice, wanton disregard and indifference for Plaintiff's protected civil rights, as part of a continuing pattern of conduct, and Plaintiff is entitled to punitive damages of at least $20,000,000 to adequately punish Defendants, jointly and severally, and to deter Defendants from continuing and repeating such conduct in the future.

## AS AND FOR A SIXTH CAUSE OF ACTION

### RETALIATION IN VIOLATION OF NEW YORK CITY HUMAN RIGHTS LAW § 8-107

430.   Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

431.   Based upon the aforementioned facts, Plaintiff had reasonable belief that Defendants were engaged in unlawful conduct under NYCHRL § 8-107.

432.   Plaintiff acted in opposition to such unlawful conduct by making good faith claims and/or complaints of sexual harassment and discrimination to Defendants and appropriate authorities, including the EEOC.

433.   Defendants had actual knowledge of Plaintiff's activities in respect of making good faith claims and/or complaints of sexual harassment and discrimination to Defendants and appropriate authorities, including the EEOC.

434.   As a proximate result of Plaintiff's activities in respect of making good faith claims and/or complaints of sexual harassment and discrimination to Defendants and appropriate authorities, including the EEOC, Defendants engaged in adverse treatment of Plaintiff, including, inter alia, terminating her employment.

435. As a result of Defendants' actions, Plaintiff is unable to return to comparable employment.

436. The aforementioned acts of Defendants constitute unlawful retaliation against Plaintiff in violation of the provisions of NYCHRL § 8-107.

437. As a proximate result of Defendants' aforementioned retaliation against Plaintiff, Plaintiff has and will continue to suffer substantial losses, including the loss of past and future earnings, bonuses, deferred compensation and other employment benefits.

438. As a further proximate result of Defendants' actions, Plaintiff has and will continue to suffer irreparable and significant damage to her personal and professional good name and reputation.

439. As a further proximate result of Defendants' actions taken because of Plaintiff's sex, Plaintiff has and will continue to suffer severe and lasting embarrassment, humiliation and anguish and other incidental and consequential damages and expenses.

440. As a result of the foregoing, Plaintiff is entitled to recover from Defendants, jointly and severally, an amount equal to the value of all compensation to be earned by Plaintiff had her employment not been interfered with, including all to be earned salary and bonuses, benefit payments, profit sharing, costs, attorney's fees and prejudgment interest at no less than 9%.

441. As a result of the foregoing acts, Plaintiff is entitled to recover an amount no less than $20,000,000 in compensatory damages from Defendants, jointly and severally, in addition to all other amounts sought herein.

442. In committing the acts alleged herein, Defendants acted in an outrageous and malicious manner with intent, oppression, gross negligence, malice, wanton disregard and

indifference for Plaintiff's protected civil rights, as part of a continuing pattern of conduct, and Plaintiff is entitled to punitive damages of at least $20,000,000 to adequately punish Defendants, jointly and severally, and to deter Defendants from continuing and repeating such conduct in the future.

## AS AND FOR A SEVENTH CAUSE OF ACTION

### AGAINST ANSELL (NYSHRL – AIDING AND ABETTING)

443.    Plaintiff incorporates by reference and realleges each and every allegation as set forth above as if fully set forth herein.

444.    As a result of the aforementioned actions, Defendant Ansell has discriminated against Plaintiff on account of her gender with respect to the terms, conditions and privileges of her employment in violation of New York Executive Law § 290 et seq.

445.    As a result of the aforementioned actions, Defendant Ansell has violated the New York Executive Law §290 et seq. by aiding, abetting, inciting and coercing the unlawful discrimination outlined herein.

446.    As a result of Defendant Ansell's discrimination (and aiding, abetting and inciting discrimination) against her, Plaintiff has suffered damages, including, without limitation, deprivation of income and benefits, emotional pain, suffering, inconvenience, damage to reputation and career, mental anguish and humiliation.

## AS AND FOR AN EIGHTH CAUSE OF ACTION

### AGAINST ANSELL (NYCHRL – AIDING AND ABETTING)

447.    Plaintiff incorporates by reference and realleges each and every allegation as set forth above as if fully set forth herein.

448.     As a result of the aforementioned actions, Defendant Ansell has discriminated against Plaintiff on account of her gender with respect to the terms, conditions and privileges of her employment in violation of New York City Administrative Code § 8-101 et seq.

449.     As a result of the aforementioned actions, Defendant Ansell has violated the New York City Administrative Code § 8-101 et seq. by aiding, abetting, inciting and coercing the unlawful discrimination outlined herein.

450.     As a result of Defendant Ansell's discrimination (and aiding, abetting and inciting discrimination) against her, Plaintiff has suffered damages, including, without limitation, deprivation of income and benefits, emotional pain, suffering, inconvenience, damage to reputation and career, mental anguish and humiliation.

## ATTORNEY'S FEES AND COSTS

451.     Attorney's fees and costs are warranted in this matter as the undersigned, on behalf of Plaintiff, have in good faith, attempted to negotiate a reasonable resolution with Defendants without having to refer this matter to this forum for adjudication, determination and final resolution on the merits.

## PUNITIVE DAMAGES – BAD FAITH

452.     It is presumed that parties to contracts undertake their respective obligations in good faith, with intent to deal fairly.  In light of Defendants' obvious and blatant bad faith, wrongdoing and breach of other duties, ***punitive damages*** should be assessed against Defendants so that they be deterred from attempting such harmful employment practices in the future.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff requests that this Court order the following relief in favor of Plaintiff:

I.     A Declaratory Judgment declaring that the acts complained of herein violate the rights of Plaintiff as guaranteed under applicable Federal Law;

II.     A judgment granting equitable relief directing Defendant to cease and desist from exposing Plaintiff to discrimination and retaliation;

III.     A judgment directing Defendant to reimburse and make Plaintiff whole for any and all earnings, including bonus payments, she would have received but for Defendant's discriminatory treatment and unlawful dismissal, including but not limited to, back pay, double back pay, contractual damages and pension benefits;

IV.     A judgment awarding Plaintiff compensatory damages for mental anguish, loss of dignity, humiliation, and injury to livelihood in an amount that is fair, just, and reasonable, to be determined at trial, including reasonable attorneys' fees, as provided under applicable law.

V.     A judgment awarding Plaintiff double back pay damages for Defendant's intentional retaliation of Plaintiff;

VI.     A judgment awarding Plaintiff front pay;

VII.     A judgment awarding Plaintiff double back pay;

VIII.   A judgment awarding Plaintiff contract damages;

IX.     A judgment awarding Plaintiff punitive damages;

X.     An award of prejudgment interest, costs and attorney's fees; and

XI.     Such other and further relief that the Court may deem just and proper.

### **JURY DEMAND**

Plaintiff demands a trial by jury of all issues triable by jury in this action.


Dated: New York, New York
November 17, 2017

Respectfully submitted,

**SACK & SACK, LLP**


By _____ */s/ Jonathan Sack* _____
         Jonathan Sack, Esq.

**Attorneys for Plaintiff**
70 East 55th Street, 10th Floor
New York, New York 10022
Tel.: (212) 702-9000
Fax: (212) 702-9702

Case 1:19-cv-09023  Document 1-1   Filed 11/17/19   Page 1 of 2

# EXHIBIT "A"

EEOC Form 161-B (11/16)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

| To: | Kristina McLaughlin<br>10 Brook Road<br>Tenafly, NJ 07670 | From: | New York District Office<br>33 Whitehall Street<br>5th Floor<br>New York, NY 10004 |
|---|---|---|---|

☐ *On behalf of person(s) aggrieved whose identity is*
*CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 520-2018-00551 | Roxanne Zygmund,<br>Investigator | (212) 336-3665 |

*(See also the additional information enclosed with this form.)*

NOTICE TO THE PERSON AGGRIEVED:

Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA): This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA must be filed in a federal or state court **WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

☐ More than 180 days have passed since the filing of this charge.

☒ Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

☒ The EEOC is terminating its processing of this charge.

☐ The EEOC will continue to process this charge.

Age Discrimination in Employment Act (ADEA): You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, the paragraph marked below applies to your case:

☐ The EEOC is closing your case. Therefore, your lawsuit under the ADEA must be filed in federal or state court **WITHIN 90 DAYS** of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost.

☐ The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

Equal Pay Act (EPA): You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

*Kevin J. Berry* (R3)

**Kevin J. Berry,**
**District Director**

11/14/2017
*(Date Mailed)*

Enclosures(s)

cc:

MACQUARIE CAPITAL (USA)
Attn: Director of Human Resources
125 West 55th Street
New York, NY 10019

# EXHIBIT "B"

http://macnet.internal.macquarie.com/central/news/2017/mgl/20170525-heres-why-you-should-nominate-someone-for-a-macquarie-award



MACQUARIE

# Macnet

## Here's why you should nominate someone for a Macquarie Award

11 September 2017   MGL

Print

Do you know someone who has gone above and beyond to deliver an exceptional result for Macquarie or our clients? Someone who role models our principles: Opportunity, Accountability and Integrity? Someone who is committed to strengthening our risk culture?

Then you should nominate them for a Macquarie Award today.

### What do people receive Macquarie Awards for?

The Macquarie Awards recognise people not just for what they achieve, but how they achieve. People who collaborate not just within their own team or division but across our groups. People who go above and beyond the scope of their role to deliver outstanding results. The Macquarie Award categories reflect What We Stand For:

**Opportunity** means delivering a successful outcome for Macquarie, our clients, our shareholders, our people and our communities. It means thinking big – beyond your immediate role, team or group. It means making connections across Macquarie to access expertise to help our client or to solve a problem.

**Accountability** means taking responsibility for our actions and the decisions we make. It means respecting your colleagues and helping others to succeed. Being accountable creates more opportunity.

**Integrity** means acting in a way that earns trust – the trust of our colleagues, our clients, our shareholders and our communities. It is more than just a successful outcome – it is a commitment to deliver quality and to uphold the highest ethical standards.

Hear from committee members and recent nominators on what the Macquarie Awards program means to them and why you should nominate someone for an award.

United States - New York

# EXHIBIT "C"

10/30/2017

Congratulations to our FY14 Introducer Sales Credits recipients

http://macnet.internal.macquarie.com/central/news/2014/MSG20140502-msg-fy14-isc-recipients

1/2



MACQUARIE

# Macnet

# Congratulations to our FY14 Introducer Sales Credits recipients

**02 May 2014  CGM**

## From Anthony Panaretto:

The MSG **Introducer Sales Credits** (ISC) program is a new collaboration initiative that rewards anyone within MSG who leverages their existing relationships to bring in net new business to another MSG regional business. MSG staff in all roles, at all levels, are eligible to participate in the program.

When we launched the program in **February** this year, we indicated that payment for successful introductions would be recognised as part of the FY14 annual remuneration process via a profit share allocation from MSG management.

I am delighted to announce that we have recently approved the ISC payments for FY14.

## FY14 league table

Congratulations to the following staff who have been rewarded under the ISC initiative:

| | | |
|---|---|---|
| Chris Carr | Jason Rubin | Martin Hughes |
| Darrin Blumenthal | Jean Zhang | Matt Coleman |
| Denver Smith | Jessica London | Michael Ingrassia |
| Ed Southey | John Szucs | Mike Keen |
| Eric Bruce | Jon Krapman | Rob Moderelli |
| Harry Ioannou | Khristina McLaughlin | Scott Dolling |
| Jan Halaska | Marcello Damiano | Tad Nacheff |

## FY15 program launch

Last year we produced over $A3 million of "introduced" income and are looking to target $A10 million this financial year.

United States - New York

Congratulations to our FY14 Introducer Sales Credits recipients

As a reminder, all Sales and Sales Trading staff are encouraged to use the weekly "Producer Report – Global View" to identify opportunities to establish introductions with other regions.

The key elements to a successful ISC recognition include:

A clear case where an introduction was made and followed up to ensure the new relationship was encouraged, established and credentialed

An introduction that is more than "call this person" – we are looking for people to take a proactive role in establishing the new relationship

Addressing the question of multiple desk coverage. We are a multi-region platform and we will almost certainly increase our chances of selling our unique products and services when we can establish direct contact from a new regional team. We will recognise an ISC where there is one point of coverage only where senior management have met the client and agree that one point of coverage is appropriate

Electronic Execution incomes where earned in a different region from the introducer – a very easy way to increase your contribution to the overall platform.



Introductions resulting in 'net new' revenue to MSG this financial year (i.e. from 1 April 2014 to 31 March 2015) are currently open and will remain open all year – they will accrue from 1 April 2014 and be recognised in the 2015 remuneration process

View more information about the MSG ISC program.

United States - New York

# EXHIBIT "D"

# FY13 Annual MSG Cash Peer Review

## Individual feedback

| Empl ID | Full Name | Level | Business Title | Office | BU4 | Team | Manager |
|---|---|---|---|---|---|---|---|
| 53816 | Kristina McLaughlin | DD | US Equities Sales | New York Office | America | Sales | Austin Graham |

| No. Of Reviewers | Communication with Research | | Effectiveness as an Account Manager | | Telling the research | | Appreciation of key issues | | Ability to convert research to orders/ legal/ votes | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Mean | Range | Mean | Range | Mean | Range | Mean | Range | Mean | Range |
| 55 | 4.77 | 3 - 5 | 4.84 | 4 - 5 | 4.69 | 3 - 5 | 4.57 | 3 - 5 | 4.55 | 3 - 5 |

Comments

By far the hardest working, most active and best salesperson we have. She makes 2x the calls on my stocks of the next best person. : Top salesperson on platform: Kristina is awesome! / / She has put in the effort to match my product with the appropriate accounts, and really sold my ideas. She has been instrumental in helping me gain traction and build out my franchise. Always engaged, passionate about her job and thoughtful with clients Good with long-onlies and HFs : Kristina works harder than anyone to put me in front of clients. I wish she got some larger accounts. Super star: Very meticulous and proactive. Looking forward to working with Kristina as she ramps up. Kristina has been a great addition to the team and seems to be one of the most driven people on the desk; dialog has fallen off a bit this last 6 months. Encourage more teamwork when building relationships between clients and analysts. : Consistently asks questions on several names. One of the best sales people on our platform. Knows her accounts and how to sell the research. : Best salesperson at Macquarie. Knows what matters and able to sell the call better than anybody; Excellent, very glad to have KM on the team; Proactive about getting analysts in front of clients; Arguable the best we have. Please take good care of her. I would welcome h

## Regional team averages

| | Total No. Individuals Reviewed | Average No. Of Reviewers Per Individual | Communication with Research | Effectiveness as an Account Manager | Selling the research | Appreciation of key issues | Ability to convert research to orders/ legal/ votes | Overall |
|---|---|---|---|---|---|---|---|---|
| **Sales** | | | | | | | | |
| Overall Average | 26 | 39 | 3.91 | 3.96 | 3.86 | 3.88 | 3.78 | 3.88 |
| L1 | | | | | | | | |
| L2 | | | | | | | | |
| L3 | | | | | | | | |
| L4 | | | | | | | | |
| L5 | 3 | 36 | 3.97 | 3.99 | 3.96 | 3.98 | 3.83 | 3.95 |
| AD | 8 | 42 | 3.98 | 4.03 | 3.88 | 3.98 | 3.87 | 3.95 |
| DD | 10 | 41 | 3.94 | 4.05 | 3.92 | 3.95 | 3.85 | 3.94 |
| ED | | | | | | | | |

## Rating scale

## Khristina McLaughlin (Macquarie Securities)

By far the hardest working, most active and best salesperson we have. She makes 2x the calls on my stocks of the next best person. ; Top salesperson on platform.; Khristina is awesome! / / She has put in the effort to match my product with the appropriate accounds, and really sold my ideas. She has been insturmental in helping me gain traction and build out my franchise.; Always engaged, passionate about her job and thoughtful with clients. Good with long-onlies and HFs ; Khristina works harder than anyone to put me in front of clients, I wish she got some larger accounts.; Super star; Very meticulous and proactive. Looking forward to working with Khristina as she ramps up.; Khristina has been a great addition to the team and seems to be one of the most driven people on the desk; dialog has fallen off a bit this last 6 months.; Encourage more teamwork when building relationships between clients and analysts. ; Consistently asks questions on several names; One of the best sales people on our platform. Knows her accounts and how to sell the research. ; Best salesperson at Macquarie. Knows what matters and able to sell the call better than anybody; Excellent, very glad to have KM on the team; Proactive about getting analysts in front of clients; Arguable the best we have. Please take good care of her. I would welcome Khristina on any account and fear perhaps she is underutilized.; Very strong effort, very engaged, easy to work with and clearly interested in pushing my product; Simply a great sales person. Always willing to help, offer feedback, and one of our best. The US chemical team is a big fan. She is a joy to work with.; another stand out...good communication and follow thru.; really allows our team to gain votes; Very aggressive (in a good way) and has done a great job of penetrating her account base. Think some of the underperforming long-only accounts would benefit from having her on-board; Without doubt the most impressive of the newer sales people. Good sense of what her clients need.; Extremely strong work. Very proactive/aggressive and consistent in communicating with me and with the clients. Let's get some more votes/trades!; I remain impressed by Khristina's dedication, consistency and work ethics. By far the best sales person on our platform.; Khristina is tuned into the key topics and focus areas in energy and has shown an increased willingness to highlight our top ideas with her key accounts. She has great relationships at many of her key accounts and there could be good upside as momentum builds.; Has been positive addition to the team. A passionate advocate for an idea or stock that she believes in. ; does an awesome job pursuing clients whenever we are making a call. ; khristina is a consumate pro, she has top energy, builds great relationships with both research & clients, and gets results.; Kristina is the best sales person on our platform. She does an outstanding job on developing strong relationships with clients and understanding and selling our research and calls. Nice to have a veteran presence on the desk - her highly professional approach is much appreciated.; Really been impressed by Khristina's hard work. She really goes the extra mile and it shows. One of Macquarie's best in Sales. ; Tremendous effort and follow through. Thank you for all of your hard work. One of our best.

Khristina McLaughlin
Managing Director
Macquarie Capital (USA) Inc.
khristina.mclaughlin@macquarie.com
W: 212-231-8012
C: 917-589-1081
AOL: KMcLaugMACQ

# EXHIBIT "E"



No Service · 9:40 PM · 42%

< **Robby**

7:11 PM

so minor stress... you and I have become friends and I appreciate your work mentorship immensely ...... BIG. and like to have fun. and like to be casual.... but don't want people ...███... to think I have gotten to where I am bc I'm casual ... make sense ?

7:13 PM ✔✔

Sure  7:13 PM

Don't stress  7:13 PM

struggle with how to work really hard and earn it and have fun but not be put into box bc I can do both

7:13 PM ✔✔

bc easy for women to be put into fun box which discredits effort

7:14 PM ✔✔

Listen. We all have fun. I've had lots with ███ over the years. He won't judge you. Trust me





# EXHIBIT "F"

No Service 📶      **9:20 PM**      🔒 58% 🔋

🔍 Search      Cancel

I respect your text even in the context of my phone was broken and I wasn't intentionally ignoring you. It's what needs to be anyway. I only wish you happiness and I will still look forward to seeing you at work and hopefully still leaning on you for work guidance    7:44 AM ✓✓

happy new year.    7:45 AM ✓✓

I also went to bed at like 8pm last night bc I was tired from trip and needed to rest up bc I have James non stop starting this morning for next 3 days. so that's why I didn't get your red cup reply til this morning too. was def not blowing you off.    7:51 AM ✓✓

So what do you want?
You know what I want    7:58 AM

I was so worried about you
I was thinking of calling the police
If it were me, I would have



∧    ∨

Search    Cancel

I said I want to be friends that's what I want but I don't think we are capable of being friends without continuing to cross lines    8:09 AM ✓✓

and that I want you to be happy    8:09 AM ✓✓

and I want us to continue to crush it at work    8:10 AM ✓✓

Don't you want more than friends/happiness/crush work?    8:17 AM

That's my question    8:18 AM

What do you really, truly want?    8:18 AM

I don't    8:18 AM ✓✓

and I don't know what I truly want for myself other than my job in order to be able to take care of my boy ... and a simple happy uncomplicated life ... I was in FL in the sun and thinking fuck. why can't I live here by the beach and

No Service    9:21 PM    58%

Search    Cancel

boy ... and a simple happy uncomplicated life ... I was in FL in the sun and thinking fuck. why can't I live here by the beach and just have an easier life ... but I can't for now. James is too young and I am not allowed to move bc of my ex etc    8:20 AM

I guess that's where we differ.
I want to be with you.
Anyways: friends, happiness and work.
We can do all 3.    9:27 AM

I'd like if we can manage all 3.    9:29 AM

This is such an unsatisfactory outcome and deffo not how I wanted the new year to start.    1:41 PM

I'm sorry. I don't really know wh else to say.    2:19 PM

# EXHIBIT "G"

●●○○○ AT&T 📶          8:51 PM          🔒 ✈ ⏰ ∗ 40% 🔋

From:  Michael Silverton (MacCap) ❯          Hide

To:  Robert Ansell (Macquarie Securities) ❯

## (No Subject)

Mon 28 Nov 2016 8:48 PM

I said to Andrew that good he's going w you as business head.  He said he agrees


Michael Silverton
Macquarie Capital
+13125765922

Message sent.

⚐          🗁          🗑          ↰          ✎

●●○○○ AT&T 📶  6:34 PM  🔄 ⌲ ⏰ ⚹ 61% 🔋

⌃   ⌄

---

From:  Michael Silverton (MacCap) >           Hide

---

To:  Robert Ansell (Macquarie Securities) >

---

## (No Subject)

Mon 21 Nov 2016 6:25 PM

---

Congrats


Michael Silverton
Macquarie Capital
+13125765922

---

                    

# EXHIBIT "H"

12/17/16

MCLAUGHLIN/MQ 000001

12/17/16



MCLAUGHLIN/MQ 000002

12/17/16



MCLAUGHLIN/MQ 000003

# EXHIBIT "I"

No Service  9:24 PM  57%

Search  Cancel

I hear you  5:37 PM

It's when then interferes with me then I have a problem  5:37 PM

what did you do today?  lounge ? tan.?  sip margs?  5:38 PM

can't believe you let them drink  5:42 PM

maybe on Houston  5:42 PM

still need to "talk"  5:42 P

Yep. Still need to talk.

# EXHIBIT "J"



# EXHIBIT "K"



No Service    9:26 PM    57%

Search                          Cancel

12:58 AM

12:58 AM

12:58 AM

☎️ Missed voice call at 2:25 AM

2:27 AM

2:27 AM

this does not make me happy at all. it makes me incredibly sad. I am so sorry. I never wanted this. I don't love your husband. he was my boss. I tried many times to tell him no, but he just wouldn't accept it. I finally gave in. I wish none of this ever happened. again I am sorry.

11:15 AM ✓✓

I've got my phone back          12:48 PM

# EXHIBIT "L"





Case 1:17-cv-02935-RA   Document 75-3   Filed 07/08/20   Page 165 of 205



# EXHIBIT "M"

10/21/17

" Ed Eppley "



Sent from VMware Boxer

On October 21, 2017 at 5:02:04 PM EDT, Ed
Eppley <oceppley@gmail.com> wrote:

···

Good Afternoon Robby,

I'm looking forward to our dinner
tomorrow night. When you are able, can
you please confirm the time and
location. I'll be staying at the same
hotel as we are conducting the offsite.

I understand you are interested in the
talking points I would share with
Khristine if given the chance to speak
with her before Monday's offsite. Here
are the key items I think she needs to
know:

MCLAUGHLIN/MQ 000007



**Robert Ansali**
5:00 PM

- There is a theme from her peers that its not safe to share opinions with either her or Robby that are in conflict with what Khristina wants.
- This concern comes from a sense that Robby shows unusual amounts of bias to do as Khristina suggests and this is something that Khristina intentionally works to achieve.
- This will test her ability to hear these concerns and understand that they are real. They are hopeful she will alter her behavior enough so her peers believe she is doing what is in Macquarie's best interest instead of what is of most benefit to her.
- Her inability to listen and learn and accept this feedback a moment of truth for her career. To the extent

    

MCLAUGHLIN/MQ 000008



• Her inability to listen and learn and accept this feedback a moment of truth for her career. To the extent that she takes this as valid and meaningful and makes adjustments will show she's capable of learning.

Please let me know any questions or concerns. Otherwise, I'll ask Jenny to schedule a call for me and Khristina sometime Sunday afternoon.

One final thought... I appreciate that you want to get this issue on the table and addressed. Many executives try to avoid having what can be challenging discussions. Thanks for demonstrating such courage.

Best regards,

   


MCLAUGHLIN/MQ 000009

# EXHIBIT "N"



**T-Mobile** 5:07 PM 45%

Connecting...

anyways. I'll deal. have a good night
7:44 PM

**Today**

I won't let it be a witch hunt
6:17 AM

There's no way you ever put yourself before MQ
6:17 AM

Well, I've never seen it.
6:17 AM

As I said - this is about perception
6:18 AM

We need to address why people perceive it to be the case
6:18 AM

6:21 AM

I will defend you.
I will not run you over.
I will explain my philosophies and how they matched up.
It'll be better than ok.
10:34 AM

ok
2:19 PM

# EXHIBIT "O"



**From: Brian McLaughlin** ›

To: Khristina McLaughlin ›          Hide

## Your firm is doing little to contain the rumor mill

November 1, 2017 at 10:52 AM

Hi Khris,
I hate to be giving you this news but I just got a call from one of my longest sell side relationships. He covers Honeycomb and apparently their coverage at MacQ  told him that the head of equities was fired for having an affair with you and that you await your fate. The details he gave him were that the T&E's and were a tip-off. Obviously a lie and slander. I hate to hear this stuff obviously and you should pass this along to your council.
Call me if you want to speak.

Best,
Brian

    

# EXHIBIT "H"



Proskauer Rose LLP    Eleven Times Square    New York, NY 10036-8299

November 17, 2017

Lloyd B. Chinn
Member of the Firm
d +1.212.969.3341
f 212.969.2900
lchinn@proskauer.com
www.proskauer.com

Via E-FILE
The Honorable Judge Victor Marrero
Daniel Patrick Moynihan
United States Courthouse
500 Pearl St.
New York, NY 10007-1312

Re:   *McLaughlin vs. Macquarie Capital (USA) Inc.*, et al., No. 1:17-cv-09023

Dear Judge Marrero:

I represent Macquarie Capital (USA) Inc., in the above-captioned action.  I write to request, on an expedited basis, that the Complaint filed by Khristina McLaughlin in this action be temporarily sealed pending the resolution of a Motion to Compel Arbitration and Seal the Complaint, to be filed imminently by my client.

Plaintiff's claims arise out of her employment with Macquarie Capital (U.S.A.) Inc., an operating group of Macquarie Group Limited, and a subsidiary of Macquarie Holdings (USA) Inc. (Affidavit of G. Weidy ("Weidy Aff." (notarized version to be supplied) at ¶2) Macquarie Group Limited is a global investment banking and diversified financial services group. (Weidy Aff. at 2) Macquarie Capital (U.S.A.) comprises the U.S. arm of Macquarie Group's corporate advisory, equity, debt and private capital markets businesses, and undertakes principal investing. (Weidy Aff. at 3) It is a Delaware corporation with a principal place of business in New York, New York.  (Weidy Aff. at 5) Macquarie Capital (U.S.A.) has operations across the United States. (Weidy Aff. at 5) Plaintiff is employed by Macquarie Capital (U.S.A.) (hereinafter referred to as "Macquarie") in its office located at 125 W 55 Street, 22nd Floor, New York, NY, 10019, and has been since February 21, 2012.

Plaintiff, a current employee of Macquarie, entered into an employment agreement at the time of her hire in which she expressly agreed to arbitrate "any controversy or claim arising out of or relating to [her] employment relationship with Macquarie, the terms and conditions of [her] employment or the termination thereof."  (The Agreement, annexed to Weidy Aff. as Exhibit ("Ex.") A, at 8).  Moreover, McLaughlin agreed to the condition that any such arbitration be "strictly confidential." (Weidy Aff., Ex. A, at Annex A, p. 12).  McLaughlin further acknowledged in the Agreement that claims covered by the Agreement include "claims for discrimination…based on sex…and/or claims for violation of any federal state or other governmental law, statute, regulation or ordinance including…Title VII of the Civil Rights Act of 1964."  (Weidy Aff. Ex. A, at Annex A, p. 11).  I advised Plaintiff's counsel of the existence of this Agreement on November 1, 2017, and sent him a reminder with an attachment of the

## Proskauer»

Judge Victor Marrero
November 17, 2017
Page 2

Agreement this morning. In disregard of her obligations under the Agreement, McLaughlin has filed a Complaint against Defendant in this Court purporting to assert claims relating to her employment, including claims of sexual harassment and sex discrimination.

While in general the public has a right to access judicial records, this presumption can be overcome by balancing competing considerations, including "the privacy interests of those resisting disclosure." *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 120 (2d Cir. 2006). Indeed, the Second Circuit has recognized that documents "may be sealed if specific, on the record findings are made demonstrating that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Id.* Among the factors for a court to consider in evaluating the privacy interest of those opposing disclosure are the following: (1) "the degree to which the subject matter is traditionally considered private rather than public," and (2) "the nature and degree of the injury" that will be caused by revealing the information, which may include determining "whether the nature of the materials is such that there is a fair opportunity for the subject to respond to any accusations contained therein." U.S. v. Amodeo, 71 F.3d 1044, 1051 (2d Cir. 1995).

Each of the relevant factors weighs in favor of sealing the Complaint in this case. First, the allegations are meant to have been "private rather than public," because Plaintiff entered into a valid Agreement providing that all claims arising out of her employment must only be brought in strictly confidential arbitration proceedings. (Weidy Decl., Ex. A, at Annex A, p. 12). Second, the Complaint makes various salacious allegations and attaches salacious documents concerning Macquarie and certain of its employees. The negative publicity that will undoubtedly result from publication of the allegations will likely cause irreparable harm to Macquarie and its reputation. Finally, without the sealing of the Complaint, Macquarie will lose the benefit of its binding and valid agreement with McLaughlin to arbitrate all claims in strictly confidential arbitration. Courts in this District have found that a party's interest in the enforcement of a confidential arbitration agreement is a sufficient interest to support a grant of a motion to seal. *See, e.g, Century Indem. Co. v. Glob. Reinsurance Corp. of Am.*, No. 15-cv-6426 (S.D.N.Y. Dec.10, 2015) (order granting motion to continue sealed filing of documents) ("In light of the confidentiality provisions of the arbitration agreement … the parties' request for continued sealed filing of the petition and the award is also granted.") These interests outweigh any right of public access, and accordingly, the Court should temporarily seal the Complaint pending the outcome of Macquarie's forthcoming Motion to Compel Arbitration and Seal the Complaint.

Respectfully Submitted,

Lloyd B. Chinn, Esq.

Attachments

Proskauer≫

Judge Victor Marrero
November 17, 2017
Page 3

Cc: Jonathan Sack, Esq.

```
------------------------------------ X
KHRISTINA MCLAUGHLIN,               :
                                    :
                   Plaintiff,       :
                                    :
      -against-                     :       Case No.  Case No. 1:17-cv-09023
                                    :
                                    :
MACQUARIE CAPITAL (U.S.A.) INC.,    :
                                    :       AFFIDAVIT OF GARY WEIDY
                   Defendant.       :
                                    :
                                    :
------------------------------------ X
```

Gary Weidy, having personal knowledge of the facts herein, having been duly sworn, and under penalty of perjury, hereby states:

1.  I am currently employed as Regional Operations Lead, Associate Director, for Macquarie Holdings (U.S.A.) Inc. I submit this affidavit based upon my personal knowledge and in support of the Motion to Compel Arbitration and to Seal the Complaint on behalf of Defendant in the above-captioned matter.

2.  Plaintiff Khristina McLaughlin's ("Plaintiff") claims in this action arise out of her employment with Macquarie Capital (U.S.A.) Inc., an operating group of Macquarie Group Limited, and a subsidiary of Macquarie Holdings (U.S.A.) Inc.

3.  Macquarie Group Limited is a global investment banking and diversified financial services group.

1

4. Macquarie Capital (U.S.A.) ("Macquarie USA") comprises the U.S. arm of Macquarie Group's corporate advisory, equity, debt and private capital markets businesses, and undertakes principal investing.

5. Macquarie U.S.A. is a Delaware corporation with a principal place of business in New York, New York. Macquarie U.S.A. has operations across the United States.

6. McLaughlin is employed by Macquarie U.S.A. in its office located at 125 W. 55th Street, 22nd Floor, New York, NY, 10019, and has been since February 21, 2012.

7. Attached hereto as Exhibit A is a true and correct copy of Plaintiff's employment agreement with Defendant, agreed to and acknowledged by Plaintiff on May 6, 2017, at which time she was promoted to a new position.

8. Attached hereto as Exhibit B is an electronic communication, sent to Plaintiff on May 6, 2017, confirming that she accepted the terms of the employment agreement.

Dated: November 17, 2017

_____
Gary Weidy

Subscribed and sworn to before me

This ____ day of _____, 2017

_____

Notary Public

2

# EXHIBIT "A"

**Macquarie Holdings (U.S.A.) Inc.**
A member of the Macquarie Group

| | | |
|---|---|---|
| 125 West 55th Street | Telephone | (212)231 1000 |
| 22nd Floor | Facsimile | (212)231 1010 |
| New York NY 10019 | Internet | http://www.macquarie.com |

May 5, 2017

Khristina McLaughlin
C/o Macquarie Holdings (U.S.A.) Inc.
New York Office



Dear Khristina,

This employment agreement ('Agreement') sets out terms and conditions of your employment effective from July 1, 2017. Except as set forth in any prior agreement with respect to any previous or existing clawbacks or other contractual repayments owed to the firm, which shall remain in full force and effect, this Agreement constitutes the entire agreement between you and Macquarie Holdings (U.S.A.) Inc. ('Employer') in relation to the subject matter herein and supersedes any previous or contemporaneous written and oral agreements, understandings, commitments and representations between you and the Employer in relation to that subject matter. Any implied contractual duty of good faith or duty of cooperation owed to you by the Employer is expressly excluded from forming part of this Agreement. By entering into this Agreement, you confirm that you have not relied on any previous written or oral agreement, understandings, commitments or representations other than those set out in this Agreement. Any amendments or revisions to the terms of this Agreement must be in writing and signed by an authorized officer of the Employer.

Subject to the conditions herein, below is a summary of the terms of your employment with the Employer:

| | |
|---|---|
| **Position:** | Head of US Sales, Cash Equities |
| **Assigned to:** | Macquarie Capital (U.S.A.) Inc. |
| **Business Group:** | Commodities and Global Markets |
| **Salary:** | USD 400,000.00 |

The Macquarie Group ('Macquarie') comprises the Employer, Macquarie Group Limited and their worldwide related entities (each a 'Macquarie entity'). You agree that your obligations under this Agreement are owed to, and for the benefit of, Macquarie and that this Agreement shall serve to the benefit of and be binding upon the Employer's successors and assigns.

**Employee Information**

The Employer relies on representations made and information given by you during your recruitment process and on the Employment Declaration as being true and correct for the

**Macquarie Holdings (U.S.A.) Inc. is not an authorised deposit-taking institution for the purposes of the Banking Act (Commonwealth of Australia) 1959, and Macquarie Holdings (U.S.A.) Inc.'s obligations do not represent deposits or other liabilities of Macquarie Bank Limited ABN 46 008 583 542 (MBL). Neither MBL nor any other Macquarie Group entity guarantees or otherwise provides assurances in respect of the obligations of Macquarie Holdings (U.S.A.) Inc.**

duration of your employment with the Employer. You must update or provide to the Employer any material information in relation to those representations or any matters which may impact your employment which may change or arise at any time during your employment. The omission of any relevant information, or the provision of false or misleading information, could result in disciplinary action including termination of employment.

Your employment is contingent upon your compliance with the Immigration and Naturalization regulations requiring the establishment of your identity and ongoing right to work in the United States.

It is the Employer's practice to conduct occasional background checks on its employees during their employment. It is a condition of your employment that you consent to additional background checks being conducted during your employment, and to the results of those checks being made available to Macquarie, for the purpose of considering your suitability for ongoing employment. Your employment may be terminated if the Employer considers the results of a background check to be unsatisfactory or materially inconsistent with the information given to the Employer during the recruitment process.

**Employment within Macquarie**

From time to time, the Employer may change your role, duties, responsibilities, reporting line and/or work location and direct you to work for, or undertake duties for, another business group or Macquarie entity.

Macquarie may, at times, need to transfer employees from one Macquarie entity to another Macquarie entity for accounting, taxation, regulatory, licensing, business or other reasons. You consent, to the extent permissible by law, to your employment being transferred to another Macquarie entity at the discretion of the Employer.

Although your, role, duties, responsibilities, reporting line, work location and/or employer within Macquarie may change, unless otherwise agreed, the terms and conditions set out in this Agreement will continue to apply.

**Employee Obligations and Macquarie's Policies**

Macquarie's policies, including, but not limited to, Macquarie's Code of Conduct, Confidential Information policy, Works Created during Employment policy, Information Barriers and Confidentiality policy, Outside Business Activities policy, Conflicts of Interest policy, Personal Investments policy and Appropriate Workplace Behaviour (EEO) policy, are available on Macquarie's intranet ('Macnet') (collectively, the 'Policies'). You agree to comply fully with the Policies and Macquarie's guidelines and procedures applicable to employees, as amended, varied or replaced from time to time. Macquarie may amend, replace, revoke or suspend the Policies at any time (with the exception of its "at will" policy) and you must comply with any amended or new Policies.

You agree that you will act in the best interests of Macquarie and faithfully and diligently devote your full time and energies to your position. You agree that you will perform your duties in a manner that is consistent with all laws and regulatory requirements (including without limitation any regulations of any applicable self-regulatory organization) applicable to your position and the work you perform. You also agree to comply with all lawful directions of the Employer and undertake training as directed.

You further agree to inform the Employer of any matter in connection with your employment which comes to your notice that may be regarded as material and relevant to the Employer or Macquarie; and to immediately disclose to the Employer any information which does, or may, lead to you not being lawfully entitled to perform your duties or responsibilities. A breach by you

of any of the Policies may result in disciplinary action which may include the termination of your employment for cause.

**Outside Business Activities**

The Employer may require you to provide details of interests you have outside of your employment for regulatory purposes or to help the Employer manage risks. You are required to advise the Employer of any external directorships, secondary employment or engagement or other business activities ('Outside Business Activities') that you hold or engage in or which you propose to take up. The Employer may require that you resign from, do not accept or do not take up such Outside Business Activities. You must not engage in any Outside Business Activities without the prior written consent of the Employer. This obligation is currently detailed in Macquarie's Outside Business Activities policy and Conflicts of Interest policy.

**Confidential Information**

During your employment and after your employment with the Employer ends, you must not, directly or indirectly, disclose, copy or use any information which Macquarie designates as being confidential or that you might reasonably expect Macquarie to regard as confidential. You are directed to not bring or use any information to the Employer or Macquarie which belongs to a third party, or to which you are not lawfully entitled. Further details of your duties regarding confidential information are included in Macquarie's Confidential Information policy which has been provided to you with this Agreement.

**Compensation**

Your annualized salary of $400,000.00 will be paid at a semi-monthly rate of $16,666.67 in accordance with customary payroll practices and procedures, subject to applicable law. This salary covers all hours worked by exempt employees. You will receive your semi-monthly pay on or around the 15th and the last day of each month.

**Discretionary Profit Share**

In addition to your base salary, a discretionary profit share bonus may be allocated to you in recognition of your contribution in the course of your employment for the financial year to 31 March. Profit share bonuses are completely discretionary, do not form part of your base salary, and will not be included in the calculation of any termination payments including payments in lieu of notice and payments in lieu of accrued but untaken leave.

While you may receive a profit share bonus in a particular financial year, you will not necessarily receive a profit share bonus in any subsequent year. All profit share allocations will be made in installments in accordance with applicable Macquarie policies, including the Profit Share and Profit Share Retention policies, as amended from time to time. Under these policies, any profit share allocations are conditional on, among other things, your remaining employed by the Employer on the relevant vesting and crystallization dates. No amounts (pro-rata or otherwise) or payments in lieu will be payable if you are not employed on those dates. This means that you will have no entitlement to any retained portion of your profit share allocation until the relevant vesting dates.

The Employer reserves the right to terminate (with or without substitution) or vary the terms of any profit sharing or bonus scheme, including, without limitation, the Profit Share and Profit Share Retention policies, at its discretion from time to time.

**Insurance and Other Benefits**

All regular full-time, regular part-time (scheduled to work 20 or more hours per week), and fixed-term employees (with an initial term of greater than 90 days) are eligible as of their date of hire to participate in the Employer's health and welfare benefit plans, as they exist from time to time, in accordance with the terms of applicable plan documents.

If, after the initial date of hire, an ineligible employee subsequently meets the eligibility requirements as described above, he or she will become eligible to participate in the Employer's health and welfare benefit plans after a waiting period of 90 days of continuous employment.

All eligible employees will be enrolled in the Employer's default medical benefits coverage selection, as then in effect, if no affirmative election or declination of coverage is made within 30 days of their date of hire or the end of their waiting period, as applicable.

**401(k) Plan**

The Employer maintains a 401(k) plan for its eligible employees. Subject to the terms and conditions set forth in the applicable plan documents, eligible employees may participate in the plan following their date of hire.

The 401(k) plan has an automatic enrollment feature. All employees will be enrolled automatically in the plan if no affirmative election or declination of participation is made within the first 60 days of employment, in accordance with the terms and conditions set forth in applicable plan documents.

**Paid Time Off**

Full-time exempt employees are eligible for four weeks of vacation per year and for other holiday, sick and personal time as is generally provided to other exempt staff.  Part-time employees will accrue vacation time on a pro-rata basis. Time is accrued on a monthly basis pursuant to the Employer's governing time off policies, which also set forth rules pertaining to usage of time and other related issues.

The Employer requires you to submit a properly completed and authorized leave application for all periods of absence. Depending on your role, you may be required to take at least two weeks of continuous leave during every 12 month period for risk management purposes. If at any time you work in such a role, you agree to take the required period of continuous leave annually.

You will be entitled to statutory public holidays in accordance with the relevant legislation of the location in which you are based. Employee who trade or settle foreign markets are expected to take such holidays in accordance with the Cash Equities and Equities & Derivatives Trading's public holiday guidelines as amended from time to time.

**Status of Employment/Termination of Employment**

Termination with Notice

Your employment is "at will."  Either you or the Employer may terminate your employment, with or without cause at any time, subject to the notice provisions set forth herein.

You agree to provide the Employer with four (4) weeks' notice of your voluntary resignation. The Employer may exercise its discretion to shorten any notice period associated with your resignation. The Employer agrees to provide you with four (4) weeks' notice of your termination when feasible except in the case of a termination for Cause. The period between such notice and

termination of employment will be referred to as the 'Notice Period.' Such notice provision shall not alter your at-will status.

If the Employer terminates your employment without Cause or you resign by giving notice in accordance with the terms herein, the Employer may in its sole discretion, alter your duties or place you on a paid leave of absence during the Notice Period.

You may not provide services to any other employer or act as a consultant or otherwise assist any person or entity in connection with their business during your employment including during the Notice Period, regardless of whether you are working or on a paid leave of absence during such period, unless otherwise approved by management. You must continue to act in accordance with your employment obligations during your employment, including during any Notice Period.

<u>Termination for Cause</u>

For the purposes of this Agreement only, termination for 'Cause' means:

(i)     an action taken by a regulatory body or a self-regulatory organization against you that substantially prohibits or suspends you from performing or substantially impairs the performance of your duties of employment;

(ii)    your lack of relevant qualifications, licenses or approvals by a regulatory body required to perform your duties of employment;

(iii)   your negligent or wilful failure to perform the material duties of your employment (other than any such failure resulting from incapacity due to physical or mental illness);

(iv)    your material misrepresentation of facts relied upon in entering this Agreement or your material breach of any of your obligations under the terms and conditions of your employment, including but not limited to your obligations set out under this Agreement or of any of the Policies or Macquarie procedures (written or unwritten) of which you are aware or reasonably should be aware;

(v)     your breach of fiduciary duties to Macquarie;

(vi)    your conviction of, or pleas of guilty or nolo contendere to, a criminal offense (where the offense is relevant to your employment) or an action taken by a law enforcement organisation against you that substantially prohibits or suspends you from performing or substantially impairs the performance of your duties of employment;

(vii)   your wilful refusal to follow the proper direction of the Employer or any individual to whom you directly report;

(viii)  your commission of an act or omission that, in the reasonable opinion of the Employer, may materially injure the reputation of the Employer or Macquarie; and

(ix)    your commission of an act or omission that constitutes fraud, embezzlement or material dishonesty or any other act of gross misconduct.

**Property**

On termination of employment, or if instructed at any time during your employment, you must deliver to the Employer any Macquarie property in your possession or control and certify that you have not retained Macquarie property. For the avoidance of doubt, Macquarie property includes, but is not limited to, data or any phone or computer hardware and software belonging to Macquarie. You are not entitled to retain a copy of, or record in any form, any documents or records referred to above following the termination of your employment.

On termination of employment, or if instructed at any time during your employment, you must provide (to an appropriate individual within Macquarie's Human Resources or Technology division) details of any passwords required to access and reset any device or technology belonging to Macquarie.

**Protection of Macquarie's Interests**

<u>Acknowledgement</u>

You acknowledge and agree that:

a. Macquarie engages in a broad range of activities on a global basis in connection with its banking, financial, financial markets, advisory, capital raising, investment and funds management businesses and related support functions across its different business groups (collectively, 'the Activities'); and

b. during your employment, you have been and/or will be exposed to Confidential Information (as defined in the Confidential Information policy, as amended, varied or replaced from time to time), and other aspects of Macquarie's business that are the property of, and valuable to, Macquarie (including the Employer), and Macquarie is entitled to reasonable protection of those rights.

Notwithstanding any other term of this Agreement, you acknowledge and agree that, immediately upon accepting any offer of new employment, you will inform your new employer of the restrictions contained in this Protection of Macquarie's Interests clause which continue to apply to you following the end of your employment with the Employer.

<u>Non-Competition</u>

This clause will apply automatically during your employment. This clause will also apply for a period ('Restraint Period') of three months following the date on which this Agreement ends ('Termination Date'), if:

- you hold the position of, or equivalent to, Senior Manager, Associate Director, Division Director or Executive Director on the Termination Date; and

- the Employer notifies you in writing within 14 days following the Termination Date that it has exercised its discretion to enforce this clause.

You agree that:

- during your employment you will not, either directly or indirectly and whether as an employee, contractor, consultant, director or agent or in any other capacity, be engaged by, assist, work for or participate in any business that competes with any of the Activities: in which you were materially involved; or in respect of which you had access to Confidential Information, within the last 12 months of your employment with Macquarie ('Material Activities'), in any country in which those Activities are undertaken by the group or groups in Macquarie in which you were employed.

- during the Restraint Period (if applicable), you will not, either directly or indirectly and whether as an employee, contractor, consultant, director or agent or in any other capacity, be engaged by, assist, work for or participate in any Material Activities, in the same, or a substantially similar position, or in a position where you perform any of the Material Activities, that you held with Macquarie, in any country in which those Activities are undertaken by the group or groups in Macquarie in which you were employed.

If the Employer enforces this clause after the Termination Date, it will pay you an amount equal to the base salary and the value of medical benefits (which you had elected at the time of your notice of termination) that you would have received, less any applicable deductions, had you been employed during the Restraint Period ('Restraint Payment').

Non-Solicitation

You agree that:

- during your employment and for a period of three months after the Termination Date, regardless of the reason your employment ends, you must not:

  - directly or indirectly, solicit, canvass or approach any person who, or any entity which, was at any time within the last 12 months of your employment with Macquarie, an actual or prospective client or business partner of Macquarie in that part or parts of the business carried on by Macquarie in which you worked and with whom you had contact, dealings, influence, or learned information about, with a view to obtaining the business or patronage of such client or business partner in a business that is the same or similar to that part or parts of Macquarie's business; or

  - otherwise interfere with the relationship between Macquarie and its clients or business partners with whom you had contact, influence or learned information about while you were employed by Macquarie;

- during your employment and for a period of six months after the Termination Date, regardless of the reason your employment ends, you must not:

  - directly or indirectly, induce or assist in the inducement or solicitation of any employee, contractor or consultant of Macquarie who was an employee, contractor or consultant of Macquarie within the last 12 months of your employment with Macquarie, and with whom you had contact or influence during your employment, to leave their employment or engagement with Macquarie, or to become employed by you or an entity with whom you become affiliated, after the Termination Date, whether or not in leaving their employment or engagement the employee, contractor or consultant would breach the terms of that employment or engagement; or

  - otherwise interfere with the relationship between Macquarie and its employees, contractors or consultants with whom you had contact, influence or learned information about while you were employed by Macquarie.

The restrictions contained in this Non-Solicitation clause are not contingent on a Restraint Payment being made.

Violation of Covenant Provisions

You agree that the restrictions contained in the above clauses, Confidential Information, Non-Competition and Non-Solicitation together with any applicable Policies ('Covenant Provisions') are fair and reasonable and necessary for the protection of the Employer's legitimate business interests and that the Employer would not have entered into this Agreement without the inclusion of such restrictions. Moreover, you recognize and expressly acknowledge that these restrictions grant to the Employer only such reasonable protection as is admittedly necessary to preserve Macquarie's legitimate business interests. It is expressly agreed by the Employer and you that the Covenant Provisions shall survive the termination of this Agreement and the termination of your employment, for any reason.

You further acknowledge that any breach of the Covenant Provisions will result in irreparable harm to the Employer and that no remedy at law will be adequate for such breach, and you therefore consent to the entry of a restraining order, preliminary injunction or other court order to enforce this Agreement without posting of bond, to the extent permitted by law. You agree that the foregoing relief shall be in addition and without prejudice to all other remedies to which Employer is entitled at law or in equity.

**No Third Party Rights or Benefits**

The parties do not intend that this Agreement should confer any right or benefit on any third party, other than the entities within Macquarie.

**Ongoing Obligations**

The clauses titled "Confidential Information", "Property", and "Protection of Macquarie's Interests", continue to apply following the end of your employment with Macquarie.

**No Waiver**

Any failure or delay by Macquarie to enforce a provision of this Agreement will not affect or render that provision unenforceable, or prevent Macquarie from pursuing remedies in respect of a breach of this Agreement at any time in the future.

**Arbitration Agreement**

You agree that the Arbitration Agreement attached to this Agreement as Annex A applies to the terms and conditions of your employment with the Employer. By accepting this Agreement, you affirmatively indicate your agreement to the terms set forth therein. Both you and the Employer understand that by agreeing to the terms of the Arbitration Agreement, both are giving up any constitutional or statutory right they may possess to have covered claims decided in a court of law before a judge or a jury.

**Data Privacy**

You acknowledge and agree that the Employer has the right to collect, use and disclose your personal information for purposes relating to the administration of your employment with the Employer, including administering your compensation and benefits and compliance with any regulatory, reporting and withholding requirements. You acknowledge and agree that your personal information may be disclosed by the Employer to its affiliated entities for such purposes. The Employer will take reasonable steps to maintain physical, technical and procedural safeguards regarding your personal information. You consent to the transmission, processing and storage of your personal information in the United States and at international service centres outside the United States.

**Governing Law and Forum Selection**

This Agreement shall be governed by and construed in accordance with the laws of the state of New York without giving effect to its principles of conflict of laws.  Should any dispute not be subject to arbitration, any action to enforce the terms of this Agreement or any other dispute arising out of your employment shall be brought in the appropriate state or federal court located closest to your final work location and the parties consent to such personal jurisdiction and waive any objections to the resolution of disputes hereunder in such jurisdiction.

**Severability**

Any provision or part of a provision of this Agreement which is held to be illegal, void or unenforceable will either be modified so that it is enforceable, or deemed ineffective to the extent only that it is illegal, void or unenforceable, without invalidating the remaining provisions or part of a provision of the Agreement.

Yours truly,

**Austin Dowling**
Regional Head of Human Resources, Americas

**Acceptance**

I understand and, by selecting the 'accept' button on the portal, acknowledge and accept the terms of my employment as set out in this Agreement and the Arbitration Agreement, and will comply with the terms and conditions of my employment and the Policies as amended from time to time.

I acknowledge that I have received, read and understand the Policies provided to me with this Agreement entitled Benefit and Policy Information (March 2017 v1) and that these provisions are incorporated by reference into this Agreement. My acceptance indicates my agreement to comply with and be bound by these Policies and with all Policies as amended from time to time, including but not limited to:

- Acceptable Use of Technology policy
- Appropriate Workplace Behaviour (EEO) policy
- Code of Conduct
- Confidential Information policy
- Conflicts of Interest policy
- Information Barriers and Confidentiality policy
- Macquarie US Benefits Guide
- New York City's Earned Sick Time Act
- Outside Business Activities policy
- Pregnancy and Employment Rights
- Personal Investments policy
- Works Created during Employment policy
- MSG Personal Investments policy

I confirm that this Agreement has been provided to me in my primary language, or if English is not my primary language I confirm that the information relating to compensation has been provided to me in my primary language if a translation has been prepared by the Department of Labor.

ANNEX A

**ARBITRATION AGREEMENT**
**For Registered Employees of Macquarie Holdings (U.S.A.) Inc.**

While Macquarie hopes that employment disputes with its Employees will not occur, Macquarie believes that where such disputes do arise, it is in the mutual interest of all concerned to handle them promptly and with minimal disturbance to the operations of Macquarie's businesses and the lives of its Employees.

Accordingly, to provide for more expeditious resolution of certain employment-related disputes that may arise between Macquarie and its Employees, Macquarie has instituted a mandatory arbitration procedure (the "Macquarie Arbitration Procedure" or the "Procedure") for its Employees as set forth herein. This Arbitration Agreement ("Agreement") applies to all Macquarie Employees in the United States of America. Under the Procedure, certain disputes that may arise from your employment with Macquarie, the terms and conditions of your employment or the termination of your employment must (after appropriate attempts to resolve your dispute internally through Macquarie management channels) be submitted for resolution by mandatory arbitration.

In agreeing to submit employment disputes for resolution by arbitration, you acknowledge that such agreement is given in exchange for rights to which you are not otherwise entitled - namely, your employment as a Macquarie Employee and the more expeditious resolution of such disputes. In exchange for your agreement to submit such disputes to the binding arbitration process set forth herein, Macquarie likewise agrees to the use of arbitration as the exclusive forum for resolving employment disputes covered by this Agreement.

Hence, the parties shall be precluded from bringing or raising in court or another forum any dispute that was or could have been brought or raised pursuant to the procedures set forth in this Agreement.

**Arbitration Procedure**

As a condition of your employment at Macquarie, you agree that any controversy or claim arising out of or relating to your employment relationship with Macquarie, the terms and conditions of your employment or the termination thereof must be submitted for final and binding resolution by a private and impartial arbitrator, to be jointly selected by you and Macquarie.

**Claims Covered:** This Agreement to arbitration includes any claim that could be asserted in court or before an administrative agency or claims as to which the employee has an alleged cause of action, including without limitation claims for breach of any contract or covenant (express or implied), tort claims, claims for discrimination (including, but not limited to, discrimination based on sex, pregnancy, race, national or ethnic origin, age, religion, creed, marital status, sexual orientation, mental or physical disability or medical condition, or other characteristics protected by statute), claims for wrongful discharge, violations of confidentiality or breaches of trade secrets, and/or claims for violation of any federal state or other governmental law, statute, regulation or ordinance (including, but not limited to, the Americans With Disabilities Act, the Age Discrimination in Employment Act, the Family Medical Leave Act, the Fair Labor Standards Act, the Employee Retirement Income Security Act, Title VII of the Civil Rights Act of 1964, the Genetic Information Non-Discrimination Act and any and all claims relating to your employment and/or termination of your employment with the company whether based on state law, commonwealth law, local law, statute, regulation, ordinance or common law).

Disputes covered by the Procedure include all such claims whether made against Macquarie, any of its subsidiary or affiliated entities, or its individual officers, directors, or trustees thereof (in an official or personal capacity).

**Claims Not Covered:** Claims covered by this Agreement do not include (i) a claim for workers' compensation benefits; (ii) a claim for unemployment compensation benefits; (iii) a claim by Macquarie for temporary or preliminary injunctive and/or other equitable relief, including, but not limited to, such claims for unfair competition and/or the use or unauthorized disclosure of trade secrets or confidential information, as to which Macquarie may seek and obtain relief from a court of competent jurisdiction in advance of pursuing such claims in arbitration pursuant to this Agreement; (iv) a claim for money damages by Macquarie related to claims for unfair competition and/or the use or unauthorized disclosure of trade secrets or confidential information, as to which Macquarie may seek and obtain relief from a court of competent jurisdiction; (v) a claim based upon Macquarie's current (successor or future) employee benefits and/or welfare plans that contain an appeal procedure or other procedure for the resolution of disputes under the plan; (vi) a claim for violation of the National Labor Relations Act; (vii) any non-employment-related claim that arises out of an Employee's Form U4 Agreement and relates solely to the obligations attendant to the Employee's status as a  "Registered Representative"; and (viii) any claim in respect of which arbitration is prohibited under applicable law.

You shall not be entitled to join or consolidate claims in arbitration with claims brought by other individuals, or to arbitrate any claim as a representative member of a class or in a private attorney general capacity.  Nor shall any arbitrator appointed pursuant to this Agreement have the authority to arbitrate claims on a class, collective or multiple-claimant basis.  Accordingly, you and Macquarie agree that the American Arbitration Association's ("AAA") Supplementary Rules for Class Action Arbitration shall not apply to any arbitration under this Procedure.  If, however, an agreement to dispense with class, collective or multiple-claimant claims in arbitration is held to be unenforceable, then such claims shall proceed in court, not in arbitration. Any dispute about the enforceability, applicability or interpretation of any portion of this paragraph shall be submitted to and resolved by a court of competent jurisdiction only and shall not under any circumstances be submitted to or resolved by any arbitrator or organization sponsoring arbitration.

**Internal Efforts**

As a prerequisite for submitting an employment dispute to arbitration, both you and Macquarie agree to make good-faith efforts at resolving any dispute internally on an informal basis through Macquarie management channels appropriate to the circumstances of that individual dispute, including, but not limited to, Employee Relations and/or the Head of Human Resources, Americas.  Only when such internal efforts fail may an employment dispute be submitted to binding arbitration under the terms of this Procedure.

**Binding Arbitration**

If a covered dispute remains unresolved at the conclusion of a good-faith effort to resolve the dispute internally, either party may submit the dispute for resolution by final binding arbitration under this Procedure.  The arbitration will be conducted under the Employment Dispute Resolution Rules of AAA, with the proviso that the arbitration shall be strictly confidential.  These Rules, incorporated by reference herein, include (but are not limited to) the procedures for the joint selection of an impartial arbitrator and for the hearing of evidence before the arbitrator.  The arbitrator shall have the authority to allow for appropriate discovery and exchange of information prior to a hearing, including (but not limited to) production of documents, information requests, depositions, and subpoenas.  Discovery shall be conducted pursuant to the AAA rules.  A copy of the complete AAA Employment Dispute Resolution Rules may be obtained from the AAA as Administrator.  You may also access the Rules from AAA's website at http://www.adr.org.[1]

---

[1] This Agreement does not prohibit or restrict Associated Persons from filing an arbitration claim in the FINRA arbitration forum as specified in FINRA rules.

Any conflict between the rules and procedures set forth in the AAA rules and those set forth in this Agreement shall be resolved in favor of those in this Agreement. The burden of proof at arbitration shall at all times be upon the party seeking relief. The arbitrator shall have the power to award all remedies that could be awarded by a court or administrative agency in accordance with the governing and applicable substantive law relating to covered claims, except is limited to individual relief, and not relief on a class or collective basis. Without limiting the arbitrator's power and authority, it is understood that the arbitrator shall have the authority to entertain and rule on motions to dismiss and motions for summary judgment by any party and shall apply the standards governing such motions under the Federal Rules of Civil Procedure (unless otherwise agreed to by the parties in connection with disputes involving a non-US Employee).

**Choice of Law**

In reaching his/her decision, the arbitrator shall apply the governing substantive law applicable to the claim(s), cause of action(s), and defense(s) asserted by the parties as applicable in the state in which you are primarily assigned to work.

**Forum of Arbitration**

Any arbitration conducted pursuant to this Agreement shall take place in the state in which you are primarily assigned to work unless an alternative location is chosen by the mutual agreement of the parties.

**Time Limits and Procedures**

The aggrieved party must give written notice of any claim to the other party within the same statute of limitations period that would apply with respect to such claim if it was brought in a judicial or administrative forum. The written notice shall describe the nature of all claims asserted and the facts upon which such claims are based and shall be mailed to the other party by certified or registered mail, return receipt requested. Any such notice mailed to Macquarie shall be addressed to Macquarie's Head of Human Resources, Americas, and the AAA as Administrator in accordance with applicable AAA rules.

The arbitrator shall render a decision and award within 30 days after the close of the arbitration hearing or at any later time on which the parties may agree. The award shall be in writing and signed and dated by the arbitrator and shall contain express findings of fact and the basis for the award.

The parties agree that Macquarie will pay all of the AAA administrative fees and the arbitrator's fees and expenses. All other costs and expenses associated with the arbitration, including, without limitation, the party's respective attorneys' fees, shall be borne by the party incurring the expense, unless the law under which the claim is brought permits an award of attorneys' fees and/or costs to the prevailing party.

Judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction. The award may be vacated or modified only on the grounds specified in the U.S. Federal Arbitration Act or other applicable law.

**Severability**

Except as specifically set forth herein, if any provision of this Agreement is held to be illegal, void or unenforceable, the agreement will be ineffective to the extent only of that illegality, voidness or unenforceability, without invalidating the remaining parts of this Agreement. If a court or arbitrator should determine that any portion of this Agreement is overbroad or unreasonable, such provision shall be given effect to the maximum extent possible by narrowing the provision found to be overbroad or unreasonable.

**No Retaliation/Employment At-Will**

Under no circumstance will a Macquarie Employee be retaliated against in any way for invoking this Procedure in good-faith to seek the resolution of a dispute. Macquarie managers who engage in such retaliation will be subject to discipline under the appropriate Macquarie disciplinary procedures.

The Macquarie Arbitration Procedure does not in any way alter the at-will employment status of Macquarie Employees. Macquarie and its Employees are always free to terminate the employment relationship at any time for any lawful reason, with or without cause, and employment is not for any specific or definite duration.

This Agreement sets forth the complete agreement of the parties on the subject of arbitration of the covered claims defined above, and supersedes any prior or contemporaneous oral or written understanding on these subjects. No party is relying on any representations, oral or written, on the subject of the effect, enforceability or meaning of this Agreement, except as specifically set forth herein.

_____

**END OF DOCUMENT**

# EXHIBIT "B"

| From: | COG HR Employment Agreement |
|---|---|
| To: | Khristina McLaughlin |
| Subject: | 53616 - Khristina McLaughlin - EA Confirmation - Acceptance of updated employment documentation |
| Date: | Saturday, May 06, 2017 2:26:39 PM |
| Importance: | High |
| Sensitivity: | Private |

Dear Khristina

You have just accepted the updated employment documentation via the online portal system. The updated employment documentation which is effective from 1 July 2017 is listed below.

If you did not intend to accept, please contact the Employee Relations consultant for your Group/Division immediately. Otherwise, you do not need to take any further action. A copy of your acceptance will be retained on your file.

Regards,
COG HR Employment Agreement

_____

EA Confirmation Details:

Action: Acknowledged acceptance of updated employment documentation effective 1 July 2017

Time stamp: 7 May 2017 4:26:27 AM AEST

Employment Documentation:

  * 53616~1~Khristina McLaughlin~USA~2017 Employment Agreement.pdf


This email and any attachment is confidential. If you are not the intended recipient, please delete this message. Macquarie does not guarantee the integrity of any emails or attachments. For important disclosures and information about the incorporation and regulated status of Macquarie Group entities please see: https://protect-us.mimecast.com/s/kJ5aBRIOLw7vCL?domain=macquarie.com

# EXHIBIT "I"

# Proskauer »

Proskauer Rose LLP   Eleven Times Square   New York, NY 10036-8299

November 17, 2017

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #:
> DATE FILED: 11/17/17

Lloyd B. Chinn
Member of the Firm

d +1.212.969.3341
f 212.969.2900
lchinn@proskauer.com
www.proskauer.com

Via E-FILE
The Honorable Judge Victor Marrero
Daniel Patrick Moynihan
United States Courthouse
500 Pearl St.
New York, NY 10007-1312

Re:   *McLaughlin vs. Macquarie Capital (USA) Inc.*, et al., No. 1:17-cv-09023

Dear Judge Marrero:

I represent Macquarie Capital (USA) Inc., in the above-captioned action.  I write to request, on an expedited basis, that the Complaint filed by Khristina McLaughlin in this action be temporarily sealed pending the resolution of a Motion to Compel Arbitration and Seal the Complaint, to be filed imminently by my client.

Plaintiff's claims arise out of her employment with Macquarie Capital (U.S.A.) Inc., an operating group of Macquarie Group Limited, and a subsidiary of Macquarie Holdings (USA) Inc. (Affidavit of G. Weidy ("Weidy Aff." (notarized version to be supplied) at ¶2) Macquarie Group Limited is a global investment banking and diversified financial services group. (Weidy Aff. at 2) Macquaric Capital (U.S.A.) comprises the U.S. arm of Macquarie Group's corporate advisory, equity, debt and private capital markets businesses, and undertakes principal investing. (Weidy Aff. at 3) It is a Delaware corporation with a principal place of business in New York, New York.  (Weidy Aff. at 5) Macquarie Capital (U.S.A.) has operations across the United States. (Weidy Aff. at 5) Plaintiff is employed by Macquarie Capital (U.S.A.) (hereinafter referred to as "Macquarie") in its office located at 125 W 55 Street, 22nd Floor, New York, NY, 10019, and has been since February 21, 2012.

Plaintiff, a current employee of Macquarie, entered into an employment agreement at the time of her hire in which she expressly agreed to arbitrate "any controversy or claim arising out of or relating to [her] employment relationship with Macquarie, the terms and conditions of [her] employment or the termination thereof." (The Agreement, annexed to Weidy Aff. as Exhibit ("Ex.") A, at 8).  Moreover, McLaughlin agreed to the condition that any such arbitration be "strictly confidential." (Weidy Aff., Ex. A, at Annex A, p. 12).  McLaughlin further acknowledged in the Agreement that claims covered by the Agreement include "claims for discrimination…based on sex…and/or claims for violation of any federal state or other governmental law, statute, regulation or ordinance including…Title VII of the Civil Rights Act of 1964." (Weidy Aff. Ex. A, at Annex A, p. 11).  I advised Plaintiff's counsel of the existence of this Agreement on November 1, 2017, and sent him a reminder with an attachment of the

**Proskauer»**

Judge Victor Marrero
November 17, 2017
Page 2

Agreement this morning. In disregard of her obligations under the Agreement, McLaughlin has filed a Complaint against Defendant in this Court purporting to assert claims relating to her employment, including claims of sexual harassment and sex discrimination.

While in general the public has a right to access judicial records, this presumption can be overcome by balancing competing considerations, including "the privacy interests of those resisting disclosure." *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 120 (2d Cir. 2006). Indeed, the Second Circuit has recognized that documents "may be sealed if specific, on the record findings are made demonstrating that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Id.* Among the factors for a court to consider in evaluating the privacy interest of those opposing disclosure are the following: (1) "the degree to which the subject matter is traditionally considered private rather than public," and (2) "the nature and degree of the injury" that will be caused by revealing the information, which may include determining "whether the nature of the materials is such that there is a fair opportunity for the subject to respond to any accusations contained therein." U.S. v. Amodeo, 71 F.3d 1044, 1051 (2d Cir. 1995).

Each of the relevant factors weighs in favor of sealing the Complaint in this case. First, the allegations are meant to have been "private rather than public," because Plaintiff entered into a valid Agreement providing that all claims arising out of her employment must only be brought in strictly confidential arbitration proceedings. (Weidy Decl., Ex. A, at Annex A, p. 12). Second, the Complaint makes various salacious allegations and attaches salacious documents concerning Macquarie and certain of its employees. The negative publicity that will undoubtedly result from publication of the allegations will likely cause irreparable harm to Macquarie and its reputation. Finally, without the sealing of the Complaint, Macquarie will lose the benefit of its binding and valid agreement with McLaughlin to arbitrate all claims in strictly confidential arbitration. Courts in this District have found that a party's interest in the enforcement of a confidential arbitration agreement is a sufficient interest to support a grant of a motion to seal. *See, e.g, Century Indem. Co. v. Glob. Reinsurance Corp. of Am.*, No. 15-cv-6426 (S.D.N.Y. Dec.10, 2015) (order granting motion to continue sealed filing of documents) ("In light of the confidentiality provisions of the arbitration agreement ... the parties' request for continued sealed filing of the petition and the award is also granted.") These interests outweigh any right of public access, and accordingly, the Court should temporarily seal the Complaint pending the outcome of Macquarie's forthcoming Motion to Compel Arbitration and Seal the Complaint.

Respectfully Submitted,

Lloyd B. Chinn, Esq.

Attachments

Application GRANTED. The Clerk of Court is directed to seal the Complaint in this action pending the consideration of this motion and the motion to compel arbitration to be adjudicated by the judge assigned to the underlying action.

**SO ORDERED:**

11-17-17
DATE          VICTOR MARRERO, U.S.D.J.

Proskauer»

Judge Victor Marrero
November 17, 2017
Page 3

Cc: Jonathan Sack, Esq.

# EXHIBIT "J"

# Macquarie U.S. Executive Departs Amid Sexual Harassment Claim

By **Laura J Keller** and **Max Abelson**
November 20, 2017, 12:00 AM EST

→ Robert Ansell left bank's New York office within past month

→ Khristina McLaughlin says in a suit she was pushed into affair

Robert Ansell, head of U.S. cash equities for Macquarie Group Ltd. <https://www.bloomberg.com/quote/MQG:AU> , left the bank weeks before a colleague alleged in a lawsuit that she was pressured into having an affair with him.

Ansell pushed Khristina McLaughlin, now head of U.S. sales for cash equities, to begin a relationship in 2015 and continue it until this year, according to a complaint she filed Friday in federal court in Manhattan. She's suing Ansell and the Australian bank's U.S. unit for $40 million, saying co-workers are now ostracizing her, making her job impossible.

"No one had ever said no to me in a long time," Ansell, who's married, allegedly wrote to her this year in a letter about their relationship, according to a copy attached to the suit. "You tried so many times to reset the boundaries, but we just couldn't do it. I couldn't do it. I had to be with you."

McLaughlin said in the complaint that Ansell sent her snapshots of his penis in December and June. Copies of photos are included in the filing.

"We have only recently been made aware of these allegations and we have taken appropriate actions in response," Paul Marriott, a spokesman for Sydney-based Macquarie, said in an emailed statement. "We take any allegation of workplace impropriety extremely seriously and have no tolerance for such conduct."

Ansell didn't return calls and online messages seeking comment.

**Christmas Party**

In Australia, lawyers for upset clients have accused Macquarie of having a chauvinistic culture and allowing predatory behavior, the Sydney Morning Herald reported in September. The company said <https://www.macquarie.com/us/about/newsroom/2017/sept-macquarie-response> those claims lack credible evidence. Beyond Wall Street, men who wield power across Hollywood, television, food, politics and journalism have been accused this year of harassing and assaulting women.

McLaughlin, a 40-year-old single mother, said Ansell switched jobs so that he could supervise her. Colleagues have sidelined her since he left the firm in the past month, according to the suit.

"My peers on the management team barely acknowledge me," McLaughlin said in an interview last week. "They don't know what I went through."

McLaughlin had spent about seven years at Goldman Sachs Group Inc. <https://www.bloomberg.com/quote/GS:US> and joined Macquarie as a managing director in 2012. She won an award this month from the publisher Markets Media for women in finance.

Ansell, who was based in New York, first spoke to her at a 2014 Christmas party, according to the letter. He became infatuated with her, it said, and saw her crying in the office after a colleague yelled at her.

"What good fortune!" he wrote. "Now I had another reason to talk to you."

**'Just Deal'**

As the relationship deepened, she told him it was going somewhere she didn't want it to be, he recounted in the letter.

"He came on to me and wouldn't take no for an answer," McLaughlin said in the interview. After their relationship became romantic, she said she didn't tell the bank's human resources department because she hadn't been satisfied with the handling of the yelling incident she had previously brought to HR.

"You don't want to be the girl that's always going to HR," she said. "You work in a male-dominated industry. You suck it up and you just deal with it."

Ansell promoted McLaughlin after he became her boss, telling her he would protect her pay, according to the suit. She said in the interview she tried to cut off their romantic relationship but was afraid he would take revenge.

It ended this year, after his wife read their messages on his phone, according to a screen grab of messages included in the suit.

"It's just messy," McLaughlin said in the interview. "No one wants a mess. I think we all know no one wants a messy woman."

Terms of Service Trademarks Privacy Policy
©2017 Bloomberg L P. All Rights Reserved
Careers Made in NYC Advertise Ad Choices     Website Feedback Help