# Exhibit F

AMERICAN ARBITRATION ASSOCIATION

– – – – – – – – – – – – – – – – – – – – – – – – – – x

**MACQUARIE HOLDINGS (USA), Inc.**,

Respondent/Counterclaim Respondent,

vs.

**KHRISTINA MCLAUGHLIN,**

Respondent/Counterclaim Claimant,

vs.

**MACQUARIE CAPITAL (USA) Inc.
and ROBERT ANSELL**,

Additional Counterclaim Respondents.

– – – – – – – – – – – – – – – – – – – – – – – – – – x

**AAA Case No. 01-17-0007- 1828**

**<u>COUNTERCLAIMS</u>**

Respondent/Counterclaim Claimant Khristina McLaughlin ("McLaughlin") by her attorneys, Epstein Ostrove, LLC, as and for her Counterclaims against Counterclaim Respondent Macquarie Holdings (USA) Inc. ("Holdings") and against Additional Counterclaim Respondents Macquarie Capital (USA) Inc. ("Capital") and Robert Ansell ("Ansell"), with Holdings and Capital sometimes collectively referred to as "Macquarie Companies", "Macquarie" or "Capital/Holdings", state as follows

**<u>NATURE OF THE ACTION</u>**

1.     McLaughlin brings this action against Macquarie Companies and Ansell to redress unlawful discrimination based upon her sex and gender and subsequent retaliation in the terms, conditions, and privileges of her employment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C.A §2000e (*"Title VII"*) (against Macquarie), the New York State Human Rights

1

Law, Executive Law § 290 et seq. ("*NYSHRL*") (against Macquarie and Ansell) and the Administrative Code of the City of New York § 8-101 et seq. ("*NYCHRL*") (against Macquarie and Ansell).

2.      Included in the statutory claims against Ansell are the claims that he violated the NYSHRL and the NYCHRL as an aider and abettor of discrimination.

3.      In addition, McLaughlin brings common law claims against Ansell, ███████████ ████████████████████████████████████████████████████████████████████

## **INTRODUCTION**

4.      Specifically, Respondent suffered and continued to suffer sexual harassment amidst a hostile work environment and quid pro quo sexual harassment, both of which were promulgated by Ansell, the ████████████████ significantly high level senior manager, whose title was Executive Director and Head of the New York Global Index Arbitrage Trading desk, and subsequently became McLaughlin's direct supervisor as Head of US Cash Equities.

5.      Sexual harassment in the workplace causing a hostile work environment leading to retaliatory actions against the victim in many recently publicized instances is easy to detect (e.g., a young aspiring actress is invited up to the apartment of one of Hollywood's most ubiquitous producers, a man several years her senior and grossly overweight, and is asked to perform a sexual act – she does so in order to protect her career). In the words of Supreme Court Justice Potter Stewart in attempting to define unlawful "pornography," which words apply with equal force to the scenario described above, "You know it when you see it." The sexual harassment that existed at

2

the Macquarie Companies and which pervades the financial industry is more covert and is generally

over a period of time.  McLaughlin was subjected to sexual harassment that led to a hostile work

environment, ultimately being subjected to retaliatory actions at work over a period of nearly 3

years (July 2015 – April 2018).  Ansell was the only Executive Director, the most senior title given

at the firm, in the New York Securities Division.  ██████████████████████████

████████████████████████████████████

████████████████████████████████

      6.     McLaughlin following graduation from Arizona State University (summa cum laud)

in 1999, began, and continued, her career in the financial industry, first at The Vanguard Group in

the suburbs of Pennsylvania, then in New York City at Goldman Sachs, followed by WJB Capital

and finally in 2012, starting her career as a Managing Director at Macquarie.  At Macquarie she

quickly demonstrated her revenue producing and leadership skills and was ultimately promoted to

Head of New York US Cash Equities Sales and further to Global Head of US Cash Equities Sales.

As a Producing Manager, ultimately she was accountable for 21 sales executives across New York,

Boston, San Francisco, Atlanta, Boca Raton and London.  McLaughlin professionally reached the

pinnacle of success while at the same time being the single mom of an 8 year old son living in a

million dollar plus home in the upscale suburbs of New York City (Tenafly, New Jersey) with an

$850,000 mortgage.  In her divorce, expecting her career to continue on an upward trend, she gave

her then unemployed ██████ ex-husband much of the marital assets to allow them to continue a

cordial relationship for the benefit of their son (who at the time of their divorce was only 3 years

old).

7.      Ms. McLaughlin achieved her dream of becoming financially independent while at the same time being a devoted mother to her son.  As the child of an ███████ mother, for whom she was the caregiver growing up, and the daughter of a father, living over 2,000 miles from where she grew up in Arizona who rejected her efforts to be accepted by him, her rise to the top of her profession is even more remarkable.  That which played a role in her descent to where she now finds herself is not only her emotional state given her background and her beauty within, but more so, her physical attractiveness on the outside.  She had been successful in letting men down easily who continuously "hit on her" as she climbed the ladder of success on Wall Street.  This is one of the "curses" McLaughlin had to face since starting her career in financial services – avoiding men in the workplace who were attracted to her and wanting to "bed" her – men she had no interest in other than to professionally interact with them "on the trading floors".

8.      The "curse" that led McLaughlin to where she finds herself is not only her physical attractiveness, but also ███████████████ Ansell, who, in his own words, "No one had ever said no to me in a long time." (see **Exhibit A** being a letter written by Ansell to McLaughlin after his wife in July 2017 learned of his affair with McLaughlin).  The proofs at the hearing of this arbitration will establish that Ansell relentlessly pursued McLaughlin until on the evening of August 27, 2015, following a business outing with others, ████████████████ in a New York City hotel.  In an effort "to get it over with" ████████████████████████ █ she had sex with him.  Unfortunately for McLaughlin, Ansell did not move on. ██████████ ██████████████████████████████████████████████████████████ ██████████████████████████ and all she worked for over the last 16 years, becoming destitute financially just as her mother ended up, living in a trailer park in Texas.  In the words of

4

Diane Schumaker – Krieg, Global Head of Research, Economics and Strategy at Wells Fargo Securities, "People talk a lot about motivation, and I can tell you that fear is a tremendous motivator." Fear of losing her job and being unable to provide for her child, drove McLaughlin from that first night in her hotel room with Ansell to the depths of despair now permeating through her whole being.

9.       The story to be told through proofs at the hearing of this arbitration will be broken down into 7 phases, as follows: ( a ) Phase 1, background leading to McLaughlin's graduation from college in 1999; ( b ) Phase 2, her rise in the financial industry from 1999 – August 2015 ███████ ████████████████████████████ Phase 3, the period from August 2015 through November 2015 when McLaughlin was able to, for the time being, end the ██████████████ ███████████████████████████████████████████████ ████ ████████████████████████████████████ Phase 4, the 13 month period of November 2015 through December 2016 ████████████████████████████ ████████████████; Phase 5, the period of December 2016 through July 2017 when Ansell positioned himself to take what was perceived as a demotion to become McLaughlin's direct supervisor to control her future, namely, in her mind to ███████████████████es or end up as did her mother, metaphorically, in a trailer park. It was during this period (Phase 5) that McLaughlin mentally succumbed to Ansell, still fearful, but giving in to the power and control he continued to hold over her. Attached as **Exhibit B** is a March 1, 2017 text message to McLaughlin from Ansell stating that in part, "such a large part of taking the role was the opportunity to work with you. It's everything I hoped it would be".

10.     Following the end of Phase 5, Ansell wrote to McLaughlin in August 2017 **(Exhibit A)**.  In that letter Ansell outlined his premeditation, his power over her and her effort to establish "boundaries".   Not only does he acknowledge McLaughlin's repeated attempt to establish boundaries, personal versus professional, but he further confesses that "no one had ever said no to him in a long time".  This, according to him, "was different". This was something he really wanted. This was something that had become a daily feature in his life.  This was his life.  This was something he wasn't ready to give up without a fight so he didn't give up.

11.     Phase 6 covers the period from August 2017 through November 17, 2017 when the sexual relationship ended and McLaughlin hired a lawyer.  McLaughlin was fearful of losing her job given the circumstances that were enveloping her and filed the lawsuit in federal court.  It was during this period that McLaughlin learned that her fear all along of going to Human Resources was real, believing if she did so, she would be let go by Macquarie.  After her lawyer met with Hoi-Ling Wong, Senior Employee Relations at Macquarie, and was told that McLaughlin's relationship with Ansell was "the worst kept secret," with no one from the company coming to her rescue, she confirmed her fear of going to Human Resources was well-founded.  This was further reinforced when she learned that after a former employee told Macquarie of the relationship in an exit interview, Ansell's boss in Singapore told Ansell to "take care of it".  See also, paragraphs 113 through 118, below.

12.      Phase 7, encompassing the period from November 18, 2017 through April 18, 2018, demonstrates the retaliatory efforts undertaken by Macquarie to punish McLaughlin for allowing herself to be victimized by Ansell.  It was in April 2018 that McLaughlin was told to take a paid leave of absence, retaining her position as Managing Director – Head of US Cash Equities Sales and

subsequently being delivered her lowest fiscal year end bonus during the time of her employment at the firm, despite her ever increasing management responsibility, revenue production and results.

13.     Head of U.S. Cash Equities, Ansell reported directly to Andrew Downe ("*Downe*"), one of five (5) division heads at the firm and Head of Commodities and Global Markets (CGM) and reporting directly into CEO, Nicholas Moore.  Ansell was the only Executive Director in the entire U.S. Cash Equities business.  Following Ansell's termination of employment on or about November 2, 2017, there were no Executive Directors in the U.S. Cash Equities business.

14.     Immediately following McLaughlin's lawful and protected complaints of harassment and discrimination and the conclusion of the *quid pro quo*, McLaughlin was retaliated against in respect of the terms, conditions, and privileges of her employment.

15.     McLaughlin files these Counterclaims to seek monetary relief for the denial of equal employment opportunity and for the unlawful employment practices of Counterclaim Respondents.

16.     McLaughlin further complains that she has suffered, is suffering, and will continue to suffer severe economic and non-economic damages because Counterclaim Respondents deprived Respondent of her employment rights in violation of federal, state and local city law as well as common law.

17.     Despite her stellar professional qualifications and proven performance, long term employment and experience, proven commercial skills, capabilities and competencies, and unquestioned outstanding personal moral and ethical character spanning her long career in the

financial services sector and on Wall Street, McLaughlin experienced unwanted blatant and at times grotesque bias and discrimination.

18.      At all times relevant herein, Holding's and Capital's employees, managers, and Human Resource specialists acted at the behest of Counterclaim Respondents during the course, and within the scope, of their employment with Holdings and Capital.

19.      McLaughlin seeks compensatory and punitive damages, the benefits she was denied, injunctive and declaratory relief, and appropriate legal and equitable relief, including attorney's fees.

## PARTIES

20.      McLaughlin is a woman who, at all times relevant to these Counterclaims, resided at 10 Brook Road, Tenafly, New Jersey 07670.  She is a citizen of the United States.  Respondent is divorced and the sole financial supporter of her household and is the primary source of financial support for her now eight year old child.

21.      At all times relevant herein, McLaughlin was an "employee" within the meaning of 42 U.S.C.A. §2000e, et seq., § 296 of the NYSHRL and under § 8-102(1) of the NYCHRL and is thus afforded protection against discrimination and retaliation in employment on the basis of her gender, female.

22.      Upon information and belief, Holdings is a publicly traded Australia-based corporation doing business as Capital within New York County in the State of New York and

8

maintains an office within the City and County of New York at 125 West 55th Street, New York, New York 10022.

23.      Upon information and belief, Holdings and/or Capital maintain control, oversight, and direction over the operation of their respective facilities, including their employment practices.

24.      At all times material to this action, Holdings and/or Capital were McLaughlin's "employer" within the meaning of Section 701(f) of Title VII (42 U.S.C. §2000e(f)), Section 292(1) of the NYSHRL, and Section 8-102(1) of the NYCHRL.

25.      Upon information and belief, Ansell is a United Kingdom national with permanent resident status in the United States.  Married with three children, Counterclaim Respondent Ansell ████████████████████████████████████████████████████████████

26.      Ansell, for the time period referenced as Phase 5, was the direct manager of McLaughlin.  He was also responsible during the period of time covered by Phases 3,4 5 and a portion of 6 for hiring, firing, screening, training, retention, supervision, discipline, compensation and counseling at Capital.  In addition, he had at times the same authority for Holdings.

27.      Ansell knew or should have known of the discriminatory customs, practices, policies and wrongful acts described in these Counterclaims but nonetheless incited, condoned, ratified, and/or authorized such conduct.  Ansell is being sued in his official and individual capacities.

28.      During Phase 5 and later periods, until he was fired by Macquarie, Ansell was McLaughlin's supervisor ████████████████████████████████████████████████ ████████████████████████████████████

29. ████████████████████████████████████████████

████████████████████████████████████████████

30.     At all times material to this action, Counterclaim Respondents have acted under color or custom or usage of law and continue to so act, depriving McLaughlin of rights, privileges and immunities secured to her by the Constitution and laws of the United States and the State of New York, and in direct violation of the Civil Rights Act of 1871, 42 U.S.C. § 1983.

31.     Counterclaim Respondents individually and in their official capacities have individually and collectively harassed McLaughlin, fostered a hostile work environment, condoned horrific forms of sexual harassment, and retaliated against McLaughlin.

32.     Counterclaim Respondents individually and in their official capacities have individually and collectively discriminated and retaliated against McLaughlin on the basis of gender.

## JURISDICTION AND VENUE

33.     This arbitration tribunal has jurisdiction of Respondent's federal claims pursuant to 28 U.S.C. §1331 and 1343, respectively, and 15 U.S.C. §787-6(h)(1)(B)(1) and the state law claims pursuant to 28 U.S.C. §1367(a), because the state law claims arise from a common nucleus of operative facts with the federal claims and are so related to Respondent's federal claims that they form a part of the same case or controversy between the parties under Article III of the United States Constitution.

34.     At all times relevant herein, Counterclaim Respondents are an "employer" within the meaning of 42 U.S.C.A. § 2000e-(), § 292 of the NYSHRL and under § 8-102() of the NYCHRL.

## ADMINISTRATIVE PROCEDURES

35.     On November 14, 2017, McLaughlin filed a charge of discrimination with the Equal Employment Opportunity Commission ("*EEOC*").  The EEOC accepted the Charge and processed it by assigning charge number 520-2018-00551.

36.     Prior counsel for McLaughlin requested that the EEOC issue a Notice of Right to Sue ("*NORTS*") letter.

37.     Respondent has fulfilled the administrative prerequisite for filing federal claims of discrimination in this matter.

38.     Following commencement of the relevant action, a copy of the Complaint was served both on the New York City Commission on Human Rights and the Office of the Corporation Counsel of the City of New York, thereby satisfying the notice requirements of the New York City Administrative Code.

39.     Any and all other prerequisites to the filing of the Federal Lawsuit had been met.

40.     By Decision and Order dated August 7, 2018, the Federal Lawsuit was stayed and the matter referred to arbitration.

## FACTS COMMON TO ALL COUNTS

## PERSONAL AND PROFESSIONAL BACKGROUND

41.     McLaughlin is a 40 year-old female and is protected under the Federal, State and City anti-discrimination statutes protecting employees.

42.     In 1999, McLaughlin graduated *summa cum laude* from Arizona State University with a Bachelors degree (BA) in finance.

43.     Following graduation, McLaughlin began work as a trader on the equity execution desk at Vanguard Brokerage Services.

44.     In 2000, McLaughlin began working at Goldman Sachs ("Goldman") in Equity Capital Markets ("*ECM*").  In 2001, McLaughlin transitioned from Goldman's ECM desk to their Institutional Sales desk.

45.     In May 2007, McLaughlin attempted to resign from Goldman to start a family.

46.     At the time, McLaughlin believed she could not balance the intensity that was required to remain a top performer, while being the mom she always wanted to be.  Goldman did not want to lose McLaughlin, and asked her to take a three-month sabbatical (*i.e.*, rather than just leaving) to see if she could find another role within the firm that would allow her more work-family life balance.  McLaughlin agreed.

47.     At the end of the three-month leave, McLaughlin concluded that she could not find a role that would fulfill her at Goldman, while still being able to have the flexibility she wanted in motherhood to be around for her future children.

48.      In July 2007, McLaughlin resigned from Goldman in order to start a family.

49.      In 2008, McLaughlin suffered a devastating late loss miscarriage of twins.

50.      In early 2009, McLaughlin joined the work force at WJB Capital, a predominately execution only commission shop.  She continuously worked there until WJB ceased operations and closed in January 2012.

51.      In October 2009, McLaughlin gave birth to her son James.

52.      Over the course of January 2012, after WJB closed, McLaughlin interviewed to find a firm she thought would accommodate her need to successfully balance motherhood and her career on the sell-side.  Goldman made her an offer to return to work.  Macquarie made her a competing offer to join its nascent equity sales, trading, and research division in New York City.  McLaughlin chose Holdings/Capital, which she thought was a better platform in terms of culture, opportunity, career growth, and flexibility to balance her desire to be an active caregiver and mother to her infant son.

53.      McLaughlin's former employers and client references were overwhelmingly positive and supportive.

54.      In or around February 2012, McLaughlin joined Holdings/Capital as a Managing Director in its U.S. Cash Equities Sales group.

55.      McLaughlin's responsibilities included serving as U.S. relationship manager for large, predominantly New York based hedge funds.  McLaughlin was a producing salesperson covering mostly New York investors such as "Investor A" (a $18 billion assets under management

13

long short equity activist fund founded by a well known sharp-tongued activist), "Investor B" (a $30 billion assets under management family office), and "Investor C" (a $16 billion assets under management long/short multi-manager platform).

56.     McLaughlin immediately became a top revenue producer and contributor on the team.  She brought with her a unique combination of bulge bracket bank (Goldman) and execution dominated commission shop (WJB) experience.  She used both to rise at the firm.

57.     McLaughlin was not only a top producer, but she also brought with her an inherent and natural networking ability.

58.     From the start of her career at Macquarie, she made it a point to collaborate with different divisions and foster a network to help build the US Cash Equities internal brand.

59.     McLaughlin also proactively reached out to ███████████████, who was Macquarie Americas Country Head and senior Executive Director in the Credit Markets Division.

60.     ███████████ remarked that, in all of his time at Macquarie, no one in the securities division (not even the senior leaders) had been proactive in making an introduction.

61.     McLaughlin cross-sold the firm's offerings and brought in other product specialists to market their respective financial products in growing both the Macquarie name and the client relationship.

62.     McLaughlin was an informal mentor to other less experienced women, including █████████████, who was one of several people on the floor that came to McLaughlin for guidance and support.

63.     As a result of McLaughlin's mentorship and sponsorship in early 2017, ████████ was able to successfully transition out of an administrative role into front office sales trading coverage for the New York based international desk.

64.     In January 2013, McLaughlin filed a TRO against her then-husband Brian McLaughlin.

65.     In the fall of 2013, McLaughlin finalized a difficult divorce.

66.     McLaughlin is a single mother and was awarded primary residential custody of her son.

67.     McLaughlin is her child's primary caregiver and financial provider / supporter.

68.     As of the filing of this Counterclaim, McLaughlin remains and is currently employed by Macquarie as a Managing Director, Head of U.S. Cash Equities Sales.

**MCLAUGHLIN'S RISE TO SUCCESS AT MACQUARIE**

69.     In February 2012, McLaughlin commenced employment with Macquarie as a Managing Director, U.S. Cash Equities sales.

70.     In October 2013, McLaughlin earned a Macquarie Award.  The Macquarie Award recognizes people not just for what they achieve, but how they achieve it: people who collaborate

15

not just within their own team or division but across groups; people who go above and beyond the scope of their role to deliver outstanding results.

71.     The Macquarie Award reflects "What We Stand For": Opportunity, Accountability, and Integrity.

72.     In May 2014, McLaughlin was recognized in the inaugural Introducer Sales Credit initiative.

73.     At the time, the program was a new collaboration initiative that rewarded anyone within Macquarie Securities Group ("*MSG*"), which has since merged with another division and is now called Commodities and Global Markets ("*CGM*"), which leveraged existing relationships to bring in "net new" business to another MSG regional business.

74.     McLaughlin's 2013/2014 reviews were stellar.

75.     In 2015, due to her excellent performance, acumen, communication, mentorship, and leadership skills, McLaughlin was promoted to the role of Head of New York Cash Equities Sales by Andrew Root ("*Root*") and Austin Graham ("*Graham*"), then Co-Heads of U.S. Cash Equities.

76.     McLaughlin would now be a *producing* manager, responsible for the 14-person, predominantly senior and male, New York and MidAtlantic-based sales team.

77.     In 2015, McLaughlin was given a verbal offer of employment from Macquarie's competitor, Deutsche Bank, for $900,000 in guaranteed total annual compensation for one year.

16

78.     A loyal employee of Macquarie, McLaughlin chose to stay at Macquarie for $850,000 in guaranteed total annual compensation for one year.

79.     McLaughlin had already invested over two years and many long hours to acclimate at Macquarie, and as a single mom, she did not want to have to rebuild somewhere else.

80.     McLaughlin believed Macquarie was acutely aware of this ever-growing phenomenon, of working moms being willing to accept lower compensation with Macquarie willing to take advantage of it where possible.

81.     Specifically, McLaughlin had previously shared with Macquarie the value she placed on "earned" flexibility as a working mom, and Macquarie took advantage of the idea that working moms would sacrifice some compensation for flexibility.

82.     Unfortunately, in 2016 Macquarie took further advantage of the "working mom discount" and reduced the bonus portion of McLaughlin's compensation from $550,000 to $500,000.

83.     Since recommitting herself to Macquarie, McLaughlin worked even harder and succeeded even more – especially to dispel the preconceived notions that reverberated amongst the management at Macquarie about working women and mothers.

84.     In March of 2016, McLaughlin used her professional network to secure Twitter's first Asian non-deal roadshow ("*NDR*").  McLaughlin took their representatives to meet with institutional investors and sovereigns across Tokyo, Singapore and Hong Kong.

17

85.     This "roadshow" significantly increased McLaughlin's global profile at Macquarie, not only in the securities division (MSG at the time), but firm wide.  In Hong Kong, McLaughlin was introduced to Ben Way, Macquarie's CEO of Asia.

86.     In November 2016, McLaughlin helped champion a Women's Event with fashion legend Diane von Furstenburg ("*DVF*").

87.     Specifically, McLaughlin volunteered to represent the securities group invites for this event, which was being spearheaded by the Women's Network.

88.     People often approach McLaughlin for diversity efforts and/or guidance.  Because of the network she had worked tirelessly and passionately to build, McLaughlin was the "go-to" for other divisions, for guidance within U.S. Cash Equities.

89.     The DVF event in particular was another brand building event for Macquarie with Macquarie's female client base and with senior women at the firm who with McLaughlin personally invited several clients.

90.     The event provided clients and Women@Macquarie, Macquarie's internal women's group, the opportunity to hear an inspiring talk by DVF about her break in the male-dominated fashion industry.

91.     McLaughlin was also a regular contributor to Diversity & Inclusion initiatives at the firm and consistently participated in recruiting efforts.

92.     In March 2017, McLaughlin contributed to an internal Flexibility Campaign and shared her own personal experiences for people looking to work more flexibly.

18

93.     In April 2017, McLaughlin was promoted again, to Head of U.S. Cash Equities Sales.

94.     In October 2017, McLaughlin was nominated for the 2017 Markets Media Women in Finance Award.

95.     On or about November 7, 2017, McLaughlin learned that she had won the Markets Media Women in Finance Award for "Excellence in Institutional Sales."

96.     As of April 2018, McLaughlin remained a *producing* manager, which is remarkable, considering she was then responsible for 21 sales executives globally across Macquarie's New York, Boston, San Francisco, Atlanta, Boca and London offices, with $30+ million in targeted attributed revenue to the U.S. business.

97.     Since assuming the management role, McLaughlin had driven stability for the platform, reduced turnover, and created transparent and measurable goals, contributing to a 50% year over year increase in the division's bottom line.

98.     Although McLaughlin was a top individual producer for the U.S. Cash Equities Sales Team, it is worth noting that she proactively chose to give up a significant portion of her client coverage in order to put Macquarie's interest first and balance her increasing managerial responsibilities while turning client coverage over to up-and-coming salespeople who were looking to increase their revenues and grow their individual client bases.

99.     McLaughlin as of April 2018 remained the #4 (out of 21) producer on the team and was responsible for client coverage with an individual annual U.S. attributable revenue budget of close to $4 million.

100.    Specifically, McLaughlin had transitioned full coverage of "Investor D" (a $9 billion AUM hedge fund) to her subordinate salesperson ████████     "Investor D" was one of McLaughlin's many success stories and client highlights at Macquarie.   In June 2016, "Investor D's" U.S. commissions were a mere $29,000, down over 60%, and globally, commissions were only $100,000.   McLaughlin drove payment conversations with the head trader, who would later call McLaughlin a "bulldog."   This was a compliment regarding how the conversation was delivered.   "Investor Ds" head trader told ████████ McLaughlin's subordinate, that, were it not for McLaughlin's service versus Macquarie's payment dialogue, Macquarie would not have the partnership that Macquarie now has.   "Investor D" had recently indicated they would now pay Macquarie closer to $500,000 globally for the relationship, which includes research, trading ideas, and strategies.

101.    The account "Investor A" has also been a notable CGM highlight for McLaughlin in calendar year 2017.

102.    McLaughlin introduced ████████, Macquarie Managing Director in commodity sales, to "Investor A" to help expand the revenue opportunity.

103.    McLaughlin sought to introduce Macquarie's broader commodity capabilities (beyond cash equity) and to cross-sell the hedging business.

20

104.     Because of this timely introduction, "Investor A" gave Macquarie their very first iron ore options trade, which ended up being, as it is commonly discussed on the floor, "the largest iron ore options trade Macquarie had ever printed." Not only was this trade commonly discussed on the floor, but also it was highlighted by Andrew Downe, one of five Division heads reporting directly to CEO Nicholas Moore, at the internal Town Hall.

105.     "Investor A" (specifically, their Head trader) indicated that Macquarie generated around $400,000 in incremental commissions alone on this new iron ore options business.

106.     At the time of McLaughlin's April 2018 forced departure, "Investor A" was tracking to be a seven-figure cross product account for Macquarie.

107.     Throughout her tenure at Macquarie, in recognition for her success, McLaughlin consistently received impeccable performance reviews concerning her revenue production, diligence, competence, exceptional management skills, and ability to enhance the profitability of the business and services that she managed.

**ANSELL INITIATES A PERSONAL RELATIONSHIP WITH MCLAUGHLIN**

108.     ███████████████████████████████████
█████████████████████████████████████████
█████████████████████████████████████████
█████████

109.     Ansell sought after McLaughlin beginning in mid-2015 and then █████████ ██████████████████████ McLaughlin reluctantly gave in for fear of losing her job, ████████████████████████████████████

110.     Such termination was successful for a period of about 13 months at which time McLaughlin was able to reject, or otherwise avoid responding to, Ansell's efforts to continue the ████████████ relationship established earlier.

111.     In or about December 2016, Ansell, who admittedly after the fact told McLaughlin he does not take "no" for an answer, sought to take a perceived demotion from the position he held (Head of Global Index Arb trading in New York), █████████████████████████ ████████████████████████████ a position which made him McLaughlin's immediate supervisor (Head of U.S. Cash Equities – which was losing on an annual basis in excess of $50.0 million). ████████████████████████████████ █████████████████████████████████████████ █████████████████████████████████████████ ████████████████████████████

112.     Phase 5 began for McLaughlin much like that which occurred during Phase 3, namely, she being fearful of losing her job if she did not give in to Ansell's ████████████ but as Phase 5 developed, ████████████████████████████████████████

113.     At all times from the beginning of Phase 3 through to the conclusion of Phase 5, McLaughlin did not report Ansell's ████████████████ acts to Human Resources given her state of mind that to do so would further jeopardize her career at Holdings/Capital and at other

22

financial institutions comparable to Holdings/Capital if she were to leave Holdings/Capital either voluntarily or involuntarily.

114.    That described above, is evident from an admission made by the Holdings/Capital Senior Employment Counsel/Employee Relations Partner at Holdings/Capital that Ansell's relationship with McLaughlin was "the worst kept secret". Despite that knowledge, Holdings/Capital failed to protect McLaughlin from Ansell's ▮▮▮▮▮▮▮▮▮▮ actions. When one of the six most Senior Executives at Holdings/Capital, located in Singapore, learned of the ▮▮▮▮ relationship, he told Ansell "to take care of it." During the entire period from Phase 3 through Phase 5 no one at Holdings/Capital communicated with McLaughlin to address the issues of which they were fully aware.

115.    From 2015 through August 2017, Macquarie was aware that Ansell ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ This became especially evident in and shortly following December 2016 when Ansell asked for, and received, what was perceived as a demotion to become McLaughlin's immediate supervisor. At least one Macquarie employee ▮▮▮▮▮▮▮ who questioned why Ansell with no pertinent experience would be appointed to that position, reported to ▮▮▮▮▮▮▮▮ ▮▮▮ located in Hong Kong, that Ansell was having an affair with McLaughlin that was of concern to ▮▮▮▮ and wanted those "up the chain" at Macquarie to be aware of his concerns and to take action. ▮▮ told McWilliam that "we are aware" and the information was escalated "up the chain of command" to Andrew Downe, Head of Commodities and Global Markets, which is one of five divisions reporting directly into the CEO. ▮▮▮▮ stated that other Macquarie representatives were also concerned and participated in the escalation of the

23

information up to ███████████████████████████████████████

███████████████

116.   ███████████ indicated that he was told the matter was being investigated and dealt with, resulting in his making no further reports to those above him in the corporate hierarchy, although commenting that immediately prior to McLaughlin's claim, which resulted in Ansell's termination of employment with Macquarie, he was not aware of any action being taken or "outcome" by Macquarie, relative to the prior reports that were generated up to and including the highest levels at Macquarie.

117.   Inexplicably, the alleged investigation that was overseen by ███████ did not result in anyone, whether it be a Macquarie employee or outside consultant retained to do an investigation, communicating with McLaughlin.

118.   McLaughlin, in turn, did not report the sexual harassment and hostile work environment to Human Resources due to her fear, based on information in her possession, that such reporting would result in her losing her job.  See, among other things, **Exhibit C** consisting of an email from McLaughlin to ██████ dated November 21, 2015.  This is just one of several instances that caused McLaughlin to recognize that any effort on her part to report the matter to Human Resources would not result in Ansell being sanctioned, but would nonetheless most likely end her career at Macquarie, making it extremely difficult to find comparable work elsewhere.  In an email dated September 24, 2017 from Hayward to Downe, Hayward, in part, iterated, "the dynamics between [Ansell] and [McLaughlin] have been an issue for some time."

24

This is not a surprise in that Hoi–Ling Wong, Senior Employee Relations, Americas, has stated the affair between Ansell and McLaughlin was "the worst kept secret."

119.    Once the sex came to an end, McLaughlin was discriminated against on the basis of her gender.

120.    After Phase 5 ended, ███████████████████████████████

████████████████████████████████████████████

121.    Ansell reached out to McLaughlin to talk with her.  In early August 2017, Ansell went to New Jersey, where McLaughlin lives, and they met at a restaurant, Axia.

122.    McLaughlin was very emotional, distraught, upset, and concerned about losing her job.

123.    Later in August, Ansell came running over to McLaughlin's desk in a panic asking if they could talk.  McLaughlin said, "No", explaining that she did not want to become emotional in the office and had a lot of work to do.  Ansell then asked if they could meet; she said ok; and they met on the sidewalk after work.  Ansell stated that he was very concerned that she would hire a lawyer and asked her to give him a heads-up if she did so, so that he could resign first.

124.    Later in August, Ansell wrote McLaughlin a letter, remarkably demonstrating confirmation and admission of the power dynamic inherent in the claims of sexual harassment. **(see Exhibit A)**.

125.    In it, Ansell provides a timeline ██████████████████████████████

███████████████   He openly admits that:

25

a.  His intentions "were not wholly altruistic" when he aided her at work (the ██████ ███ Incident");

b.  McLaughlin rebuffed his advances: "You could see that this was going somewhere you didn't want it to.  You told me as much.  Boundaries";

c.  He nonetheless persisted in pursuing her, against her wishes, as "no one had ever said no to me" and "This was something I really, really wanted";

d.  McLaughlin tried so many times to reset the boundaries, but he would not let her;

████████████████████████████████████████████████████
████████████████████████████

f.  He "unleashed a world of pain and a lifetime of hurt on so many innocent and underserving people"; and

g.  McLaughlin is "a victim here too".

126.    Ansell hired an outside "consultant" Ed Eppley to analyze and identify any "weaknesses" in the US Cash Equities management team.

127.    A management team offsite was scheduled in order to review the consultant's findings.

128.    As part of preparations for the offsite, everyone on the management team had to do a pre-call interview with the consultant.

129.     From October 19-20, McLaughlin called in sick.  She thought she had a bad cold or maybe even the flu.  Once again, the stress wore her down and was taking its toll.  McLaughlin's weight was dropping.

130.     On Friday, October 20, 2017, Ansell notified McLaughlin that he had reached out to Human Resources and that they would like to schedule a call with McLaughlin and the consultant regarding the overwhelming collection of false negative feedback shared about McLaughlin by her peers on the U.S. Cash Equities management team.  This was in stark contrast to every single review McLaughlin had ever received in her now 5+ years of employment at the firm.  The timing was also alarming because McLaughlin had notified Ansell that she was not quitting.

131.     On October 21, 2017, the consultant emailed Ansell as follows, in relevant part, which email Ansell forwarded to McLaughlin.  The text reveals the planned set-up:

"Good afternoon Robby,

        I'm looking forward to our dinner tomorrow night…

I understand you are interested in the talking points I would share with Khristina if given the chance to work with her before Monday's offsite.

Here are the key items I think she needs to know:

- There is a theme from her peers that it's not safe to share opinions with either her or Robby that are in conflict with what Khristina wants.

- This concern comes from a sense that Robby shows unusual amounts of bias to do as Khristina suggests and this is something that Khristina intentionally works to achieve.

27

- This will test her ability to hear these concerns and understand that they are real. They are hopeful she will alter her behavior enough so her peers believe she is doing what is in Macquarie's best interest instead of what is of most benefit to her.

- Her inability to listen and learn and accept this feedback is a moment of truth for her career. To the extent she takes this as valid and meaningful and makes adjustments will show she's capable of learning."

132.    After sharing this email with McLaughlin, Ansell notably texted her on October 22, 2017: "There's no way you ever put yourself before MQ […] We need to address [at the offsite and with the consultant] why people perceive it to be the case." (see **Exhibit D**)

133.    Ansell, texted McLaughlin with the details of the career ambush to come.

134.    On October 22nd, after obtaining counsel, McLaughlin did not dial in for the follow-up consultant / Human Resources call and did not attend the setup / offsite, which took place October 23rd and October 24th.

135.    On or about October 22, 2017, McLaughlin's prior counsel put Macquarie on notice that McLaughlin had been the victim of egregious sexual harassment by Ansell that included, among other things, ███████████████████████████████████████

████████████████████████████████████████████████████████

███████

28

136.    Immediately following Macquarie learning of McLaughlin's complaints, Macquarie continued the retaliation ███████████████, that includes leaving her out of important management meetings and generally, mishandling of the entire situation allowing a rumor mill of scandal to permeate the workplace.

137.    Macquarie has focused solely on covering up Ansell's wrongdoings and has done nothing to remediate the retaliatory environment McLaughlin found herself subjected to.

138.    On October 31, 2017, Andrew Downe informed the U.S. Cash Equity Management team that Ansell would not be returning to Macquarie.

139.    It was a simple message; no additional details were given, and no questions were asked.

140.    Not a single person on the management team reached out to McLaughlin to discuss the news of Ansell's discharge from the firm.  This is unusual, as McLaughlin was informed that there had been many discussions concerning the reason for his abrupt departure.

141.    Macquarie had and has done absolutely nothing to protect McLaughlin from the (pre November 17, 217 filing) vicious rumor mill, when in fact their handling created.

142.    The delivery of Ansell's firing neither contained the rumor mill nor allowed McLaughlin to feel comfortable at work.

143.    In a public release to his group dated October 31, 2017, Andrew Downe wrote, "I regret to advise you that Robert Ansell has left Macquarie's employment" (emphasis added).  The next sentence further communicates that the decision was one that Macquarie did not want to have

29

to make – thus construing McLaughlin as a pariah: "A leadership change for our US Cash Equities business at this point in time is *regrettable*…" (emphasis added).

144.   When McLaughlin raised concerns about tone of Downe's communications and the effects of Macquarie's silence concerning Ansell's unlawful and inappropriate behavior, Downe granted McLaughlin permission to speak about her allegations of sexual harassment.

145.   Specifically, with respect to discussing the circumstances of the situation, Downe told McLaughlin unequivocally, "Honesty is the best policy."

146.   Now, in a classic case of "entrapment," Macquarie is suing McLaughlin in arbitration for actions she undertook with their consent in retaliation for her lawful complaints of discrimination.

147.   The events following the offsite and Macquarie management's decisions to exclude her have ruined McLaughlin's mobility at the firm, her professional network at the firm, and potentially, her ability to find work outside the firm, as Macquarie did nothing to prevent nor contain (in fact caused) the rumors, which quickly reached McLaughlin's clients and contacts outside Macquarie.

148.   McLaughlin has since been ostracized, labeled, and stigmatized by Macquarie's retaliatory mishandling of McLaughlin's complaints in the hopes of forcing McLaughlin to resign from Macquarie amidst a cloud of rumor, scandal, humiliation, embarrassment and shame.

149.     McLaughlin's ability to lead members of her team diminished immediately. Her subordinates disrespected her and she has been severely and irreversibly impeded as she remains the victim of snicker, banter, and "coffee room whisper".

150.     Macquarie created, condoned, and fostered a work environment for McLaughlin that was so intolerable, no reasonable person would be able to withstand it.

151.     Macquarie created, condoned, and fostered a work environment that villainized McLaughlin, the victim.

152.     This is why most women in finance, especially senior women, stay quiet and tolerate harassment.

153.     On Wednesday, November 1, 2017, Macquarie U.S. Cash Equities had one of its biggest trading days of the year.  McLaughlin offered kudos to her sales team members, and received muted or non-replies.  The chorus of silence when there would otherwise be a loud cheer was astonishing to note.  The leak of Ansell's termination and the rumored reasons for it therefore was good for business at Macquarie.

154.     At 10:30AM on November 1st, McLaughlin's ex-husband e-mailed her to call him, saying that he had gotten hit with the rumor mill that morning.

155.     McLaughlin also received a text on the same day from a former Macquarie analyst and side-sell competitor, Brad Zelnick, asking McLaughlin, "What's your story?", to which she did not respond.

156.    As of November 2, 2017, no one in HR, nor Andrew Downe, had circled back with McLaughlin to check in on how things are going.

157.    On or about November 3, 2017, McLaughlin emailed ████████████ her partner on the execution side of the business, concerning the discomfort she felt with his treatment in recent days.  She wrote:

> ██
>
> Yesterday's conversation kept me up last night and is still bothering me, so I felt I needed to address.
>
> First, I want to acknowledge that I appreciate you proactively pulling me off the desk to apologize for snapping at me on the attribution project that you and I have worked tirelessly on for Robby this past year.  I was going to just let that one go, but I Do appreciate the recognition.
>
> As you said, you are 'f---ing angry and resentful'.  You didn't even need to articulate it.  Your body language and lack of even professional courtesy this past week has been nothing short of hostile.   We have gone from talking consistently throughout our days, to you barely looking at me, let alone engaging in personal or professional banter.
>
> I will treat you with the professional and personal respect that I would expect of any leader. I'd appreciate the same in return.
>
> Khristina"

158.    It is remarkable that in this day and age, of the #MeToo movement, Macquarie continues to have no checks for ensuring that this hostile work environment and *quid pro quo* sexual harassment does not occur.

159.    Macquarie does not engage in best industry practices, apparently offering no sexual harassment and sensitivity training seminars to its employees and managers.  Macquarie condones this behavior by permitting ███████████████████████████████████████ a single mother who is the sole supporter and provider for her household.

160.    On or about November 7, 2017, McLaughlin had a one-on-one meeting with Andrew Downe.  During the meeting he asked how she was; she said, "Trying to hang in there." He replied, "I hope we can do better than that."

161.    They shifted quickly into business conversation.   At some point during the discussion, McLaughlin brought up how tense things were.  Downe said he noticed the tension in the management meeting earlier when they were discussing the slides for the Town Hall.

162.    In the meeting, McLaughlin had pointed out that no one on the management team had responded to her input on the slides and she had asked them directly what they thought, because at this time, everyone else had slides to present but McLaughlin.

163.    At this point in the meeting with Downe, recounting the day's earlier meeting, McLaughlin became emotional and told him how hard this was on her.

164.    In response Downe told McLaughlin to "put on a brave face" and said he would address anything he needed to; however, the irreparable damage had been done.

33

165.    As of April 2018, McLaughlin continued to report to work.   It was very uncomfortable.  She was ostracized.  In what would normally be an upbeat trading desk with lots of camaraderie, McLaughlin was isolated and no one engaged her in personal or professional banter. Interactions with colleagues were minimal, making her job difficult to successfully perform.

166.    One cannot undo the damage that's already been done to McLaughlin's career and life by being subjected to this systemic and planned sex-based discrimination.

**RETALIATION CONTINUES (AND ESCALATES) AFTER FILING OF THE COMPLAINT**

167.    On November 17, 2017, McLaughlin commenced the lawsuit by filing a Complaint against Capital and Ansell alleging discrimination on the basis of her gender, which included, *inter alia*, claims of egregious sexual harassment (the *Complaint*").

168.    It was McLaughlin's hope that the filing of the Complaint would be the first step towards moving past the egregious actions of Macquarie's cover-up of Ansell's actions and its perpetuation of a ████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████

169.    Instead, immediately following McLaughlin's commencement of the federal action, Macquarie took further steps to embarrass, intimidate, and harm McLaughlin in steadfast retaliation for once again asserting her statutory right to a discrimination-free workplace environment.

34

**MACQUARIE CONTINUES THE RETALIATORY PRESSURE EVEN MORE**

170.    In furtherance of its intention to retaliate against McLaughlin for filing her discrimination claim with the Court, Macquarie sought to undermine McLaughlin's ability to effectively manage her team by continuing to embarrass McLaughlin and create the impression that she is toxic and harmful to the running of Macquarie's business.

171.    On or about November 21, 2017, McLaughlin received a voice message from Andrew Downe indicating that he wanted to set up a call with McLaughlin and her team to discuss McLaughlin's current "situation."   McLaughlin was under the impression that Downe's intention was to assist McLaughlin in assuring her team that the steps she took to redress the harm inflicted by Macquarie would in no way impede her ability to effectively do her job as a manger and employee.

172.    Ultimately, a videoconference took place on Wednesday, November 29, 2017 with McLaughlin, Dan Ritchie, Andrew Downe, Jenny Kiernan, Alexis Conoscente and McLaughlin's global US Sales team (all offices that report to McLaughlin including London) in attendance.

173.    During the conference, instead of vesting confidence in McLaughlin in the face of her being compelled to file a discrimination lawsuit against her employer, McLaughlin's own managers communicated to McLaughlin's subordinate words to the effect that we understand because your boss filed a discrimination lawsuit against Macquarie, you may not be comfortable going to her to address work issues and that we are here to tell you that you don't have to go to McLaughlin as there are other people in the institution that you can go to.

174.    Additionally, on or about December 5, 2017, Austin Dowling, Macquarie's Head of Human Resources, Americas, sent McLaughlin a letter demanding that she sit for an interview with, and turn over her phone to, Macquarie; further falsely asserting that she has "refused to cooperate" with earlier requests.

175.    This bad-faith attempt to set up McLaughlin for termination in retaliation of her prior lawful complaints of gender discrimination, hostile work environment, and quid pro quo sexual harassment belies McLaughlin's thorough cooperation with Macquarie throughout the process and was nothing more than a sham attempt by Macquarie to further harass McLaughlin following the filing of the Complaint.

176.    Macquarie continues to unlawfully retaliate against McLaughlin for engaging in activities protected by anti-discrimination statutes.

## CLAIMS AND DAMAGES

Based upon the above allegations, Respondent maintains the following legal claims against Counterclaim Respondents:

## AS AND FOR A FIRST CAUSE OF ACTION

**SEX DISCRIMINATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964;
42 U.S.C.A. § 2000E**

177.    Counterclaim Claimant repeats, realleges and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

178.    Counterclaim Respondents' discriminatory behavior and then retaliatory placing of Counterclaim Claimant on paid administrative leave were made as a direct result of Counterclaim Claimant's sex, female, and her complaints regarding Counterclaim Respondents' discriminatory treatment of her, and show an animus of sex bias.

179.    Counterclaim Respondents' animus towards Counterclaim Claimant's sex is revealed in instances where similarly situated male employees were treated differently than Counterclaim Claimant in respect to their terms, conditions, and privileges of employment.

180.    Counterclaim Respondents have undertaken these discriminatory practices willfully or with reckless disregard for Counterclaim Claimant's rights protected under Title VII.

181.    These employment practices violate § 703 of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-2.

182.    As a result of Counterclaim Respondents' actions, Counterclaim Claimant has suffered damages.

183.    Counterclaim Respondents' aforementioned acts constitute unlawful discrimination and retaliation against Counterclaim Claimant in the terms, conditions and privileges of her employment because of her gender and in retaliation against her in violation of the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e.

184.    As a proximate result of Counterclaim Respondents' aforementioned sex discrimination and retaliation against her, Counterclaim Claimant has and will continue to suffer

Case 1:17-cv-09023-RA Document 75-6 Filed 07/08/20 Page 39 of 69

substantial losses, including the loss of past and future earnings, bonuses, deferred compensation and other employment benefits.

185.    As a further proximate result of Counterclaim Respondents' actions, Counterclaim Claimant has and will continue to suffer irreparable and significant damage to her personal and professional good name and reputation.

186.    As a further proximate result of Counterclaim Respondents' actions, Counterclaim Claimant has and will continue to suffer severe and lasting embarrassment, humiliation, anguish, emotional pain, suffering, and other incidental and consequential damages and expenses.

187.    As a result of the foregoing, Counterclaim Claimant is entitled to recover from Counterclaim Respondents' an amount equal to the value of all compensation to be earned by Counterclaim Claimant had her employment not been interfered with, including all to be earned salary and bonuses, benefit payments, profit sharing, costs, attorney's fees and prejudgment interest at no less than 9%.

188.    As a result of the foregoing acts, Counterclaim Claimant is entitled to recover an amount no less than $20,000,000 in compensatory damages from Counterclaim Respondents', jointly and severally, in addition to all other amounts sought herein.

189.    In committing the acts alleged herein, Counterclaim Respondents, jointly and severally, acted in an outrageous and malicious manner with intent, oppression, gross negligence, malice, wanton disregard and indifference for Counterclaim Claimant's protected civil rights, as part of a continuing pattern of conduct, and Counterclaim Claimant is entitled to punitive damages

of at least $50,000,000 to adequately punish Macquarie and to deter it from continuing and repeating such conduct in the future.

## AS AND FOR A SECOND CAUSE OF ACTION

### DISCRIMINATION ON THE BASIS OF GENDER UNDER NEW YORK STATE HUMAN RIGHTS LAW §296(1)(A)

190.    Counterclaim Claimant repeats, realleges and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

191.    Counterclaim Respondents' discriminatory behavior and then retaliatory placing of Counterclaim Claimant on paid administrative leave were made as a direct result of Counterclaim Claimant's gender, female, and her complaints regarding Counterclaim Respondents' discriminatory treatment of her, and show an animus of gender bias.

192.    Counterclaim Respondents' animus towards Counterclaim Claimant's gender, female, is revealed in instances where similarly situated male employees were treated differently than Plaintiff in respect to of her terms, conditions, and privileges of employment.

193.    As a result of Counterclaim Respondents' actions, Counterclaim Claimant has suffered damages.

194.    The aforementioned acts of Counterclaim Respondents constitute unlawful discrimination against Counterclaim Claimant in the terms, conditions and privileges of her employment because of her gender and in retaliation against her in violation of the provisions of the NYSHRL § 296(1)(a).

195.    As a proximate result of Counterclaim Respondents' aforementioned sex discrimination and retaliation against her, Counterclaim Claimant has and will continue to suffer

substantial losses, including the loss of past and future earnings, bonuses, deferred compensation and other employment benefits.

196.     As a further proximate result of Counterclaim Respondents' actions, Counterclaim Claimant has and will continue to suffer irreparable and significant damage to her personal and professional good name and reputation.

197.     As a further proximate result of Counterclaim Respondents' actions, Counterclaim Claimant has and will continue to suffer severe and lasting embarrassment, humiliation, anguish, emotional pain, suffering, and other incidental and consequential damages and expenses.

198.     As a result of the foregoing, Counterclaim Claimant is entitled to recover from Counterclaim Respondents, jointly and severally, an amount equal to the value of all compensation to be earned by Counterclaim Claimant had her employment not been interfered with, including all to be earned salary and bonuses, benefit payments, profit sharing, costs, attorney's fees and prejudgment interest at no less than 9%.

199.     As a result of the foregoing acts, Counterclaim Claimant is entitled to recover an amount no less than $20,000,000 in compensatory damages from Counterclaim Respondents, jointly and severally, in addition to all other amounts sought herein.

200.     In committing the acts alleged herein, Counterclaim Respondents acted in an outrageous and malicious manner with intent, oppression, gross negligence, malice, wanton disregard and indifference for Counterclaim Claimant's protected civil rights, as part of a continuing pattern of conduct, and Counterclaim Claimant is entitled to punitive damages of at least $50,000,000 to adequately punish Counterclaim Respondents, jointly and severally, and to deter Counterclaim Respondents from continuing and repeating such conduct in the future.

## AS AND FOR A THIRD CAUSE OF ACTION

**DISCRIMINATION ON THE BASIS OF GENDER UNDER NEW YORK CITY HUMAN RIGHTS LAW §8-107**

201.   Counterclaim Claimant repeats, realleges and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

202.   Counterclaim Respondents' discriminatory behavior and then retaliatory placing of Counterclaim Claimant on paid administrative leave were made as a direct result of Counterclaim Claimant's gender, female, and her complaints regarding Counterclaim Respondents' discriminatory treatment of her, and show an animus of gender bias.

203.   Counterclaim Respondents' animus towards Counterclaim Claimant's gender, female, is revealed in instances where similarly situated male employees were treated differently than Counterclaim Claimant in respect to of their terms, conditions, and privileges of employment.

204.   As a result of Counterclaim Respondents' actions, Counterclaim Claimant has suffered damages.

205.   The aforementioned acts of Counterclaim Respondents constitute unlawful discrimination against Counterclaim Claimant in the terms, conditions and privileges of her employment because of her gender and in retaliation against her in violation of the provisions of the NYCHRL § 8-107.

206.   As a proximate result of Counterclaim Respondents' aforementioned sex discrimination and retaliation against her, Counterclaim Claimant has and will continue to suffer

substantial losses, including the loss of past and future earnings, bonuses, deferred compensation and other employment benefits.

207.   As a further proximate result of Counterclaim Respondents' actions, Counterclaim Claimant has and will continue to suffer irreparable and significant damage to her personal and professional good name and reputation.

208.   As a further proximate result of Counterclaim Respondents' actions, Counterclaim Claimant has and will continue to suffer severe and lasting embarrassment, humiliation, anguish, emotional pain, suffering, and other incidental and consequential damages and expenses.

209.   As a result of the foregoing, Counterclaim Claimant is entitled to recover from Counterclaim Respondents, jointly and severally, an amount equal to the value of all compensation to be earned by Counterclaim Claimant had her employment not been interfered with, including all to be earned salary and bonuses, benefit payments, profit sharing, costs, attorney's fees and prejudgment interest at no less than 9%.

210.   As a result of the foregoing acts, Counterclaim Claimant is entitled to recover an amount no less than $20,000,000 in compensatory damages from Counterclaim Respondents, jointly and severally, in addition to all other amounts sought herein.

211.   In committing the acts alleged herein, Counterclaim Respondents acted in an outrageous and malicious manner with intent, oppression, gross negligence, malice, wanton disregard and indifference for Counterclaim Claimant's protected civil rights, as part of a continuing pattern of conduct, and Counterclaim Claimant is entitled to punitive damages of at least

$50,000,000 to adequately punish Counterclaim Respondents, jointly and severally, and to deter Defendants from continuing and repeating such conduct in the future

## AS AND FOR A FOURTH CAUSE OF ACTION

**RETALIATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964; 42 U.S.C.A. § 2000E**

212.    Counterclaim Claimant repeats, realleges and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

213.    Based upon the aforementioned facts, Counterclaim Claimant had reasonable belief that Counterclaim Respondents' were engaged in unlawful conduct under Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e

214.    Counterclaim Claimant acted in opposition to such unlawful conduct by making good faith claims and/or complaints of sexual harassment and discrimination to Counterclaim Respondents and appropriate authorities, including the EEOC.

215.    Counterclaim Respondents had actual knowledge of Counterclaim Claimant's activities in respect of making good faith claims and/or complaints of sexual harassment and discrimination to Counterclaim Respondents and appropriate authorities, including the EEOC.

216.    As a proximate result of Counterclaim Claimant's activities in respect of making good faith claims and/or complaints of sexual harassment and discrimination to Counterclaim Respondents and appropriate authorities, including the EEOC, Counterclaim Respondents engaged

43

in adverse treatment of Counterclaim Claimant, including, inter alia, placing her on paid administrative leave.

217. As a proximate result of Counterclaim Respondents' actions, Counterclaim Claimant has suffered damages.

218. The aforementioned acts of Counterclaim Respondents' constitute unlawful retaliation against Counterclaim Claimant in violation of the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. §2000e.

219. As a proximate result of Counterclaim Respondents' aforementioned retaliation against Counterclaim Claimant, Counterclaim Claimant has and will continue to suffer substantial losses, including the loss of past and future earnings, bonuses, deferred compensation and other employment benefits.

220. As a further proximate result of Counterclaim Respondents' actions, Counterclaim Claimant has and will continue to suffer irreparable and significant damage to her personal and professional good name and reputation.

221. As a further proximate result of Counterclaim Respondents' actions, Counterclaim Claimant has and will continue to suffer severe and lasting embarrassment, humiliation and anguish, emotional pain, suffering, and other incidental and consequential damages and expenses.

222. As a result of the foregoing, Counterclaim Claimant is entitled to recover from Counterclaim Respondants' an amount equal to the value of all compensation to be earned by Counterclaim Claimant had her employment not been interfered with, including all to be earned salary and bonuses, benefit payments, profit sharing, costs, attorney's fees and prejudgment interest at no less than 9%.

223.     As a result of the foregoing acts, Counterclaim Claimant is entitled to recover an amount no less than $20,000,000 in compensatory damages from Counterclaim Respondents' in addition to all other amounts sought herein.

224.     In committing the acts alleged herein, Counterclaim Respondents' acted in an outrageous and malicious manner with intent, oppression, gross negligence, malice, wanton disregard and indifference for Counterclaim Claimant's protected civil rights, as part of a continuing pattern of conduct, and Counterclaim Claimant is entitled to punitive damages of at least $50,000,000 to adequately punish Counterclaim Respondents' and to deter them from continuing and repeating such conduct in the future.

## AS AND FOR A FIFTH CAUSE OF ACTION

### RETALIATION IN VIOLATION OF NEW YORK STATE HUMAN RIGHTS LAW §296(1)(A)

225.     Counterclaim Claimant repeats, realleges and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

226.     Based upon the aforementioned facts, Counterclaim Claimant had reasonable belief that Counterclaim Respondents were engaged in unlawful conduct under NYSHRL § 296 (1) (a).

227.     Counterclaim Claimant acted in opposition to such unlawful conduct by making good faith claims and/or complaints of sexual harassment and discrimination to Counterclaim Respondents and appropriate authorities, including the EEOC.

228.     Counterclaim Respondents had actual knowledge of Counterclaim Claimant's activities in respect of making good faith claims and/or complaints of sexual harassment and discrimination to Counterclaim Respondents and appropriate authorities, including the EEOC.

229.     As a proximate result of Counterclaim Claimant's activities in respect of making good faith claims and/or complaints of sexual harassment and discrimination to Counterclaim Respondents and appropriate authorities, including the EEOC, Counterclaim Respondents engaged in adverse treatment of Counterclaim Claimant, including, inter alia, placing her on paid administrative leave.

230.     As a result of Counterclaim Respondents' actions, Counterclaim Claimant has suffered damages.

231.     The aforementioned acts of Counterclaim Respondents constitute unlawful retaliation against Counterclaim Claimant in violation of the provisions of NYSHRL § 296 (1) (a).

232.     As a proximate result of Counterclaim Respondents' aforementioned retaliation against Counterclaim Claimant, Counterclaim Claimant has and will continue to suffer substantial losses, including the loss of past and future earnings, bonuses, deferred compensation and other employment benefits.

233.     As a further proximate result of Counterclaim Respondents' actions, Counterclaim Claimant has and will continue to suffer irreparable and significant damage to her personal and professional good name and reputation.

234.     As a further proximate result of Counterclaim Respondents' actions, Counterclaim Claimant has and will continue to suffer severe and lasting embarrassment, humiliation, anguish, emotional pain, suffering, and other incidental and consequential damages and expenses.

235.     As a result of the foregoing, Counterclaim Claimant is entitled to recover from Counterclaim Respondents, jointly and severally, an amount equal to the value of all compensation to be earned by Counterclaim Claimant had her employment not been interfered with, including all to be earned salary and bonuses, benefit payments, profit sharing, costs, attorney's fees and prejudgment interest at no less than 9%.

236.     As a result of the foregoing acts, Counterclaim Claimant is entitled to recover an amount no less than $20,000,000 in compensatory damages from Counterclaim Respondents, jointly and severally, in addition to all other amounts sought herein.

237.     In committing the acts alleged herein, Counterclaim Respondents acted in an outrageous and malicious manner with intent, oppression, gross negligence, malice, wanton disregard and indifference for Counterclaim Claimant's protected civil rights, as part of a continuing pattern of conduct, and Counterclaim Claimant is entitled to punitive damages of at least $50,000,000 to adequately punish Counterclaim Respondents, jointly and severally, and to deter Counterclaim Respondents from continuing and repeating such conduct in the future.

## AS AND FOR A SIXTH CAUSE OF ACTION

### RETALIATION IN VIOLATION OF NEW YORK CITY HUMAN RIGHTS LAW §8-107

238.     Counterclaim Claimant repeats, realleges and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

239.     Based upon the aforementioned facts, Counterclaim Claimant had reasonable belief that Counterclaim Respondents were engaged in unlawful conduct under NYCHRL § 8-107.

240.    Counterclaim Claimant acted in opposition to such unlawful conduct by making good faith claims and/or complaints of sexual harassment and discrimination to Counterclaim Respondents and appropriate authorities, including the EEOC.

241.    Counterclaim Respondents had actual knowledge of Counterclaim Claimant's activities in respect of making good faith claims and/or complaints of sexual harassment and discrimination to Counterclaim Respondents and appropriate authorities, including the EEOC.

242.    As a proximate result of Counterclaim Claimant's activities in respect of making good faith claims and/or complaints of sexual harassment and discrimination to Counterclaim Respondents and appropriate authorities, including the EEOC, Counterclaim Respondents engaged in adverse treatment of Counterclaim Claimant, including, inter alia, placing her on paid administrative leave.

243.    As a result of Counterclaim Respondents' actions, Counterclaim Claimant has suffered damages.

244.    The aforementioned acts of Counterclaim Respondents constitute unlawful retaliation against Counterclaim Claimant in violation of the provisions of NYCHRL § 8-107.

245.    As a proximate result of Counterclaim Respondents' aforementioned retaliation against Counterclaim Claimant, Counterclaim Claimant has and will continue to suffer substantial losses, including the loss of past and future earnings, bonuses, deferred compensation and other employment benefits.

246.    As a further proximate result of Counterclaim Respondents' actions, Counterclaim Claimant has and will continue to suffer irreparable and significant damage to her personal and professional good name and reputation.

247.     As a further proximate result of Counterclaim Respondents' actions, Counterclaim Claimant has and will continue to suffer severe and lasting embarrassment, humiliation, anguish, emotional pain, suffering, and other incidental and consequential damages and expenses.

248.     As a result of the foregoing, Counterclaim Claimant is entitled to recover from Counterclaim Respondents, jointly and severally, an amount equal to the value of all compensation to be earned by Counterclaim Claimant had her employment not been interfered with, including all to be earned salary and bonuses, benefit payments, profit sharing, costs, attorney's fees and prejudgment interest at no less than 9%.

249.     As a result of the foregoing acts, Counterclaim Claimant is entitled to recover an amount no less than $20,000,000 in compensatory damages from Counterclaim Respondents, jointly and severally, in addition to all other amounts sought herein.

250.     In committing the acts alleged herein, Counterclaim Respondents acted in an outrageous and malicious manner with intent, oppression, gross negligence, malice, wanton disregard and indifference for Counterclaim Claimant's protected civil rights, as part of a continuing pattern of conduct, and Counterclaim Claimant is entitled to punitive damages of at least $50,000,000 to adequately punish Counterclaim Respondents, jointly and severally, and to deter Counterclaim Respondents from continuing and repeating such conduct in the future.

## AS AND FOR A SEVENTH CAUSE OF ACTION

## AGAINST ANSELL (NYSHRL – AIDING AND ABETTING)

251.     Counterclaim Claimant incorporates by reference and realleges each and every allegation as set forth above as if fully set forth herein.

252.    As a result of the aforementioned actions, Ansell has discriminated against Counterclaim Claimant on account of her gender with respect to the terms, conditions and privileges of her employment in violation of New York Executive Law § 290 et seq.

253.    As a result of the aforementioned actions, Ansell has violated the New York Executive Law §290 et seq. by aiding, abetting, inciting and coercing the unlawful discrimination outlined herein.

254.    As a result of Ansell's discrimination (and aiding, abetting and inciting discrimination) against her, Counterclaim Claimant has suffered damages, including, without limitation, deprivation of income and benefits, emotional pain, suffering, inconvenience, damage to reputation and career, mental anguish and humiliation.

## AS AND FOR AN EIGHTH CAUSE OF ACTION

## AGAINST ANSELL (NYCHRL – AIDING AND ABETTING)

255.    Counterclaim Claimant incorporates by reference and realleges each and every allegation as set forth above as if fully set forth herein.

256.    As a result of the aforementioned actions, Ansell has discriminated against Counterclaim Claimant on account of her gender with respect to the terms, conditions and privileges of her employment in violation of New York City Administrative Code § 8-101 et seq.

257.    As a result of the aforementioned actions, Ansell has violated the New York City Administrative Code § 8-101 et seq. by aiding, abetting, inciting and coercing the unlawful discrimination outlined herein.

258.    As a result of Ansell's discrimination (and aiding, abetting and inciting discrimination) against her, Counterclaim Claimant has suffered damages, including, without

limitation, deprivation of income and benefits, emotional pain, suffering, inconvenience, damage to reputation and career, mental anguish and humiliation.

### AS AND FOR A NINTH CAUSE OF ACTION



### AS AND FOR A TENTH CAUSE OF ACTION

**AGAINST ANSELL (INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS)**

264.   Counterclaim Claimant incorporates by reference and realleges each and every allegation as set forth above as if fully set forth herein.

265.   Ansell engaged in extreme and outrageous conduct towards Counterclaim Claimant.

266.   Ansell had the intent to cause or the disregard of a substantial likelihood of causing Counterclaim Claimant severe emotional distress.

51

267.    Ansell proximately caused Counterclaim Claimant to suffer severe emotional distress.

268.    As a result of Ansell's extreme and outrageous conduct, Counterclaim Claimant suffered damages including, without limitation, emotional pain, suffering, inconvenience, damage to reputation and career, mental anguish and humiliation.

## AS AND FOR AN ELEVENTH CAUSE OF ACTION



## ATTORNEY'S FEES AND COSTS

274.    Attorney's fees and costs are warranted in this matter as the undersigned, on behalf of Counterclaim Claimant, have in good faith, attempted to negotiate a reasonable resolution with

Counterclaim Respondent, without having to refer this matter to this forum for adjudication, determination and final resolution on the merits.

## PUNITIVE DAMAGES – BAD FAITH

275.     It is presumed that parties to contracts undertake their respective obligations in good faith, with intent to deal fairly.  In light of Counterclaim Respondents' obvious and blatant bad faith, wrongdoing and breach of other duties, ***punitive damages*** should be assessed against Counterclaim Respondents so that they be deterred from attempting such harmful practices in the future.

## REQUEST FOR RELIEF

**WHEREFORE**, Counterclaim Claimant requests that the Arbitrator award the following relief in her favor:

I.      An Award declaring that the acts complained of herein violate the rights of Counterclaim Claimant as guaranteed under applicable Federal, State, and New York City Law;

II.     An Award granting equitable relief directing Counterclaim Respondents to cease and desist from exposing Counterclaim Claimant to discrimination and retaliation;

III.    An Award directing Counterclaim Respondents to reimburse and make Counterclaim Claimant whole for any and all earnings, including bonus payments, she would have received but for Counterclaim Respondents' discriminatory and retaliatory treatment, including but not limited to, back pay, double back pay, contractual damages and pension benefits;

IV.     An Award awarding Counterclaim Claimant compensatory damages for mental anguish, loss of dignity, humiliation, and injury to livelihood in an amount that is fair, just, and reasonable, to be determined at arbitration, including reasonable attorneys' fees, as provided under applicable law.

V.      An Award awarding Counterclaim Claimant double back pay damages for Counterclaim Respondents' intentional retaliation of Counterclaim Claimant;

VI.     An Award awarding Counterclaim Claimant front pay;

VII.     An Award awarding Counterclaim Claimant double back pay;

VIII.    An Award awarding Counterclaim Claimant contract damages;

IX.      An Award awarding Counterclaim Claimant punitive damages;

X.       An Award of prejudgment interest, costs and attorney's fees; and

XI.      Such other and further relief that the Arbitrator may deem just and proper.


Dated: September 26, 2018


                              Respectfully Submitted,
                              **EPSTEIN OSTROVE, LLC**


                              By: _____
                                   RICHARD PLOTKIN
                                   OF COUNSEL


55

# EXHIBIT A



MCQ00000149



MCQ00000150



MCQ00000151

# EXHIBIT B

Search                                    Cancel

8:21 PM

We're going to turn this business around.
8:22 PM

God, it was great seeing you today.
8:22 PM

Such a large part of taking the role was the opportunity to work with you. It's everything I hoped it would be.
You're such quality. A joy to work with.
8:23 PM

😘😘😘❤️❤️❤️  8:37 PM

[redacted]  10:20 PM

[redacted]  10:21 PM

Mar 1, 2017

How ya doing?  5:27 AM

# EXHIBIT C

████████████████████████████████████████████████

**From:** Chris Hayward (HR)
**Sent:** Monday, 23 November 2015 8:59 AM
**To:** Khristina McLaughlin (Macquarie Securities) <Khristina.McLaughlin@macquarie.com>
**Subject:** Re: Chris, something continues to bother me.

Hi Khristina,

Many thanks for your email. Can I set up a time for us to talk through this?  I am aware of the situation that arose and it would be good to speak with you about it given the interaction between you both is not working out as you need it to.

Rest assured I will keep this strictly confidential between us too.  What I'd like to be able to do is to give you advice that will help the situation between you and ███ - not make it worse.

I will send through a mtg request this morning.

Kind regards
Chris

On 21 Nov 2015, at 12:06, Khristina McLaughlin (Macquarie Securities) <Khristina.McLaughlin@macquarie.com> wrote:

Chris ~

One of the big themes I took away from the MSG offsite was collaboration and virtually every senior person I meet with reinforces this to me (as recent as late yesterday which is the driver of my email to you this evening … I always like to take a pause, 24 hours or so, to make sure I am clear in my thinking and reflect before acting in matters such as what is to follow).

I imagine, you are aware of the HR issue I had earlier this year with ████████

To be clear, this email is not to raise issue with ███ … if anything I feel terrible about the resolution of the process.  Without any disrespect to you, my issue is with how poorly handled things were by HR / ███████████ and what I see has now left ███ in an impossible situation.  One that likely has him in fear of verbally talking to me.

I'm bringing this up now, bc again late Thursday afternoon … at Dan Ritchie's request, he and I met to catch-up while he was in NY.  I asked Dan what advice he would give me as a new manager and from someone in his position.  Again, he indicated inter-office collaboration and specifically said you should just be walking up to ███████████████ and bouncing stuff off eachother (or something along those lines).  Dan is not the first more senior person that has casually made this recommendation to me.  I didn't get into any history, detail or challenges w. ███ but thanked him for his advice.

MCQ00006914

The whole handling of the ▮▮▮▮▮ thing continues to linger and upset me.  I don't know how to move it forward and collaborate.  Again, this is not an issue w. ▮▮▮ but my concern and frustration with how HR handled the process and outcome (what is now ▮▮▮▮ clear discomfort and even fear in interacting with me).

After I met with HR/▮▮▮▮ and she met with ▮▮▮ and others, her conclusion that I recall was that she confirmed the allegation that someone else had raised and that things had been resolved (I don't know what the actual resolution was) and that I could/should move forward business as usual.  I told her I thought it was important that I speak to ▮▮▮ directly to clear the air, to let him know that I was not the person that ran to HR and that I just wanted to work together, move forward and 'collaborate'.  ▮▮▮▮ not only encouraged me to do so, she specifically told me that I should go to him and work to move things forward and that me doing so directly was the best path.  I asked ▮▮▮ to step off the desk for a minute, which he agreed to but as soon as I brought up anything about the incident, he said he couldn't talk to me.  I tried to quickly express that I just wanted to move forward etc and he reiterated that he couldn't talk to me and abruptly left.  ▮▮▮ appeared visibly shaken and fearful.  This is not a good outcome and if anything makes me feel even worse about the whole situation and how it was handled.  I now feel bad for ▮▮▮▮.

In hindsight, I don't know why this was put in my court and on me, but again I just wanted it to go away and get back to business (that is still what I want).  I went back to ▮▮▮▮ and ▮▮▮▮ about what happened when I went to speak ▮▮▮ and they apologized for the miscommunication …..  and in their misunderstanding of my new frustration assured me that ▮▮▮ wasn't being aggressive again … in this instance, ▮▮ being aggressive never came out of my mouth that was not my issue… my issue was clearly misguided and misdirected me by telling me I could go to ▮▮▮ and clear the air and move forward.  I can see from ▮▮▮▮ position at this time, he just didn't want to find himself in a compromising situation with me again.

I've expressed my frustration to several senior people about the uncomfortable situation that lingers and somehow it always ends up back on me to just make it work … 'just ask ▮▮▮ to grab some beers, it's just how he is, collaborate, interact ..' I actually asked ▮▮▮▮ to join a few of us for drinks one night and he politely declined.  Again, this is not about ▮▮ it's about I don't know how to make it better .. working w. ▮▮▮ (as regional heads in NY) is important and comes up over and over again.  I understand its important, I want nothing more for it to work … but I don't know how to make it better.

I'm coming to you directly for advice here and I really do not want another problem with ▮▮▮ / HR … I don't want to raise issue with him.  I just want to follow thru with what everyone is telling me I need to do and that is collaborate.  At this point, I am really not comfortable going thru ▮▮▮▮ in NY bc of how poorly I see she has handled it throughout.  Clearly the process failed.  He shouldn't be afraid to talk to me.

Sincerely,
*Khristina*


**Khristina McLaughlin** | Managing Director
Macquarie Securities Group | Macquarie Capital (USA) Inc.
125 W. 55th Street, New York, NY 10019
T 212-231-8012 | M 917-589-1081 | F 917-677-8584 | E khristina.mclaughlin@macquarie.com



Please consider the environment before printing this email
Important notice - The information contained in this email is confidential. If you are not the intended recipient, you
must not disclose or use the information in this email in any way. If you received it in error, please tell us immediately

MCQ00006915

by return email and delete the document. Macquarie does not guarantee the integrity of any emails or attached files. It is also not responsible for any changes made to them by any other person.

*This material is not a product of Macquarie research personnel, and you should not regard it as Macquarie research or a research report.  This material is provided for informational purposes only and is not intended as a recommendation or an offer or solicitation for the purchase or sale of any security or financial instrument. This material is not intended to provide a sufficient basis on which to make an investment decision.  This material is intended for institutional customers (e.g. QIBs) of Macquarie only, is intended for your use only, and must not be forwarded or shared with retail customers or the public. Unless otherwise specifically stated, any views or opinions expressed herein are solely those of the individual author and may differ from the views and opinions expressed by Macquarie research personnel or other departments or divisions of Macquarie and its affiliates.  Macquarie and  its related bodies corporate (the "Macquarie Group") may act in various roles including as provider of corporate finance, underwriter or dealer, holder of principal positions, broker, lender or adviser and may receive fees, brokerage or commissions for acting in those capacities. In addition, the Macquarie Group and associated personnel may at any time buy, sell or hold interests in financial instruments mentioned within.  Therefore, this information should not be relied upon as either independent or objective from the interests of the Macquarie Group and associated personnel which may conflict with your interests. The information contained herein is as of the date and time referenced above and Macquarie does not undertake any obligation to update such information.  All market prices, data and other information are not warranted as to completeness or accuracy and are subject to change without notice.  To the extent permitted by law, no responsibility or liability (in negligence or otherwise) is accepted by Macquarie for the use made of this information. Past performance is not indicative of future results.  The investments discussed may fluctuate in price or value.*

Full disclaimer is available at the following location
http://www.macquarie.com/dafiles/Internet/mgl/com/furniture/docs/disclaimer.htm

MCQ00006916

# EXHIBIT D



anyways. I'll deal. have a good night
7:44 PM

**Today**

I won't let it be a witch hunt
6:17 AM

There's no way you ever put yourself before MQ
6:17 AM

Well, I've never seen it.
6:17 AM

As I said - this is about perception
6:18 AM

We need to address why people perceive it to be the case
6:18 AM

6:21 AM

I will defend you.
I will not run you over.
I will explain my philosophies and how they matched up.
It'll be better than ok.
10:34 AM

ok   2:19 PM

**CERTIFICATE OF SERVICE**

I hereby certify that on this date the within Counterclaim of the Respondent/Counterclaim Claimant, Khristina McLaughlin, was served on all counsel of record at their last known address, by sending the same via e-mail and regular mail from Englewood Cliffs, New Jersey, addressed as follows:

> Lloyd B. Chinn, Esq.
> Proskauer Rose LLP
> Eleven Times Square
> New York, NY 10036-8299

I further certify that a copy of the within Counterclaim was sent to Arbitrator William Kandel for his approval by e-mail and regular mail from Englewood Cliffs, New Jersey, addressed as follows:

> William L. Kandel, Esq., Arbitrator
> 2200 Century Parkway, Suite 300
> Atlanta, Georgia 30345

With a copy also sent by e-mail to AAA Bryan Corbett, Manager of ADR Services and by regular mail from Englewood Cliffs, New Jersey, addressed as follows:

> AAA Bryan Corbett
> Manager of ADR Services
> American Arbitration Association
> 2200 Century Parkway, Suite 300
> Atlanta, Georgia 30345

RICHARD L. PLOTKIN

DATED:  September 26, 2018