# Exhibit G

**Macquarie Holdings (USA), Inc. v. Khristina McLaughlin**

  **v. Macquarie Capital (USA), Inc. and Robert Ansell**

**AAA Case No. 01-17-0007-1828**

**<u>Rulings on Sexual Harassment</u>**

April 17, 2019

Macquarie moves for judgment pursuant to AAA Employment Arbitration Rule 27 ("EAR 27") and Fed. R. Civ. P. 52(c) on whether (a) McLaughlin was sexually harassed by Ansell, (b) retaliation occurred prior to the end of October 23, 2017, and (c) sanctions against McLaughlin are warranted. McLaughlin cross-moves for a finding of sexual harassment. Based on my consideration of the record as a whole, I conclude that (a) McLaughlin has not proved sexual harassment, (b) as conceded by McLaughlin, no retaliation occurred prior to October 23, 2017, and (c) because the record is incomplete on the issue of sanctions, consideration of that portion of the motion is deferred.

McLaughlin and Ansell, high- and higher-ranking Macquarie employees, had several relationships with each other between 2015 and 2017, much of that time with a sexual component. Macquarie sees the relationships as romantic, enjoyed by both parties. McLaughlin urges that she was victimized, forced into sex with Ansell by fear of losing her job. Ansell and McLaughlin concealed their relationship from Macquarie by communicating with each other about their private matters through WhatsApp, using fictitious names. Their secret was discovered by Ansell's wife who demanded that Ansell and McLaughlin end their sexual relationship. Ansell complied, and, at McLaughlin's request, sent her an August 2017 text ("the letter") acknowledging his infatuation with her but explaining his decision to put family first and

1

end the sexual part of their relationship.  McLaughlin contends that the letter proves that Ansell approached her from the outset as a predator, and that it confirms the power imbalance that impelled her compliance with his continual sexual demands.

However, the letter does not stand alone:  It is among almost 32,500 texts exchanged between Ansell and McLaughlin over a two-year period – including some after the letter where McLaughlin described continuing affection for Ansell and regret about the end of their sexual relationship.  The Parties had full and fair opportunity during the hearing to present those contemporaneous communications in support or defense of their claims and counterclaims, frequently providing context through other texts or McLaughlin's testimony (Ansell did not testify).  Rather than dispute the authenticity of the texts, McLaughlin minimized by denying she meant them:  Their power imbalance required that she placate rather than deny Ansell. McLaughlin explained that she communicated the opposite of what she meant as a coping mechanism.  McLaughlin thus tries to overcome the persuasiveness of contemporaneous texts through years-later testimony characterizing them as a sham, evidence merely of the fear that pervaded her every communication with Ansell.  Fourteen Macquarie employees testified that, based on their own eyes and ears during 2015 – 2017, McLaughlin suffered no fear or trepidation relating to Ansell at work, and instead flourished in his presence. The letter is thus no smoking gun.  Its probative value lies somewhere between a frank and candid self-evaluation and "it's not you, it's me" apology upon ending a relationship.  In context the letter cuts both ways.

Although the Parties' briefs on these motions quote freely from the thousands of texts between them – and the evidentiary hearing focused on projections of those texts – their precise contents are excluded from today's Rulings.  I have read all, but choose only to summarize or characterize them here. The Parties have suffered substantially from re-publication of those texts.

2

This confidential proceeding, already leaked, has whetted appetites for more.  The likely return trip to court on motions to confirm and/or vacate may introduce more susceptibility to public disclosure.  Therefore, regarding quotes from the texts here, less is more.

Absent quotations from the thousands of relevant texts between McLaughlin and Ansell, these Rulings use simile and metaphor to help illuminate the reasoning.  Some of the allusions may appear to lack sufficient gravity for a decision that resolves the Parties' very significant disputes.  However far out they may appear, these non-legal sources were part of the decision-making process.  Testimony and texts dominated, so the Parties are well aware of the sexual content omitted from these Rulings.  Relevant case law supplied by the Parties is discussed more traditionally herein.  Unconventional sources may become controversial if outcome-determinative (these are not) and if Parties were denied the chance to advocate their positions on them.  Their use here, instead of quotations from the texts, is intended to help the Parties understand the Rulings while minimizing the risks of further disclosure of embarrassing details.

## Legal Standards Applied to the Facts

The Parties agree on arbitral authority in EAR 27 to narrow issues as a matter of law, and on the applicability of Fed. R. Civ. P. 52(c) at this stage of the proof on sexual harassment, where evidence "has been fully heard [and, as here, read] on an issue" and the claim "cannot be maintained or defeated without a favorable ruling on that issue".  Support for the judgment must be grounded in stated findings which, pursuant to Rule 52(a), shall account for "the credibility of witnesses", and, pursuant to Rule 52(c), "the controlling law".  Nobody disputes that sufficient testimonial and documentary evidence was admitted to enable firm assessments of credibility.

The Parties also agree that controlling law on what constitutes actionable sexual harassment is in <u>Meritor Sav. Bank, FSB v. Vinson</u>, 477 U.S. 57 (1986).  Although it construed sexual harassment under federal law, and McLaughlin has state and city claims as well, courts apply <u>Vinson</u> to all three statutes.  <u>Tomka v. Seiler Corp.</u>, 66 F. 3d 1295, 1305 n. 4 (2d Cir. 1995); <u>Kahn v. Objective Sols. Int'l.</u>, 86 F. Supp. 2d 377, 381 (S.D.N.Y. 2000) (dismissing under all three statutes where sexual advances were "consensual and not unwelcome.").  The Parties also agree on two essential holdings of <u>Vinson</u>:  "The gravamen of any sexual harassment claim is that the alleged sexual advances were unwelcome"; and "[t]he correct inquiry is whether [McLaughlin] by her conduct indicated that the alleged sexual advances were unwelcome, not whether her actual participation in sexual intercourse was voluntary".  <u>Vinson</u> also agreed with EEOC's Guidelines which, it found, "emphasize that the trier of fact must determine the existence of sexual harassment in light of 'the record as a whole' and 'the totality of the circumstances, such as the nature of the sexual advances and the context in which the alleged incidents occurred'".  <u>Vinson</u> also quoted approvingly from lower court authority that not all harassment – sexual or otherwise – is actionable: "For sexual harassment to be actionable, it must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment'".

Implicit in <u>Vinson</u> is that the burden of proof for sexual harassment, as with all other forms of employment discrimination, rests with the alleged victim.  McLaughlin's Brief thus states (at 2): "While McLaughlin does not allege that her participation in the sexual relationship was non-consensual or involuntary, a sexual harassment plaintiff is not required to prove as much.  Rather, a plaintiff need only demonstrate that her words and actions indicated that the advances were unwelcome".  To the extent "demonstrate" means "prove by a preponderance of

4

the evidence", that is a correct statement of the law; "only" underestimates McLaughlin's burden of proof.  Because Macquarie initiated this arbitration seeking declaratory relief, that does not shift McLaughlin's burden to prove her underlying claim of sexual harassment.  See Medtronic v. Mirowski Family Ventures, LLC, 571 U.S. 191, 199 (2014).

Regardless of workplace power imbalance, consenting adults can enjoy a sexual relationship that is lawful under anti-discrimination law.  To the extent McLaughlin advocates some presumption that "fear" necessarily compels assent to sex among corporate unequals, the law offers no support:  Proof is required on a case-by-case basis.  No case cited by the Parties supports generalization or shortcut in assessing "unwelcome", even with a supervisor-employee harassment claim.  Indeed, in an analogous circumstance per Vinson: "[W]e hold that the Court of Appeals erred in concluding that employers are always automatically liable for sexual harassment by their supervisors".  Rather, Vinson found that "unwelcome presents difficult problems of proof and turns largely on credibility determinations"; and that "[t]he correct inquiry is whether [McLaughlin] by her conduct indicated that the alleged sexual advances were unwelcome, not whether her actual participation in sexual intercourse was voluntary".  "Conduct" under Vinson necessarily includes communications.

Readers of business news are aware of lawful romantic relationships between corporate unequals, e.g., Mary Cunningham and William Agee (Bendix), Jane Cahill and Ralph Pfeiffer (IBM), and Suzy and Jack Welch (General Electric).  Jeff Bezos met wife MacKenzie when he interviewed her for a job at D. E. Shaw.  The aphrodisiac from working well together is dramatized (perhaps satirized) in "Network", currently on Broadway.  Even "Singin' In The Rain" has star Don Lockwood (to whom nobody said no) falling in love with the struggling Kathy Seldin after they have worked together creating a show.  Putting aside marital infidelity,

none of these real or fictional workplace romances among corporate unequals violate employment laws or cultural norms.  Accordingly, McLaughlin has to meet her burden to prove "unwelcomeness" with no presumption in her favor.

Similarly, corporate level of the person who initiates a workplace relationship is not dispositive but among the totality of circumstances.  At the initiation of their relationship, Ansell had no supervisory role and no influence on McLaughlin's compensation or other terms or conditions of employment.  McLaughlin urges that Ansell's corporate rank, combined with his statements in the letter about how he planned and began their relationship, amounts to workplace predation.  The letter indicates also that Ansell perceived welcoming signals from McLaughlin, that perhaps a mutual interest existed.  Regardless, no authority puts decisive weight on who initiated a relationship, or even how it occurred.  Unless brought together by a matchmaker, all couples have an initiator, some an aggressor, and very few a predator.  Ansell's choosing what he perceived to be McLaughlin's weak moment to ingratiate himself is no more sinister than waiting for an opportune elevator ride or water cooler moment or chance for ride-hailing heroism.  As Oscar Hammerstein wrote: "You fly down the street/ On the chance that you'll meet/ And you meet … not merely by chance."  Once McLaughlin admitted that no evidence supported her court complaint allegation that Ansell preyed on other female employees, the words "Ansell" and "predator" should not have again appeared in the same sentence.

The Parties agree that the court cases most on point here, besides <u>Vinson</u>, are: <u>Holmes v. North Texas Health Care Laundry Cooperation</u>, 304 F. Supp. 3d 525 (N.D. Tex. 2018); <u>Zhao v. Kaleida Health</u>, 2008 WL 346205 (W.D.N.Y. Feb. 7, 2008); <u>Prystajko v. Lowe's Home Ctrs, Inc.</u>, 2007 WL 781932 (W.D.N.Y. Mar. 13, 2007); <u>Piccone v. Town of Webster</u>, 2011 WL 3322550 (W.D.N.Y. Aug. 2, 2011); and <u>Bouveng v. NYG Capital LLC</u>, 175 F. Supp. 3d 280

(S.D.N.Y. 2016).  Each, as here, devolves to <u>Vinson</u>'s essential test for sexual harassment: "The correct inquiry is whether [McLaughlin] by her conduct indicated that the alleged sexual advances were unwelcome, not whether her actual participation in sexual intercourse was voluntary or consensual."  Following is a brief summary of how each of these federal cases applies and informs here.

<u>Holmes</u>, most on point, involved a sexual relationship between general manager and subordinate female employee memorialized by hundreds of sexually-charged emails – in both directions.  Plaintiff, as here, claimed it was all to "appease him, to placate him, to tell him what he wanted to hear" – except for an email where she described "one of the reasons I resisted for so long", which was "I totally disagree with relationships in the work place [and] also because you are married and that makes me feel like a terrible person also.  BUT I am not willing to let you go."  The court found this communication "cannot reasonably be interpreted . . . as a particular point at which [plaintiff] clearly indicated that, going forward, [alleged harasser's] conduct would be considered offensive".  Here, as discussed later, McLaughlin occasionally expressed mixed feelings about sexual relations with her married colleague, followed by renewed enthusiasm for the many levels of their mutual attraction.  In <u>Holmes</u>, the court considered "the plethora of e-mail communications . . . in which she unambiguously stated her desires to have sexual relations with him, described how much she enjoyed these encounters, how much she wanted to be with him, missed him, and loved him . . .".  The court compared this evidence of welcomeness with plaintiff's "failure to provide any evidence that she clearly indicated to [the alleged harasser] that his conduct would be considered offensive . . .".  Finding no reasonable basis to conclude the sexual advances were unwelcome, the court dismissed the sexual harassment claims on summary judgment.

The key in <u>Holmes</u> was conduct, not motive; that the plaintiff failed to communicate "clearly" that sexual relations, from the outset or at some later point, were unwelcome, i.e., offensive to her.  The mixed motives she later alleged – an affair propelled by fear – were irrelevant because, consistent with <u>Vinson</u>, unwelcomeness "cannot be determined by [her] subjective state of mind".  McLaughlin's reliance on her efforts to create sex-based "boundaries" or "lines in the sand" with Ansell were consistently blurred by flirtatiousness, reminiscence of their prior sexual encounters, personal accounts of the loneliness of single-motherhood – certainly not the stuff of the pure business relationship she sometimes championed.  The themes that contributed to the on-again/off-again McLaughlin-Ansell relationship were very similar to those in that single <u>Holmes</u> email.  However, McLaughlin's admittedly elusive way of texting "no" (apparent to her therapist, but not the average reader) was consistently followed by less subtle forms of "yes".  And as in <u>Holmes</u>, McLaughlin communicated to nobody at Macquarie during her Ansell relationship that it even existed, much less was unwelcome.

In <u>Zhao v. Kaleida Health</u>, the plaintiff, a married HR analyst, alleged that sexual advances by the senior HR analyst culminated in a sexual assault at work.  That preceded a year-long relationship with regular sexual encounters at work, at his apartment, and at her home, memorialized in frank and suggestive emails.  Zhao supported unwelcomeness "by claiming that she was scared that if I did not submit to his advances or withdrew from the relationship, he would negatively impact my job evaluation and threaten my immigration status.  I felt trapped and helpless."  (The relationship ended when she discovered his affair with another co-worker and bit him.)  The court relied on <u>Vinson</u> and subsequent EEOC Policy Guidance (1990) that: "When welcomeness is at issue . . . [t]riers of fact rely on objective evidence, rather than subjective, uncommunicated feelings", concluding that a plaintiff "must show that at some point

she clearly made her co-workers and supervisors aware that in the future such conduct would be considered 'unwelcome'."  Zhao was able to muster no such objective evidence, just her hidden motives.  Because no rational fact finder could conclude that plaintiff "by her conduct indicated that the sexual advances were unwelcome" (citing Vinson), the court dismissed on summary judgment.  Here, as in Zhao, McLaughlin's conduct – which included thousands of texts to Ansell and several sexual encounters in world-wide venues, including her own home – communicated at most the ups and downs of a two-year relationship; she did not communicate unwelcomeness, with clarity, as to the sexual component.  Her alleged fear or inhibition as explanation for not being frank is no justification for her failure to communicate.

What McLaughlin and Ansell did not suffer was a failure to communicate – 32,500 texts in two years, many brimming with sexual pleasure.  Work-related communications often morphed into verbal foreplay.  This, too, could have been actionable.  See Holmes, at 541 ("Unwelcome sexual harassment includes sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature that is unwelcome in the sense that it is unsolicited or unincited and is undesirable or offensive to the employee.").  Based solely on the sexually suggestive content of their texts, McLaughlin gave as well as she got.  Ansell's were more discursive, McLaughlin's blunt, often nonverbal, including astrology messages supportive of their relationship, videos, photos, and naughty emojis. Think Henry Miller meets Lenore Kandel's "The Love Book."  McLaughlin and Ansell, at all hours, initiated texts of random romantic/sexual thoughts of each other, to which each enthusiastically replied.  The main distinction was Ansell appearing more smitten, and McLaughlin more grounded, perhaps in control of their sexual relationship.  Think Chagall's "The Birthday Kiss".  Never during their two-years' exchanges did McLaughlin ever say "enough already".  When she briefly went quiet

(while apparently dating another man), Ansell grieved being "dropped like a brick" but, despite being her boss, uttered not a threatening word.

Illustrative of the problem proving unwelcomeness from their exchanges is the Ansell text most extensively quoted in McLaughlin's Brief (at p. 10): It is his surrender on the sexual front – "friends without benefits" – and an offer to embark nonetheless on a professional and platonic friendship with sex available whenever she wants it. The quoted paragraph resembles an adult version of James Taylor's "You've Got A Friend". Rather than evidence of Ansell's recognition that McLaughlin had clearly communicated unwelcomeness, as the Brief urges, the quoted paragraph juxtaposed with McLaughlin's quoted hearing testimony reveals the benign, nonthreatening way Ansell responded to a down in their up-and-down sexual relationship. Most significant is McLaughlin's immediate text response to the quoted one: "I like that. I think that dynamic can defo [definitely] work for me." Given that Ansell knew McLaughlin was dating other men at the time (March 11, 2016), McLaughlin's text implied assent to perhaps resuming sexual relations with Ansell when she – a serial monogamist – would be ready again. Suggestive texts kept flowing and, after McLaughlin's own description of "a public high school make-out session" with Ansell in the Fall, they resumed their sexual relationship. Despite McLaughlin's hearing testimony that she intended an unequivocal "no" to sex in response to Ansell's text, her words on March 11, 2016 did not do that. The context of the quoted Ansell text does not indicate that his conduct had been deemed offensive by McLaughlin or that it would become offensive going forward.

In Prystajko, also dismissed on summary judgment, the court found that plaintiff's multiple engagements in sexual intercourse with her supervisor were not unwelcome. She had admitted in deposition that the affair was "mutually agreeable", that when he first kissed her she

did not object and kissed him back, and then "things escalated". Faced with the summary judgment motion based on welcomeness, plaintiff alleged she "reluctantly acquiesced to get the [Lowe's] job to support my children". Absent corroborating evidence for these conclusory statements, and in light of her contradictory deposition testimony on voluntariness, the court found no triable issue. McLaughlin's Brief (at 19-20) attempts to distinguish <u>Prystajko</u>'s inconsistency between deposition and affidavit by asserting: "Here, no such contradiction exists, McLaughlin has been consistent throughout that Ansell's advances were unwelcome." Suffice to say, my review of the record as a whole – particularly the hundreds of texts introduced at the hearing – reveals numerous suggestions of sexual encounters with Ansell by McLaughlin and very few indications of her reluctance, much less refusal. Disagreements over time or place for overnights together – e.g., Boston or Baltimore – were the norm for her pushback, not "boundaries". As in <u>Prystajko</u>, McLaughlin testified that her sexual relations with Ansell were motivated not by wanting to be with him but to enable her to support her son. That court found it to be a conclusory assertion and insufficient to meet the test of <u>Vinson</u>. Here, too, McLaughlin's hidden motive did not convey to Ansell (or, indeed, anyone at Macquarie) "by her conduct" that their sexual relationship was unwelcome.

Similarly, in <u>Piccone</u>, summary judgment for the employee on the sexual harassment count was based largely on plaintiff's admission "that she might have initiated one of the allegedly offensive email exchanges". The court found that her deposition testimony about harassment by sexually offensive workplace emails was contradicted by her apparent participation in that traffic. Plaintiff's internal inconsistency not only failed to create a triable issue; it also facilitated the court's finding the defendants' entitlement to judgment as a matter of law. Here, McLaughlin's Brief (at 20) reiterates that everything she communicated was to ward

off Ansell, that she "consistently ignored his advances or changed the subject"; and that "no such contradiction exists", as it did in the cited cases, because McLaughlin's conduct was "consistent throughout that Ansell's advances were unwelcome".  Macquarie's Reply Brief (at 5 – 13) contains substantial and substantiated evidence from the record as a whole that McLaughlin's allegations of unwelcome sex were contradicted by her own willing participation in a two-year affair with Ansell that he ended only with his wife's discovery of it.  The sum total of everything McLaughlin did, said, or wrote did not indicate to Ansell or anyone else at Macquarie that his sexual advances were unwelcome or created a hostile environment.

McLaughlin's Brief (at 4) relies on Bouveng for the uncontroversial proposition that consensual sex may still be unwelcome pursuant to Vinson.  Bouveng involved the owner of a venture capital firm's relentless pursuit of sex with a college-age intern.  After business trips together in single hotel rooms where she rebuffed him, and fearing his explosive temper, she finally submitted in an apartment he had bought her – but with no hugs, kisses or any other suggestions of welcomeness.  When she shielded herself with friends to avert his apartment visits, he fired her, defaming her and her family in publications he controlled.  She sued and won.  Although the jury did not find sexual assault (because of her consent to the sex), it did find it was unwelcome and therefore actionable and compensable as sexual harassment under Vinson.  Other than its application of the Vinson distinction between consent and welcomeness, Bouveng on the facts is inapposite:  McLaughlin was an enthusiastic sex partner with Ansell and communicated ups and downs rather than any unwelcomeness in their relationship.  In contrast with the boss-arranged business trips in Bouveng, McLaughlin was at least an equal partner with Ansell in planning their trips together as romantic getaways.  Bouveng submitted to threats and

gave no indication of willing participation.  McLaughlin offered no evidence that Ansell ever threatened her and documented her willingness to have sex with him.

Vinson and its progeny, fully recognizing the distinction between consensual and welcome sex, are a high hurdle for McLaughlin's effort to prove sexual harassment.  Applying the courts' standards, much depends on the credibility of her allegations, as discussed below. Obviously, almost 32,500 text messages can be cherry-picked to distort reality.  As was discussed at the hearing, with editing Romeo may become a stalker and Juliet a Delilah.  In order to simulate what most likely occurred between McLaughlin and Ansell, their texts must be considered chronologically and in context, not just ripped from the headlines.

<u>Whether McLaughlin's Conduct, Including Communication, Indicated Unwelcomeness</u>

One lesson of #Me too is how reluctant – indeed, fearful – women have been to "indicate" unwelcome sexual behavior, especially by men higher in the corporate hierarchy.  The Parties have provided a good answer to the dilemma of how to resolve sexual harassment disputes that account for this new awareness:  Dig deeper for facts and apply strict scrutiny to them.  The Parties marshalled the facts and presented them effectively in an evidentiary hearing over more than 25 days, plus post-hearing memoranda on these cross-motions, and oral summations.  The result was practically a daily simulation of the two-year professional and sexual relationship between McLaughlin and Ansell, along with windows into their other lives beyond each other and Macquarie.  32,500 texts provided most of the material for this reenactment, but substantial on-point testimony was taken as well.  As Vinson and its progeny make clear, resolution of sexual harassment disputes depends largely on credibility.  Here, superficially, the he-said/she-said credibility contest would be between Ansell and McLaughlin,

and only she testified.  But 32, 500 texts created a paradigm shift:  Whether McLaughlin

indicated unwelcomeness is also a credibility test of she said/she wrote, or the distance between

McLaughlin's texts and her later sworn testimony at the hearing.

The overarching theme of McLaughlin's testimony was that her seductive texts were

insincere, written out of fear that Ansell could hurt her job and career prospects if she rejected

his advances.  To counter McLaughlin's fear-based testimony, Macquarie called as witnesses

fourteen fellow employees, including male and female peers who also reported to Ansell and

served on a committee with her; HR representatives; the executive to whom Ansell reported; and

sales and trader employees who reported to McLaughlin or her peers.  None could identify a

single word or action by Ansell or McLaughlin suggesting anything amiss between them.

Eyewitnesses to a two-year fear-based relationship should have been able to discern something –

even an implied threat, fearful behavior, something.  Workplace victimization creates a hostile or

abusive environment, discernible to co-workers.  Not so here.  Instead, everyone saw and heard

the opposite:  a very comfortable Ansell-McLaughlin relationship marked, after his becoming

her boss, by her heightened self-confidence and assertiveness.  None saw any change in this

positive relationship during the almost year-long period Ansell and McLaughlin were not having

sex (and while he knew she was dating), or after July 29, 2017 when Ansell's wife discovered

and helped break up their sexual relationship.

McLaughlin's Brief (at 16-17) minimizes the weight of all this testimony as the product

of company witnesses interested in protecting their own jobs and unaware of private

communications between McLaughlin and Ansell.  Their demeanor while testifying, and their

words, left their credibility intact.  More significantly, nothing McLaughlin said or wrote was

inconsistent with their observations:  None of her thousands of texts suggested even workplace

disagreement with Ansell, much less any threat to her job or prospects.  To the contrary, even during the no-sex periods, she felt free to nominate Ansell as her mentor, as a performance reviewer, and as a sponsor for a financial services industry award given after their sexual relationship had ended.  She engaged exuberantly in corporate power politics, confident throughout of Ansell's support.  To the extent McLaughlin's testimony was inconsistent with these witnesses', she basically disagreed about the amount of additional power she wielded while reporting to Ansell.  Otherwise, their testimony is consistent with McLaughlin's to the extent they had no basis to know she was in a sexual relationship (McLaughlin told nobody and was careful to keep it a secret) or that any aspect of her relationship with Ansell was hostile (absent any contrary evidence).

Thus, McLaughlin's assertions that a work-based fear factor inhibited her indicating to Ansell (or anybody else at Macquarie) the unwelcomeness of his sexual advances are belied by objective evidence.  Her testimony frequently repeated fear-based reasons to excuse her own welcoming conduct.  McLaughlin's therapist identified her characteristic failure to indicate unwelcomeness – to Ansell or anyone at Macquarie – as "pathological independence".  Regardless of this reason – which presumably was not known to Ansell or anyone at Macquarie – she did not meet the test of Vinson.  And by persistently disavowing her own texts, her credibility suffered along with her ability to sustain her burden of proof.

The conflict on welcomeness between McLaughlin's testimony in 2018-2019 and her voluminous texts from 2015-2017 is significant.  Basically, McLaughlin wants the texts to be ignored or edited in favor of a fear-based version of the facts, that the texts otherwise are a sham.  As indicated above (and in prior-cited case law), that excuse is unpersuasive.  Macquarie's Brief (at 7-17) compiles a veritable scoreboard in fully-cited bullet points – which McLaughlin's Brief

15

does not contest for accuracy – that documents McLaughlin's contemporaneous version of her relationship with Ansell:  five I love you's, eleven I adore you's, dozens of kisses in public, approximately 86 texts with "kissmark" emojis, numerous frank and seductive comments on sex had or about to be had, and, after his wife's discovery and the end of their sex together, McLaughlin's deep regrets that their relationship had changed because of his new "platonic indifference".

During the hiatus in their sexual relationship, flirtatious texts flowed in both directions until the "very public high school makeout" followed by McLaughlin's inviting Ansell to spend an "adult Saturday" together in Manhattan on Thanksgiving weekend – which they did, without sex – and her text response was "counting blessings including you".  Ansell became her boss shortly thereafter, their sexual relationship reignited, and their texts thereafter reflected unalloyed pleasure tempered only by her regrets about his sometimes being unavailable, like around Valentine's Day, 2017.  That cancelled date inspired McLaughlin's text (cited at McLaughlin's Br. 14), expressing disappointment over the broken plans and regrets about "having sex with a married colleague".  These regrets were not the words of someone wanting to convert a welcome sexual relationship into an unwelcome one going forward.  Nor were the subsequent facts:  A week later McLaughlin welcomed Ansell into her home where they had sex; his thankful follow-up text was met with McLaughlin's smiley emoji.

McLaughlin's Brief seeks to bolster her Valentine text's regrets about sex with Ansell because he was a married man, that it proves she communicated to him the unwelcomeness of their relationship.  Besides the equivocation (they promptly resumed sex at her home), there is also a question of whether McLaughlin's expression of regret was or should have been taken seriously by Ansell.  After all, during their no-sex period, McLaughlin had a few-months' affair

16

with another man – also married – of which Ansell was aware.  The abrupt and unexplained breakup of that second relationship dominated her therapist Dr. Gandler's notes from her visits during that period.  (McLaughlin's involvement with Ansell was not even mentioned.)  Evidence adduced at the hearing revealed that a brief earlier affair with a third married man, then a current or potential firm client, contributed to McLaughlin's marriage breakup and, if discovered then, could have jeopardized her job.

McLaughlin's testimony emphasized her primary interest in keeping secret her sexual relationships, not wanting to be "that girl" who could be regarded as sleeping her way to the top. Several of her texts with Ansell focused on logistics of secrecy, the safe times and places for assignations to avoid Macquarie's detection.  Whether in New York, New Jersey, Boston, Baltimore, San Francisco, even London or Sydney, they planned vacation-type escapes from the business portions of those overnights.  It is hard to reconcile McLaughlin's "line in the sand" with her texts longing to get away secretly to a beach with Ansell (consistent metaphorically only).  Indeed, McLaughlin's overriding fear of exposure may have driven her toward married men, who, presumably, would be more discreet and secretive than others.  Based on the totality of evidence, it is not credible that McLaughlin's fleeting regret about her affair with Ansell, as a married man, indicated to him unwelcomeness about that relationship.

Also unpersuasive was McLaughlin's testimony that an affair with her supervisor would foreclose her dating unattached men.  She had the affair in 2016 with Ansell's knowledge and to which he responded benignly, accepting second-fiddle status with no threat of retaliation.  That it was with another married man was irrelevant to Ansell's reaction.  According to the texts, Ansell was not possessive, seeking only to maintain their friendship while McLaughlin was dating.  The stark contrast with <u>Bouveng</u> on this point shows further its inapplicability here.

McLaughlin's Brief (at 4-9) emphasizes her first sex with Ansell, that it was unwelcome then and served as the basis for McLaughlin's communicating unwelcomeness from that point forward.  That first night, August 27, 2015, recurred in their text exchanges like a mantra throughout their two-year relationship.  This positive post-event coverage was initiated by McLaughlin, continuing throughout their hot and warm phases.  These numerous verbal and pictorial reminiscences of that first night, always wistful, never regretful, evolved to fond memories recounted by McLaughlin as the auspicious beginning of their welcome relationship. That Ansell was the aggressor or initiator with suggestive texts leading up to August 27, and McLaughlin did not follow his lead with equal alacrity, at most leaves the issue of initial welcomeness up in the air. They then enjoyed sex throughout the night, texted about their mutual pleasure and McLaughlin's reservations about sex going forward (although "no regrets" about what had occurred), and resolved any ambiguity about welcomeness by planning and having several more assignations.

To argue that fear compelled acquiescence on August 27, 2015 ignores the fact that Ansell was not her boss and was not then involved in decision making that could affect her employment.  To claim that his high rank and access at Macquarie were irresistible goes too far from what any court has accepted (or should accept) as evidence of a consensual but unwelcome sexual encounter.  It is inconsistent with real #MeToo job threats, which forced women into unwelcome sex or acceptance of harassing behavior.  It suggests that anyone with perceived access to power, even if he says nothing about having or wielding it, cannot have even signed-and-sealed consensual sex without the risk that it may later be recharacterized as unwelcome. Vinson and its progeny do not allow later and unsupported assertions of subjective fear to overwhelm contemporaneous and objective evidence.  Here, the totality of circumstances

includes post-August 27 communications from McLaughlin, over almost two years, that the sex that night was indeed welcome.

An additional point on credibility regarding welcomeness that the Parties did not address in their post-hearing submissions or arguments:  Did McLaughlin believe that her relationship with Ansell could evolve to where he would get divorced and they would become regular partners, married or not?  I raised it briefly during therapist Susan Walden's testimony, there was brief colloquy, but follow-up was impossible because McLaughlin's testimony was not continued.  However, I was struck by the frequency of McLaughlin's sending to Ansell – who had three teenage daughters – photos and videos of her 8-year-old son, sometimes to ameliorate Ansell's distress over matters outside of their relationship.  McLaughlin even permitted some direct contact between Ansell and her James, and humor-bonding over his "slowpoke" car racing skills.  Single mothers generally discourage adult male relationships with young sons to avoid the risk of attachment and then disappointment from another breakup.  Was McLaughlin having Ansell and James audition for compatibility with each other, as a consideration for where McLaughlin would go with the relationship?

Macquarie argued that McLaughlin's characterization of Ansell as a sexual predator is belied by encouraging his interaction with her son (to which McLaughlin responded that she was not calling Ansell a pedophile).  Perhaps that argument was not ambitious enough: The abrupt end of their affair triggered McLaughlin texts to Ansell professing her love, loneliness, and regret about their breakup, culminating in her dashed belief that "we would end up being together some day".  I do not believe this was made up to placate Ansell or protect her job; indeed, she reproachfully described her work as less fulfilling because of his new "platonic indifference".

From beginning to end of their sexual relationship, McLaughlin's contemporaneous texts were more accurate descriptions than her later and contrary testimony about what had occurred 1 – 2 years earlier.  Based on the texts and hearing testimony, I conclude that the credible evidence demonstrates that the Ansell-McLaughlin sexual relationship, throughout, was consensual and welcome.  McLaughlin did not prove the relationship was, at any point, unwelcome.

<u>Conclusions</u>

Based on mu findings on sexual harassment and McLaughlin's concession on retaliation, the sexual harassment claim is dismissed; McLaughlin's cross-motion is denied; any claim of unlawful retaliation before the end of October 23, 2017 is also dismissed; and Macquarie's request for sanctions is deferred pending a more complete record.

Dated: New York, New York

April 17, 2019

*William Kandel*

William L. Kandel, Esq., Arbitrator