# Exhibit H

**Macquarie Holdings (USA), Inc. v. Khristina McLaughlin**

**v. Macquarie Capital (USA), Inc.**

**AAA Case No. 01-17-0007-1828**

**<u>Rulings on Breach of Contract by McLaughlin and Retaliation by Macquarie</u>**

July 11, 2019

## I.  Summary

Macquarie seeks a declaratory judgment that McLaughlin's federal lawsuit violated the Parties' Arbitration Agreement to resolve their disputes through "strictly confidential arbitration".  McLaughlin counterclaims that, beginning October 23, 2017, Macquarie unlawfully retaliated against her for engaging in statutorily-protected activity.  Macquarie bears the burden of proof on its contract claim, and McLaughlin bears that burden on her retaliation claim.  Based on the record as a whole, including extensive briefing by counsel, I conclude that Macquarie prevails on its contract claim and on its defense to McLaughlin's retaliation claim.  References to Claimant Macquarie's exhibits are "CX #" and to Respondent McLaughlin's are "RX #".

## II.  Macquarie's Claims of Breach of Contract and Damages

McLaughlin's Employment Agreement with Macquarie, dated May 5, 2017 (CX 22), provided (at page 8), under the heading "Arbitration Agreement", a very clear statement about the centrality of arbitration to their employment relationship: "You agree that the Arbitration Agreement attached to this Agreement as Annex A applies to the terms and conditions of your employment with the Employer [Macquarie].  By accepting this Agreement, you affirmatively indicate your agreement to the terms set forth therein.  Both you and the Employer [Macquarie]

1

understand that by agreeing to the terms of the Arbitration Agreement, both are giving up any constitutional or statutory right they may possess to have covered claims decided in a court of law before a judge or a jury."

The "annex A" attached to the Agreement, titled "Arbitration Agreement", is a 3-1/2 page document in the same format and font as the attached Employment Agreement.  The provision of the Arbitration Agreement most relevant to this breach of contract claim is headed "Arbitration Procedure" and provides: "As a condition of your employment with Macquarie, you agree that any controversy or claim arising out of or relating to your employment relationship with Macquarie, the terms and conditions of your employment or the termination thereof, must be submitted for final and binding resolution by a private and impartial arbitrator, to be jointly selected by you and Macquarie."

This contract language could not have been clearer:  disputes were to be resolved through confidential arbitration.  Alerted by McLaughlin's attorney to her intent to litigate employment claims against Macquarie, the company emailed him a letter, dated November 17, 2017, attaching the employment agreement with the Arbitration Agreement, and highlighting that "the arbitration shall be strictly confidential".  McLaughlin's attorney at 2 PM emailed Macquarie's letter to her.  Nonetheless, at 4 PM that same afternoon, November 17, 2017, Mclaughlin's Complaint was filed in federal court.

Macquarie was thus forced to move in federal court to (a) transfer the case into arbitration where it clearly belonged, and (b) seal McLaughlin's Complaint to preserve the proceeding's confidentiality.  That the Complaint was filed in court late Friday afternoon significantly complicated Macquarie's efforts to seal the file.  I take arbitral notice that late-

Friday filings require efforts by several lawyers and staff to contest, especially when the Complaint's contents, as here, are inflammatory and the media have, as here, been alerted. Crisis litigation is expensive. That Macquarie succeeded in obtaining Judge Marrero's later-evening approval for sealing the file on such short notice and over McLaughlin's opposition was a significant achievement. That the Complaint nonetheless went public (and viral) electronically, before the court's sealing process was completed between Friday and Monday, rewarded McLaughlin's legal team's strategy of filing close to the court's Friday closing time.

McLaughlin's publicly-filed Complaint was preceded by her obtaining through her attorney an interview with Bloomberg News. She provided the basis for a self-serving Bloomberg report on November 20, 2017 (CX 17) related to allegations in the Complaint and her negative opinions of Macquarie. On November 20, that Bloomberg report was the most-read business article related to Australia; was in the top 20 of most-read business articles; and was the fourth most-read article about Macquarie in all of 2017. This obliteration of confidentiality was predicted, indeed promised, by McLaughlin's first attorney from the outset of communications with Macquarie on her behalf: The threat of devastating publicity was frankly used as leverage for a $12 million settlement, a tactic allegedly useful with other employers. (CX 24). These threats were implemented through the Bloomberg interview and the Complaint's filing.

Judge Abrams, on August 7, 2018, granted Macquarie's motion to compel arbitration and stayed the court case, finding that the Employment Agreement "clearly mandates confidential arbitration of any claims arising from her employment", and that McLaughlin "clearly assented to these terms when she accepted the agreement". McLaughlin v. Macquarie Capital (USA) Inc., 2018 U.S. Dist. LEXIS 134401 (S.D.N.Y. Aug. 7, 2018). According to the court, McLaughlin lacked "a valid basis . . . to argue" that she was not bound by the Arbitration Agreement, and that

3

she had "clearly assented" to confidential arbitration in her employment agreement which included the Arbitration Agreement.  Thus, almost nine months of federal court litigation were consumed in the glare of world-wide publicity generated by McLaughlin over a dispute manifestly subject to confidential arbitration.  McLaughlin was now remanded to the private forum contemplated by her employment agreement, having failed to convince the court that she had "a valid basis" to avoid confidential arbitration.

Confronted with Macquarie's claims of breach of contract and resultant damages, McLaughlin deployed two consecutive teams of lawyers to allege (a) her arbitration and confidentiality obligations were void as against federal and New York public policy; (b) her aggressive pursuit of litigation and publicity rather than confidential arbitration was the fault of her first attorney,  and not McLaughlin; (c) she was unaware of the confidential Arbitration Agreement, so she should not be held accountable for breaching it; and (d) McLaughlin was unaware that, by filing her Complaint in federal court, all the contents could be disclosed worldwide.  That first attorney (henceforth "Attorney A") has come under withering criticism by McLaughlin as overly aggressive and the main cause of her potential liability.*

A.  McLaughlin's Public Policy Arguments Are Unpersuasive

McLaughlin urges that NY CPLR 7515 (a)(3), effective July 11, 2018, should void Macquarie's confidential arbitration agreement to the extent it covers sexual harassment; or, at least, it should serve as a public policy basis to deny damages for McLaughlin's breach of that agreement.  Here, the at-issue Arbitration Agreement, executed and effective May 5, 2017, preceded the New York legislation by more than a year.  A canon of statutory construction is that federal or state legislation must clearly state that it is retroactive in order to be accorded

retroactivity.  Statutory coverage of "any" contract is insufficiently specific to reach back to pre-existing ones like this Arbitration Agreement.

McLaughlin also argues that her Bloomberg interview and Complaint were protected activity under the National Labor Relations Act ("NLRA") and that any employer-imposed confidentiality/nondisclosure obligation should face statutory prohibition.  However, the employee-conduct policies, at issue in McLaughlin's cited National Labor Relations Board cases, were held to be so broad as to deter protected employee communications about working conditions, to the extent the policy restrictions could discourage access to the NLRB.  Here, by contrast, Macquarie provided several internal channels for McLaughlin to pursue workplace grievances, forbade retaliation for exercising these rights (see last paragraph of Arbitration Agreement, CX 22), and, except for reasonable coordination with the public relations staff, freedom to communicate with the media.  (CX 84).

Contrary to McLaughlin's argument, NLRA's protection of employees' concerted activity does not override the public policy of encouraging arbitration pursuant to the Federal Arbitration Act and numerous decisions by the U. S. Supreme Court.  McLaughlin tried similar public policy arguments before Judge Abrams, but they were rejected as lacking any authority and ignoring contrary Supreme Court decisions.  The court also rejected as precedent for invalidating the confidential arbitrability of this dispute "the uncontroversial proposition that confidentiality provisions in FLSA settlement agreements are contrary to public policy because they may incentivize employers not to comply with the statute". Confidentiality has long been an inducement for private parties to use the private process of arbitration.  Indeed, as provided in AAA's Employment Arbitration Rules (the "EAR"): "23.  Confidentiality.  The arbitrator shall maintain the confidentiality of the arbitration and shall have the authority to make appropriate

rulings to safeguard that confidentiality, unless the parties agree otherwise or the law provides to the contrary." According to EAR 1: "The parties shall be deemed to have made these rules a part of their arbitration agreement whenever they have provided for arbitration by the American Arbitration Association...." Accordingly, based on the Parties' confidential Arbitration Agreement, and no law to the contrary, I find no public policy reason to excuse or justify McLaughlin's foregoing arbitration and filing her Complaint in court to maximum self-generated publicity.

B. McLaughlin Was Responsible for Breaching the Arbitration Agreement

McLaughlin's blaming Attorney A for her foregoing confidential arbitration is unavailing. There is no dispute that Attorney A was McLaughlin's lawyer when she filed the Complaint in court rather than seek arbitration. Represented by new counsel in the arbitration, McLaughlin argued she was unaware of the Arbitration Agreement, blaming Attorney A for missing it. This finger-pointing is insufficient to excuse McLaughlin's breach. Ignorance of a contract's arbitration requirement (to which she "clearly assented" per the court) is, as a matter of law, no defense to a breach of contract. Moss v. Rent-A-Car, Inc., 2007 WL 2362207 (E.D.N.Y. Aug. 15, 2007) ("employee's failure-to-read an arbitration agreement would not generally allow an employee to avoid the terms set forth in that arbitration agreement"). Moreover, McLaughlin was bound by the acts of Attorney A, her duly authorized counsel, in filing the lawsuit rather than pursuing arbitration. Williams v. King, 679 F. App'x 86 (2d Cir. 2017) (party is "bound by the actions of counsel on his behalf").

Even more compelling than the legal principles affixing McLaughlin's responsibility are the facts specific to her circumstances. As pointed out earlier herein documentary evidence

supports that approximately four hours before the Complaint was filed on November 17, 2017, Macquarie's counsel supplied Attorney A with the Macquarie-McLaughlin Employment Agreement containing the Arbitration Agreement, along with a cover letter focused on the exclusivity of arbitration; and two hours pre-filing, Attorney A forwarded that Macquarie correspondence to McLaughlin.  I also credit representations by Macquarie that exclusivity of the Arbitration Agreement was discussed with Attorney A prior to Macquarie's letter of November 17, 2017 to Attorney A, which concluded (after quoting provisions on "confidential arbitration"): "Although I advised you of this provision during our first conversation on this matter, I wanted to make sure you had a copy of it."  Given Macquarie's valuing confidentiality so highly, it is reasonable to believe that, from the outset of this dispute, the contractual requirement of confidential arbitration was made known to Attorney A, McLaughlin's agent.

C.  McLaughlin Was Aware of Her Confidential Arbitration Agreement

McLaughlin's claims not to have read that November 17 material in time to stop the filing ring hollow as support for her claimed ignorance, especially because the Employment Agreement of May 5, 2017 (CX 22) was not the first arbitration agreement she had signed during her tenure at Macquarie.  McLaughlin signed a robust Arbitration Agreement upon joining Macquarie in February 2012 (CX 19), and another on May 6, 2016 when she became Head of NY Equity Sales (CX 20).  Moreover,  McLaughlin testified quite knowledgeably about other aspects of her Employment Agreement, including cross-referenced complex compensation arrangements.  Described throughout the hearing as a competent up-and-coming member of Macquarie's U. S. Cash Equities management team, and a summa cum laude college graduate, I find her protestations of ignorance as to a prominent feature of all of her Employment Agreements – the multi-pages Arbitration Agreement – to lack credibility.  For purposes of this

7

arbitration, I find that responsibility for her breaching the Arbitration Agreement and filing the Complaint rests squarely with McLaughlin.

    D.  McLaughlin Was Aware Her Court Filing Could Go Public

    McLaughlin denied any intent to damage Macquarie by filing her Complaint in court, testifying she did not know the filing's potential for public disclosure.  However, she undercut this profession of ignorance by admitting that she deleted from drafts of the Complaint identifiers of clients and her ex-husband.  The reason?  McLaughlin testified that she did not want clients to receive unwanted publicity or issues about her ex-husband to become known.  Thus, her own testimony contradicted her earlier representations that she thought court filings were confidential. This testimony was particularly disingenuous in light of Attorney A's written communications to Macquarie on McLaughlin's behalf, threatening damaging publicity when her harassment claims in court would go public.  McLaughlin was well aware of these exchanges between October 23 and November 17, 2017, regarding the possibilities of business damage to Macquarie from filing a Complaint.

    Just as McLaughlin and Attorney A saw negotiation leverage in talking to Bloomberg on November 16, they were well aware that her court filing the next day would likely create more negative publicity against Macquarie, perhaps forcing a settlement of her claims.  This is not speculation; Attorney A's first letters to Macquarie, beginning October 23, 2017, emphasized the settlement value ($12 million) of avoiding a court complaint (CX 24).  McLaughlin's testimony, that she was unaware the court filing could have public consequences, lacked credibility.  Having participated in drafting the 65-page Complaint and marshaling – indeed, editing – the inflammatory exhibits, then stoking media interest in the Complaint through the Bloomberg

8

interview, McLaughlin effectively assumed the role sarcastically described for others by
Attorney A in his demand letter of October 23, 2017 to Macquarie:  "An arsonist, he can set the
fire, pull the alarm, and be a hero".  McLaughlin's breach of the Arbitration Agreement involved
no heroics or other justifiable basis.  She is liable.

E.  Macquarie Is Entitled to Damages for Breach of Contract

Macquarie seeks contract damages measured by (1) attorneys' fees and expenses incurred
for motion practice in court necessitated by the Complaint, i.e., obtaining contested orders to seal
and then to compel arbitration, and (2) the loss of Macquarie business, i.e., reduced trading
revenue, attributable to McLaughlin's publicizing what should have been a private dispute
resolved by confidential arbitration.  Although the two requested bases for recovery are related,
damages are precisely calculable only for legal fees and expenses, as explained below.

1.  Attorneys' Fees and Expenses for Proceedings in Court

Macquarie's fee-shifting application as a proxy for contract damages seeks an exception
to the "American Rule" whereby each side typically pays its own legal fees.  Macquarie relies on
Aero Garage Corp. v. Hirschfeld, 185 A.D. 2d 775, 586 N.Y.S. 2d 611 (1st Dept. 1992) and
Sands Bros. & Co. v. Nasser, 2003 U. S. Dist. LEXIS 23406 (S.D.N.Y. 2004).  Each is
applicable to the facts here, and each ordered fee-shifting as a remedy for a breach of contract.
Hirschfeld involved a property owner who created sufficiently "unusual circumstances",
intentionally evading the terms of a contract, to impose unfair legal costs on the lessee, being
"fully aware from the outset that their actions were blatantly in breach of the agreement with
plaintiff and yet displayed their willingness to go to any lengths to achieve their ends."  Here, as
previously found, McLaughlin and Attorney A knew "from the outset" that the Bloomberg

interview of November 16, 2017 and the filing of the Complaint on November 17, 2017 violated the confidentiality and confidential arbitration requirements of her Employment Agreement. Their intent to "go to any lengths to achieve their ends" was manifest in Attorney A's letter to Macquarie of October 23, 2017 which threatened, through adverse publicity, not only severe injury to its business but also the downfall of its CEO.  (CX 24).

Nasser ordered fee-shifting because the plaintiffs were "frivolous" seeking to enjoin the defendant from pursuing arbitration against parties known to be subject to mandatory arbitration under NASD rules.  The court relied on its authority to award attorneys' fees where "the party refusing arbitration acted without justification or did not have a reasonable chance to prevail". Here, the Arbitration Agreement in light of New York and federal law leaves no reasonable alternative to confidential arbitration as the exclusive forum for this matter.  McLaughlin's attempted justifications for rejecting confidentiality and arbitration have themselves been rejected herein and in large part by Judge Abrams in holding that "all of the claims in this action will be referred to arbitration".  (S.D.N.Y. Dkt. No. 53).  I conclude that, as in Nasser, Mclaughlin's actions in court have been "without justification" and she should bear the fees and expenses incurred by Macquarie in resisting them.

### 2. Loss of Gross Trading Revenue and Other Make-Whole Relief

McLaughlin and Attorney A imposed on Macquarie two foreseeable (indeed, foreseen by them) kinds of injury by breaching the confidential Arbitration Agreement: (a) adverse publicity causing damage to business by cutting into trading revenue, and diminishing recruitment opportunity and employee morale by portraying Macquarie as a bad place to work, and (b) legal fees and expenses compelled by Macquarie's having to try to prove the damages referred to in

(a).  Based on the record as a whole, Macquarie has proved entitlement to monetary relief for its legal costs referred to in (b), but not the difficult-to-prove business losses referred to in (a).

Macquarie presented statistical (CX 131, 132) and anecdotal evidence purporting to show that the notoriety of McLaughlin's claims caused a significant drop in trading business, both in volume and market share.  While the business drop-off coincided with when McLaughlin went public, that correlation alone does not prove causation.  Macquarie's trading volume and market share pre-McLaughlin were not on an unbroken upward trajectory, and U. S. Cash Equities appears to have been losing money regardless of volume or share.  It is hard to ascribe monetary loss directly to McLaughlin's breach when large losses preceded it, and may even have abated months later.  Moreover, while the anecdotal evidence indicated wide outside awareness of McLaughlin's claims that put Macquarie in a bad light, no specific evidence was adduced that a client or transaction or recruitment prospect was lost because of McLaughlin.  This lack of proof was more significant than the reasonable assumption, fed to Macquarie by Attorney A, that publicity like McLaughlin's would put any financial institution under a cloud, appearing to be out of control and unsafe.  Perhaps the most compelling evidence supporting causation may be Attorney A's representation to Macquarie that he had personal knowledge that another financial institution suffered significant trading losses from similar claims he asserted on behalf of another client.  (CX 24).  However, no admissible evidence from that other bank's dispute establishes that causation existed even there, much less here.  Insufficient Macquarie-specific evidence was adduced to prove business loss caused by McLaughlin.

The only consequential damages from McLaughlin's breach that are definite are legal fees and expenses incurred by Macquarie in trying to prove that it suffered the business losses promised by McLaughlin and Attorney A when they went public.  As openly predicted by them,

Macquarie had to have been injured.  Although Macquarie was unable to carry its burden to prove causation regarding specific business injury, largely because the relevant business was previously unprofitable, there is no dispute that Macquarie would have to, and did, spend money in legal fees and expenses trying to obtain a remedy for McLaughlin's impact on that business. Causation in that context was clear.  Just because Macquarie was unable to prove specifically cause-and-effect – between McLaughlin's actions on November 16 and 17, and the resultant Bloomberg report on November 20, 2017 and its business falloff in the immediate aftermath – does not mean Macquarie cannot be compensated for good faith efforts to be made whole through arbitration.  Accordingly, Macquarie is entitled to recover its legal fees and expenses invested in pursuing its claim against McLaughlin for intentionally injuring its business by threatening to and then breaching the confidential Arbitration Agreement.

### 3.  Remedy for McLaughlin's Breach

As found earlier in this Ruling, McLaughlin is liable for (a) Macquarie's attorneys' fees and expenses incurred from court proceedings related to the Complaint, because this dispute was contractually committed to arbitration; and (b) Macquarie's attorneys' fees and expenses incurred trying to prove damage to its business directly attributable to McLaughlin's breach of her contractual obligations of confidentiality and to pursue confidential arbitration.  Macquarie shall submit to the arbitrator related billing information with sufficient specificity by August 2, 2019.  McLaughlin may reply to Macquarie's submission by August 16, 2019.

## III.  McLaughlin's Claims of Unlawful Retaliation

McLaughlin's pre- and post-hearing submissions correctly identify her burden of proof to establish unlawful retaliation under the applicable federal, state, and city statutes: (a)

McLaughlin engaged in "protected activity", i.e., she opposed, or participated in an effort to eliminate, employment discrimination – here, sexual harassment; (b) Macquarie knew of that activity; (c) Macquarie subjected McLaughlin to a materially adverse action when or after it learned of the protected activity; and (d) there was a causal connection between McLaughlin's protected activity and Macquarie's adverse employment action in that retaliation was "a motivating factor".  McLaughlin's claims of unlawful retaliation must be dismissed for failure to prove any materially adverse action.

McLaughlin's authority prominently cites Burlington N. & S. F. Ry v. White, 548 U. S. 53 (2006), and its admonitions that actionable retaliation requires "that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination"; and, later: "We speak of material adversity because we believe it is important to separate significant from trivial harms.  Title VII, we have said, does not set forth 'a general civility code for the American workplace'. [citation omitted] An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work, and that all employees experience".  The Court in Burlington goes on to emphasize that anti-retaliation provisions seek to prohibit employer responses that deter reasonable employees from seeking statutory relief, and that "normally petty slights, minor annoyances, and simple lack of good manners will not create such deterrence".  This emphasis on reasonableness in evaluating what is a "materially" adverse action is particularly relevant here.  That these limiting principles apply also under the New York City Human Rights Law ("NYCHRL") is set forth in Mihalik v. Credit Agricole, 715 F. 3d 102 (2d Cir. 2013).

McLaughlin's retaliation claim against Robert Ansell, then a Party, was dismissed via summary judgment on Day 1 of the evidentiary hearing (October 29, 2018) for no showing of "protected activity", rendering immaterial the other elements of retaliation with respect to Ansell. McLaughlin later narrowed the time frame of her claims against Macquarie by voluntarily dismissing any claim of unlawful retaliation before the end of October 23, 2017 (Rulings on Sexual Harassment, April 17, 2019, at p. 20). McLaughlin then failed to prove at the hearing that any post-October 23 action by Macquarie was materially adverse to her. Just as she failed to prove the prerequisite protected activity with respect to her claims against Ansell, McLaughlin failed to establish the essential element of adverse action taken by Macquarie.

Macquarie urges dismissal of McLaughlin's retaliation claim for her lack of good faith in alleging the underlying sexual harassment. Indeed, it has already been found in several places of the Rulings on Sexual Harassment (April 17, 2019) that McLaughlin lacked credibility when testifying that scores of her own texts, written during her two-years' involvement with Ansell, meant the opposite of what they said. McLaughlin's effort to create a "fear motivator" was contradicted not only by the romantic and symbiotic nature of her (and Ansell's) texts, but also debunked by the testimony of at least fourteen credible witnesses that McLaughlin appeared to flourish, personally and professionally, during her time working near and then with Ansell. Besides her sexual harassment testimony, McLaughlin was also not credible finger-pointing away from responsibility for her breaches of contract, as found herein.

Despite valid factual underpinnings for Macquarie's argument to dismiss retaliation for "bad faith", the law is unclear. As Macquarie candidly informs, the Second Circuit has not opined on this. It remains uncertain whether the NYCHRL will be construed as more protective of protected activity than its federal and state counterparts. Accordingly, the invitation to

dismiss McLaughlin's retaliation claims, based on her lack of candor in asserting "unwelcomeness" and sexual harassment, is declined.  However, based on the settled law of retaliation as declared by the U. S. Supreme Court in <u>Burlington</u>, there is ample established authority to address each and every retaliation claim made by McLaughlin.  Individually and together, these retaliation claims are insufficient and must be dismissed.

McLaughlin's opposition to Macquarie's motion for JMOL (March 13, 2019), conceding that her retaliation claims were "not based on pre-October 23, 2017 conduct", aptly summarized them as "premised in the protected conduct in which she engaged starting with her prior counsel's October 23, 2017 email to Macquarie and including, but not limited to, subsequent communications with Macquarie regarding her being subject to harassment and discrimination, and for her filing the lawsuit against Macquarie in district court.  The retaliatory actions include, but are not limited to, Macquarie's poor treatment of her in the workplace, its placing her on paid leave, and the reduction of her 2018 bonus (the lowest bonus McLaughlin had received since she joined Macquarie)."  (at p. 21).  Mclaughlin's pre-hearing brief (October 22, 2018) enumerated more specific retaliatory actions "that included, among other things: (a) the plans to fire McLaughlin during the October 23 and 24 offsite meeting; (b) not maintaining confidentiality of the issues being addressed by Macquarie which arose as a result of that which followed Mrs. Ansell's learning on July 29, 2017 of the relationship her husband was having with McLaughlin; (c) causing the Macquarie employees in the office, including those with whom she was working on a daily basis, to ostracize her and make "life at work" very difficult; (d) also causing the word to reach those outside Macquarie including clients, competitors, friends and acquaintances which publicly humiliated and embarrassed her; (e) fabricated complaints against her to be included in her file (evaluations) that were not only not true, but were also totally inconsistent with prior

years' evaluations; (f) Macquarie's giving McLaughlin the lowest bonus for the year ending

March 31, 2018 that she received during any of the six prior years of her employment at

Macquarie, this despite being promoted two times since joining the company in 2012, with

annual increases, each year, in revenue production, including for the year ending March 31,

2018. [footnote omitted]."  {at p. 27).

McLaughlin's testimony at the hearing offered sub-parts of these six categories of alleged

retaliation, as if after October 23, 2017, practically every human interaction she had at

Macquarie now became offensive -- and even some that she didn't have.  Attorney A had

correctly advised McLaughlin that employers faced with similar claims often slip up and

succumb to the urge to retaliate, or do so inadvertently, becoming liable for the latter violation

even if not for the underlying allegations of sexual harassment.  Here, as set forth below, this

array of retaliation claims, individually and together, were insufficiently supported to meet

McLaughlin's burden of proof.

The context for McLaughlin's retaliation claims is important to understanding them.  Her

communications with Ansell, post-breakup, revealed far less enthusiasm about work than

previously.  Plans for the Eppley offsite had been ongoing when Mrs. Ansell discovered the

affair.  The evidence reveals no objective evidence that McLaughlin's job was at risk.  But

McLaughlin believed Ansell might try to jettison her to save his marriage, and could use the

offsite as the means.  Despite Ansell's providing her heads-ups about what would occur, which

should have allayed her concerns, McLaughlin essentially threw her hands up and contacted

Attorney A.  In her email of October 22, 2017 to Attorney A, she concluded: "I would really love

to find a way not to go back to that place."  (CX 88).  After Attorney A had apparently described

his passion to keep working regardless of any financial need, McLaughlin's reply was: "I on the

other hand would choose a different path if I had the financial flexibility to do so.  It would allow me to spend more time with my son.  Currently, I wake up at 5 a.m. every day and leave him in the morning by 6 a.m." (CX 89).  Attorney A attached to his email to Macquarie on October 30, 2017 McLaughlin's summary of her first day back at work since the offsite and Ansell's suspension, which concluded: "There is zero chance this just goes away and people don't link me to his departure and whether or not HR wants to make it work, and do everything they can, they can't change peoples' behavior towards me.  We both know that."  (CX 6).  She was telling Attorney A, who relayed to Macquarie, that reinstatement would be disruptive and futile.  Clearly, McLaughlin wanted out.

McLaughlin's frequently-repeated testimony, that she only wanted to protect her job, was not credible.  She wanted to leave Macquarie at all costs (to them), and her primary goal was to obtain a large settlement.  Only her lawyer's urging induced her to return to Macquarie for the purpose of gaining leverage and raising risks of retaliation during settlement negotiations.  This was the context for McLaughlin's allegations of mistreatment from all levels of Macquarie employees upon her grudging return to work in late October 2017.

A.  Poor Treatment at Work:  Presumptions, Not Reality

CX 6 was McLaughlin's contemporaneous detailing of her return to work after Ansell's departure and the perceived slights that made her "incredibly uncomfortable and I felt like a leper.  My US management team barely acknowledged me."  She also testified about five named individuals who either ignored her or were less voluble than usual or not responsive to an email.  Three of them testified (McLaughlin did not call the other two) about no animus toward McLaughlin, that they did not know why Ansell had left, but that there was indeed workplace

17

upset about the revolving door for executives over U. S. Cash Equities.  It was not about McLaughlin.  This was unpersuasive evidence of mistreatment.

Subsequently, McLaughlin complained internally that a subordinate worker had ignored her need for access into the office from the elevators.  Macquarie HR investigated, the cause may have been inadvertent as reported to McLaughlin and McLaughlin did not seek further relief. During the arbitration, McLaughlin dwelled on the incident as reflecting not only the employee's uncorrected retaliatory animus, but also Macquarie's spoliation of the building management's security camera tape (which Macquarie denied).  Despite McLaughlin's burden to prove retaliation, she did not call the employee as a witness.  The incident is inconsequential.  Similarly unavailing was McLaughlin's effort to prove that Macquarie turned her Sales team against her and supplanted her role in employee evaluations for bonuses.  Credible testimony revealed that, after McLaughlin's Complaint and its $40 million demand became known, some people reporting to her sought to have someone other than McLaughlin with them to help advocate their individual bonus requests.  That Macquarie accommodated these reasonable requests for help in no way implicates management in retaliation against McLaughlin.  Nor can anything about the Eppley offsite be ascribed to retaliation since the chronology does not work, and no adverse action was associated with it.  McLaughlin's claims of

 being ostracized by co-workers after her Complaint went viral was met by convincing testimony to the contrary by those co-workers.  McLaughlin presented not a single witness to support those claims.  The few documented incidents of even misperceived slights were met with apologies. Based on Burlington, the sum total of her complaints about rough-edged workplace interactions was the stuff of "civility codes", not retaliation.

B.  Failure to Protect Confidentiality:  Irony, Not Reality

That McLaughlin would criticize Macquarie, for not doing more to keep confidential the role of McLaughlin in Ansell's departure, is sheer chutzpah.  Putting aside McLaughlin's publicizing in embarrassing detail her own version of their sexual relationship, reasonable communication by Macquarie management with those having a need to know was absolutely essential to prevent unlawful retaliation.  Macquarie did that.  By not commenting on McLaughlin-Ansell matters and instead focusing on Dan Ritchie's replacing Ansell and McLaughlin's continuing in her prior role, Macquarie was businesslike and helpful in avoiding retaliation.  That the communications were sufficient is evident from the absence of actionable retaliation incidents.  That the employee communications did not cross the lines into private matters hurtful to McLaughlin is evident from lack of incriminating testimony.  That McLaughlin, if asked, would have conducted Macquarie's internal communications differently, particularly giving her more early warning and heads-ups about what was to be said and when, is merely disagreement about business judgment.  The U. S. Supreme Court has long ordered judges (and arbitrators) not to become "super personnel departments" instead of focusing on discrimination and retaliation.  Macquarie's handling of the difficult circumstances surrounding McLaughlin's very public allegations and her presence as an active employee was professional and nonretaliatory.

C.  Paid Leave of Absence:  Benefit, Not Detriment

McLaughlin's claim that Macquarie retaliated by forcing her to take paid leave is not credible.  First, the context: McLaughlin's stated goal from the beginning (late October 2017) was to leave Macquarie with a large severance pay settlement.  She made that clear to Attorney

19

A in communications previously described herein.  She did not want to return to Macquarie even before her self-made notoriety through the Bloomberg interview on November 16, 2017.  As she communicated to HR prior to going on leave, she was back at work only at the urging of Attorney A who saw the leverage in settlement negotiations of her workplace presence rather than absence.  Think Trojan Horse.  As McLaughlin's relationship with Attorney A soured, she began to value her own need to exit Macquarie higher than his advice to stay and bear it.

Finally, on April 11, 2018, she met with Austin Dowling of HR in his office, became emotional, described her conflicting pressures, then asked unequivocally to be put on paid leave. Not only did Dowling hear this, but so did Jessie Cardinale, also of HR, who sat close to that office.  Both testified credibly at the hearing to this effect.  Dowling that day sent McLaughlin a confirming email before seeking approval for her request (CX 79), and McLaughlin did not indicate disagreement for a week.  On April 18, when Dowling got Macquarie's approval for the paid leave, he notified McLaughlin of its start date and the mechanics of security, including suspended access to the office.  (CX 81). McLaughlin's responses (CX 81), copying Attorney A, were remarkably similar in style and format to Attorney A's initial communications with Macquarie (CX 24).  At that point, McLaughlin protested against going on paid leave – not that she had changed her mind or was committing to renewed efforts on Macquarie's behalf, but because she had never agreed to the leave; and also:  "My lawyer has advised me to continue to show up for work which I intend to do".  And in a same night follow up email: "I made no such formal request....  This was a total setup....  I will be back to work on Friday...".  Now quite belligerent on this (and at the hearing), invoking an adversary role at work, McLaughlin's testimony was that Macquarie had proposed the leave, she rejected it, and it was therefore involuntary leave in retaliation for her protected activity.  Dowling and Cardinale testified that

McLaughlin had requested the paid leave, and Dowling credibly described his thought process in getting it approved and then sticking to it in the face of McLaughlin's erratic retraction later. Ritchie supported his judgment: paid leave was clearly in both sides' best interests, both business and legal.  Based on the record as a whole, McLaughlin's denial that she sought and got paid leave of absence lacked credibility.  McLaughlin thus tried to prove retaliation, from Macquarie's conferring of a benefit that met her originally-stated needs, but may have conflicted with Attorney A's litigation strategy.  Her effort not only failed but diminished her credibility.

D.  Bonus Reduction:  Business Judgment, Nor Retaliation

McLaughlin urged that, because her bonus was reduced from $415,000 in 2017 to $300,000 in 2018, this must have been retaliation for her protected activity which began October 23, 2017.  Macquarie countered with several business judgment justifications for the reduction. First, the bonus pool for U. S. Cash Equities had been reduced overall.  This was a macro-economics decision unrelated to McLaughlin's harassment claims:  U. S. Cash Equities had lost millions of dollars that year.  Since bonuses are typically a share of profits, any amount for McLaughlin could have been deemed a benefit, not detriment.  Second, Ansell was no longer responsible for allocating bonuses from the pool, and there was testimony from numerous witnesses that he had favored McLaughlin.  Bonus allocations were a zero-sum game, and some peers of McLaughlin's had endured disproportionate reductions under Ansell.  Ritchie, having assumed Ansell's decision-making role, saw a need to give a catch-up bonus boost to a McLaughlin peer who had endured an undeservedly large bonus reduction the prior year. Pursuant to McLaughlin's Employment Agreement and incorporated compensation policies and programs, business decisions such as these were clearly within the discretion of Macquarie in allocating bonuses.  Third, Ritchie certainly had discretion to consider in bonus allocation the

21

disruption caused by McLaughlin's erratic behavior in showing up unannounced in the office on Thursday (she had written about Friday) after the commencement of her paid leave, then exiting for the lobby where she sat crying in plain sight.  I take arbitral notice that bonuses are not just to reward hard work (which McLaughlin's testimony emphasized) but also to incentivize behavior likely to reach positive goals.  To reward disruptiveness, stemming from apparently willful misunderstanding/borderline insubordination, would be counterproductive.  Fourth, as McLaughlin emphasized in her closing argument, her 2018 bonus reduction was not the first she had experienced at Macquarie: "In 2013 my bonus was $400,000.  In 2014 my bonus was also $400,000.  In 2015 my bonus was $550,000.  In 2016 $500,00.  In 2017 $415,000.  And then in 2018 $300,000."  (Transcript 7906).  Putting aside that during that period McLaughlin also received an increase in base salary, this erratic pattern of bonus allocation reflects the multi-factor bonus considerations – including overall company and business unit performance – that characterized McLaughlin's tenure.  Presumably, she worked just as hard during the up years as during the downs.  She did not (and does not) complain about that compensation history.  Indeed, high executive turnover meant several different decisionmakers with varying priorities were raising or reducing her bonuses.  She accepted bonus reduction without complaint while supervised by Ansell, simultaneously promoting his mentorship.  Given this comp history, there is nothing remarkable about McLaughlin's 2018 bonus that even implies unlawful motives. McLaughlin failed to prove that her 2018 bonus reduction was evidence of retaliation.

**Conclusions**

Based on the foregoing findings and conclusions, Macquarie's Claims for breach of contract and related attorneys' fees are GRANTED and McLaughlin's Counterclaims for unlawful retaliation are DENIED.

As previously stated herein, Macquarie's application for reasonable attorneys' fees and expenses related to the breach of contract is due on or before August 2, 2019.  McLaughlin may reply to Macquarie's submission on fees and expenses by August 16, 2019.

Dated: New York, New York

     July 11, 2019

*William Kandel*

     William L. Kandel, Esq., Arbitrator

**Endnote**

*Because McLaughlin has refused to provide the complete waiver of attorney-client privilege requested by that attorney and law firm as prerequisite to testifying in this arbitration, then it is unfair to use personal identifiers.  Instead we shall refer to Attorney A hereafter, including Attorney A's law firm.  Attorney A represented McLaughlin from on or about October 2017 and the initial communications of McLaughlin's issues to Macquarie, through the Bloomberg

interview, the Complaint and subsequent federal court proceedings, and through the early stage

of this arbitration, including the initial conference call with Parties and arbitrator, until on or

about the second week in September 2018.  Attorney A was thereupon replaced by attorney

Richard Plotkin, and then the law firm Epstein Ostrove LLC., whose limited-purpose appearance

was supplemented by the regular assistance at the hearing provided to McLaughlin by William

C. Costopoulos, Esq., her father.