# Exhibit M

# AMERICAN ARBITRATION ASSOCIATION
# EMPLOYMENT ARBITRATION TRIBUNAL

| | |
|---|---|
| **Macquarie Holdings (USA), Inc.,** | **February 5, 2020** |
| Claimant/Counterclaim Respondent, | |
| vs. | |
| **Khristina McLaughlin,** | **Case No. 01-17-0007-1828** |
| Respondent/Counterclaim Claimant, | |
| vs. | |
| **Macquarie Capital (USA), Inc., and Robert Ansell,** | **Arbitrator:** |
| Additional Counterclaim Respondents. | **William L. Kandel, Esq.** |

## REASONS FOR SANCTIONS IN FINAL AWARD

The Final Award, dated February 5, 2020, paragraph 4, adverts to "the accompanying Reasons for Sanctions". This is them, based largely on Rulings on Attorneys' Fees II – Sanctions, dated October 2, 2019 ("the October Rulings"), and the Parties' subsequent presentations related to McLaughlin's sanctionable conduct. The latter, supplied by both sides, included the following relevant facts and circumstances occurring or learned subsequent to the evidentiary hearing: McLaughlin's salary continuation ended during the summer of 2019 when she was fired for cause; Macquarie shut down the business unit which had employed Ansell and her; and, most significantly, Macquarie's fee application approximates McLaughlin's net worth. Rulings on Attorneys' Fees I, dated September 29, 2019 ("the September Rulings") used Macquarie's attorneys' fees as the measure of damages for McLaughlin's breach of contract in violating her "strictly confidential" arbitration agreement and publicizing that breach. The attorneys' fees shifted to McLaughlin in the September Rulings -- $69,419.50 – were contract

1

damages only, independent from the sanctions ordered in the October Rulings.  The dollar amount of sanctions is central to the remaining dispute – whether Macquarie is entitled to (a) make-whole relief, (b) just an amount necessary to deter similar conduct by McLaughlin and others, or (c) a combination which compensates and deters.  Bottom line:  It would take substantially fewer dollars to deter McLaughlin than to compensate Macquarie.

Background

The October Rulings granted Macquarie's motion for sanctions pursuant to Rules 11 and 37 of the Federal Rules of Civil Procedure, as well as pursuant to Christiansburg Garment Co. v. EEOC. 434 U.S. 412 (1978) (hereafter "Christiansburg").  The October Rulings noted that sanctions for violating Rule 11 are primarily to deter repetition of frivolous claims by not only the violator but also by "others similarly situated".  Because the McLaughlin-Macquarie agreement required "strictly confidential" arbitration, there should have been no "others similarly situated" to deter.  However, McLaughlin's breaches of that agreement, creating public notoriety from a private dispute, makes it likely that "others" may learn of the dispute and may need to be deterred.

Rule 11 also permits fee-shifting to reimburse the party having to defend against frivolous claims.  Here, the fact that McLaughlin filed in federal court rather than in arbitration, along with the McLaughlin-generated publicity attending her late-Friday filing, forced Macquarie to incur additional legal costs to change forums.  All this preceded even getting to the substance of McLaughlin's massive and frivolous court complaint, later redrafted as an arbitration counterclaim.  Those preliminary fees and expenses were ordered to be reimbursed to Macquarie in the September Rulings, and will not be duplicated here.  What remained for

2

Case 1:17-cv-09023-RA   Document 75-13   Filed 07/08/20   Page 4 of 18

Macquarie v. McLaughlin                                                    Case No. 01-17-0007-1828

Macquarie, once in arbitration, was to defend against 55 pages of similarly frivolous counterclaims, including six separate counts each seeking $20 million in compensation and $50 million in punitive damages from Macquarie.  The October Rulings confirmed not only that those counterclaims, previously dismissed as lacking support in law or fact, were framed not only by the reviled Attorney A and the now-deceased Attorney B, but were in large part initiated, edited and, ultimately, approved by McLaughlin.  I conclude that Rule 11 sanctions should be levied against McLaughlin, but for reasons expressed in the October Rulings, not against Attorneys A or B.

The October Rulings also found that McLaughlin spoliated evidence, particularly (a) texts she sent to Ansell damaging to her "unwelcomeness" claims, (b) texts she sent to Attorney A with attachments such as revealing photographs, and (c) audio recordings of her surreptitious taping of important office meetings.  As Rule 37 violations, the remedy depends on prejudice which Macquarie mitigated by replacing much of the missing evidence through additional, albeit more expensive, discovery.  As found in the October Rulings, even where evidence such as the tape recordings of meetings could not be replaced, witness testimony and related documentation supported Macquarie's versions of the facts.  Thus, Rule 37 "prejudice" consisted only of the extra costs incurred by Macquarie, particularly for a forensic expert and related attorney time.  The absence of evidence caused by spoliation did not unduly inhibit Macquarie's ability to prove or defend against claims.

Christiansburg also focuses on relief for having to defend against frivolous claims of employment discrimination, but unconstrained by the procedural prerequisites under Rules 11 and 37.  As noted in the October Rulings, the prevailing employer in Christiansburg made the

point of employer eligibility for Title VII fee-shifting, but the trial court's denial of that relief was affirmed by the U. S. Supreme Court because the government's initial and persistent losing position had not been frivolous. The same frivolous standard was articulated as under Rule 11 for pleadings. Christiansburg permitted judicial scrutiny of plaintiff's behavior throughout the case, allowing fee-shifting if it "continued to litigate after it clearly became" evident that sufficient proof would never emerge. Here, McLaughlin not only filed but pursued – for 29 hearing days – frivolous claims, eschewing settlement off-ramps. Fee-shifting applies pursuant to Christiansburg, but because the Court denied the employer any recovery, it did not guide as to criteria for such an award. Here, the Parties' submissions and arguments on sanctions show the evolution of Christiansburg in the Second Circuit, where employers were awarded attorneys' fees. Courts have outlined equitable considerations that must inform the decisionmaker's discretion in assessing amounts of sanctions. Christiansburg at this stage of the case means a multi-factor analysis not only of extra costs incurred by the employer contesting frivolous claims and discovery offenses, but also the financial resources of the parties and amount of sanction serious enough to deter repetition of the misconduct. What follows is an effort based on all the known facts and circumstances to calibrate remedies suitable for the Parties.

      Preliminarily, sanctions here should not be mitigated because of inadequacy or absence of counsel. The role of Attorney A and his firm, experienced employment lawyers, has been discussed in prior Rulings and is not a sanctions factor because they were replaced prior to the arbitration hearing. Attorney B, a competent commercial litigator, searched exhaustively for more suitable arbitration counsel before assuming first chair himself, backed by a dedicated associate and his former law firm. When Attorney B had to resign for health reasons, he exerted similar efforts to ensure McLaughlin's adequate representation. New counsel's sanctions brief

implies those efforts may have been insufficient, adverting to AAA's EAR 19 and replacement of counsel. I find that, pre- and post-representation of McLaughlin, Attorney B exceeded the requirements and policy goals of EAR 19 by summarizing on the record his solicitation of help from the plaintiff bar throughout his connection to the case, at one point having an outside lawyer familiar with a technical point participate by phone. Unable to obtain replacement counsel for the entire case, Attorney B secured competent representation of McLaughlin by a senior partner of his former law firm during a significant hearing phase when he was physically unable to participate. I do not recall a hearing day or even segment when McLaughlin was not assisted by counsel. When Attorney B and his firm withdrew, McLaughlin was effectively assisted in the second chair by her father, William C. Costopoulos, Esq., a prominent litigator in Pennsylvania whose practice included the representation of judges.

Also unpersuasive, given the facts here, is the usually reasonable question raised in McLaughlin's closing arguments by new counsel: If the claims were so frivolous, why did it take so long – 29 hearing days – to decide and dismiss them? Where was the motion practice permissible under the AAA Employment Arbitration Rules to dismiss or cull her claims before the running up of substantial legal, contractor, and arbitration fees and expenses? Macquarie was not reluctant about trying to close the case early, moving for dismissal of McLaughlin's sexual harassment and retaliation claims based on her counsel's opening statement. That motion was denied because counsel's erroneous theory for liability – the sufficiency of "subjective fear" -- was argument, not evidence. The alleged facts, if proven, could still have established liability for sexual harassment under alternative legal theories. Shortly thereafter, McLaughlin's retaliation counterclaims against Ansell were dismissed orally because her facts failed to show the prerequisite "protected activity". McLaughlin then voluntarily dismissed her retaliation claims

against Macquarie, but only those based on evidence prior to October 23, 2017.  After McLaughlin concluded her testimony on Macquarie's declaratory judgment action (which mirrored McLaughlin's counterclaims in all material respects), Macquarie moved pursuant to Fed. R. Civ. P. 52(c) against her sexual harassment claims on several grounds, and they were dismissed on April 17, 2019 because her affair with Ansell was not only "voluntary" but "welcome" and "subjective fear" was not a motivating factor ("the April Rulings").  Now, McLaughlin's counsel implies the April Rulings were limited to McLaughlin's proceeding under the mistaken theory that only "subjective fear" of retaliation could show "unwelcomeness", suggesting bad legal advice underlay the dismissal.  A fair reading of the April Rulings is that McLaughlin was found to be not just a willing but enthusiastic and equal partner in her affair with Ansell.  Numerous witnesses testified to McLaughlin's confidence and ebullience at work during that period, the objective opposite of exhibiting subjective fear.  McLaughlin's contemporaneous text messages extolling the relationship debunked her later hearing testimony that the affair was unwelcome.  Credibility, not some legal technicality, defeated the sexual harassment allegations.  That was on McLaughlin, not her lawyers.

McLaughlin's counterclaims of retaliation post-October 2017, after a full hearing on the merits, were also dismissed on July 11, 2019 ("the July Rulings").  Macquarie's claims of breach of contract against McLaughlin, while straightforward, became complex mainly because of McLaughlin's finger-pointing to deflect blame to Attorney A.  Resolution of these disputes in the July rulings was complicated by discovery delays caused in large part by McLaughlin's spoliation of documents (broadly defined), the transitions among her attorneys, and then her blaming Attorney A, which created issues of attorney-client privilege and its waiver.  Moreover, McLaughlin's improper court filing motivated Macquarie's filing the underlying arbitration

demand which, in turn, required a full presentation before McLaughlin could raise her dismissible counterclaims. Had McLaughlin filed first in arbitration, the hearing could have ended in days rather than weeks.

The short answer, then, is that frivolous is not immediately obvious, especially with counterclaims packaged in 55 pages and evidence compromised by spoliation. A frivolous case, as here, can consume more attorney time than non-frivolous litigation.

McLaughlin's counsel also attacks Macquarie's attorneys' fee application as disproportionate overall and, in specific areas, insupportable. I find the application to be compliant with Second Circuit disclosure requirements in terms of specificity and comprehensiveness. As indicated in the September Rulings, where fee-shifting became the measure for contract damages, the applied-for hourly rates were consistent with Manhattan large-firm practice, and the expended hours were not unreasonable given the exigencies of the case. Contrary to Macquarie's argument for law-of-the-case acceptance of those findings here, I prefer to get it right and, if warranted, take a fresh look based on new counsel's arguments. However, substantial time for reconsideration need not be invested because of overarching equitable considerations also required in the Second Circuit, and discussed later herein.

Considerations in Implementing the October Rulings

The October Rulings (at p. 11) ordered the following: "Macquarie's remedy shall be proportionate attorneys' fees and expenses associated with extra efforts expended on spoliation, defending against the sexual harassment and retaliation claims, working with outside experts related to these disputes, and fees incurred in bringing these motions. Excluded from this remedy are attorneys' fees and expenses related to breach of contract, resolved in [the September

7

Case 1:17-cv-09023-RA   Document 75-13   Filed 07/08/20   Page 9 of 18
Macquarie v. McLaughlin                                              Case No. 01-17-0007-1828

Rulings]." Compliant with the October Rulings, Macquarie submitted its detailed fee application which McLaughlin opposed through her current attorneys – addressing proportionality from the standpoints not only of the amount of Macquarie's expenditures sought to be recouped, but also Macquarie's size and resources compared with McLaughlin's ability to pay. McLaughlin also advocated that any sanctions award should give more attention to deterrence in implementing the October Rulings' "proportionate attorneys' fees and expenses associated with extra efforts expended" because of frivolous claims and their prosecution. McLaughlin's opposition focuses on case law that prefers deterrence over make-whole remedies, particularly when compensatory relief would impoverish the sanctioned party. McLaughlin's opposition reveals what have become for her precarious financial circumstances, particularly after being fired "for cause" and whether the required recording of a "for cause" termination is career death in financial services. The Parties dispute the direness of this last circumstance, whether the job market at sell-side firms would be foreclosed and the likelihood that buy-side firms would have no problem with a "for cause" entry. Regardless, "for cause" also cuts off substantial contractual income streams from her exiting Macquarie under that cloud.

Absent sufficient income or comparable job prospects, burdened by hard-to-liquidate assets (especially a house), and already obligated to pay Macquarie close to $70,000 for breaching her agreement of "strictly confidential" arbitration, McLaughlin may well be desperate. If so, that feeling would be based on objective facts rather than what turned out to be the unfounded suspicions that fueled her scorched-earth campaign against Macquarie in October 2017. It is instructive in fashioning a suitable remedy to recall how just the misperception of financial risk quickly drove McLaughlin to extreme behavior, as previewed in her August 2017 text to Ansell after he ended their affair, which she feared could jeopardize her job: "#MeToo. I

want to be very clear.  I will protect you til the end . . . end means when I feel I'm at uncontrollable personal risk and puts my ability to financially care for James at risk.  If I was a bad person I would have cashed in a long time ago.  I'm not and I sleep well at night knowing I'm not and if anything I am too much a martyr.  I am a good person and likely way too naïve.  If it gets there . . . I'll fight til the end and I WILL win.  This isn't a war yet and I don't want it to be.  I hate the battle but I will win.  We can make this work.  I've fought many more battles than you have . . . ."  (Macquarie Exhibit 9).

McLaughlin's threatening text invoked "#MeToo" as a shield to a sudden sense of job insecurity.  Within two months, and absent intervening facts to support her anxiety, McLaughlin had collaborated with Attorney A to produce not only the court complaint (after several drafts) but also incendiary exhibits designed to inflict maximum injury on Ansell and Macquarie.  McLaughlin and Attorney A weaponized Bloomberg News to amplify her allegations filed in court.  The Bloomberg interview and court complaint attempted to turn #MeToo into a sword, alleging that Ansell preyed not only on McLaughlin but other female employees as well.  (Complaint para. 103).  During the arbitration hearing, McLaughlin admitted that she never had evidence Ansell had made sexual advances on anyone else, and that she had even asked the one young woman from whom she suspected incriminating evidence but got none.  In stark contrast with the Harvey Weinstein comparison raised here by Attorney A, and "predator" by Attorney B, not only was no other woman identified by McLaughlin, but, despite the worldwide publicity given her claims, nobody came forward even to say that Ansell had approached anyone else.  As concluded in the Rulings on Sexual Harassment, April 17, 2019, at p. 6 ("the April Rulings"): "Once McLaughlin admitted that no evidence supported her court complaint allegation that Ansell preyed on other female employees, the words 'Ansell' and 'predator' should not have

again appeared in the same sentence." Yet that characterization persisted in this arbitration, right through closing argument where McLaughlin repeated approvingly Attorney B's: "We're dealing with a stalker"; and twice referred to the hubris in Ansell's end-of-affair letter: "No one ever said no to me." The latter by itself might have sounded like the Harvey Weinstein case, but for one glaring difference: McLaughlin and her attorneys could not muster a single other person who had said "yes" to Ansell, or who had even been approached by him, despite the world-wide notoriety of her allegations to Bloomberg and salacious court complaint. Moreover, McLaughlin could not have been intimidated into sex by that statement since Ansell wrote it as part of his August 2017 letter explaining why he had ended their affair, not to initiate anything.

McLaughlin's testimony dramatized her capacity and disposition to injure Macquarie even when she was doing well financially, eminently recruitable, and with lots to lose. McLaughlin testified to her willingness after their breakup to use a prestigious Wall Street dinner, where Ansell had nominated her for an award and would attend, to announce her sexual harassment victimization by him. And she won that award! She also considered leading a #MeToo public relations campaign in the financial services industry, based on her own circumstances at Macquarie. Having overreacted to misperceived threats from Macquarie, it is difficult to predict how McLaughlin in her current financial circumstances would respond to various levels of sanctions. Unknown and risky to both Parties, it recalls: "Freedom's just another word for nothin' left to lose". (Joplin, J., "Me and Bobby McGhee").

Macquarie does not need to create either a pitiable or vengeful McLaughlin. Nor is its fee application and supporting argument framed in absolute or retributory terms. While I do not perceive Macquarie as intending to push sanctions beyond boundaries of reasonableness, the

unknowns about McLaughlin's financial and, more importantly, psychological resilience defy any formulaic award.  It is also difficult to predict how likely it would be for McLaughlin to flout any peace-seeking order by breaching confidentiality just like she did despite the "strictly confidential" Arbitration Agreement.  She has exhibited no failure of imagination in plans to "go public", threatening Ansell "when I feel I'm at uncontrollable personal risk and [it] puts my ability to financially care for [son] James at risk".  (Macquarie Exhibit 9).  Sanctions necessarily impose financial burden, but can they avoid "uncontrollable personal risk"?  Today's Rulings must be calibrated to these unknowns.

      I learned from the Parties' presentations on sanctions that proper exercise of discretion fashioning remedies should be more forward- than retroactive-focused, and that non-monetary measures deserve more attention than acknowledged in the October Rulings.  McLaughlin's current attorneys assure that she has "had it" with her Macquarie relationship and just wants to get on with her life.  Macquarie remains skeptical, particularly in light of McLaughlin's hearing testimony which threatened persistent risk to its business.  Reasons abound to doubt McLaughlin's just "walking away".  Her closing statement at Day 29 of the evidentiary hearing was a mix of unrepentant and unconvinced, suggesting she remained   undeterred and unrestrained.  Because McLaughlin did not attend the December 19 hearing on sanctions, we can rely only on her lawyers' characterization of McLaughlin as essentially a different person since she presented her summation at the close of the evidentiary hearing on May 16, 2019 – substantially less inclined or capable to continue her dispute with Macquarie.  Regardless how competent new counsel are to provide a credible comparison of McLaughlin before and after, they urge that she at least perceives that she is in precarious financial straits and susceptible to disaster from an insensitive ruling here.  Her former workplace has not flourished either:  Oral

11

argument on sanctions revealed that, since the evidentiary hearing (and presumably not because of it), U. S. Cash Equities, the money-losing business unit that employed McLaughlin and Ansell, has been shut down.  I am uncertain whether its absence reduces the risk to Macquarie of McLaughlin's possible regression to behavior akin to what began in October 2017.  It is surely little consolation to her to know that she would not likely have flourished had she not been fired.

      Neither side of this grueling battle appears inclined to a rematch.  However, prudence in light of Rules 11 and 37 and Christiansburg dictates a remedy tailored to these unique circumstances.  An essential element of the non-monetary portion of the award is the requirement that McLaughlin seek gainful employment, whether in or out of the financial services industry and regardless if as an employee, contractor or entrepreneur.  Testimony by her therapist emphasized the importance of work to McLaughlin.  I take arbitral notice that work rather than idleness mitigates more than financial issues.  This noncontroversial observation is supported by Richard B. Freeman, a Harvard labor economist and at the National Bureau of Economic Research, as recently quoted in the New York Times:  "If you are not in school and not in work or actively searching for a job, you are not involved in society, and you are more likely to engage in antisocial activities."  McLaughlin's counsel at the sanctions hearing suggested it would be futile for McLaughlin to seek comparable employment in financial services because of her "for cause" termination.  The Parties disputed those prospects, much like arguments over mitigation of damages in routine employment cases.  Counsel also questioned her psychological fitness for employability.  While the prevailing employee has the burden of proof on reasonable job search and suitability, McLaughlin does not bear it here – except if that mitigation obligation could be created in a sanctions award as an incentive, beyond the basic economic motivation for job-seekers, to get back out there.  Both Parties would benefit if a

financial incentive were added to encourage compliance with the award. The goal would be to create sanctions that deter repetition of McLaughlin's breach of the Parties' "strictly confidential" contractual relationship while not exceeding an actual or perceived financial tipping point for her, ie., imposing no "uncontrollable risk" but, instead, creating positive incentives for her to control the amount of sanctions.

Conclusions Regarding Arbitral Authority

Having been supplied informative written and oral arguments for and against Macquarie's fee application, one authority is the most persuasive: Judge Weinfeld's decision in Collucci v. The New York Times Company, 533 F. Supp. 1011 (S.D.N.Y. 1982). There, an employee whose discrimination claims were dismissed as frivolous would have faced financial ruin if even the two-thirds-reduced attorneys' fee conceded by the employer had been imposed. The court instead shifted to the plaintiff only 15 percent of the applied-for reduced legal fee (only 4 percent of the actual fee) as the sanction. As noted in McLaughlin's brief, the court thus explained its criteria: "The assessment of fees must be fair and reasonable based on the particular circumstances of the case. The factors to be considered in fixing the fee include the plaintiff's earning capacity, his financial resources and ability to pay the sum awarded; the relative financial status of the defendant may also be taken into account – in sum, the equities of the situation are to be considered to assure that although the deterrent purpose of the statute is enforced, a losing party is not subjected to financial ruin [citing on-point Second Circuit authority]." In Faraci v. Hicket-Freeman Company, Inc., 607 F. 2d 1025 (2d Cir. 1979), cited in Collucci, the court encountered a Christiansburg fee-shifting award below that had already been reduced to 13 percent of the reasonably billed amount. The court concluded that had the trial

court properly considered the frivolous plaintiff's financial circumstances, the award to the employer would have been only 2 percent of the billed amount.  Based on the same reasoning, Judge Weinfeld refused to award sanctions in an amount that could drive the plaintiff into bankruptcy or effectively mortgage his future earnings.  Amen to that.  And here we have the additional consideration of seeking a sanction that will not create "uncontrollable risk" – extreme financial insecurity – that could reactivate McLaughlin's hostile actions toward Macquarie.

      My authority to exercise equitable discretion similar in scope as in Collucci exists in the McLaughlin-Macquarie Arbitration Agreement, which provides:  "The arbitrator shall have the power to award all remedies that could be awarded by a court or administrative agency in accordance with the governing and applicable substantive law relating to covered claims... ."  The Arbitration Agreement operates under the AAA Employment Rules, which similarly provide, at EAR 39d:  "The arbitrator may grant any remedy or relief that would have been available to the parties had the matter been heard in court including awards of attorney's fees and costs, in accordance with applicable law."  The Arbitration Agreement also provides:  "The burden of proof at arbitration shall at all times be upon the party seeking relief."  Here, Macquarie's seeking sanctions casts them as that party and shifts the burden of proof to Macquarie.  And to reiterate an overarching principle of the Arbitration Agreement that governs all phases of this proceeding:  "the arbitration shall be strictly confidential".

      The court decisions slashing sanctions-related fee applications reveal the extraordinarily broad discretion allowed.  No formula or rule of thumb is even in the picture.  Here, sufficient facts have been adduced to support principled rather than arbitrary decision making.  Accordingly, given wide discretion to fashion sanctions suitable to the facts and circumstances

here, the following sanctions are the result of due consideration of the Parties' positions and the record as a whole. The sanctions are separate and apart from McLaughlin's breach of contract obligation to Macquarie, previously ordered (the September Rulings) in the amount of $69,419.50, which is not a sanction but damages. However, we are mindful imposing sanctions that, although contract damages are no offset, McLaughlin does carry that financial burden as well as likely her own attorneys' fees.

Terms and Conditions of Sanctions

    1. Because of the structure and flexibility of the sanctions, Macquarie must designate a named individual as administrator, responsible for implementation of the sanctions, including receiving payments and interacting in writing only with McLaughlin. Macquarie shall communicate this name to McLaughlin's attorney(s) by no later than February 28, 2020.

    2. Sanctions amounts and payment dates shall vary within a specified range, according to the absolute and unreviewable direction of the administrator.

    3. Sanctions amounts to be paid by McLaughlin shall range in grand total from no lower than ten thousand dollars ($10,000) and no higher than sixty thousand dollars ($60,000), depending on variables set forth herein and as construed and applied by the administrator.

    4. Sanctions shall require McLaughlin's payment to Macquarie, immediately upon demand from the administrator, of the highest amount -- $60,000 – if she again breaches the Arbitration Agreement's requirement that proceeding thereunder be "strictly confidential".

5. Absent a breach of confidentiality, McLaughlin shall make her first payment to Macquarie in the amount of $5,000 on or before March 31, 2020; and her second payment of $5,000 on or before June 30, 2020.

6. McLaughlin may reduce or eliminate her payment obligations under this sanctions order after the June 30 installment by demonstrating in writing to the administrator reasonable diligence seeking or obtaining gainful employment (broadly to include as employee, contractor, or entrepreneur).  As in routine disputes over mitigation of damages, McLaughlin shall not be required to accept unsuitable opportunities, such as relocation, but may be required to lower her sights from the levels of authority and compensation she had at Macquarie.  The administrator shall decide whether McLaughlin is demonstrating reasonable and good faith efforts to reenter the work force.

7. Paragraph 6 is particularly important because of McLaughlin's conflicting evidence over her motive in initiating the litigation – to protect her job, as alleged, or to leave it with a multi-million-dollar package.

8. If McLaughlin has a medical reason to detach from the work force, then she must demonstrate that to the administrator with suitable documentation from the treating professional.

9. Absent sufficient evidence of McLaughlin's reasonable efforts at reemployment or related medical excuse, McLaughlin's payment schedule shall consist of additional $5,000 payments on September 30 and December 31, 2020, and quarterly thereafter until December 31, 2023, when this order will expire.

10. This three-year sanctions order is intended to award Macquarie a tolerable portion of its sanctions application balanced with incentives to deter recurrence of the dispute; and to motivate McLaughlin to control her financial risk by taking and avoiding actions that should serve the mutual interests of the Parties.

Dated: New York, New York

February 5, 2020

*William Kandel* (signature)

William L. Kandel, Esq., Arbitrator